IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 1:17-CR-00154 (TSE) |
| | ) | |
| KEVIN PATRICK MALLORY, | ) | |
| | ) | |
| Defendant | ) | |

GOVERNMENT'S RESPONSE TO DEFENDANT'S MEMORANDUM OF LAW REGARDING
RELEVANCE OF EVIDENCE INCONSISTENT WITH A CULPABLE STATE OF MIND

The government hereby submits its response to the Defendant's Memorandum of Law Regarding Relevance of Evidence Inconsistent with a Culpable State of Mind ("Defense Memorandum"). For the reasons set forth herein, the defense should be precluded from presenting the classified information that they are seeking to use at trial, in the level of detail that they are seeking. This response is merely intended to address the unclassified Defense Memorandum. With regards to any classified filings, the government continues to stand by the arguments set forth in its classified CIPA filings, and will make any arguments related to those filings at that closed hearings scheduled to begin the week of March 19th.

The thrust of the defense's argument in its Defense Memorandum is that the defendant "worked on several highly classified and sensitive projects that would be of enormous interest and value to the People's Republic of China ("PRC"), but that are not alleged to have been disclosed." Defense Memorandum at p. 1. The defense later characterizes the classified information that was provided to the defendant's Chinese contacts as "essentially worthless," while again making the claim "that he possessed far more sensitive classified information of

1

which no evidence shows any effort to sell or disclose to the PRC." Defense Memorandum at p. 4.[1] The defense argues that evidence of the defendant withholding certain classified information is relevant and admissible at trial to rebut the government's suggestion that the defendant was motivated by money and to show that the defendant was not acting in bad faith.

However, this argument fails for two reasons. First, as discussed in detail below, there is no evidence that the defendant actually did withhold any information from his Chinese contacts, and no way for him to prove that he did not sell any given piece of information to the Chinese. Second, even if such "prior good act" evidence did exist, it is not relevant because it would concern only the defendant's *motivation* for selling classified information, which is not probative of his *mens rea* with regard to the charged conduct—specifically, whether the defendant intended or had reason to believe that the NDI he is charged with delivering, attempting to deliver, and conspiring to deliver was "to be used to the injury of the United States or to the advantage of a foreign nation[.]" § 794(a). Accordingly, the government respectfully requests that the Court find the purported evidence not relevant and admissible.

> I. There Is No Way to Tell What Information, If Any, the Defendant Withheld from the Chinese

The defendant's claim that he did not sell information for which he was not charged concerning "several highly classified and sensitive projects that would be of enormous interest and value to the People's Republic of China" is not supported by any evidence in the record. In so arguing, the defense is attempting to conflate what the government can prove with what the defendant intended. Per the traditional aphorism, absence of evidence is not evidence of

---

[1] With regard to the claim this information is "essentially worthless," witnesses from the affected intelligence agencies will testify at trial, and the government anticipates that they will strongly disagree with that characterization.

absence. Accordingly, the defense's request should be denied.

As the defense points out repeatedly in its memorandum, the defendant was "highly trained and experienced in counterintelligence techniques and operations." *See, e.g.*, Defense Memorandum at p. 1. This is not in dispute. And, in fact, the defendant employed that counterintelligence training to conceal his criminal activities from the U.S. government. But it does not follow that the defendant was reluctant to sell certain highly classified information that resided in his head. To the contrary, the facts of this case make it clear that the defendant had no qualms about selling classified U.S. government documents to people he identified as PRC Intelligence Officers, and further, that he communicated with them about selling more information in the future. The nature of these communications strongly suggest that the defendant was seeking to develop a long-term, financially profitable relationship with these Chinese Intelligence Officers. It strains credulity then, to conclude that someone like the defendant, who acknowledges being in possession of "highly classified and sensitive projects that would be of enormous interest and value to the People's Republic of China," would not attempt to draw the relationship out long enough to command a high price for that information.

As early as March 7-8, 2017, more than two months before his first interview at the CIA, the defendant emailed his contact in China, his unindicted co-conspirator ("UCC") in this case, to tell him to "prepare a mobile phone for me . . . I may bring something on a Sim card." The defendant also told the UCC to put the phone in a double-sealed envelope, and to initial around the seals, before leaving it for him at his hotel. He concluded by saying, "I will look for a person who has a newspaper under their left arm with keys in their left hand. Please find a private place that we can meet one another for a few minutes."

