IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:17-CR-00154 (TSE) |
| | ) | |
| KEVIN PATRICK MALLORY, | ) | |
| | ) | |
| Defendant | ) | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF
ACQUITTAL WITH RESPECT TO COUNTS ONE THROUGH THREE

Defendant Kevin Mallory moves for acquittal on three counts of delivering, conspiring to

deliver, and attempting to deliver National Defense Information ("NDI") to the People's Republic

of China ("PRC") in violation of 18 U.S.C. § 794(a) and (c). Because his claims are unsupported

by law and fail to account for the copious evidence supporting his convictions, his motion should

be denied.

## I.      BACKGROUND

### A.      The Indictment

In July 2017, a grand jury sitting in the Eastern District of Virginia returned an indictment

charging the defendant with both Conspiring and Attempting to Gather or Deliver National

Defense Information to Aid a Foreign Government, in violation of 18 U.S.C. § 794(a) and (c),

Delivery of National Defense Information to Aid a Foreign Government in violation of 18 U.S.C.

§ 794(a), and making Materially False Statements to the FBI in violation of 18 U.S.C. § 1001(a)(2).

Since the defendant's crimes involved co-conspirators in another country, as well as two

international trips, the venue language in the indictment was charged broadly in the three espionage

1

counts. Specifically, the government alleged that they occurred "in Loudoun County, in the Eastern District of Virginia, and elsewhere, including locations outside of the jurisdiction of any particular state or district." The facts, as introduced at trial, however, show that the vast majority of the conduct and contacts at issue here occurred in the Eastern District of Virginia, including, (1) the "covcom" device the defendant used to communicate with an individual in the PRC *only* being seen in the Eastern District of Virginia upon his return from his April 2017 trip to the PRC; (2) the defendant scanning and destroying the NDI at issue in this case at a FedEx located within the Eastern District of Virginia; (3) both SD cards containing classified NDI being stored in the defendant's home in the Eastern District of Virginia; (4) the defendant making false statements to cover up his conspiracy in CIA and FBI interviews in the Eastern District of Virginia; (5) the defendant calling his family from the Alexandria Detention Center in the Eastern District of Virginia in an attempt to locate one of the SD cards hidden in his home; (6) law enforcement officers arresting the defendant in the Eastern District of Virginia; and (7) both victim agencies having offices in the Eastern District of Virginia.

## B.     The Defendant's Initial Contact with a Chinese Intelligence Officer

The Indictment and trial in this matter centered around the defendant's quickly evolving relationship with Michael Yang, a PRC national the defendant himself identified as a likely IO for the PRC intelligence service ("PRCIS"). The facts show that the defendant's relationship with Michael Yang, the Chinese IO, progressed rapidly, so much so that the jury could infer that they reached a conspiratorial agreement quite early in the relationship. In late February 2017, the defendant was contacted by a purported Chinese business recruiter, Richard Yang, who appears to have acted as a "cut-out" or "co-optee" to serve as a go-between for the defendant and Michael Yang. The defendant readily admitted in a May 12, 2017 interview at the CIA that anyone with

2

"a refined eye," could see that the defendant's LinkedIn profile was indicative of an intelligence background.  GX 7-31 and 7-31T.  That LinkedIn profile included terms such as "defense," "security clearance," "intelligence," and "national security," among others.  GX 3-2.

After Richard Yang approached the defendant based on that LinkedIn profile, Richard Yang handed the defendant off to Michael Yang almost immediately.  On approximately February 21, 2017, the defendant had a telephone call with Michael Yang during which he took written notes which included terms such as "Soc. Science Academy," "Priv. + CG clients," "public/private networks," "Dept. of State, Dept. of Treasury, Dept. of Commerce," and "Military Matter related to China."  GX 3-9.  FBI later found these notes during the June 22, 2017 search of the defendant's home in the Eastern District of Virginia.  GX 9-6.

### C.    Contact with Ralph Stephenson

The defense made much at trial of the fact that, on February 22, 2017, the defendant reached out to Ralph Stephenson, an acquaintance from the defendant's church who worked at the CIA.  The defendant asked Mr. Stephenson to help him contact someone at the CIA working on China issues, a request which prompted Mr. Stephenson to report the defendant to security.  The request itself indicates that the defendant had strong suspicions that Michael Yang was with the Chinese government, and not with a think tank or a private business.  Further, the jury could easily infer that the defendant's contact with Mr. Stephenson was in keeping with the notes from the defendant's February 21 call with Yang noting he should engage his "public/private network." GX 3-9.  The in-person conversation with Mr. Stephenson occurred at their church in the Eastern District of Virginia.

