# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 1:17-CR-154 |
| | ) | |
| KEVIN PATRICK MALLORY, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

After a four day trial, a jury convicted defendant of four counts:

Count 1: conspiracy to gather or deliver defense information to aid a foreign government in violation of 18 U.S.C. § 794(c);

Count 2: delivery of defense information to aid a foreign government in violation of 18 U.S.C. § 794(a);

Count 3: attempted delivery of defense information to aid a foreign government in violation of 18 U.S.C. § 794(a); and

Count 4: making material false statements in violation of 18 U.S.C. § 1001(a)(2).

Defendant now moves for judgment of acquittal on the grounds (i) that the government's evidence at trial was insufficient to support the conspiracy charge alleged in Count 1, (ii) that it was an error to deny defendant's request for a buyer-seller instruction in connection with the conspiracy charge alleged in Count 1, and (iii) that the government's evidence at trial was insufficient to support a finding of venue on the offenses charged in Counts 2 and 3.

Defendant's motion for judgment of acquittal has been fully briefed, and is now ripe for disposition.

## I.

The facts recited here are derived from the trial record, which includes extensive recorded interviews of defendant by Central Intelligence Agency (CIA) and Federal Bureau of

Investigation (FBI) agents,[1] certain records from the cellphone provided to defendant by suspected intelligence officers of the People's Republic of China (PRC), and expert testimony.

Defendant is a former CIA and Defense Intelligence Agency (DIA) operative and contractor. Between 1981 and 2012, defendant worked for various U.S. Government agencies and cleared defense contractors. He also served some time on active duty in the U.S. Army. After leaving his last position as a contractor, defendant, at the times relevant here, was self-employed, operating his own largely unsuccessful consulting business.

The majority of the trial evidence focused on defendant's contacts and relationship with Michael Yang, a citizen of the PRC who defendant believed was an intelligence officer for the PRC intelligence service (PRCIS). In February 2017, a Chinese business recruiter named Richard Yang contacted defendant through LinkedIn, a social media website used for job networking. Richard Yang told defendant that he had leads about possible consulting work in the PRC. After defendant expressed an interest in this possible consulting work, Richard Yang arranged for defendant to contact an individual named Michael Yang. Defendant, who was in the United States, then engaged in a Skype call with Michael Yang, who was located in the PRC. The purpose of the call was to determine the nature of the information Michael Yang was seeking. In this Skype call, Michael Yang apparently described to defendant the nature of the information he, Michael Yang, was seeking. Defendant took notes on the topics in which Michael Yang had expressed an interest. The notes defendant made of the call reflect that Michael Yang was interested in the following: the United States' THAAD[2] missile defense

---

[1] Defendant, at his request, was interviewed by CIA and FBI agents on May 12, 2017 and May 24, 2017. Transcripts of both interviews were admitted at trial and selections of the video and audio recordings were played for the jury.

[2] THAAD is an acronym that stands for Terminal High Altitude Area Defense. It refers to a U.S. anti-ballistic missile defense system.

system, the South China Sea, currency manipulation by the PRC, and public-private partnerships, a subject that a government expert at trial testified could involve classified information/national defense information (NDI).[3]

Following his initial Skype call with Michael Yang, defendant, in late February, contacted Ralph Stephenson (Stephenson), a person defendant knew from defendant's church and who defendant also knew worked at the CIA. Defendant asked Stephenson to help him contact someone at the CIA working on China issues. Stephenson testified at trial that defendant's contact made him uncomfortable and accordingly Stephenson reported defendant's contacts with Stephenson to CIA security agents.

In early March 2017, defendant and Michael Yang arranged for defendant to travel to the PRC to meet with Michael Yang and Mr. Ding, putatively Michael Yang's boss. In advance of the trip, defendant asked Michael Yang to provide defendant with an Apple iPhone for defendant to use to communicate with Michael Yang while defendant was in the PRC. Defendant asked Michael Yang to have WeChat, a communication application popular in the PRC, installed on the iPhone. Defendant requested that Michael Yang have the iPhone left in a sealed envelope in defendant's hotel so that in defendant's words defendant could be sure the iPhone "[had] not been tampered with." Gov't Trial Ex. 3-15.