The next day, March 9, it became apparent why the defendant felt the need to employ

such extensive counter-measures.  On that date, he went to a FedEx store in Virginia and bought a micro SD card with adapter, and scanned nine pages to a PDF.  Four days later, while in China, the defendant sent an email to the UCC with a subject line of "Examples."  The email consisted of three PDF documents.  The creation date of those documents (March 9, 2017), and the number of pages (nine) matched exactly the documents the defendant had scanned at the FedEx store on March 9.  While those particular documents were not classified, they did suggest that the defendant had access to U.S. government information.  The first document was entitled "DI Quality Framework. Analytic Tradecraft Standards," and the first page bore the CIA logo in the upper left-hand corner.  The second document was captioned "Military Intelligence Related Acronyms" and contained five pages of military acronyms.  The third document appeared to be technical instructions for operating a "WCDMA Test Handset."

When the defendant was later interviewed at the CIA on May 12, and by the FBI on May 24, he was asked on a number of occasions and in a number of different ways if he had given anything to his Chinese contact during that first trip.  While the defendant said that he met with his Chinese contacts over several days, and each meeting would last from three to five hours, the most that he admitted was that he wrote a small amount of unclassified information from the hotel business office.[2]  Despite that claim, the defendant was paid $10,000 in cash for this first trip to China.  His Chinese contacts also paid for his hotel and his flights.

The defendant's Chinese contacts paid for him to fly back to China the following month.  The defendant later admitted that the meetings during this second trip also covered several days and lasted a number of hours each day.  Yet he denied providing anything more than open source

---

[2]  However, in a communication with the UCC in May using what he called a "CovCom" (for "covert communications") device, the defendant referenced "a myriad of other items I have alluded to but we have not discussed."

information. Despite that claim, the defendant was paid $15,000 in cash for this trip, and he was provided with what he described as a CovCom device. This CovCom device was a Samsung telephone. In the May 12 interview at the CIA, the defendant said that he understood that this CovCom device would allow him to communicate with his Chinese contacts "in the clear." However, he also said during the May 12 interview that he merely sent some tests using the CovCom device and that he could not figure out how to use it.

Despite what he said in the interview at the CIA, the defendant did use the CovCom device to communicate with the UCC, and to send, and attempt to send, classified documents from May 1 through May 5, 2017, only a week before being interviewed at the CIA. These are some of the allegations detailed in the Indictment. Yet beyond sending and attempting to send those classified documents, the defendant mentioned on multiple occasions *additional* information that he could sell to the Chinese. For example, after sending two classified documents and saying, "CONFIRM RECEIPT," he then told the UCC, "I will type two pages of notes (no. 1) and send later today or tomorrow." The fact that the defendant could type up notes that related to classified material demonstrates that he had additional information in his head that he was willing to market to the Chinese.

Later in this communication, the defendant explained why he had crossed out the classification markings on one document ("I had to get it out with out [*sic*] the chance of discovery. Unless read in detail, it appeared like a simple note"). He concluded by telling the UCC, "Others I got out through safer means." There was nothing about these communications to suggest the defendant was being selective about which government secrets he was willing to sell.

Not only did the defendant have other means of moving documents beyond the CovCom device, he also had covert bank accounts set up for receiving money. He told the UCC in one

5

CovCom communication, "I have arranged for a USD account in a [*sic*] another name.  You can send the funds broken into 4 equal payments over 4 consecutive days…the bank account is not in my true name but I have access to…I will send *more docs* when payments are made."  [Emphasis added].  Again, the reference to sending "more docs when payments are made" beyond what was recovered from the CovCom device indicates that the defendant had much more classified information that he hoped to sell to the Chinese.

It was likely the defendant's arrest in June 2017—not any reluctance to sell U.S. government secrets—that kept the damage to national security from being any greater.  In fact, the defendant even tried to convince his Chinese contacts, falsely, that the $15,000 they had paid him in April had been seized by U.S. Customs, telling them, "When you get the OK to replaced [*sic*] the prior payment. the [*sic*] I will send more docs.  I will also type my notes."  At another point the defendant said, "I will typa [*sic*] notes and resend by Sat."

Clearly, the defendant had not only sent typewritten classified documents in his possession, but also had classified information in his head that he could type up and provide to the Chinese.  There would be virtually no limit to how much he could potentially sell, and there is simply no basis to conclude that the defendant was making any judgment calls about which classified information would, or would not, harm the national security.  Rather, he was eagerly hoping to make as much money from his Chinese contacts as he could.  To that end, "highly classified and sensitive projects that would be of enormous interest and value to the People's Republic of China" would certainly be some of the most lucrative information that he could offer.  The fact that the government cannot definitively prove if the defendant had already broached those topics with his Chinese contacts should not inure to the defendant's benefit.  He managed to conceal his activities by traveling to China twice, and by employing tradecraft when

dealing with his handlers. Therefore, the government cannot say what he talked about in those hours of meetings. But whatever it was, it was intriguing enough that his Chinese contacts paid him $25,000 in cash and gave him a CovCom device *before* the government can prove that any classified information was passed.