### D.    Preparation for First PRC Trip

The defendant's subsequent activities provide strong circumstantial evidence that he

believed that Michael Yang was a Chinese IO, and that the defendant felt a need to conceal their illicit activities. On March 8, 2017, the defendant engaged in a series of emails with Michael Yang in which he instructed Yang to prepare a phone for him and "put it in a envelope initial around the seals tape over that initials and put that envelope in another envelope." GX 3-15. Since they had presumably never met before, the defendant told Yang that when he got to his hotel he would look "for a person who has a newspaper under their left arm with keys in their left hand." *Id.*

The following day, the defendant went to a FedEx store in Washington, D.C. where he paid to scan nine pages of documents onto an SD card. GX 6-5. Yet he did not send those documents to Michael Yang at the time. He waited until March 13, when he was in Shanghai, PRC, to send the email with the subject "Examples," which included three attachments totaling nine pages. GX 3-18. While the defendant claimed in his subsequent May 12 and May 24 interviews with the CIA and FBI that some of the topics he most frequently discussed in the PRC included the THAAD missile defense system, the South China Sea, and currency manipulation, GX 7-7 and 7-7T; 7-35 and 7-35T; 13-7 and 13-7T, none of the documents in his March 13 email related to those topics.[1] Instead, the attachments included a list of Department of Defense ("DOD") military intelligence-related acronyms, an analytic product with the CIA seal visible in the upper left-hand corner, and some sort of technical specifications for a communications capability.

Former CIA operations officer and Defense Intelligence Agency ("DIA") Director of Operations H. Michael Higgins testified that the transmission of these documents was consistent with the stage in a potential asset recruitment by a foreign IO during which the IO attempts to determine whether the targeted asset has access to U.S. government documents. According to Mr.

---

[1] The defendant also never told CIA investigator Mike Dorsey or the FBI Special Agents with whom he met about sending these documents to Michael Yang. This was despite the fact that the May interviews lasted for multiple hours and included multiple questions from government investigators as to what, exactly, the defendant had provided Yang.

Higgins, the CIA seal demonstrated access on the part of the defendant, and the DOD acronyms would absolutely be of interest to Chinese intelligence officers. Mr. Higgins further testified that the relationship between an IO and a potential recruit is typically an evolving relationship in which the IO gradually seeks more sensitive information. Here, according to Mr. Higgins, GX 3-18 indicated that the relationship had proceeded quickly to the point that it was in an advanced state. Mr. Higgins described this email as a "watershed event," because this sort of an exchange of information allows the IO to exercise a modicum of control over the recruit.

Though the defendant never told the CIA or the FBI about this "Examples" email, he did freely acknowledge that his initial meetings with Michael Yang, and his boss, Mr. Ding, lasted for hours. GX 13-6 and 13-6T; GX 7-38 and 7-38T. The defendant also freely admitted that he was paid $10,000 for that initial trip. *See*, *e.g.*, Def. Br., Dkt. 172 at 5. The defendant further admitted that the Chinese IOs were pressing him for classified U.S. government information during those meetings. GX 7-40 and 7-40T ("they said, you know, we really don't want academics. We want – and then they said – they didn't use the word Jee Mee which is top secret or something. But they emphasized that it was not stuff that you could publicly get"); GX 7-41 and 7-41T ("my sense is that they were looking for Government secrets, U.S. Government secrets of some, at some level"); GX 13-14 and 13-14T ("they didn't use the Chinese, you know, the term secret or top secret . . . that they use in Chinese, ching-me, or what have you, but they infer that they're looking – eventually looking for information that is, uhm, not, you know, our, our terminology, not open source…not academics").

### E. Activity Between Trips to the PRC

Following this first trip to China in March, the defendant returned to the United States where he, among other things, renewed his communications with his former DIA assets, the

Johnsons.[2]   As a *former* handler of the Johnsons while at DIA, both the defendant's former colleague Robert Ambrose and former DIA Director of Operations Michael Higgins testified that the defendant was prohibited from having any further contact with them.  Despite this prohibition, the defendant had a handful of communications with them – one in October 2013 and two in March 2016.  After spending those many hours with Michael Yang and his boss, Mr. Ding, in Shanghai, the defendant proceeded to send the Johnsons *nine* LinkedIn messages on March 28 and 29, 2017.  GX 3-26.  These dates fell almost precisely in the middle of the defendant's two trips to the PRC.  Through these March communications, the defendant learned that the Johnsons would be going to the PRC that coming summer.  As is discussed below, despite having knowledge of that trip, the defendant later sent and attempted to send information with specific, identifying information that could allow the PRCIS to identify the Johnsons as former U.S. government assets.