The day following defendant's email exchange with Michael Yang concerning defendant's request for an iPhone, defendant went to a FedEx store in Washington D.C. where

---

[3] Sections 793 and 794 criminalize the transmission of "information related to the national defense" (NDI), not classified information. *United States v. Morrison*, 844 F.2d 1057, 1065 (4th Cir. 1988). Of course, the fact that information is classified is relevant to whether the information is NDI because classified information, by definition, is closely held by the government. For discussion of the distinction between NDI and classified information, *see United States v. Truong Dinh Hung*, 629 F.2d 908, 926 (4th Cir. 1980) (discussing the distinction between NDI and classified information); *United States v. Rosen*, 599 F. Supp. 2d 690, 69495 (E.D. Va. 2009) (same). Here the jury apparently concluded that the information described by government witnesses as NDI was in fact NDI. Accordingly, it is appropriate to refer to the information pertinent to this case as classified/NDI.

defendant had nine pages of documents scanned onto an SD card. These documents were unclassified and related to CIA analysis standards, military intelligence acronyms, and other topics. On March 13, 2017, after defendant arrived in Shanghai, China, defendant sent an email to Michael Yang attaching the nine pages of scanned documents from the SD card. As defendant put it, these attached nine pages were attached as "examples." Gov't Trial Ex. 3-18.

During this visit of defendant to the PRC, defendant met for several hours with Michael Yang and Mr. Ding. Defendant in his later interviews with CIA and FBI agents acknowledged that in the course of this visit to the PRC defendant understood that Michael Yang and Mr. Ding were in fact PRC intelligence officials seeking U.S. Government secrets.

In April 2017, defendant again traveled to the PRC. On this trip Michael Yang provided defendant with a Samsung Galaxy Note 4 smartphone, which defendant described as a covert communications (covcom) device. This covcom device included a custom application that allowed defendant to send encrypted communications to Michael Yang through WeChat, a program that was loaded on the covcom device. While defendant was in the PRC, Michael Yang trained defendant on how to use the covcom device to communicate securely with Michael Yang via encrypted messages.

Defendant then returned to the United States, landing first in Chicago. There, Customs and Border Protection (CBP) officers found $16,500 in cash in defendant's luggage, despite the fact that defendant had falsely declared in his customs declaration that he did not possess on his person or in his luggage more than $10,000 in cash. When asked about the covcom device, defendant falsely told CBP officers that the covcom device was a gift for his wife. The CBP officers allowed defendant to retain both the $16,500 and the covcom device, and then to return to his home in Leesburg, Virginia.

On April 25, 2017, defendant visited a FedEx store at a location near his home in Leesburg, Virginia. Footage from surveillance cameras at the FedEx store showed defendant handing a FedEx clerk nine stacks of documents to be scanned onto an SD card. The page count (47 pages) for the scanning job matched the total page count for eight documents and a handwritten table of contents later found on June 22, 2017 on two SD cards secreted in a junk drawer in defendant's closet in his home in Leesburg. According to the government witness's trial testimony these documents contained classified information/NDI. Among the documents defendant later transmitted to Michael Yang were a handwritten table of contents containing classified information/NDI, and an unclassified White Paper with two yellow pages of handwritten notes containing classified information/NDI. The surveillance footage at the FedEx store showed flashes of sheets of yellow paper being scanned which matched the notes accompanying the White Paper that defendant transmitted to Michael Yang. The FedEx receipt shows that defendant paid the FedEx clerk to shred all nine documents after they were scanned onto the SD card.

Expert testimony presented by the government shows that shortly before midnight on May 1, 2017 and just after midnight on May 2, 2017 defendant completed all the steps necessary to transmit to Michael Yang in the PRC via the covcom device the following documents: (i) handwritten table of contents describing the various documents defendant intended to send to Michael Yang, and (ii) the White Paper and handwritten notes. Both the table of contents and the White Paper contained classified information/NDI. Michael Yang acknowledged receipt of these documents and told defendant that Michael Yang's boss was interested in the documents, but needed more detailed and complete documents relating to the PRC. Defendant told Michael Yang that he would send additional documents once defendant received reimbursement for his

5

trip to the PRC and payment for the documents he had already sent.

The government also presented expert testimony that several days later on May 5, 2017 defendant completed the steps on the covcom device necessary to transmit to Michael Yang in the PRC two additional documents containing classified information/NDI. Although the evidence discloses that defendant succeeded in completing the steps necessary to transmit the classified information/NDI to Michael Yang in the PRC, the evidence does not disclose whether or not Michael Yang received these documents. After the attempted transmission of these documents, Michael Yang told defendant via the covcom device that defendant should hold off on sending more documents. Defendant and Michael Yang also discussed a possible third trip to the PRC in July 2017.