Moreover, the defendant had a third trip to China planned for June 2017. In one CovCom communication he told the UCC, "I can also come in the middle of June. I can bring the remainder of the documents I have at that time." Three days after the May 12 interview at the CIA, the defendant sent the UCC an email where he told him, in response to an email from the UCC referencing a future meeting, "I will have some interesting information for our discussions." As noted above, the government simply does not know what this interesting information or the remaining documents consisted of, since much of that information likely resided in the defendant's head. But these communications do not paint a picture of an individual who was attempting to withhold really damaging information.

In *United States v. Marlinga*, a case cited by the defense, the court began its admissibility analysis of the "prior good act" evidence offered by the defense by asking the threshold question, "Did the other acts actually occur?" 457 F. Supp. 2d 769, 774-75 (E.D. Mich. 2006). In this case, there is no evidence that the defendant actually did refuse to disclose any classified information to the Chinese. Because absence of evidence is not evidence of absence, the defendant's unsupported citation to "the absence of any evidence of an effort to disclose this more valuable information" should not be presented to the jury as evidence that such transactions did not occur.

> II. Any Evidence of Withheld Information Would Not Be Relevant to the Defendant's Intent to Commit the Crimes Charged

Even if there were evidence that the defendant possessed classified information that he did not sell, such evidence would not be relevant to the defendant's intent to commit the crimes charged. Under Federal Rule of Evidence 402, evidence is only relevant "if it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." 18 U.S.C. § 794 does not require the government to prove that the defendant's motivation was financial, political, or ideological.[3] The government need only prove that the defendant acted "with intent or reason to believe that [the material delivered] is to be used to the injury of the United States or to the advantage of a foreign nation[.]" § 794(a). As a result, even if there were evidence that the defendant withheld some classified information from the Chinese, that evidence would not be admissible because it is not probative of whether the defendant intended or had reason to believe that the NDI he did deliver was to be used either to the injury of the United States or to the advantage of China.

Like any evidence of a defendant's "prior good acts," evidence that a defendant refrained from engaging in criminal conduct on certain occasions is generally not admissible because the absence of criminal conduct at certain times is not relevant to the existence of criminal conduct at other times. *See United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990) ("A defendant may not seek to establish his innocence, however, through proof of the absence of criminal acts on specific occasions."); *United States v. Gravely*, 840 F.2d 1156, 1164 (4th Cir. 1988) ("Unless

---

[3] The defense alludes in its Memorandum to the fact that it anticipates the government presenting evidence of the defendant's financial situation. The defense is correct in this belief. The government does intend to present evidence to demonstrate that the defendant was in a very precarious financial situation, and that virtually his only means of generating income in 2017 was from his Chinese contacts. While a motive for financial gain is not a requirement of this statute, it is certainly relevant. Especially where the defendant made so many comments to his contacts about wanting to get additional payments in the future (for some, as yet, unspecified information) using a secret bank account.

evidence of character is an essential element of a charge, claim or defense, proof of character is limited to general good character (reputation as a good person and law abiding citizen). Evidence of specific good acts is not admissible.") (citing *Michelson v. United States*, 335 U.S. 469, 476 (1948); Fed. R. Evid. 405); *United States v. Winograd*, 656 F.2d 279, 284 (7th Cir. 1981) (defendant may not seek to establish his innocence through proof of the absence of criminal acts on other specific occasions).

However, such evidence can be admitted when it is probative of an issue other than a defendant's character, such as to show the defendant's intent to commit the crime charged. *See United States v. Rosen*, 520 F. Supp. 2d 802, 808, 813 n.21 (E.D. Va. 2007); *see also Scarpa*, 913 F.2d at 1010 (observing that "good acts" evidence "would only be relevant if the indictment charged [defendants] with *ceaseless* criminal conduct") (emphasis in original). But courts interpret this exception narrowly, and regularly deny attempts to introduce such evidence when it is not clearly probative of the defendant's intent to commit the acts charged in the indictment. *See United States v. Marrero*, 904 F.2d 251, 259–60 (5th Cir. 1990) (affirming rejection of defendant's attempt to use specific acts circumstantially to prove lack of intent because "[t]he fact that [defendant] did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment"); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming district court's rejection of evidence that defendant had prepared truthful asylum applications, which defendant claimed was relevant to disprove his alleged fraudulent intent, because whether the defendant "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"); *see also United States v. Lane*, 323 F.3d 568, 584 (7th Cir. 2003) ("Even if we were to assume that the evidence would have shown

9

that [the defendant] was acting in good faith in February 1994, the fact that he may have been communicating to the bank in good faith in February 1994 has no bearing on whether he was honest with the bank in November 1993."); *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (affirming the district court's decision to preclude as irrelevant past trips to Jamaica during which the defendant, charged with importing cocaine, did not engage in drug activity, and rejecting defendant's claim that the evidence of innocent travel was necessary to rebut the government's allegation that the defendant had been involved in other cocaine importations from Jamaica).