### F.     The Defendant's Receipt of the Covcom Device

It was during his second trip to the PRC, in April 2017, that the defendant received the covcom device, a Samsung Galaxy Note 4 smartphone.  The jury could certainly infer that the defendant and Michael Yang had reached their conspiratorial agreement by this point given that the covcom device was ultimately only used to talk about and send NDI.  According to the testimony of reverse engineering expert, James Hamrock, the day that the defendant arrived in the PRC, April 14, 2017, the Xposed application was installed on the covcom device.[3]   GX 8-28.  Continuing in short order, a custom application was installed on the device on April 17.  *Id.*  A day later, on April 18, 2017, Xposed was configured to work with that custom application, and external

---

[2]  "Johnson" was a pseudonym used for the purposes of trial in order to protect the assets' true identities.

[3]  Per the testimony from Mr. Hamrock, Xposed is a commercially available application that allows users to customize certain other commercial applications.  In this case, Xposed enabled a Chinese custom application to "hook into" WeChat and create a more secure means of communication.

media was loaded for initialization and operation of the custom application on April 19. *Id.*

During that same week, Yang trained the defendant on how to use the covcom device. In fact, the defendant took notes on how to send a document securely using steganography. He showed these notes to FBI agents during the May 24 interview, *see* GX 8-17, and stressed on multiple occasions that he believed his communications on the covcom device were secure. GX 7-19 and 7-19T ("Now, we can, we can talk, so to speak, clearly; in the clear; securely"); GX 13-16 and 13-16T ("What keeps someone else from seeing what we're talking about? He goes this phone would only work with this phone"); GX 13-17 and 13-17T ("So it's encrypted"); GX 13-18 and 13-18T ("So we have a special way to use WeChat to make it safe").

Following this April trip to the PRC, the defendant returned to the United States, first landing in Chicago. In Chicago, Customs and Border Patrol ("CBP") officers found $16,500 in cash in the defendant's hand luggage, despite the fact that the defendant had claimed not to have more than $10,000. It was also there that the defendant lied to the CBP officers by claiming that the covcom device was a gift for his wife. CBP allowed the defendant to keep the money and the covcom device, and to finish his trip. The defendant traveled onward to Dulles Airport in the Eastern District of Virginia. GX 4-2.

### G. Transmission and Attempted Transmission of NDI

The jury viewed surveillance footage of the defendant's April 25, 2017 visit to the FedEx location closest to his home, in Leesburg, Virginia, within the Eastern District of Virginia. The footage shows the defendant handing nine separate stacks of documents to the FedEx clerk to be scanned to an SD card. The page count for the scanning job, as confirmed via the FedEx receipt, aligns with the total page count for the eight classified documents and handwritten table of contents found on two SD cards in the defendant's home in the Eastern District of Virginia on June 22,

2017.  GX 9-6.  Further, the video footage shows flashes of yellow sheets of paper being scanned.  GX 6-9.  The White Paper for which the defendant and Yang's own statements prove completed transmission, *see* GX 8-6, Chat Bubble #17, consisted of one typed page, followed by two handwritten yellow pages of paper.  Per the testimony of Robert Ambrose of the DIA, this White Paper contained information that could lead to the identification of the Johnsons as DIA assets.  The FedEx receipt from April 25, 2017 shows that the defendant paid to have all nine documents shredded after they were scanned.  GX 6-4.

As testified to by James Hamrock, log files from a custom database on the covcom device show "send sequences" for certain documents between just before midnight on May 1, 2017 and just after midnight on May 2, 2017.  GX 8-21 at 1-8.  The naming conventions of the documents for which the defendant completed all the send steps align with the naming conventions of the classified documents found on the Kingston SD card in the defendant's home in the Eastern District of Virginia.  GX 9-8A.  A second log file, linked to the Xposed application, shows two send sequences confirming the defendant completed the steps necessary to transmit two documents from the covcom on May 5, 2017.  GX 8-21 at 8-9.  While these documents are named with random hash values[4], providing no insight as to which documents the defendant sent, the timestamps align with the defendant telling Yang he was sending Document No. 2 (a DIA PowerPoint with specific identifying information for the Johnsons) and a CIA document entitled "FISA."  GX 8-6, Chat Bubbles #84-88 and 92-93.