After these transmissions and attempted transmissions, defendant met with the CIA and FBI agents in Virginia on May 12, 2017 and May 24, 2017, respectively. In these meetings, defendant described to the agents some of his contacts with Michael Yang and showed the covcom device to FBI agents. Defendant also described how the covcom device worked. Defendant had taken notes on how to send a document securely using steganography.[4] Defendant showed these notes to FBI agents during the May 24 interview. Defendant also stressed during the FBI interview that he believed the covcom communications were secure. In fact, defendant told FBI agents that he believed messages sent using the covcom device were automatically deleted for security purposes at the close of each session. Yet, when the covcom device was activated during the FBI interview, messages between defendant and Michael Yang were still present on the covcom device. The FBI agents present at the interview testified at trial that defendant appeared visibly surprised that messages between defendant and Michael Yang

---

[4] Trial testimony reflects that steganography is the practice of concealing secret information in non-secret text or data. In this case, the steganography was accomplished by concealing secret data within the date for image files.

remained on the covcom device. In the course of the interview, defendant allowed the FBI to take an imprint of the covcom device, which included copies of the custom applications and some of defendant's communications with Michael Yang. At the conclusion of both interviews, defendant was allowed to leave and was not asked to turn the covcom device over to the FBI or CIA.

On June 21, 2017, a criminal complaint issued alleging defendant had violated 18 U.S.C. § 1001 and 18 U.S.C. § 794. On June 22, 2017, defendant was arrested and defendant's home was searched pursuant to a search warrant. On July 27, 2017, a grand jury indicted defendant on four counts: (i) conspiracy to gather or deliver defense information to aid a foreign government in violation of 18 U.S.C. § 794(c), (ii) delivering defense information to aid a foreign government in violation of 18 U.S.C. § 794(a), (iii) attempted delivery of defense information to aid a foreign government in violation of § 794(a), and (iv) material false statements in violation of 18 U.S.C. § 1001(a)(2).

## II.

A Rule 29 motion must be denied if, viewing the evidence in the light most favorable to the government, a rational trier of fact could find the defendant's guilt beyond a reasonable doubt. *See United States v. Lentz*, 383 F.3d 191, 199 (4th Cir.2004); *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982). Consideration must be given to both direct and circumstantial evidence, and the government must be given "the benefit of all reasonable inferences from the facts proven to those sought to be established." *Tresvant*, 677 F.2d at 1021. Indeed, "'circumstantial evidence . . . may be sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis consistent with innocence.'" *United States v. Osborne*, 514 F.3d 377, 387 (4th Cir.2008) (quoting *United States v. Jackson*, 863 F.2d 1168,

7

1173 (4th Cir. 1989)). These settled principles govern the disposition of defendant's motion for judgment of acquittal.

### III.

In addition to criminalizing the communication, delivery, or transmission of NDI, the Espionage Act provides that "[i]f two or more persons conspire to violate this section, and one of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offenses which is the object of the conspiracy." 18 U.S.C. § 794(c). Count 1 of the Indictment, on which the jury convicted defendant, charged that between February 22, 2017 and June 22, 2017, defendant conspired with Michael Yang and others to communicate, deliver, and transmit documents and information relating to the national defense to agents of the Chinese government with the intent and reason to believe that such documents and information were be used to the injury of the United States or the advantage of the PRC, all in violation of 18 U.S.C. § 794(c).

Defendant contends that he is entitled to judgment of acquittal with respect to his conspiracy conviction (i) because the evidence presented to the jury supported only the existence of a buyer-seller relationship and was insufficient to prove the existence of a conspiracy to achieve a criminal objective separate and independent from the mere sale of defense information and (ii) because even assuming the evidence was sufficient to support a conspiracy conviction, it was an error to deny defendant's request for a buyer-seller instruction.[5]

The first question raised by defendant's motion—whether the evidence was sufficient to prove a conspiracy—is easily answered in the affirmative; the evidence presented to the jury was ample, indeed overwhelming, in support of the existence of a conspiracy between defendant and

---

[5] Defendant does not challenge the validity of the conspiracy instruction itself; defendant challenges only the refusal to give a buyer-seller instruction.