The evidence the defendant seeks to introduce does not fall within this exception. The defendant seeks to discuss valuable NDI he purportedly did not sell to suggest that if he were motivated by money, he would have sold that information.[4] But whether the defendant sought to maximize his profits is not relevant under § 794; the relevant question is whether he intended or had reason to believe that the NDI he delivered was to be used to the injury of the United States or to the advantage of China. *See* § 794(a); *see also Williams*, 205 F.3d at 34 (rejecting defendant's contention that absence-of-criminality evidence was relevant to rebut government's allegation that the defendant had been involved in other crimes). Simply put, whether the defendant's subjective motivation was financial or political or ideological is not a fact "of consequence in determining the action." Fed. R. Evid. 402. All that matters is what the defendant had reason to believe about the NDI's use. The proffered evidence in not relevant to that inquiry.

In this respect, the facts of the defendant's case differ markedly from those in *Rosen*,

---

[4] In addition to assuming that the defendant actually did not sell this information, as discussed above, this argument also assumes the dubious proposition that someone motivated by money would necessarily sell all information—including the most valuable information—up front.

10

where this Court held that the evidence at issue was relevant to the defendants' claimed belief that they were serving as a sanctioned back channel with a foreign government. *United States v. Rosen*, 520 F. Supp. 2d 802 (E.D. Va. 2007). The *Rosen* defendants were indicted, *inter alia*, for conspiring to communicate NDI to persons not authorized to receive it, in violation of 18 U.S.C. § 793(g) and (e). *Id.* at 804. The indictment in that case described numerous overt acts in furtherance of the alleged conspiracy, including telephone calls and in-person meetings, during which information the government alleged to be NDI was obtained by defendants, who were not authorized to receive it, and who then disclosed the NDI to persons who were also not authorized to receive it. *Id.* at 805.

In their defense, defendants claimed that their non-governmental organization employer, AIPAC, was actually serving to advance the United States' policy goals by serving as a diplomatic back channel with foreign governments. *Id.* at 812-13. In support of this claim, defendants sought to subpoena government officials to testify about their conversations with defendants directly, as well as with other AIPAC employees who subsequently relayed the substance of those conversations to defendants. *Id.* In addition to the conversations charged as overt acts, defendants sought to introduce evidence of conversations during which NDI was not disclosed and which were not charged in the indictment. *Id.* Defendants contended that during all of these conversations, they believed officials communicated information with the expectation that defendants would further disclose that information in order to help, rather than hurt, U.S. policy interests. *Id.* This Court ruled that such evidence could be relevant to the defendants' intent, because it could show that to defendants, there was no difference between the meetings for which they were not charged in the indictment and those for which they were charged, and that they believed the meetings charged were simply further examples of the government's use of

AIPAC as a back channel. *Id.*

In contrast, nothing about the NDI the defendant claims to have withheld would serve to negate his *mens rea* with regard to the charged offenses. Unlike the defendants in *Rosen*, the defendant here does not claim that he believed he was acting as a sanctioned back channel, but merely that he could have sold more valuable NDI than what he did sell and, therefore, that he was not motivated by money. This assertion does nothing to negate his criminal intent—it should go without saying that "I could have sold more secrets" is not an affirmative defense to § 794. If it were, as the defendant's argument suggests, any defendant charged with § 794 would be permitted to introduce evidence of all the NDI he or she possessed but did not disclose. Because such evidence is not relevant to the defendant's intent to commit the crimes charged, it should not be admitted.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court find the defendant's purported evidence not relevant and admissible.

Respectfully submitted,

Tracy Doherty-McCormick
Acting United States Attorney

By:  /s/ John T. Gibbs
JOHN T. GIBBS
Virginia Bar No. 40380
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: 703-299-3700
Fax: 703-299-3981

JENNIFER KENNEDY GELLIE
Trial Attorney

National Security Division
United States Department of Justice
600 E Street N.W. (10th Floor)
Washington, D.C. 20004
Tel.: (202) 233-0785
Fax: (202) 233-2146
Jennifer.Gellie@usdoj.gov

COLLEEN E. GARCIA
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Ave.
Alexandria, VA
Tel.: (703) 299-3700
Fax: (703) 299-3980
Colleen.E.Garcia@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that I have caused an electronic copy of the GOVERNMENT'S REPLY TO DEFENDANT'S MEMORANDUM OF LAW REGARDING RELEVANCE OF EVIDENCE INCONSISTENT WITH A CULPABLE STATE OF MIND to be served via ECF upon counsel for Defendant Kevin Patrick Mallory.

By:     /s/
John T. Gibbs
Virginia Bar No. 40380
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: 703-299-3700
Fax: 703-299-3981