Significantly, once the defendant continued on to Dulles Airport on April 21, 2017, the covcom device he used to transmit and attempt to transmit NDI was never seen anywhere other than in the Eastern District of Virginia.  And the only evidence in the case places the covcom

---

[4] A hash value is a  numeric value  that uniquely identifies data.

8

device in the Eastern District of Virginia.  For example, on May 12, 2017, when CIA investigator Mike Dorsey interviewed the defendant at the CIA, the defendant described how he came into possession of the phone and noted he was keeping it in his Leesburg home.  GX 7-17 and 17-17 T ("So then they brought out a box. A phone box, right? A box with a phone in it. It was a Samsung. I have that. I have that Samsung here.  And – not here – here, ***but here in my home in Leesburg***. And they said, okay, this is, we talked to you before about being able to – my words, communicate.") (emphasis added).

The defendant actually brought the covcom device with him to the May 24, 2017 interview in Ashburn, Virginia, and the Court took judicial notice of the fact that the May 24 interview took place in the Eastern District of Virginia.  The next time the covcom device was seen was on June 22 when FBI agents seized it during the search of the defendant's home in Leesburg, Virginia, also in Eastern District of Virginia.  GX 9-6.

Not only was the covcom device ***only*** ever seen in the Eastern District of Virginia after April 21, 2017, but there was no evidence presented of the defendant even leaving the Eastern District after that date.  While the defendant talked multiple times about taking a third trip to China in June, no such trip ever took place.  In addition, at one point in his covcom communications with Michael Yang, the defendant alluded to taking a trip.  GX 8-6, Chat Bubble # 83 ("I am traveling for next few days on DOD project.").  Yet the defense went to great pains to point out on cross-examination of Special Agent Stephen Green that this was not true, and it was an example of the defendant's puffery with Michael Yang.  Therefore, not only did the jury have a firm basis upon which to conclude that the defendant transmitted the White Paper and the Table of Contents from the Eastern District of Virginia, but there was no evidence to suggest that the defendant went anywhere else in May 2017 from where he could have transmitted those documents.

## II.     LEGAL STANDARD

A Rule 29 motion should be denied if, "viewing the evidence in the light most favorable to the government, **any** rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982) (emphasis in original).[5]  *See also United States v. Perkins*, 470 F.3d 150, 160 (4th Cir. 2006).  This analysis involves consideration of circumstantial as well as direct evidence, and allows the government the benefit of all reasonable inferences from the facts proven to those sought to be established. *Tresvant*, 677 F.2d at 1021.

In conducting its review, a court does not assess the credibility of witnesses, weigh the evidence, or resolve any conflicts in the evidence presented; these are inquiries properly reserved for the jury.  *See, e.g.*, *Burks v. United States*, 437 U.S. 1, 16 (1978); *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005).  The evidence need not exclude every reasonable hypothesis of innocence, and circumstantial evidence alone is sufficient to support a guilty verdict.  *United States v. Osborne*, 514 F.3d 377, 387 (4th Cir. 2008); *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996) (*en banc*).

In this case, after weighing all the evidence and assessing the credibility of the witnesses, the jury found the defendant guilty as to all four counts in the indictment.

## III.     ARGUMENT

### A.     Venue Is Proper In The Eastern District Of Virginia

A defendant is guaranteed the right to be tried where the crime alleged was committed. U.S. Const., Art. III; § 2; U.S. Const., Amend. VI; *see also* Fed. R. Crim. P. 18 ("[T]he government

---

[5]  The italicization of the word "any" does not appear in the on-line version of *Tresvant* available on Westlaw, but it **does** appear in the .pdf version of the printed copy that is available on Westlaw.

must prosecute an offense in the district where the offense was committed" and "[t]he court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice."). The Framers included these provisions in the Constitution because they were "[a]ware of the unfairness and hardship to which trial in an environment alien to the accused exposes him." *United States v. Johnson*, 323 U.S. 273, 275 (1944).