8

Michael Yang, and not merely a buyer-seller relationship. This is so because the Fourth Circuit has recognized that although "mere evidence of a simple buy-sell transaction" is insufficient to prove the existence of a conspiracy, evidence of "any agreement made *in addition to or beyond* the bare buy-sell transaction may be taken to infer a joint enterprise between the parties beyond the simple distribution transaction and thereby support a finding of conspiracy." *United States v. Edmonds*, 679 F.3d 169, 174 (4th Cir.), *cert. granted, judgment vacated*, 568 U.S. 803 (2012). For example, if, in addition to the bare agreement inherent in the sale, the transaction includes an agreement that the buyer will redistribute the illegal good, the defendant can be found guilty not just of the substantive distribution offense but also of a conspiracy. *Id.* Similarly probative of conspiracy are agreements "that the parties will become regular participants in such transactions" or agreements "that future transactions will involve particular prices or quantities[.]" *Id.*

Here, far from revealing the existence of a mere buy-sell transaction, the evidence adduced at trial provided convincing support for the conclusion that defendant and Michael Yang were engaged in a conspiracy to gather and deliver NDI. To begin with, evidence adduced at trial reflected that defendant and Michael Yang agreed that Michael Yang would retransmit any NDI delivered by defendant to Michael Yang's boss. In the videotapes and transcripts of defendant's May 12 and May 24 interviews with law enforcement, defendant explained his understanding of his relationship with his Chinese contacts. Specifically, defendant explained that although he communicated primarily with Michael Yang while defendant was in the United States, defendant understood on those occasions that Michael Yang's boss was "in the background." Gov't Trial Ex. 13-4T. Defendant explained that when he met with his Chinese contacts on his April 2017 trip to the PRC, Michael Yang's boss, Mr. Ding, "did . . . 90 percent of the talking" and gave defendant a "laundry list" of topics in which he was interested. Gov't

9

Trial Ex. 13-6T. Michael Yang also repeatedly confirmed that Michael Yang was transmitting to Michael Yang's boss all of the information that defendant provided. For example, on May 3, 2017, Michael Yang wrote to defendant explaining that Michael Yang had "discussed with [his] friend [Mr. Ding]" and that Mr. Ding was "interested in the products." Gov't Trial Ex. 8-6 at 17. And defendant acknowledged his awareness of, and agreement with, Michael Yang's transmission of the information defendant gathered to Michael Yang's boss, at one point even suggesting explicitly that Michael Yang's boss review the documents defendant transmitted. *See id.* at 59 ("I suggest your boss review the INDEX and I will send another document as a sigh [sic] of trust.").[6] Thus, there was ample evidence adduced at trial to support a finding that defendant and Michael Yang not only agreed that defendant would deliver NDI to Michael Yang in exchange for payment, but also that Michael Yang would then deliver that NDI to additional foreign agents, namely Michael Yang's "higher up" boss. *Id.* at 55.

There was also extensive evidence adduced at trial of agreements between defendant and Michael Yang (i) "that the parties [would] become regular participants in such transactions" and (ii) "that future transactions [would] involve particular prices or quantities[.]" *Edmonds*, 679 F.3d at 174. For example, on May 3, 2017, after defendant sent the table of contents to Michael Yang, Michael Yang asked defendant to send Michael Yang additional, more detailed, information related to China. *See id.* at 70 ("[M]y focus will be CN related so pls [sic] make it detailed and complete of these docs."). Two days later, on May 5, 2017, defendant sent WeChat messages to Michael Yang saying that defendant had attempted to send two additional documents and that he was "expecting previous payment . . . for materials provided." *Id.* at 90. Defendant also repeatedly told Michael Yang that defendant would send additional documents to

---

[6] *See also id.* at 55 (Defendant tells Michael Yang that defendant is "taking the real risk as you, Mr ding, and higher up bosses know.").

10

Michael Yang when he received payments for previous transmissions. *See, e.g.*, *id.* at 51 ("I will send more docs when payments are made"); *id.* at 80 ("When you get the OK to replaced [sic] the prior payment..the [sic] I will send more docs").