In assessing whether venue is proper, "[t]he locus delicti [of the charged offense] must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278-79 (1999) (internal quotation marks and citations omitted); *U.S. v. Ebersole*, 411 F.3d 517, 524 (4th Cir. 2005) ("If Congress does not explicitly provide for venue when it enacts a criminal statute, is to '"be determined from the nature of the crime alleged and the location of the act or acts constituting it."' (quoting *United States v. Cabrales*, 524 U.S. 1, 6-7, (1998) (citation omitted))). Although examination of the verbs used in a given statute is one method of doing so, the Fourth Circuit has recognized that "it [is] not always possible by the use of one analytical tool to discern the location of where a crime has been committed . . . examination of verbs employed in the statute is not an exclusive method and 'there are crimes where the situs is not so simple of definition.'" *United States v. Cofield*, 11 F.3d 413, 417 (4th Cir. 1993) (citing *United States v. Billups*, 692 F.2d 320, 332 (4th Cir. 1982)). In *Cofield*, the Fourth Circuit quoted approvingly from a Second Circuit opinion that stated:

> [A] review of relevant authorities demonstrates that there is no single defined policy or mechanical test to determine constitutional venue. Rather, the test is best described as a substantial contacts rule that takes into account a number of factors – the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal factfinding.

*Cofield*, 11 F.3d at 417 (quoting *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985)).

Where an offense spans multiple districts or locations outside any U.S. district, the matter "may be . . . prosecuted in any district in which any offense was begun, continued, or completed."[6] 18 U.S.C. § 3237(a); *see also Bowens*, 224 F.3d at 309 (for some offenses, there may be "more than one appropriate venue") (citing 18 U.S.C. § 3237(a)); *United States v. Barfield*, 969 F.2d 1554, 1557 (4th Cir. 1992) ("Under 18 U.S.C. § 3237(a), jurisdiction over the prosecution of a continuing offense lies in any district in which any portion of the offense occurred."). For espionage offenses "involving a violation, begun or committed . . . out of the jurisdiction of any particular . . . district" venue is proper "in the District of Columbia or *in any other district authorized by law*." 18 U.S.C. § 3239 (emphasis added); *see also* 18 U.S.C. § 3238 (where an offense is committed outside jurisdiction of any U.S. district, venue is proper where the defendant "is first arrested" or in the "district of last known residence of the" defendant).

Here, the evidence creates the presumption that the defendant completed certain send sequences to transmit the NDI from his home in the Eastern District of Virginia. In addition, the overwhelming bulk of the evidence shows that the defendant conducted the majority of the overt acts in furtherance of the conspiracy in the Eastern District of Virginia. Furthermore, the defendant resided and was arrested in the Eastern District of Virginia.

### 1. Count Two: Delivering National Defense Information

With regards to the charge of delivering NDI in Count Two of the Indictment, the

---

[6] While the bulk of the defendant's criminal activities occurred in the Eastern District of Virginia, it is undisputed that he also committed some acts in other jurisdictions. For example, in March and April 2017, the defendant traveled to Shanghai, PRC, where he met for many hours with his un-indicted co-conspirators, and where he was ultimately provided with a Samsung Galaxy Note 4 smartphone, which the defendant described as a "covert communications" or "covcom" device, to be used for transmitting classified U.S. government information to the PRC government. In addition, in March 2017, the defendant traveled to Washington, D.C. where he obtained a visa for travel to the PRC. On that same trip into Washington, D.C., the defendant also scanned nine pages of unclassified documents (including one bearing the Central Intelligence Agency ("CIA") logo) to an SD card at a FedEx store. He later sent these unclassified document attached to an email with the subject line "Examples" to unindicted co-conspirator and PRC intelligence officer ("IO") Michael Yang. Government Exhibit ("GX") 3-18.

government introduced numerous facts at trial from which the jury could infer that the transmission of the handwritten table of contents and the DIA "White Paper" occurred in the Eastern District of Virginia.   Furthermore, there were no facts to even suggest that the transmission occurred anywhere else.   For example, the log files from the Samsung device, about which reverse engineer James Hamrock testified at trial, showed that certain "send sequences" were initiated a little before midnight on May 1, 2018 and continued just past midnight on May 2, 2018.   GX 3-21; *see also* GX 8-18 (WeChat log chart showing transmission from the defendant's WeChat id number to Michael Yang's WeChat id number); GX 8-6, Chat Bubble #17 (Yang discussing content of passed document).   The evidence showed that the defendant was in the United States at that point in time. The jury also heard evidence that the defendant lives in Leesburg, Virginia and on April 25, 2017 had scanned the NDI at issue here onto an SD card at a FedEx near his home, just days before those send sequences.   Based on these facts, and the time of night the defendant initiated the send sequences, the jury could properly conclude that this transmission and attempted transmission occurred in the Eastern District of Virginia.