But defendant and Michael Yang did not simply discuss future plans to exchange documents via the covcom device; they did far more. Defendant and Michael Yang also discussed defendant making a return trip to the PRC to deliver additional information in June 2017. Specifically, in a WeChat message to defendant, Michael Yang told defendant that defendant "[could] still come in mid June" if defendant was available and thought the situation was safe. *Id.* at 140. Defendant later replied that he could "come in the middle of June" and offered to "bring the remainder of documents [defendant had] at that time." *Id.* at 150. Evidence adduced at trial also revealed that defendant and Michael Yang agreed on defendant's rates for this June 2017 trip. Specifically, defendant explained in his May 24 interview with the FBI that on his first trip to the PRC in April 2017, defendant and Michael Yang had agreed that defendant would receive $1,000 per day while traveling and $2,000 per day plus expenses while in the PRC. *See* Gov't Trial Ex. 13-5T. Defendant further explained that he expected "to get the daily rate again" when he returned to the PRC in June. Gov't Trial Ex. 13-37T.

In sum, the evidence adduced at trial revealed that defendant and Michael Yang had precisely the type of arrangement that the Fourth Circuit has identified as characterizing and proving the existence of a conspiracy. Beyond a mere agreement to buy and sell NDI, defendant and Michael Yang agreed that Michael Yang would retransmit the information to his boss, that defendant would provide additional documents in a future trip to the PRC, and that Michael Yang would pay defendant a specific amount for future documents and trips. Defendant also fronted several documents as a sign of trust, expecting future payments for the documents.

Accordingly, the evidence adduced at trial was sufficient for the jury to find that a conspiracy, and not a mere buyer-seller relationship, existed between defendant and Michael Yang.

The second question—whether defendant was entitled to a buyer-seller instruction—is also properly answered in the affirmative. The Fourth Circuit has made clear that district courts "should include instructions 'to instruct the jury in the defendant's theory of defense" if "the instructions have an evidentiary foundation and are accurate statements of the law." *United States v. Dornhofer*, 859 F.2d 1195, 1199 (4th Cir. 1988) (quoting *United States v. Mitchell*, 495 F.2d 285, 287-88 (4th Cir. 1974)). An adequate evidentiary foundation for a proposed instruction exists where there is "evidence sufficient for a reasonable jury to find in [the defendant's] favor." *United States v. Ricks*, 573 F.3d 198, 200 (4th Cir. 2009) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)). And importantly, the Fourth Circuit has recognized that "[i]n determining the sufficiency of the evidence to support a criminal defendant's request for a jury instruction on a theory of defense, 'the testimony most favorable to the defendant should be accepted.'" *Id.* at 199.

These principles, applied here, point convincingly to the conclusion that defendant was not entitled to a buyer-seller jury instruction because, even interpreting the evidence, as required, in the light most favorable to defendant, there was no evidence in this record to support a theory that defendant and Michael Yang's relationship was limited to a buyer-seller transaction. Instead, the evidence adduced at trial revealed the existence of a months-long relationship involving repeated communications between defendant and Michael Yang about the goals and objectives of their conspiracy. Beginning in February 2017, defendant held a Skype phone call with Michael Yang to determine the nature of the information that Michael Yang was seeking. *See* Gov't Trial Ex. 3-9 (defendant's notes from February 21, 2017 call with Michael Yang).

Defendant and Michael Yang subsequently arranged for defendant to travel to the PRC in March 2017 to meet with Michael Yang's bosses and to deliver additional information. In preparation for this trip, Michael Yang prepared a phone for defendant at defendant's request and coordinated defendant's travel arrangements. *See, e.g.*, Gov't Trial Ex. 3-15 (emails between Michael Yang and defendant regarding March 2017 trip to the PRC). Defendant later told law enforcement officers that during defendant's first trip to the PRC, defendant attended several hours-long meetings with Michael Yang and his boss where Michael Yang and his boss discussed the information they were seeking. *See* Gov't Trial Ex. 13-6T (describing two meetings lasting several hours in which Michael Yang and his boss explored defendant's "access" and gave defendant a "laundry list" of topics in which they were interested). Defendant acknowledged to law enforcement that at that time, defendant understood that Michael Yang and his boss were looking for U.S. Government secrets. *See* Gov't Trial Ex. 7-40T ("[T]hey said, you know, we really don't want academics. We want – and then they said – they didn't use the word Jee Mee which is top secret or something. But they emphasized that it was not stuff that you could publicly get.").