The defendant cites to *United States v. Sterling*, 860 F.3d 233 (2017), in support of its contention the government has failed to meet its burden on venue.   Def. Br., Dkt. 172, at 3.   In *Sterling*, the Fourth Circuit found the government had failed to meet is burden as to only one of several counts brought pursuant to 18 U.S.C. § 793.   860 F.3d at 244 (finding evidence did not prove venue as to delivery or transmission of the NDI at issue pursuant to 18 U.S.C. § 793(e)[7]). The *Sterling* court found that "[t]he government offered no evidence showing how Sterling

---

[7]   As to the counts dealing with causing the dissemination of the information at issue, improper transmission of classified information, attempt to transmit national defense information, and improper retention of classified information, the Fourth Circuit found that the circumstantial evidence supported venue in the Eastern District of Virginia.   860 F.3d at 241-43.

transmitted or delivered the [classified letter] to [a journalist], including the procedure and location of any transfer." *Id.* Here, conversely, the government introduced evidence regarding the specifics of transmission, including the device used, the dates and times of transmission, and the specific documents the defendant sent and attempted to send. As noted, the dates and timing of these transmissions provided the jury with the evidence needed to determine the defendant passed the NDI in question while in the Eastern District of Virginia. *Cf. id.* at 241.[8] ("[C]ircumstantial evidence can support a finding of proper venue: when "'supported by some evidence in the record as a whole.'" (quoting *United States v. Strain*, 396 F.3d 689, 695 (5th Cir. 2005))).

## 2. Count Three: Attempted Delivery of National Defense Information

With regards to Count Three, Attempting To Deliver NDI, the government presented a wealth of evidence to show that the defendant took a number of substantial steps to further that crime in the Eastern District of Virginia. First, the defendant scanned and shredded the NDI documents at issue at the FedEx location within the Eastern District of Virginia. Second, Special Agent Green testified that metadata from the MacBook laptop seized from the defendant's home in the June 22 search showed that the defendant had inserted both SD cards into the MacBook and likely used the MacBook as a means of transferring the NDI from the Kingston SD card to the Toshiba SD card.[9] Third, as with the completed transmission of NDI, the defendant initiated send sequences as to certain other documents late into the night of May 1, continuing to a little past

---

[8]  The defendant's reliance on *United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012) is also unpersuasive. There, the wire fraud count dismissed for lack of venue dealt with a single telephone call, which was neither placed from nor received in the Eastern District of Virginia. *Id.* at 368-69. That stands in stark contrast to this case in which the government can show specific facts regarding the transmission and attempted transmission of certain documents across three separate dates – May 1, 2, and 5 – using the covcom device, in addition to many other preparatory acts in the Eastern District of Virginia that facilitated the later transmission and attempted transmission. Once again, there is no evidence that the covcom device left the Eastern District of Virginia after the defendant landed at Dulles Airport on April 21, 2017.

[9]  Special Agent Green also testified that the defendant had searched for instructions on how to securely delete files from a Mac computer.

midnight on May 2.  GX 8-21; *see also* GX 8-18 (showing certain documents went through send steps but were sent and received by the defendant's WeChat id number, possibly due to the IO not being online at that time).

### 3.   Count One: Conspiracy to Deliver National Defense Information

Finally, as to Count One, Conspiracy to Transmit NDI, a substantial number of the defendant's overt acts in furtherance of the conspiracy occurred within the Eastern District of Virginia.  First, the defendant initially spoke with Michael Yang while in the United States, by his own admission.  The notes from that February 21, 2017 call were found in the defendant's home within the Eastern District of Virginia during the June 22, 2017 FBI search.  GX 9-6.  This creates a strong presumption that the defendant participated in that conversation from his home.  There is certainly no evidence to the contrary.

Second, other than its appearance in Chicago, the covcom device the defendant received on his second trip to meet with Yang in the PRC has only been seen in the Eastern District of Virginia.  The defendant told Mike Dorsey during his May 12 interview that he was keeping the covcom in his home.  GX 7-17 and 7-17T.  The defendant brought the covcom device with him to his to the May 24 hotel room interview in the Eastern District of Virginia.  And, as testified to by Special Agent Melinda Capitano, the covcom device was found in the defendant's closet in his home in the Eastern District of Virginia on June 22.  *See also* GX 9-6.