One month later, in April 2017, defendant again traveled to the PRC to meet with Michael Yang and his bosses. During this April 2017 trip, Michael Yang supplied defendant with a covcom device installed with a custom application which defendant believed permitted defendant and Michael Yang to communicate securely. *See* Gov't Trial Ex. 7-19T ("Now, we can, we can talk, so to speak, clearly; in the clear; securely"); Gov't Trial Ex. 13-18T ("So we have a special way to use WeChat to make it safe"). Michael Yang trained defendant regarding how to use the custom application and instructed defendant to communicate via the application in the future. *See* Gov't Trial Ex. 8-17 (defendant's notes on how to use the covcom device).

When defendant returned to the United States after his second trip to the PRC, defendant

13

scanned eight documents and a handwritten table of contents containing classified information/NDI to an SD card and then completed all the necessary steps to transmit the table of contents and one other document to Michael Yang via the covcom device. Michael Yang acknowledged receipt of the documents and told defendant that Michael Yang's boss was interested in the documents, but requested more detailed and complete documents relating to the PRC. *See* Gov't Trial Ex. 8-6 at 17-18 ("He's interested in the products . . . You need to provide detailed and complete stuff."). Defendant explained that he would send additional documents as soon as defendant received reimbursement for his trip to the PRC and for the documents he had already sent. *See id.* at 51 ("I will send more docs [sic] when payments are made"). Defendant later informed Michael Yang that he would send an additional document prior to payment as a "[sign] of trust." *Id.* at 59 ("I will send another document as a sigh [sic] of trust."). Shortly thereafter, Michael Yang suggested that it was unsafe to continue to transmit documents via the covcom device, but defendant and Michael Yang discussed the possibility of defendant making a third trip to the PRC in June 2017, during which time defendant would provide additional documents to Michael Yang and his bosses. *See id.* at 140 ("If you think the situation is ok and you're available, you can come in mid June"); *id.* at 150 ("I can also come in the middle of June. I can bring the remainder of the documents I have at that time.").

Defendant correctly notes that courts have reversed conspiracy convictions where the facts adduced at trial "left open the possibility [of] merely a buyer-seller relationship"[7] or where the evidence at trial was "as consistent with a buyer-seller relationship as it was with a conspiracy."[8] But that is not the case here. Here, in contrast to the cases defendant cites, the

---

[7] *United States v. Harris*, 65 F.3d 177, 1995 WL 497915, at *4-5 (9th Cir. Aug. 6, 1995).

[8] *United States v. Gee*, 226 F.3d 885, 895 (7th Cir. 2000); *see also United States v. Prieskorn*, 658 F.2d 631, 636 (8th Cir. 1981) (reversing conviction for failure to give buyer-seller instruction because the court "[could] not say

14

evidence adduced over the course of this trial was such that no reasonable juror could conclude that Michael Yang's and defendant's relationship was that of a mere buyer and seller; the evidence showed overwhelmingly that defendant and Michael Yang agreed to work together to transmit NDI to Chinese nationals, including Michael Yang's boss, via a covcom device and repeated trips to the PRC. Accordingly, it was appropriate to deny defendant's request for a buyer-seller jury instruction, and defendant's motion in this regard is denied.

## IV.

The venue requirement in criminal cases stems from the Constitution, which requires that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3; *see also* Rule 18, Fed. R. Crim. P. ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). The purpose of the constitutional and statutory venue requirements is to "protect criminal defendants from the inconvenience and prejudice of prosecution in a far-flung district bearing no connection to their offenses." *United States v. Smith*, 452 F.3d 323, 334 (4th Cir. 2006) (citing *United States v. Ebersole*, 411 F.3d 517, 524 (4th Cir. 2005)).[9]

Where, as here, a criminal statute does not contain an express venue provision, venue is "proper only in a district in which an essential conduct element of the offense took place." *Smith*, 452 F.3d at 334-35 (quoting *United States v. Villarini*, 238 F.3d 530, 533-34 (4th Cir. 2001)). Thus, determining proper venue requires a two-part inquiry. First, courts must identify

---

that a reasonable person might not conclude that the evidence supported [the defendant's] requested buyer-seller instruction.").