Third, the defendant scanned the NDI to an SD card at a FedEx located within the Eastern District of Virginia.  This was a crucial step toward transmitting the information per his arrangement with Michael Yang.  Further, the SD cards containing the NDI were both found in the defendant's home in the Eastern District of Virginia.  For the Kingston SD card, which the defendant had not attempted to obscure, the files were found in the deleted space.  This indicates

the defendant likely thought he had successfully removed the NDI from that particular SD card. For the Toshiba SD card, the defendant went to great lengths to hide the SD card by concealing it in foil and stuffing at the back of a tray of "gobbly-gook."  GX 3A, 3A-1, and 3A-2; GX 11-2 and 11-2T.  The call in which the defendant attempted to direct his family to find the Toshiba SD card was placed from the Alexandria Detention Center in the Eastern District of Virginia to the defendant's home within the Eastern District of Virginia.  GX 11-2 and 11-2T.

Fourth, the late-night timing of the transmissions and attempted transmissions support the conclusion that the defendant was in his home in the Eastern District of Virginia when he initiated certain send sequences for NDI in this case.  GX 8-21; *see*, *e.g.*, *Tresvant*, 677 F.2d at 1021 (government gets the benefit of all reasonable inferences in considering a defense motion pursuant to Rule 29).  There is certainly no evidence to suggest he drove out of the district simply to hit send on those documents.

Fifth, law enforcement officers arrested the defendant in the Eastern District of Virginia on June 22, 2017.  And, finally, the district further includes the headquarters of one victim agency, the CIA (where the defendant went for his voluntary interview on May 12, 2017), and one of the locations of the second victim agency, the DIA, which has a facility in Quantico.  *Cf.* Fed. R. Crim. P. 18 (convenience of victims to be factored in when setting location of trial).

During trial, the Court explained to the jury the geographic area encompassed within the Eastern District of Virginia when it took judicial notice of the fact that the May 24, 2017 FBI interview in Ashburn, Virginia occurred within the Eastern District of Virginia.  This explanation was detailed and thorough, with the Court instructing that the Eastern District covered all of northern Virginia, and a large swath of the state south all the way through Tidewater, Virginia.  As discussed, that description encompasses the defendant's home, where he likely first spoke with

Yang, stored the covcom device, transmitted and attempted to transmit NDI using the covcom device, and hid the Toshiba SD card.  It also encompasses the FedEx location where the defendant scanned and shredded the NDI at issue here and the gym where the defendant was arrested on June 22, 2017.  The district further includes offices of both victim agencies, including CIA headquarters where the defendant participated in a multi-hour interview on May 12.  Finally, the district encompasses the hotel at which the defendant met with FBI on May 24 and consented to a search of the covcom device.  Simply put, the Eastern District of Virginia was not merely an appropriate venue here, it was the *only* sensible venue in light of the facts of this case.

## B. Drug Offense Case Law Has No Bearing On Charges Pertaining To The Espionage Statute

As they argued in the context of their proposed jury instructions, defense counsel here attempts to read "buyer-seller" relationship requirements related to drug conspiracies into the Espionage Act.  *See* Proposed Defense Jury Instructions, Dkt. 133, Instruction No. 33.  Such an extrapolation makes no sense.  The buyer-seller exception which, as noted, emerges from the drug context, holds that "[w]hen the sale of some commodity . . . is the substantive crime, the sales agreement itself cannot be the conspiracy."  *United States v. Garcia*, 89 F.3d 362, 365 (7th Cir. 1993).  The rationale for this exception is that "when a crime requires the joint action of two people to commit (prostitution, adultery, incest, bigamy, and dueling are other examples), a charge of conspiracy involves no additional element unless someone else is involved beyond the two persons whose agreement is the sine qua non of the substantive crime."  *United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir. 349); *accord United States v. Edmonds*, 679 F.3d 169, 174 (4th Cir. 2012).  It follows that this purported buyer-seller problem does not exist where the object of a conspiracy is a crime that can be committed by one person acting alone and thus does not require "the joint action of two persons."  In fact, the defendant himself acknowledges this very principal.  Def. Br.,

17

Dkt. 172, at 7 ("[I]f it is possible for the crime to be completed without the cooperation of another person, any agreement made with the other person to commit the offense may constitute a separate conspiracy.").