[9] Defendant raised his venue objection at the close of the government's case. Where, as here, "an indictment properly alleges venue, but the proof at trial fails to support the venue allegation, an objection to venue can be raised at the close of the evidence." *United States v. Collins*, 372 F.3d 629, 633 (4th Cir. 2004) (citing *United States v. Melia*, 741 F.2d 70, 71 (4th Cir.1984) (per curiam)). A defendant does not waive venue unless the "indictment clearly reveals [the venue] defect but the defendant fails to object." *Id.* (quoting *United States v. Sandini*, 803 F.2d 123, 127 (3d Cir.1986)). In this case, defendant's argument that the venue evidence at trial was insufficient to establish proper venue in the Eastern District of Virginia was properly raised at the close of the government's case, and defendant did not waive his venue objection by failing to raise it earlier.

the conduct constituting the offense because venue is proper only in a district in which the essential conduct element of the offense took place. *Id.* at 334. The Fourth Circuit has explained that one method for deciding what conduct constitutes the offense is to "analyz[e] the key 'verbs' or actions sanctioned by the statute[.]" *United States v. Sterling*, 860 F.3d 233, 241 (4th Cir. 2017) (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279-80 (1999)). Preparatory acts, such as planning to commit the offense, cannot provide a basis for venue because the preparatory acts are not the essential conduct proscribed by the statute. *Id.* (citing *United States v. Ramirez*, 420 F.3d 134, 144 (2d Cir. 2005)). The second step in the venue inquiry requires courts to "determine where 'the criminal conduct was committed.'" *Id.* (quoting *Smith*, 452 F.3d at 334-35). Venue is proper in a district where defendant committed the act constituting the essential conduct element of the crime. *Smith*, 452 F.3d at 334-35.

With these principles in mind, analysis now turns to whether the government presented sufficient evidence to support a finding of venue for Counts 2 and 3, the transmission and attempted transmission of NDI. Count 2 of the Indictment, on which defendant was convicted, charged that between February 22, 2017 and June 22, 2017 in Loudoun County, Virginia, defendant communicated, delivered, and transmitted NDI to PRC agents in violation of § 794(a).[10] The government and defendant agree that the essential conduct on which venue must rest for Count 2 is the actual transmission of NDI, which occurred around midnight on the evening of May 1-2, 2017. *See Sterling*, 860 F.3d at 243-44 (holding that the essential conduct element of § 793(e) is the "communication, delivery, or transmission" of NDI). The next question is where this essential conduct occurred. The only evidence adduced at trial related to

---

[10] Section 794(a) provides in relevant part:

> Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government . . .

16

defendant's location on those dates was the testimony of Special Agent Green, the case agent, who testified that the defendant was "in the United States" on May 3, 2017. *See* Trial Tr. Excerpt at 4, lines 5-7. The other evidence establishing defendant's presence in the Eastern District of Virginia related to (i) defendant's trip to the FedEx store on April 25, six days before the transmission, and (ii) defendant's May 12 interview at CIA headquarters. But these pieces of evidence do not establish defendant's location at the time of the *transmission* of NDI, and without evidence establishing defendant's location at the time of the essential offense conduct, the government has failed to establish venue. Accordingly, defendant's motion for judgment of acquittal on venue grounds with respect to Count 2 must be granted.

Seeking to avoid this result, the government argues that the jury could infer that the transmission of NDI occurred in the Eastern District of Virginia from the fact that the defendant lived in Leesburg, Virginia. Yet, the Fourth Circuit rejected this exact argument in *Sterling*, holding that a trial jury is not permitted to "speculate" to establish venue by inferring where the transmission occurred based on where the defendant lived or stored the NDI. *Sterling*, 860 F.3d at 244 ("[T]he mere fact that [the defendant] stored the letter in his Virginia home does not, by itself, mean that the process of transmission, delivery, or communication . . . began there."). The government argues that this case is distinct from *Sterling* because the government here presented evidence showing the "procedure" by which defendant transmitted information, namely through the use of the covcom device. This evidence does not support the venue inference the government seeks because unlike the use of a landline or desktop computer, the covcom device is by its very nature a mobile device, and so evidence showing that defendant used a mobile phone to transmit information does not support the inference that defendant transmitted information from his home in Virginia. This is especially so in this case because of defendant's

17

close proximity to several other districts including the District of Maryland, the District of D.C., and the Western District of Virginia. Accordingly, the government's argument that venue may be inferred from the location of defendant's home and the procedure used to transmit information falls short of establishing venue.