It takes little imagination to conjure a scenario in which someone can successfully pass NDI to a foreign government without any prior involvement by or conspiracy with that government.  For example, a disgruntled former U.S. government employee could simply show up at the Chinese embassy and hand a stack of classified NDI to an employee there.  This unilateral act would constitute delivery of national defense information, provided the former U.S. government employee delivered the information with the "intent or reason to believe" it was to be used to the injury of the United States or to the benefit the PRC.  *See* 18 U.S.C. § 794(a).  To provide a further example, one may be found guilty of attempted transmission of NDI even when the intended recipient is an undercover law enforcement officer and, thus, does not have the requisite *mens rea* to be part of a conspiracy.  *See*, *e.g.*, *United States v. Hoffman*, 995 F.Supp.2d 555 (E.D. Va. 2014) (detailing false flag operation leading to defendant's arrest and ultimate conviction).

Thus, transmission or attempted transmission of NDI (the underlying substantive offenses here), as opposed to a conspiracy to traffic drugs, does not require a sales agreement and can be committed by one person acting alone on a single occasion.  The underlying statute itself does not require that the delivery of NDI be in exchange for any sort of financial reward.  *See*, *generally*, 18 U.S.C. § 794.  The statute would punish equally either one who sells NDI for financial gain *or* one who passes NDI because of sympathy for a foreign country or that foreign country's particular political philosophy.  Further, the statute itself does not specify that more than one piece of NDI must be passed or that the passed information must be "re-sold" for a violation to occur.  Under

the plain language of the statute, a violation can occur even where an individual orally passes a single classified fact on a single occasion.  The crime is committed the moment an individual with the requisite mental state passes a single piece of NDI to a "representative, officer, agent, employee, subject, or citizen" of a foreign country.  *See* 18 U.S.C. 794(a).  It is of no import, for purposes of prosecution pursuant to the statute, whether the foreign individual passes the information onward.

Putting the false equivalence with drug law aside, here the evidence shows that the defendant did, in fact, pass or attempt to pass multiple documents.  This was not a single transaction and the evidence further demonstrates the defendant intended to continue passing NDI for as long as he could, provided the Chinese were willing to pay. [10]  As discussed above, the jury was presented with evidence of multiple overt acts, any one of which was sufficient to find a conspiracy between the defendant and Michael Yang.  The jury unanimously returned its guilty verdict in accordance with the substantial evidence in this case.

## III.    CONCLUSION

For the foregoing reasons, the government respectfully moves this Court to deny the defendant's motion for a judgment of acquittal with respect to Counts One through Three of the Indictment.

---

[10]  The defendant misstates the evidence in arguing that "[t]here is no evidence that Mr. Mallory intended to prolong his relationship with M. Yang or any other Chinese national for the purpose of carrying out multiple transactions" before arguing a May 3 communication via the covcom device suggested a termination of the relationship.  *See* Def. Br., Dkt. 172, at 13.  There are, however, May 15 and May 26 emails between the defendant and Michael Yang demonstrating the relationship continued in full force after the May 3rd through 5th covcom communications and that the defendant maintained an intention to travel to the PRC for a third time.  *See* GX 3-20, 3-21, and 3-22.  Further, the evidence does not show that "the 'covcom' device was never used again" after May 5.  Def. Br., Dkt. 172, at 13. Rather, as Mr. Hamrock testified, it merely shows that there was likely no crash event for the covcom at any point after May 5th and, thus, no error log generated to preserve messages that would otherwise self-delete from the custom application.

Dated June 14, 2018                       Respectfully submitted,

                                          G. Zachary Terwilliger
                                          United States Attorney

                              By:      /s/ Jennifer K. Gellie
                                          JENNIFER KENNEDY GELLIE
                                          Trial Attorney
                                          National Security Division
                                          United States Department of Justice
                                          950 Pennsylvania Ave., N.W.
                                          Washington, D.C. 20530
                                          Tel.: (202) 233-0785
                                          Fax: (202) 233-2146
                                          Jennifer.Gellie@usdoj.gov

                                          JOHN T. GIBBS
                                          COLLEEN E. GARCIA
                                          Assistant United States Attorneys
                                          United States Attorney's Office
                                          2100 Jamieson Avenue
                                          Alexandria, Virginia 22314
                                          Phone: 703-299-3700
                                          Fax: 703-299-3981
                                          John.Gibbs@usdoj.gov
                                          Colleen.E.Garcia@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2018, I have caused an electronic copy of the

*GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF*

*ACQUITTAL WITH RESPECT TO COUNTS ONE THROUGH THREE* to be served via ECF upon

counsel for Defendant Kevin Patrick Mallory.


By:      /s/      
Colleen E. García
Texas Bar No. 24088876
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: 703-299-3700
Fax: 703-299-3981