But, the government also points to the late hour of the transmission in support of venue, arguing that because the transmission took place late at night it is likely that defendant transmitted the NDI from his home. But *Sterling* appears to foreclose this argument. In *Sterling*, venue existed only if direct evidence could show that defendant was located at his residence, which was within the proper venue, when defendant transmitted NDI. The government's venue argument in *Sterling* relied on the inference that defendant was at his home when he transmitted the NDI. The Fourth Circuit concluded that this inference was insufficient, a bridge too far. In the Fourth Circuit's words without "direct evidence at trial of how or where th[e] physical transmission took place . . . the jury could only speculate that the transmission occurred in the Eastern District of Virginia[.]" *Sterling*, 860 F.3d at 243-44. In the Fourth Circuit's view, evidence of venue must provide an "evidentiary hook" linked to location. *Id.* at 244. Thus, even if evidence of timing here provides the jury with more information than the jury had in *Sterling*, it still falls far short of the kind of direct evidence the Fourth Circuit held would be sufficient for a reasonable jury to find venue in a case alleging transmission of NDI. Of course, many people are home at midnight, but many are not. And the government presented no cell tower or surveillance evidence showing defendant's location at the time of transmission, nor did the government present evidence about defendant's tendency to be at his residence at any particular time. Without any evidentiary hook on which to base an inference regarding defendant's location at the time of transmission, the jury was left to speculate as to where the transmissions

18

of classified information/NDI took place. Accordingly, the government's argument that venue could be inferred from the timing of the transmissions in conjunction with the evidence about where defendant stored NDI fails.

Count 3 of the Indictment charged defendant with the attempted transmission of NDI pursuant to 18 U.S.C. § 794(a). The attempt count "proscribe[s] substantial steps taken by the defendant toward completion of his criminal goal." *Id.* at 242 (citing *United States v. Pratt*, 351 F.3d 131, 135–36 (4th Cir. 2003)). Accordingly, venue is proper anywhere the defendant "committed a substantial step toward communicating, delivering, and transmitting" NDI. *Id.* A substantial step is "a direct act in a course of conduct planned to culminate in commission of a crime that is strongly corroborative of the defendant's criminal purpose." *United States v. Engle*, 676 F.3d 405, 423 (4th Cir. 2012) (citing *Pratt*, 351 F.3d at 135). A substantial step is "more than mere preparation but less . . . than completion of the crime." *United States v. Neal*, 78 F.3d 901, 906 (4th Cir. 1996). In deciding whether conduct is merely preparatory or a substantial step toward commission of the crime, "a court must assess how probable it would have been that the crime would have been committed—at least as perceived by the defendant—had intervening circumstances not occurred[.]" *Pratt*, 351 F.3d at 136.

Here, it is clear that defendant's attempt to send NDI as evidenced by the failed send sequences is a substantial step and therefore essential conduct that could be used to determine venue. But, there was no evidence at trial as to where defendant was when he attempted to send NDI through the covcom device, as explained *supra*. Seeking to avoid the same conclusion as with Count 2, the government argues that the evidence at trial showed defendant took other substantial steps in the Eastern District of Virginia, namely the scanning of NDI at the FedEx store and the use of a MacBook located at defendant's home to transfer information to an SD

card used on the covcom device. Yet, these actions were merely preparatory and not properly considered substantial steps in the attempted transmission of NDI. The scanning of NDI documents and their placement on a particular storage device would not, on their own, violate § 794(a)'s prohibition on attempted transmission of NDI, and the crime would not have been committed as of either of those actions. Rather, the crime of transmission of NDI would have been committed at the point defendant sent the transmissions had "intervening circumstances" in the form of the failure of the send sequences not occurred. It was at the point of the *attempt* to transmit the NDI that the crime of attempt was complete, not at a time before then when defendant was gathering and preparing the NDI for transmission. Had defendant taken only the preparatory steps identified by the government, his conduct would not violate § 794(a), and as such the steps the government points to were not substantial steps. And because those preparatory activities were not substantial steps, they are not the kind of essential conduct looked to for venue analysis.

Instead, analysis must focus on the location of the unsuccessful send sequences on May 1-2 and May 5, and just as with Count 2 there was no adequate evidence at trial establishing that the transmissions occurred in the Eastern District of Virginia. The government argues that the location of the attempted transmissions can be inferred from where defendant lives and stored the NDI, but as explained *supra*, the Fourth Circuit's decision in *Sterling* forecloses that possibility. Accordingly, there is no evidence that the essential conduct took place in the Eastern District of Virginia and so Count 3 must also be dismissed for lack of venue.

An appropriate Order shall issue.

/s/
T. S. Ellis, III
United States District Judge