1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :    Case No. 1:17-cr-154
                              :
                              :
KEVIN P. MALLORY,             :
             Defendant.       :
                              :
------------------------------:
```

PARTIAL TRANSCRIPT
(Closing Arguments)

June 7, 2018

Before:   T.S. Ellis, III, USDC Judge

And a Jury

APPEARANCES:

FOR THE GOVERNMENT:

        UNITED STATES ATTORNEY'S OFFICE
        John T. Gibbs, Esquire
        Colleen E. Garcia, Esquire
        Jennifer K. Gellie, Esquire
        U.S. Attorney's Office
        2100 Jamieson Avenue
        Alexandria, VA 22314

FOR THE DEFENDANT:

        OFFICE OF THE FEDERAL PUBLIC DEFENDER
        Geremy C. Kamens, Esquire
        Todd M. Richman, Esquire
        1650 King St
        Suite 500
        Alexandria, VA 22314

OFFICIAL UNITED STATES COURT REPORTER:

        NORMAN B. LINNELL, RPR, USCRR
        United States District Court
        401 Courthouse Square
        Tenth Floor
        Alexandria, VA 22314
        703-646-1438

<u>INDEX</u>

<u>CLOSING ARGUMENTS BY:</u>

MR. GIBBS                                                6

MR. KAMENS                                              34

MR. GIBBS                                               58

4

1              NOTE:  After commencing the day with argument

2     relating to the issue of jury instruction, a portion of the

3     case on June 7, 2018, is heard in the presence of the jury as

4     follows:

5     JURY IN

6              THE COURT:  All right, you may be seated.

7              Good morning, ladies and gentlemen.  Let me begin, as

8     I have in the past, by thanking you for your patience.  And I

9     assure you, the time was necessary.

10             Now we'll have Ms. Pham call the roll for the record

11    purposes.

12             THE CLERK:  Ladies and gentlemen, as I call your

13    name, please indicate "present" or "here."

14             Juror 59, Matthew Scott Reynolds.

15             JUROR REYNOLDS:  Here.

16             THE CLERK:  Juror 72, Mary Brienne Tierney.

17             JUROR TIERNEY:  Here.

18             THE CLERK:  Juror 71, Armelle Pierrette Tallec.

19             JUROR TALLEC:  Here.

20             THE CLERK:  Juror 30, Jennifer Elizabeth Gerbi.

21             JUROR GERBI:  Here.

22             THE CLERK:  Juror 56, Marcia O'Toole.

23             JUROR O'TOOLE:  Here.

24             THE CLERK:  Juror 31, Christy Stone Gorman.

25             JUROR GORMAN:  Here.

1                THE CLERK:  Juror 28, Mary Buchanan Frankel.

2                JUROR FRANKEL:  Here.

3                THE CLERK:  Juror 32, Gary Alan Gortenburg.

4                JUROR GORTENBURG:  Here.

5                THE CLERK:  Juror 33, Paige Taylor Gray.

6                JUROR GRAY:  Here.

7                THE CLERK:  Juror 20, Nicole D'Antuono.

8                JUROR D'ANTUONO:  Here.

9                THE CLERK:  Juror 17, Kate Alison Clarke.

10                JUROR CLARKE:  Here.

11                THE CLERK:  Juror 51, Naveen Rammeduri.

12                JUROR RAMMEDURI:  Here.

13                THE CLERK:  And juror 54, Joseph Michael Mondoro.

14                JUROR MONDORO:  Here.

15                THE CLERK:  Thank you.

16                THE COURT:  All right.  Once again, good morning,

17       ladies and gentlemen.

18                We are going to proceed now with the closing

19       arguments of counsel.  This is where counsel will have the

20       opportunity to summarize and interpret the evidence as they see

21       it for you and as they recall it for you.

22                However, if any difference appears to you between the

23       evidence as they recall it or as they say it was and your

24       recollection as to the evidence, it is your recollection that

25       controls because you are the sole judges of the facts of this

1    case.

2           Also, counsel are aware of, they've been told what

3    instructions I'm going to give.  Now, they are not in a form

4    that you're going to receive, but you will have a tape

5    recording -- I will tell you more about that at the time.  You

6    are not required to listen to a tape recording, but it will be

7    provided for your convenience.

8           But the point is, they know what I'm going to

9    instruct you.  However -- and they are free to mention that if

10   they wish.

11          However, if they do so and if that mention differs in

12   any way from the instructions as I give them to you, of course

13   you are to be guided by the instructions as I give them to you.

14          All right.  Now, we will begin -- and let's move the

15   podium, please.

16          All right.  Mr. Gibbs, are you ready to make your

17   closing argument on behalf of the Government?

18          MR. GIBBS:  I am, Your Honor.

19          THE COURT:  Ladies and gentlemen, this is forecasted

20   to be about 45 minutes.

21          You may proceed.

22          MR. GIBBS:  Thank you, Judge.

23          What this case is really about, if you believe the

24   defense's argument, the one that they offered in their opening

25   statement and the one that I expect they will make in their

1    closing argument, is the reason that we are all here today is

2    because a very well-meaning, former intelligence officer,

3    someone wearing a white hat, as they claim, just wanted to help

4    the United States government.  He wanted to help by providing

5    one worthless white paper as a lure to these Chinese

6    intelligence officers, or IOs as we call them, and then he

7    wanted to tell the U.S. government about it.

8              So according to this argument, everything you saw in

9    this case, the exhibits, the witnesses, the jail calls, the

10   money, the FedEx videos, the clips, and the transcripts were

11   all the product of the defendant's attempt to set up these

12   Chinese IOs for the benefit of the CIA with one document.

13             That's what they want you to believe.  That's what

14   they will argue.  And that is just totally and completely

15   absurd.  And it's totally and completely absurd not because I

16   say it, but because the facts and the evidence in this case

17   prove it.

18             So let's talk about some of those facts.  I'm not

19   going to go through all of them here today because I think

20   everyone in this courtroom recognized how attentive and how

21   hard you have worked in this case.

22             I think we all recall a week ago at the end of a long

23   day of jury selection when Judge Ellis asked you if you wanted

24   to start the next morning at 9 or 9:30.  And the consensus was,

25   let's start at 9 o'clock.  And you demonstrated at that time

1    that you were ready to take your solemn obligation seriously

2    and be a juror that worked hard.  And on behalf of myself, my

3    colleagues, Ms. Gellie and Ms. Garcia, we want to thank you on

4    behalf of the Government.

5              Let's talk about some of the facts in the case.  We

6    know that the case started off in February of 2017 with the

7    defendant's LinkedIn communications with Richard Yang.  And we

8    know by the defendant's own words, anyone with "a refined eye"

9    could see that he had an intelligence background.

10             The Chinese intelligence service could obviously see

11   that.  You saw how the defendant was quickly handed off to

12   Michael Yang, the person he described as an IO.  From that

13   point forward, Richard Yang, the cut-out, was out of the

14   picture.

15             Now, February 2017 was also a significant date for

16   the defendant financially.  His credit card debt was up in the

17   tens of thousands of dollars.  He owed $200,000 on a line of

18   credit.  And to make matters worse, he had missed his last

19   three mortgage payments.  Not a small consideration given that

20   his monthly payment was over 5,000 a month and he had a family

21   to support.

22             In fact, as you saw, he had received a notice telling

23   him that he was in default, and he had until February 26 to

24   cure that by paying over $12,000.

25             For this defendant, the thread that runs through this

9

1   entire case is his desperation for and desire to make as much

2   money as possible.  And you saw that for someone with

3   classified information to sell, the Chinese IOs were great

4   co-conspirators.  They might push him hard for more and better

5   stuff, but they would pay, a lot, and the payments were going

6   up.

7          So the problem with the defense claiming that the

8   defendant wanted to come in and tell the truth is that if he

9   truly did that, the money would dry up.  As you heard in this

10  case, the intelligence community would not accept a double

11  agent operation like this in the first place.  But certainly if

12  the defendant did come in and tell the truth, he couldn't

13  continue to make money off the Chinese government.

14         So when the defense tries to argue that the defendant

15  really wanted to reveal this operation, compare that with the

16  statements he was making in May to Michael Yang about getting

17  more money for more documents going forward.  And he had a lot

18  to sell.  He had an unlimited amount of classified facts in his

19  head.  He wanted to take another trip to China in June.  There

20  is no way he could possibly tell the truth to the U.S.

21  government, there was just too much money at stake.

22         So in March the defendant travels to China the first

23  time.  He told the FBI and the CIA that he met with these

24  Chinese IOs for hours.  He said they talked about open source

25  topics, like THAAD and the South China Sea.

1       But here is funny thing, even though he claimed he

2   didn't tell them anything beyond open source, basic

3   information, and even though he claimed he didn't know much

4   about those topics, they paid him $10,000 in cash for that

5   first trip.

6       Here is the other funny thing.  Remember that first

7   trip to the FedEx in March when he scanned in the nine pages,

8   that Examples e-mail that he sent to Michael Yang, but only

9   after he was safely in China, the e-mail that contained things

10  like CIA and DIA documents -- or DoD documents.  The defendant

11  sure was working hard to make these IOs think that he could get

12  them U.S. government documents.  And these weren't documents

13  about THAAD or the South China Sea.

14      Now, before and after this first trip, the defendant

15  did something else strange that you will hear about from the

16  defense, I'm sure.  He reached out to two contacts he had at

17  the CIA.

18      And so, at this point you have to ask yourself, if

19  the defendant was going to betray his country and sell

20  government secrets to the Chinese, why would he reach out to

21  people at the CIA before doing that?  Why would he do that?

22      Well, the answer is that he would do that so his

23  attorney could stand up here and make the exact argument that I

24  expect you will hear shortly.  He would do that so if he were

25  ever caught, he could say, hey, I never intended to commit a

1    crime.  I wanted to help the U.S. government.

2              The defense will claim that this defendant, who

3    hadn't worked for the government in years, was using his

4    experience and his initiative and his contacts in China to lure

5    in this IO for the benefit of the U.S. government.

6              But think about how clever he was.  He knew with his

7    experience better than anyone how the U.S. government operates.

8    That you don't just sell classified secrets to a foreign

9    adversary and then get it blessed after the fact.  And if you

10   did want to do that, you certainly don't lie about it

11   repeatedly to the Government.  You disclose the entire

12   operation in excruciating detail.

13             Remember Mike Higgins when he said that the approvals

14   necessary for an operation involving DIA or CIA employees were

15   almost stifling?

16             Here then are the two big problems with this defense.

17   First, no one in the government approved what he did.  How

18   could they?  He didn't tell them what he was actually going to

19   do.  He lied repeatedly to Mike Dorsey, Steve Green, and Matt

20   Pietropola.

21             And as for Ralph Stephenson and John Doe, the defense

22   just wants to point out some text messages and toll records

23   showing contacts with them, as if a toll record from AT&T is

24   the equivalent of telling the truth.

25             But think about what they actually said.  The

1    defendant didn't tell them any details beyond some very general

2    stuff about trips to China.  And that information alone was

3    enough for Ralph and John Doe to report this to security as

4    they were trained to do at the CIA.

5           The second problem is that while the defense will try

6    to argue that contacting someone within the U.S. government was

7    significant, it stands to reason that if he was going to do

8    that, he at least needed to go to the right agency.

9           As you heard, the two classified documents, the first

10   two classified documents that he tried to sell to the Chinese

11   government, didn't even belong to the CIA.  They belonged to

12   DIA.  That white paper, Document No. 1, the proposal related to

13   the Johnsons, that was taken straight from the PowerPoint,

14   Document No. 2, that he worked so hard on and that was found in

15   his JWICKS account at DIA.

16          So that gets us up to April.  Without a good contact

17   at CIA and without every talking to DIA, the defendant goes to

18   China for trip number two.  This time he makes even more money.

19   Remember, I said the payments were increasing.  Now it is

20   15,000 in cash.

21          And something else noteworthy happens during trip

22   number two.  He gets the CovCom device.

23          Now, let's think about this for a moment, ladies and

24   gentlemen.  That is a really big deal.  This isn't some

25   off-the-shelf phone.  This is proprietary technology that the

1    Chinese government has put together to get classified

2    information from this defendant.  They gave it to him on his

3    second trip to China.

4            Remember Paul Lee?  He said it was a very custom

5    piece of technology.  That it would be the result of a team of

6    engineers working on it, and it would be very costly.

7            So why would these Chinese IOs let a piece of

8    technology like that come back into the United States, unless

9    they were very confident of two things.  First, that they could

10   truly trust Kevin Mallory.  And second, that he had U.S.

11   government secrets to sell them.

12           So what do you think the defendant talked about

13   during all those hours of meetings in Shanghai?  But we know it

14   was enough to get the CovCom device.  A device where

15   essentially the only thing the FBI could find on there were the

16   defendant and Michael Yang talking about classified

17   information.  They talked about a document to become part of an

18   image.  The defendant talked about sending classified

19   documents.  Michael Yang said he needed more detail and more

20   information.  The defendant sent more and promised to send more

21   later.  They discussed another trip in June and payment for

22   what had been provided already.

23           But then we get to the Customs stop in April.  Now,

24   one of the things we learned during the course of this trial is

25   that Kevin Mallory lies, he lies a lot.  He lied to Customs in

1    Chicago about whether he had more than $10,000 in cash, about

2    the reason for his trip to China, and about the CovCom device

3    itself with the smudged fingerprints all over the screen.  He

4    claimed that it was a gift for his wife.

5         He lied repeatedly to Mike Dorsey in the May 12

6    interview.  And he lied repeatedly to the FBI in the May 24

7    interview, even after he could see that the communications on

8    the CovCom device were, to his surprise, visible.

9         In fact, two of those lies are charged as false

10   statements in Count 4 of the indictment.  And you should have

11   no trouble finding the defendant guilty of those lies.

12        He even lied to Michael Yang, the Chinese IO.

13        Pull up 8-6.

14        Remember how he tried to convince Michael Yang that

15   he was "expecting the previous payment seized at the border"?

16   As you heard, that money wasn't seized at the border, but this

17   is a defendant firmly convinced that these IOs are going to pay

18   him a lot of money.

19        Now, after that close call in Chicago, the defendant,

20   with his 30 years of experience, knew that he might well be on

21   the government's radar.  So, of course, he came in and told the

22   truth at that point about everything, right?  No.

23        But what he did do was he redoubled his efforts to

24   get in touch with the CIA.  And remember that text message to

25   John Doe on April 24, three days after the Customs stop?  And

1    remember the next day that follow-up text, "please confirm

2    receipt," at 2:26 p.m.?

3            Ladies and gentlemen, let's think about where things

4    stood with Kevin Mallory at 2:26 p.m. on April 25, 2017.  At

5    that very moment he had convinced these Chinese IOs that he was

6    trustworthy.  So much so that they had given him a CovCom

7    device to send classified documents on.  But he hadn't sent

8    them anything yet.

9            If he truly wanted to help the U.S. government, if he

10   truly wanted to offer up Michael Yang and Mr. Ding as some sort

11   of double agent operation, this was a perfect time to do it.

12   So of course, the defendant waited to hear back from John Doe

13   and his security POC, right?  No.

14           Well then, of course, he reached out to the FBI to

15   tell them that he had been approached by at least two Chinese

16   IOs who were soliciting him to commit espionage against the

17   United States, right?  No.

18           So, of course, he reached out to someone, anyone to

19   tell them about this, right?

20           If we could go to 6-1.

21           We know what the defendant did approximately an hour

22   after that text message.  And it wasn't to notify anyone about

23   what was going on.  We know about his trip to the FedEx and

24   what's contained in that envelope.

25           Now, before we get to that, I want to talk to the law

1    just a little bit.

2           Now, at the end of the closing arguments Judge Ellis

3    will instruct you on the law and how to apply it in arriving at

4    your verdict.  The judge will instruct you that the defendant

5    is charged with violating a particular criminal statute, 18

6    U.S.C. 794, in three different ways.  He is charged with

7    delivering, attempting to deliver, and conspiring to deliver

8    national defense information to representatives, officers,

9    agents, employees, subjects, and citizens of the People's

10   Republic of China.

11          The judge will also tell that you that national

12   defense information, or what we call NDI, means information

13   that is both closely held and could potentially be damaging to

14   the United States or could be useful to a foreign nation.

15          Now, the intelligence community witnesses in this

16   case made it clear that the classified information the

17   defendant passed and attempted to pass was NDI.  As you heard

18   from Mike Higgins, the two DIA documents in this case were

19   closely held and their release could harm the United States or

20   be valuable to a foreign government.

21          Nancy Morgan said the same thing about the six CIA

22   documents.

23          And while the defense witness, Harry Cooper, tried to

24   rebut some of that information, he was left to admit that the

25   only two documents he looked at were DIA documents, though his

1    experience was at the CIA.  He even admitted that he didn't

2    look at the DIA classification guide or any DIA reporting when

3    he made his assessment of Document No. 1.

4              Now, Judge Ellis will also tell you that with regard

5    to the charge to conspiring to deliver national defense

6    information, that criminal conspiracy is an agreement or a

7    mutual understanding knowingly made or knowingly entered into

8    by at least two people to violate the law by some joint or

9    common plan or course of action.  A conspiracy is, in a very

10   true sense, a partnership in crime.

11             Did we prove that?  Well, you saw those WeChat

12   messages between the defendant and Michael Yang.  You couldn't

13   have a much more vivid example of two individuals agreeing on a

14   criminal purpose and pursuing it together.  Truly a partnership

15   in crime.

16             Finally, attempt.  In order to prove that the

17   defendant attempted to deliver NDI, one of the things the judge

18   will tell you is for attempt, the Government must prove that

19   the defendant did some act that was a substantial step in an

20   effort to bring about or accomplish the crime.

21             The judge will also tell you that a substantial step

22   is more than mere preparation, but less than completion of the

23   crime.

24             So with those definitions in mind, let's go back to

25   the FedEx store on April 25 and to some of the substantial

1    steps that the defendant took and was about to take.

2          One of the interesting things about that video that
3    I'm sure you recall was how long the defendant was there, over
4    an hour.  But it took a long time to do everything he wanted to
5    do.  He had to handwrite those eight cover sheets.  He had to
6    handwrite a Table of Contents for all the documents.  He had to
7    get the classified documents scanned in at the FedEx.  He had
8    to pay for that and to put them on a micro SD card, and to pay
9    for their shredding.

10         Ladies and gentlemen, do those sound like substantial
11   steps?  And not only were they substantial, they were
12   completely contrary to the defense argument.  If the
13   defendant's intent was really just to send one worthless
14   document as a lure to Michael Yang, then he would only need to
15   scan one document.  And he could have done that from his house.
16   He had a scanner there, as you heard.

17         If he really planned to tell the Government
18   everything anyway, then why should he care about what evidence
19   would be found at his house?  The fact that he tried to conceal
20   his actions by going into a FedEx store and paying cash, tells
21   you everything you need to know about the defendant's intent.

22         So with that SD card containing classified government
23   documents that he was never authorized to have in the first
24   place, the defendant leaves the FedEx.  Over the next several
25   days, the back and forth text messages with John Doe continue.

1  Finally, on April 29 John Doe says that he has passed on the

2  defendant's request.  April 29, ladies and gentlemen.

3          So at this point, knowing that he will be able to

4  talk to someone at the CIA, the defendant waits for the meeting

5  so he can reveal everything, right?  I mean, he wants to help

6  the U.S. government, right?  And it looks like a meeting at CIA

7  is going to happen.  And even though he has got those

8  classified documents on that tiny little SD card, he hasn't

9  sent them yet.

10          In fact, that's not the case.  On May 1, as you saw,

11  he told Michael Yang on that CovCom device that they will need

12  to go "step by step in my getting the document to become part

13  of the image."

14          As you heard, the defendant was successful in sending

15  that white paper, Document No. 1.

16          As you also heard, on the evening of the next day the

17  defendant texted John Doe to tell him, "finally made contact."

18  That was May 2.

19          So all of the defendant's efforts to get in touch

20  with someone at CIA had succeeded.  He had a meeting scheduled

21  with Mike Dorsey, he could come in and tell the truth.

22          And the following day he got some information that

23  the CIA was really going to be interested in.

24          Can we pull up 8-6.

25          Having sent that first classified document to Michael

1    Yang, the defendant got some feedback.  Number one was that

2    white paper, the DIA document related to the Johnsons.  Michael

3    Yang wanted more, more detailed and more complete.

4             Now, ladies and gentlemen, as you heard in the

5    opening, the defense's argument comes down to the claim that

6    this was all done by the defendant as a lure to hook Michael

7    Yang for the benefit of the United States government.

8             Well, as of about 10:43 p.m. on May 3, 2017, I think

9    that we can all safely confirm, mission accomplished.  Michael

10   Yang has been hooked.

11            So now the defendant tells the government about it,

12   right?  A pitch like this can slip away.  Isn't that what the

13   defense said?  He had to act quickly.  And if he had to act

14   quickly to hook Michael Yang for the benefit of the U.S.

15   government, don't you think he would act quickly to tell the

16   U.S. government?  A pitch can slip away.

17            Instead, as you heard, the defendant asked to delay

18   the CIA interview so he could have shoulder surgery.

19            Ladies and gentlemen, none of these defense arguments

20   are true.  The defendant never wanted to help the U.S.

21   government.  He never wanted to reveal what he was doing.  He

22   wanted to sell as much classified information for as much money

23   for as long as he possibly could.  And if he got caught, he was

24   hoping to have one last card to play.

25            So when Michael Yang asked for stuff that was more

1    detailed and more complete, the defendant complied.  And in

2    doing so, he did something that was absolutely chilling.

3            To understand why, let's think about what he had

4    already sent.  He had already sent the white paper, a virtual

5    executive summary of what was in the DIA PowerPoint, as Bob

6    Ambrose testified.

7            But this was real information about real human

8    assets, the Johnsons, who could be put at risk.  The defendant

9    knew these were real people, he was their handler at one time.

10   He had stayed in touch with them after leaving DIA even though

11   that was strictly prohibited.  He even knew they were planning

12   to take a trip to China that summer.

13           Can we pull up -- Government's Exhibit 3-26 are the

14   LinkedIn messages between the defendant and the Johnsons.  And

15   when you take this back in the jury room, you will see that

16   between around March 28 and March 29 the defendant had

17   approximately nine communications with the Johnsons.  This was

18   right between his two trips to China.  Coincidence?  It sure

19   seems unlikely.

20           So let's go back to the chat messages at 87 to 88.

21   On May 5 at around 6 p.m. the defendant did everything he could

22   to send more information about the Johnsons to Michael Yang.

23   That first redacted document was the PowerPoint that dealt with

24   the Johnsons and the proposed operation in China.

25           Insofar as the defendant knew, because he went

1   through all the effort to send this, Michael Yang now had more

2   complete, more detailed stuff about the Johnsons.  Real people

3   who are now in danger from the Chinese government because they

4   had tried to help this country.  That is why these actions were

5   so unbelievably chilling.

6            And here is something else that is very revealing

7   about the defendant.  While he couldn't care less about the

8   Johnsons, when it came to his own skin, well, that was a

9   different story.

10           If we can go to 68.

11           Remember how he talked in there about how "there is

12   info in the docs that could lead back to me.  I will not take

13   that chance."

14           And what was that info?  It was the 14th page of the

15   PowerPoint, Document No. 2, the one about the Johnsons that had

16   his name on there.  He wasn't willing to send that information

17   to Michael Yang.  He cut that off on the CovCom.  That's where

18   this defendant draws the line.

19           And when the defense inevitably tries to argue that

20   the white paper and the PowerPoint really weren't that

21   chilling, and it really wasn't that big of a deal, and the

22   Johnsons really weren't in any danger, just think about what

23   the defendant said to Michael Yang in the chat we just looked

24   at.  He was clearly not comfortable having his name on any

25   documents that were passed, even if it was just a first name.

1    And he is an experienced ex-spy.  He knows that the

2  capabilities of the spy services for China and the United

3  States are immense.  Immense enough to take a few small bits of

4  information and to piece them together with other information

5  they have collected in order to understand backgrounds and

6  connections and identities.

7    Remember what Mike Higgins said?  "The net of

8  suspicion is cast wide."

9    And consider this.  Don't you think that the

10  defendant is smart enough and experienced enough to write up

11  something fake that would be appealing to these Chinese IOs?

12  Don't you think he could gain their interest and their trust

13  without really sending classified information if it was only

14  going to take one document?  Why would he need to send

15  classified to China, which is a crime, by the way, if his

16  ultimate aim was to tell the U.S. government.  And if his aim

17  was really to help the U.S. government, why write up any

18  document at all?

19    As soon as you get back here in April from China,

20  take the CovCom device, the phone, to the CIA or DIA or FBI and

21  say, here you go, you are now Kevin Mallory, take this with my

22  blessing, impersonate me, set up the best double-cross in the

23  history of espionage.

24    But of course, he didn't do that.  And he didn't do

25  that because his intent was never to help.  It was never to

1   tell the truth.  His intent was to lie.

2        And that takes us to May 12.  And there is one thing

3   to keep in mind about that interview with Mike Dorsey when the

4   defendant talks about toll records and text messages and the

5   lengths of phone calls.  The fact is, those communications did

6   only one thing, help the defendant set up the meeting.  Mike

7   Dorsey was the guy.  Ralph and John Doe, they were simply

8   conduits.

9        And having gotten in front of Mike Dorsey, the

10  defendant now at someone at CIA to talk to about what was going

11  on in China.  He could do it at the CIA in a secure space

12  behind closed doors.

13       Did he finally tell the truth?  Well, recall the clip

14  where Mike Dorsey asked the defendant point blank if he sent

15  those IOs anything on the CovCom.  And he said, "just some

16  tests."

17       And then we get to this exchange.

18       NOTE:  An audio recording is played.

19       MR. GIBBS:  That clip pretty well sums up May 12.

20  And remember, the white paper that he sent, that was 11 days

21  before that interview.

22       So at this point the Government still doesn't know

23  what classified information the defendant has sent.  But if you

24  choose to believe what the defendant said, he hasn't sent

25  anything classified.  Nonetheless, he does agree to a second

1    meeting where he will bring the phone in.

2         Now, this gets back to a question I asked earlier,

3    why would he do that?  Why would he bring in the very device

4    that he was using to commit these crimes so the government

5    could inspect it?  Well, the defense is going to argue that

6    this is Exhibit A for why the defendant wanted to help the

7    government.  But that can't be it.  If you wanted to help the

8    government, you wouldn't bring in the key piece of evidence and

9    then lie repeatedly about what was on there.

10        No.  The reason the defendant agreed to bring in the

11   CovCom is because he thought it was secure, that the bubbles

12   dropped away after a period of time.  That if someone walked up

13   on you while you were in secure mode, they disappeared.

14        And that is not a crazy conclusion to reach.  This

15   device was very hard to crack.  How much testimony in this

16   trial did you hear from Paul Lee, Jim Hamrock, and Matt

17   Whatley, the defense expert, about the inner workings of the

18   CovCom?  The testimony was dense, it was complex, and it was

19   technical.

20        And we didn't present that testimony to you because

21   we were trying to confuse you or bore you.  We did it to show

22   how secure this really was.  And the defendant thought he could

23   use that colon and that exclamation point as a shield.

24        So when he showed up at that hotel in Ashburn on

25   May 24, he carried that CovCom device with him firmly convinced

1    that he could tell these young FBI agents whatever he wanted to

2    with impunity.

3              Now, let's talk about the CovCom device for a minute.

4    Now, this is a chart, it is a demonstrative, it will not go

5    back to the jury room with you, but it builds off of the

6    testimony of Jim Hamrock, Paul Lee, and Steve Green.  Moving

7    left to right on the chart, we see our familiar date of

8    4/25/2017.  And then those times around 4 p.m. when the

9    defendant was at the FedEx.

10              In the third column, we see the names for all the

11   eight documents that the defendant wrote out so he could send a

12   Table of Contents and eight cover sheets to Michael Yang to let

13   him know what he would be selling him.

14              We see the file names he saved them with on the

15   Toshiba.  And the file names the scanner at FedEx gave them.

16   Year, month, day, time.

17              And then we see what was found on the CovCom device

18   itself, whether it was a partial or complete document, and

19   whether it was just a cover sheet.

20              And finally, we see the classification of all those

21   documents.

22              And then we get to the last column, and the testimony

23   of Jim Hamrock who testified about the number of times that the

24   defendant went through every single step, the send sequences as

25   he called them, necessary to send a document.

1          In the case of Document No. 4, the one that the CIA

2     viewed as the most alarming, the defendant attempted to send

3     that one four times.

4          So a couple things to point out.  First, when the

5     defendant attempts -- when the defense attempts to play up the

6     fact that Document No. 1, the white paper, was the only

7     document we can all agree was actually sent, keep in mind,

8     that's all you need to convict the defendant of Count 2 of the

9     indictment.  That was delivery of national defense information.

10    You heard that it was NDI.  And you heard that it was sent

11    using the CovCom to a citizen of China, Michael Yang.

12         But who are we kidding?  Based on the evidence in

13    this case, you could easily conclude that Michael Yang was not

14    just a citizen of China, he was a Chinese IO.

15         Second, when you think about this chart, the word

16    that should come to mind is "attempt."  Remember what I said

17    about the jury instructions you'll hear?  A substantial step.

18    How would you characterize all the steps the defendant took to

19    hide the documents, scan the documents, shred the documents,

20    name the documents, move them across two SD cards and a

21    computer, and then send or attempt to send them to Michael

22    Yang?  Sometimes multiple times.

23         Ladies and gentlemen, that is substantial.  Those are

24    attempts.  And for that matter, all of those many steps

25    represent overt acts in furtherance of the conspiracy that he

1   and Michael Yang were engaged in.

2           Last point on this.  If the defendant only succeeded

3   in passing the white paper because Michael Yang wasn't online

4   at the same time, it wasn't for lack of effort on his part.

5           If we can pull up 100 to 115, please.

6           Remember this exchange?  What comes through in this

7   message is that the defendant is mad.  The defendant tried very

8   hard on multiple occasions to deliver more than one classified

9   document.

10          Now, unfortunately for the defendant, a few weeks

11  after those chat messages with Michael Yang, he learned that he

12  was wrong about one other thing related to the CovCom device.

13          You can take that down.

14          His chat history didn't always disappear.  And yet,

15  even when he knew that he was wrong, he still wouldn't tell the

16  truth.

17          8-3 is the picture that Paul Lee took of the CovCom

18  device and the messages displayed on there.  And when the FBI

19  agents pressed him about that message, he tried to explain it

20  away by saying it had "something to do with me pitching or then

21  talking about something like terrorism or something like that."

22          So another three-plus hours of questioning goes by,

23  and the defendant tells at least two lies to the FBI that are

24  charged as false statements in Count 4.  That he falsely said

25  he only provided the Chinese IOs with two unclassified white

1    papers, and that he said he only sent one text message using

2    the CovCom device.  Those statements are demonstrably false,

3    and you should have no trouble finding the defendant guilty of

4    them.

5           But the defendant has managed to avoid telling anyone

6    in the U.S. government about what he had really been doing in

7    China or what he had really sent with the CovCom device.  And

8    when he leaves the interview, he takes the CovCom with him.

9           But one thing has changed at this point.  He now

10   knows that the FBI can see at least some of the messages on

11   there.  The problem for him is he doesn't know how much the FBI

12   can see.  Maybe it was just that one message we just looked at,

13   8-3, that he tried to talk his way out of.  But he is not going

14   to take any chances.

15          So what does he do?  Well, he does something that

16   once again undercuts the argument that this defendant really

17   wanted to help.  Because this defendant, a former intelligence

18   officer, knows that the worst thing you can do in a double

19   agent operation is to make the target feel uncomfortable,

20   compromised, or unsafe.  And yet he takes the CovCom device

21   that they given him and he deletes the WeChat application, the

22   very application that had been trained on so he could send them

23   classified information.

24          And two days after talking to the FBI, he e-mails

25   Michael Yang to say that he needs to talk to him on Skype

1   because he was "having problems with WeChat."  I bet he was

2   having problems with WeChat.

3           Now, realistically, all we can show is that the

4   WeChat app was deleted sometime between May 24 and June 22.

5   This is a very complex device, remember?  But don't you just

6   bet that the defendant left that meeting on May 24 freaked out

7   because the phone could give him away and deleted the app.  But

8   in deleting it, he risked alerting the Chinese IOs to the fact

9   that they were compromised.

10          What do you think he said in that Skype call about

11  the problem?  Was he really so sure the Chinese couldn't

12  remotely figure out that the app had been deleted?  Wouldn't

13  they be troubled that the app the defendant was supposed to use

14  to send them classified information, detailed and complete

15  stuff in Michael Yang's words, was now disabled?

16          And that wasn't the only thing the defendant did to

17  spook Michael Yang and his bosses.  Remember the communication

18  about the Customs stop where the defendant lied and said that

19  over 19,000 in cash had been seized?  He even threw in that

20  little tidbit at the end about how if they had found the SD

21  card, we wouldn't be talking now.

22          Would a former CIA case officer really say something

23  like that to a potential target?  Because make no mistake, the

24  defendant had now let Michael Yang know at least two important

25  things or believe two important things.  One, the government

1   was suspicious enough of the defendant that they had a basis to

2   seize almost $20,000 in cash.

3           And two, the defendant was sloppy enough to risk

4   seizure of an SD card with damaging state secrets on it.

5           Can you pull up 126 to 129.

6           Is there any wonder the Chinese IOs took this so

7   seriously?  And interestingly enough, now that the defendant

8   knows that the FBI has an image of his phone, and now that he

9   knows that they have at least one very incriminating

10  communication on there, the contacts with the U.S. government

11  completely stop.

12          Does this sound like a defendant who wants to help

13  the government?  A pitch can slip away.  How long does it take

14  for a pitch to slip away?

15          Can we pull up 3-21.

16          But while the defendant stops communicating with the

17  U.S. government, he is more than happy to communicate with the

18  Chinese government.  He is still making plans for a third trip

19  to China.  And he still has all those classified documents on

20  that SD card.

21          Now, ladies and gentlemen, as you heard, that SD

22  card, well hidden as it was, was fortunately discovered on

23  June 22.  But there are only a few reasons to hang onto

24  something that incriminating.  One might be to give it to the

25  U.S. government, but clearly that wasn't what the defendant

1    intended.

2            Another might be to sell it to a willing buyer.  Do

3    you think that might have been the purpose with another trip to

4    China in the works?  Because make no mistake, this defendant

5    knew how to get rid of evidence if he needed to by shredding,

6    by deleting, by downloading a program to completely wipe a

7    computer.  And it wouldn't be very hard to flush that tiny SD

8    card down the toilet.

9            But of course, the SD card was the only place left

10   where he still had access to those classified documents.  So he

11   wrapped it in foil and he put it in that drawer with all the

12   gobbledygook, and he bided his time for that next trip to

13   China.

14           And that leads to one more question in this case.

15   How did the defendant get these classified documents?  When did

16   he get them?  Where was he keeping them all that time?  He left

17   government for the last time over five years earlier.  However

18   he did it, he was able to take classified documents belonging

19   to the CIA and to DIA to that FedEx store on April 25.

20           Are we expected to believe that he was just holding

21   them for safekeeping until it was time to get the U.S.

22   government to bless his business deal with the Chinese

23   government?  That it would be okay to sell them to a foreign

24   adversary of this country and then come in after the fact and

25   tell the U.S. government about it?  That's absurd, to use a

1    term that I used earlier in my closing.

2              This case is exactly what it looked like, a defendant

3    who was going to break the law and try to make as much money as

4    he could from the Chinese government until he got caught.  And

5    when he did get caught, he would point to his alarming

6    communications with a couple of CIA employees and the

7    lie-filled interviews from May and say, see, I was trying to

8    help.  It's complete and utter nonsense.

9              The reason you are hearing about this defense today

10   is because the defendant was arrested on June 22, 2017.  If he

11   had been arrested a year later, we all would have heard about

12   it a year later.  And if he had gotten his wish and hadn't

13   gotten caught at all, we never would have heard about this.  He

14   would have continued to sell government secrets.  Government

15   secrets that he had taken an oath to protect.  Government

16   secrets that he had stolen.  Government secrets in his head.

17   He would have continued to make money from the Chinese

18   government.  He would have continued to betray his country.

19             Thankfully, this didn't turn out the way the

20   defendant wanted.  Thankfully, he was stopped when he was.

21             But, ladies and gentlemen, for all the actions in

22   this case and for all the things the defendant did in this

23   case, you should find the defendant, Kevin Mallory, guilty of

24   all charges in this indictment.

25             Thank you very much.

1          THE COURT:  Mr. Kamens, are you ready to make your

2    closing argument?

3          MR. KAMENS:  Thank you, Your Honor.  If the

4    demonstrative could be handed out.

5          THE COURT:  All right.

6          Ladies and gentlemen, this is demonstrative evidence,

7    so it won't go to the jury room with you.  In other words, it's

8    an exhibit given to you to aid him in his argument.

9          All right, you may proceed.

10          MR. KAMENS:  Ladies and gentlemen, the only reason we

11    are here is because Kevin Mallory knocked on the door of the

12    CIA.  And he kept knocking, repeatedly and persistently, until

13    he was able to share what he found out.

14          Kevin Mallory gave to the CIA and the FBI something

15    that was incredibly valuable, a cell phone that a Chinese

16    intelligence agency had altered to include a custom

17    application.  The prosecutor just told you that it was a really

18    big deal.

19          FBI Special Agent Lee said it was an item that U.S.

20    intelligence seldom gets to see.  Agent Lee said he wouldn't

21    have been able to find the program or know how to use it if

22    Kevin Mallory hadn't told him how to do it.

23          Kevin turned over that phone on May 24, 2017, but he

24    had been knocking on the door of the CIA since February when he

25    was first contacted out of the blue on LinkedIn by a Chinese

1    headhunter.

2           Now, compare that with what Kevin actually gave to

3    the Chinese.  All of the forensic evidence, the chats using the

4    custom application, the WeChat logs, the log files from the

5    phone, they show that Kevin Mallory sent three things using

6    that phone:  A hand written Table of Contents, the white paper,

7    and two pages of illegible handwritten notes.  All perfectly

8    worthless to China, all perfectly harmless to the United

9    States.

10          What did he give and what did he get?  That is the

11   easiest way to understand what happened in this case.  This

12   wasn't a conspiracy with a Chinese intelligence agent.  This

13   was an intelligence operation against the Chinese.  Kevin

14   Mallory ran his own operation against China to help the United

15   States and to help himself.

16          There is no other explanation for why Kevin sent the

17   Chinese not a real U.S. document, but the white paper, a

18   one-page typed document that he created himself with fake

19   classification markings on the top and bottom that he had

20   marked out.

21          There is no other explanation for why Kevin Mallory

22   sent two pages of handwritten, unclassified, illegible notes.

23   There is no other explanation for why Kevin would reach out to

24   the CIA repeatedly and persistently.  And there is no other

25   explanation for why he would turn over that Samsung Galaxy

1    phone, tell the CIA and the FBI how to use it, give them the

2    password, allow them to copy all of the data, including the

3    WeChat custom application.

4          For all of the things that the prosecutor just told

5    you, he can't explain any of those things.  He can't explain

6    those things because they prove that Kevin Mallory's intent was

7    not to harm the United States or to help China.  And because

8    that was not his intent, he is not guilty of Counts 1, 2, and

9    3.

10          Let me talk about the initial contact from the

11    Chinese.  Kevin didn't go looking for contact.  He was given a

12    LinkedIn direct message from a Chinese job recruiter named

13    Richard Yang from Darren & Associates.  Contacted Kevin in

14    early February.  Kevin wrote him back on February 9.

15          And or about February 23 Richard put Kevin in touch

16    with Michael Yang, who said he was from a Chinese think tank,

17    The Shanghai Academy of Social Sciences.  They had a telephone

18    interview.  Kevin took notes.  And it included all of the

19    topics that Kevin told the CIA and the FBI about.

20          On February 24 Kevin asked Michael to make travel

21    arrangements to Shanghai.  But Kevin also did something else.

22    On February 22, two days earlier, Kevin sent a series of text

23    messages to an acquaintance from church who he knew worked at

24    the CIA, Ralph Stephenson.

25          As you heard, this unnerved Mr. Stephenson.  But the

1    fact remains that even before Kevin Mallory spoke to Michael

2    Yang on February 23, and before he had scheduled to go to

3    Shanghai for his first trip, Kevin was reaching out to the CIA.

4           In fact, on the same day that he made travel

5    arrangements, February 24, Kevin also called his former

6    colleague John Doe.  Kevin suspected from the very beginning

7    that this might not actually be a consulting job for a Chinese

8    think tank.  And since Ralph Stephenson didn't seem like he was

9    interested in helping, he contacted John Doe, his former

10   colleague at the Agency.

11          Kevin spoke to John Doe for 12 minutes on

12   February 24, for five minutes on February 27, and for

13   three-and-a-half minutes on March 1.

14          John Doe's memory of those calls was not particularly

15   clear, but he did say one thing.  He said he thought Kevin had

16   called to talk to him about getting his job or getting a job

17   back at the CIA.

18          But Kevin must have also discussed the contact from

19   China because in April when Kevin sends a text message after

20   his second trip to John Doe and asks him to "please go back to

21   your security point of contact to reach over to East Asia China

22   regarding the issue you and I discussed previously," he is

23   referencing those calls from February.

24          But as I said, even in February Kevin realized that

25   if this was actually contact from a Chinese intelligence

1    agency, he could potentially get real intelligence that would

2    be valuable to the CIA.

3              Michael Higgins, the Government's expert, said

4    neither the DIA nor the CIA would ever run an operation like

5    this with a civilian.

6              Kevin surely knew that.  But maybe, just maybe, as he

7    mentioned to John Doe, if he presented this operation with a

8    bow, he could get a job back at the CIA.

9              Let's talk about the trips to China.  There is

10   absolutely no evidence that Kevin disclosed anything of a

11   classified nature to the Chinese on his trips to China.  And

12   there is two things to suggest he didn't.  First, on March 13,

13   2017, while he is in China, he sent an e-mail with three

14   unclassified documents attached.  One is about CIA intelligence

15   analysis.  One is about military acronyms.  One is a profile of

16   a Taiwanese professor.

17             Michael Higgins testified that that is indicative of

18   something early on in recruitment, that's typically when a

19   person is asked to send unclassified documents.  But it also

20   suggests that Kevin, who suspects that this might be contact by

21   Chinese intelligence officers, is trying to see if Michael Yang

22   will bite on something and will reveal that he is a Chinese

23   intelligence officer.

24             But either way, it's clear that at that point this

25   relationship hasn't progressed to the point where the Chinese

1    are asking Kevin to turn over classified documents.

2         Second, ladies and gentlemen, he got about $10,000

3    for that first trip, and about $15,000 for the second trip.  He

4    was open about this in his interviews.  It has been confirmed

5    by the deposits into his accounts.

6         No one sells national defense information for

7    $25,000.  That is pocket change in exchange for the risk of

8    conviction of one of the most serious crimes that we have.

9         Criminal trials are not guessing games where guilt

10   can be based on what the Government thinks might have happened

11   but doesn't have evidence of.  And the fact is, there is no

12   evidence that Kevin ever disclosed any classified information

13   on those two trips to China.

14        And Kevin wasn't completely without financial options

15   in the spring of 2017.  You heard that the Morman Church helps

16   members who have fallen on hard times.  That Mr. Mallory's

17   family is actually being assisted by the Morman Church.  Ralph

18   Stephenson testified that he signed the checks.

19        Let's talk about the law for a moment.  To commit the

20   crime of selling secrets to China, you have to send national

21   defense secrets to China, and you have to do it with the

22   intention or the reason to believe that what you were sending

23   will be used to harm the United States or help China.

24        Count 1 charges conspiracy to sell secrets.  To do

25   that, you have to have a meeting of the minds.  You have to

1    have an agreement to break the law.  Conspirators are partners.

2    But you can't conspire with someone that you're deceiving about

3    the very thing you're supposed to be agreeing upon and

4    conspiring about.

5            If I offer top secret documents to a Chinese

6    intelligence agent and I know they're fake, that's not a

7    conspiracy.  That's a counterintelligence operation.

8            Second, Kevin Mallory contacted the CIA from the very

9    beginning, kept trying to set up a meeting.  He finally met

10   with the CIA and FBI and turned over the Samsung phone that he

11   had received from the Chinese.

12           But there is not one piece of evidence that Michael

13   ever told the Chinese about the CIA and the FBI.  If Kevin was

14   working with the Chinese, there would be some evidence that

15   Kevin told them about his contacts.  But there is absolutely

16   nothing.

17           Even after the May 24 interview when Kevin sends an

18   e-mail to Michael Yang to set up a call to see if he is still

19   interested, Michael doesn't do anything to suggest that he

20   thinks he's been blown or that he knows what's going on.  He

21   doesn't delete his Google profile until the day that Mr.

22   Mallory's arrest is announced.

23           Third, even the prosecution's witnesses showed that

24   Kevin and Michael were working against each other.  You heard

25   Mr. Higgins, he said that Michael Yang was trying to manipulate

1   Kevin.  And the chats clearly show that Kevin Mallory was not

2   being straight with Michael Yang.

3           Finally, the prosecutor says that Kevin tried to sell

4   secrets to Michael and Michael Yang tried to buy them.  But

5   even if that were the case, it's not a conspiracy.  If I sell

6   you a car and you buy it, we haven't conspired to sell my car.

7           But in reality, Kevin Mallory was working against the

8   Chinese, against Michael Yang.  And we know that most clearly

9   because of what he sent to Michael Yang.  And what he sent was

10  worthless.  That is why Kevin Mallory is innocent of Count 1.

11          In Count 2 he is charged with actually delivering

12  national defense information.  But the only things that he

13  sent, the Table of Contents, the white paper, those two

14  unclassified, handwritten note pages, they were not national

15  defense information.  Kevin typed the white paper himself.  He

16  stripped out any real intelligence information, and it posed

17  absolutely no danger to the United States from its release.  He

18  tried to dress it up.  He tried to put lipstick on a pig.  And

19  he said to Michael Yang, this is a top secret document and I

20  have marked out the classification markings on that document.

21          The Government has tried to dress it up too.  And you

22  heard Michael Higgins say that this document is national

23  defense information because it reveals sources and methods,

24  that the release of this one-page document would cause harm to

25  national security.

1            Ladies and gentlemen, that white paper doesn't

2    identify any actual operation.  It doesn't mention the

3    Johnsons, or the code name for the Johnsons, or anything about

4    any asset.  And the type of source and method that is

5    identified in that white paper is something that is entirely in

6    the public record.  It's in a federal statute.  It's in

7    declassified documents.  It's in the statements of current and

8    former intelligence officers.

9            There is simply no way that the target of the white

10   paper or the country identified as Foreign Country A on the

11   Table of Contents, there is no way that those countries will do

12   anything different because of the release of these documents.

13           That's why the defense classification expert, Mr.

14   Harry Cooper, who recently retired from the CIA last year, that

15   is why he said to you that the disclosure of the Table of

16   Contents and the white paper would pose no harm to the national

17   security of the United States.

18           Mr. Cooper worked at the CIA for 28 years.  He rose

19   to be head of the Classification Management and Collaboration

20   Group, and for eight years was the only person at the CIA with

21   original classification authority who trained the other

22   original classification authorities and trained the Director of

23   the CIA on classification.  He helped draft the Executive

24   Orders that defined the standards of classification across the

25   government.  He represented the CIA on classification matters.

1   And he is the only expert in this trial who was an original

2   classification authority who actually used that authority to

3   make damage assessments.  He didn't simply apply classification

4   markings based on a guide.  He was able to determine the real

5   potential harm to the United States from the disclosure of

6   information.

7            Now, the prosecutor just told you, well, he was at

8   CIA and this is DIA information.  But the standards of

9   classification are uniform across the government.  There is one

10  Executive Order that defines the standards of classification.

11  There is one standard of harm.

12           And, ladies and gentlemen, you can look at that Table

13  of Contents, and use the standard that Harry Cooper told you,

14  look at that.  And if you can say -- so what.  You all have the

15  ability to look at that document and determine and know that it

16  would pose absolutely no harm to the United States from its

17  disclosure.

18           But Mr. Cooper also told you that the release of the

19  white paper wouldn't pose any danger to national security.  And

20  he said so because it is so general and refers to things that

21  are so well established in the public record.  The white paper

22  itself is a one-page generic description of what a generic

23  operation might look like.  Any specific information from

24  Document 2 was taken out so that the white paper says nothing

25  that you cannot find in the public record.  It was a ruse, it

1    was a fake, so that Michael Yang would think that Kevin Mallory

2    was willing to send him classified documents.

3         Now, the prosecutor just spoke to you about how

4    chilling it was that Mr. Mallory had a few e-mails with the

5    Johnsons.  But Document 2 was never sent.  There is not even a

6    send sequence on the cell phone logs to suggest that Document 2

7    was ever even potentially sent.  There is a chat that

8    references it, but the document that is identified in the logs

9    related to that send sequence, it's not Document 2.

10        The only things that were sent in this case were not

11   national defense information, and that's why Mr. Mallory is

12   innocent of Count 2.

13        But why did he send them?  Why did he send these

14   worthless documents?  Look at the timeline around April 24.

15   After two meetings in China, Kevin finally has something that

16   he can show the CIA.  But time is ticking.  Michael Yang has

17   just given him this special phone with a special app.  As Agent

18   Paul Lee said, it probably cost a lot of money to develop that

19   app.  But Kevin needs the CIA if this operation is going to

20   continue.  And if he plays his cards right, maybe he can be

21   hired on to run it.

22        So within 72 hours of his return, on April 24 Kevin

23   Mallory texts John Doe and he says, could you please go back to

24   your security point of contact to reach over to East Asia China

25   regarding the issue that you and I discussed previously.  I

1    recently returned from another business trip over there and was

2    again approached in a manner from their service.

3            John Doe doesn't respond.  And time is ticking

4    because Michael Yang has given him this special phone and is

5    expecting documents.  That's when Kevin Mallory comes up with a

6    backup plan to make his own passage material to keep Michael

7    interested.

8            And so, on April 25, that's when he goes to the FedEx

9    store and he scans those documents onto the SD card.  But he

10   doesn't send them to Michael Yang on April 25, or April 26, or

11   April 27, or April 28, or April 29, or the 30th.

12           Now, put yourselves in the shoes of someone who wants

13   to sell secrets to China, who is actually intending to provide

14   classified documents to the Chinese government.  Why do you

15   wait?  Or if you're not going to send all of them, why not send

16   a real government classified document to show Michael Yang that

17   you are for real?

18           Kevin didn't do that because he was waiting for the

19   CIA.  Again, we're only here because Kevin knocked on the front

20   door of the CIA.  On April 26 Kevin leaves a voicemail for John

21   Doe.  And he says, "I sent you a text message a couple of days

22   ago, please look at the message, it's kind of urgent for me

23   because I've been over there again and I keep getting banged on

24   but in a little more detailed way."

25           John Doe writes back, says that he has been super

1   busy, hasn't been able to pass on the message, missed his

2   colleague, will try again tomorrow.

3           Kevin writes him back on April 26 saying, "I know

4   you're busy.  As I told you in the past, I suspected who they

5   are and didn't really know, but this time they were even more

6   suspicious with me.  This is obviously someone from their

7   counterpart to us."

8           On April 29 John Doe texts Kevin that he has passed

9   on the message.  But again, time is ticking.  And Michael Yang

10  isn't going to stay interested in this forever.

11          Still, Kevin waits.  He doesn't send the white paper

12  and the handwritten notes.  But on May 1 he can't wait any

13  longer.  He can't wait for the CIA to get back to him if he is

14  going to keep Kevin on the hook.  And so, he sends three

15  documents that posed absolutely no harm to the national defense

16  of the United States, the Table of Contents, the white paper,

17  and those two handwritten pages of gibberish.

18          On May 2 Michael Dorsey from the CIA finally gets

19  back to Kevin.  The problem is that the CIA waited so long to

20  get back to Kevin Mallory, that he is now scheduled for

21  surgery.  You remember Michael Dorsey said he had surgery that

22  first week in May.  Dorsey doesn't get back to Kevin until

23  May 2.  He has surgery scheduled for a day or two later.

24          So they schedule the meeting for May 12.  But Kevin

25  has to keep Michael Yang interested if this is going to be an

1    ongoing operation.  So he tried to do so by playing a role.

2    Kevin told Michael Yang that he worked for the DoD.  He implied

3    that he had recently smuggled out documents from the

4    government.  He told him he had a bank account not in his true

5    name.  He told him the classification markings on the white

6    paper were Top Secret and he'd marked them out.  He told them

7    that his money had been seized by Customs and Border

8    Protection.  None of these things were true, but if he got the

9    CIA on board quickly, they could all appear to be true.

10            Now, why would Kevin Mallory tell the Chinese about

11   the CBP stop?  Well, Kevin is a former CIA case officer

12   specializing in human intelligence.  Michael Yang had just

13   given him this super special Samsung phone with this covert

14   application on it.  If the Chinese were surveilling Kevin

15   Mallory, if they were watching him at the airport and they knew

16   he was taken out of the ordinary Customs line for

17   two-and-a-half hours, Kevin's failure to mention that would be

18   a tip-off.

19            Now, the prosecutor is right, Kevin Mallory didn't

20   tell the CBP officers, hey, I just got this new custom phone

21   from Chinese intelligence officers.  CBP officers were not the

22   proper audience for that information.  But when they asked him

23   how much money are you carrying, he said honestly, how much

24   money, 13 or $14,000.  He didn't try to hide that.  And they

25   allowed him to amend the form.

1           When the prosecutor said that he lied about how much

2     money he was carrying, it's just a little mark on the CBP form.

3     When he was asked, he was honest.

4           Now, the prosecutor showed you a number of the chats

5     on the phone as if they reflect Kevin Mallory's real

6     intentions.  Such as where Kevin says various things, playing

7     the role that he was.  But Kevin's real intentions are clear

8     because he told the CIA and the FBI about the Chinese, but he

9     didn't tell the Chinese about the CIA or the FBI.

10          You can also see Kevin's intentions by comparing what

11    he sent to Michael Yang, worthless documents.  And what he

12    received and turned over to the FBI, the Samsung phone with the

13    custom app.

14          Now, the prosecutor said the only reason that Kevin

15    reached out to John Doe when he returned from the second trip

16    was because of that stop at CBP.  But that makes no sense.  If

17    Kevin was spooked, if he was really in cahoots with the

18    Chinese, he would have thrown that Samsung phone in the Potomac

19    and he never would have used the phone to send anything to

20    Michael Yang on May 1.

21          Kevin had also been reaching out to the CIA since

22    before his first real contact with Michael Yang.  When he

23    finally had something to show the CIA, he kept knocking on that

24    door until they agreed to met with him.

25          But Kevin also continued to communicate with Michael

1    Yang because he recognized a potential opportunity, an

2    opportunity to get valuable intelligence for the United States,

3    and possibly an opportunity for him to get a job back at the

4    CIA.

5            As you know, it didn't work, but that doesn't change

6    the fact that Kevin Mallory didn't conspire with Michael Yang

7    to send national defense information to China.  And he didn't

8    actually send national defense information to China because

9    what he actually sent to China was essentially worthless.

10   That's why he is innocent of Counts 1 and 2.

11           Now, let's talk about Count 3, attempt.  First,

12   everyone agrees that you can't tell whether a document was

13   delivered using that phone unless you look at the chats, the

14   log files, send sequences, and the WeChat records, the WeChat

15   logs.

16           The defense cell phone expert, Matthew Whatley,

17   explained that the log files don't prove that any user actually

18   attempted to send a document because a user could simply be

19   familiarizing themselves with the phone when it is in airplane

20   mode or, he said, even trying to make it look like they were

21   executing a send sequence in case that phone was ever monitored

22   or was reviewed for the log files.

23           But this is important.  The prosecutor's cell phone

24   expert, James Hamrock, said that he could tell that those log

25   files on the phone were actual attempts to send documents.  But

1    he made a basic and fundamental mistake.  He didn't use the

2    real Samsung phone to test what it did.

3           He testified about the steps that it takes to use the

4    custom app to combine a document with an image, marry them

5    together and send them.  To do that, he took a forensic image

6    of that phone, he put it on another phone, and he tried to test

7    it in a controlled environment.

8           But this is what he testified.  He said, as soon as

9    he hit in the password and it comes up with the exclamation

10   point, it's been hooked, but it realizes it's not communicating

11   out on WeChat to the other individual, so it crashes.

12          In other words, he said that if you tried to put in

13   the password in the custom app to get into secure mode, but you

14   are not connected on the Internet, you're not connected with

15   another person in a chat, such as if it's in airplane mode, he

16   said the system crashes.  That's why he told you that every one

17   of those send sequences was an actual attempt to send because

18   he thought you couldn't get into secure mode unless you were

19   actually communicating with another person.

20          Do you recall that testimony?  He said that's why you

21   know that Kevin Mallory tried to send Document 4 four times,

22   because there were four log files on the phone.

23          Ladies and gentlemen, that is all completely false,

24   and I will show you why.  During the May 24 interview, the

25   actual Samsung phone was carefully put in a special bag -- do

1    you recall, they called it a Faraday bag, so it couldn't hook

2    up to the Internet when it was turned on.  And when they did

3    turn it on, they were very careful, as you recall, Paul Lee

4    said, to put it in airplane mode.

5            Then Kevin showed the FBI how to open up the custom

6    app, how to put in the password and get into the secure area of

7    the phone.  He did it with no problem.

8            In other words, the real Samsung phone didn't crash

9    even though it was in airplane mode when they got into the

10   custom portion of the app.

11           Take a look at this picture from the May 24

12   interview.  It shows a picture of the Samsung phone in the

13   secure custom app in airplane mode, not connected to anyone

14   else on WeChat.  That means as soon as you hit the password and

15   it came up with the exclamation point, it didn't crash even

16   when it was not in a chat with another person.

17           Mr. Hamrock was wrong because he didn't test the app

18   on a real phone, the Samsung phone.  It may have been a real

19   phone, but he didn't do it with the phone that Kevin Mallory

20   had.

21           As Mr. Whatley told you, the phone can be in airplane

22   mode and you can easily access the custom part of the app.

23           And so, a user can create as many log files as they

24   want.  They can do as many tests on the phone as they want, all

25   while knowing if they put it in airplane mode, that it will

1  never transmit anything to anybody.  What this means is that

2  those send sequences are not proof of attempts to send.

3        And the other evidence suggests that they weren't

4  actually attempts to send.  For example, there is nothing in

5  the chats that you saw where Kevin Mallory says, let's talk

6  about Document 4.  Or, do you recall that Document 4 that I

7  tried to send you four times?

8        You can also see in the chats that Kevin Mallory

9  makes it appear to Michael Yang as if he's trying to send

10  documents, but then he doesn't actually do it.  So starting at

11  6 o'clock in the evening on May 5, Kevin sends messages while

12  Michael Yang is not online, giving the impression that he is

13  sending things.

14        Then there is clearly what appears to be a

15  prearranged meeting.  At 8:06 Kevin says:  Here.  And then at

16  8:08 Michael says:  Hi.  Then Michael says he didn't get any of

17  the messages and to resend them.  But Kevin says he has to go,

18  he will be back in 25 minutes, something came up.

19        Mr. Hamrock also testified that log files showing

20  send sequences were created at that time on May 5, but none of

21  those log files matched anything.  And because Michael Yang

22  wasn't online, and Kevin Mallory knew that he wasn't online and

23  he couldn't transmit any documents, nothing was sent to Michael

24  Yang on May 5.

25        Michael Yang probably realized that Kevin wasn't

1  going to send anything real, and he basically cuts off

2  communication by the end of May 5.  Someone who wants to sell

3  classified documents, who has the purpose of betraying their

4  country, would have said at that point, Mr. Yang, here is a

5  real classified document to show you that I'm for real.

6          Kevin didn't do that.  He set up a meeting with the

7  CIA.  Before that first meeting with the CIA, Kevin Mallory

8  doesn't destroy the phone or update WeChat, which we heard

9  would have wiped the custom app off the phone.  He tells

10  Michael Dorsey about the phone.  He describes Michael Yang.  He

11  talks about the information he decided was their recruitment

12  effort.  He talks about their trade craft.  And he describes

13  how to use the custom app on the phone.  He also agrees to go

14  to that second meeting on May 24 and bring the phone.

15          Now, someone who is acting with the purpose of

16  harming the United States or helping China by selling national

17  defense secrets, they would never in a million years do these

18  things.  But Kevin did because he knew what he had gotten from

19  the Chinese was valuable.  And he thought he still might have a

20  chance of getting hired back at the CIA.  That's the only

21  motive that makes any sense.

22          Now, let's talk about Count 4.  Kevin is charged with

23  lying at the May 24 interview because he didn't tell the FBI

24  what he had sent on the phone.  Specifically he is charged with

25  not telling the FBI that he had sent two classified documents

1    on the phone.

2            Well, first, at the time that he sent the Table of

3    Contents and the white paper, neither were marked, neither were

4    previous government documents, neither were classified.  So

5    Michael didn't send classified documents that were marked as

6    classified at the time that he sent them.

7            Now, Kevin obviously wasn't open in the interview

8    about his chats with Michael Yang or his transmission of the

9    Table of Contents or the white paper.  But for Count 4, what

10   Kevin actually said was true, he didn't actually send anything

11   from his old jobs.

12           And in fact, Kevin actually told Michael Dorsey at

13   the May 12 interview that he had sent something typed, it was

14   innocuous, he had sent something secure from the United States.

15   He is referring to the white paper.  And whether he took a long

16   time to say it or not, the disclosure of the white paper posed

17   no danger to the United States.

18           After the May 24 interview Kevin tried to check in

19   with Michael Yang to see if the Chinese were still interested,

20   but that was basically it.  There was no subsequent trip and

21   there was very little contact.

22           There is also no reason for Kevin Mallory to delete

23   WeChat and the custom app on the phone at that point.  He had

24   given the phone to the FBI on May 24.  He allowed them to copy

25   all of the data.

1    There was also no reason at that point for him to

2 contact the FBI or the CIA.  He had no new information to

3 provide.  And as you know, Kevin didn't get a job at the CIA,

4 but what he did get was valuable information and intelligence

5 that he turned over to the United States government.

6    As Mr. McLane or Mr. Vandiver might say, Kevin leaned

7 a little too far forward, he took an enormous risk on himself,

8 but his heart really was in the right place.  Given what he

9 actually sent to the Chinese, there is simply no evidence that

10 he had the purpose or reason to believe that what he provided

11 would harm the United States or help China.

12    Kevin may have been reckless, he may have had poor

13 judgment, he should never have tried to engage in his own

14 counterintelligence operation, but all of those things are

15 consistent with innocence, and none of those things are

16 consistent with guilt of these charges.

17    We all know that the United States is founded on the

18 rule of law.  That this is a country where we are innocent

19 until proven guilty beyond a reasonable doubt and where we have

20 a right to a trial with a jury, with a judge, to make sure that

21 the process is fair.

22    In this case there is enormous doubt because what

23 Kevin did was repeatedly and from day one try to get the CIA

24 interested and to pay attention to him so he could show them

25 what intelligence value he could provide.  We are here because

1    Kevin repeatedly and persistently knocked on the front door of

2    the CIA.

3            The fact that he sent the Chinese a fake document and

4    didn't send any real classified documents that could

5    potentially harm the United States shows his purpose and

6    intention not to harm the United States or help China.  The

7    fact that he sent two pages of handwritten illegible notes

8    shows he was trying to deceive the Chinese, not help them.

9            CIA classification expert Mr. Cooper, his testimony

10   shows that what Kevin actually sent didn't pose a risk to

11   national security.  And that shows that Kevin's intentions were

12   not to harm the United States and betray this country.

13           And Kevin's repeated and concerted efforts to reach

14   out to the CIA show what I said at the beginning of this trial,

15   that Kevin is a patriot, that he loves this country, and that

16   he was trying to help it, not harm it.

17           The easiest way to figure out this case, ladies and

18   gentlemen, is to put yourselves in the shoes of a person --

19           THE COURT:  Mr. Kamens, you can't argue that.  Come

20   to the bench.

21           NOTE:  A sidebar discussion is had between the Court

22   and counsel out of the hearing of the jury as follows:

23   AT SIDEBAR

24           THE COURT:  It is impermissible to argue, in effect,

25   how would you feel if you were in his shoes.

1          MR. KAMENS:  I am not asking the jury to do that.  If

2     I can -- I was going to say the easiest way to figure out this

3     case is put yourselves in the shoes --

4          THE COURT:  "Put yourselves in the shoes" is the

5     problem.

6          MR. KAMENS:  Of someone who was trying to commit

7     these offenses, and then compare that --

8          THE COURT:  Get rid of the "put yourselves in the

9     shoes" and I'll permit it.

10          MR. KAMENS:  Okay.  Thank you.

11          MR. GIBBS:  Your Honor, one other thing.  Mr. Kamens

12     earlier made a comment about the seriousness of this type of

13     offense.  It's getting awfully close to the line of arguing

14     penalty.  I didn't object, but I just want it noted because I

15     don't want him to go back and to somehow suggest that the

16     statute carries life in prison or a big sentence in jail.

17          MR. KAMENS:  We would never do that.

18          THE COURT:  All right.  He says he wouldn't do it.

19     So let's proceed.  And remember to ask excise from your

20     argument about ask them to put themselves in his position.

21          MR. KAMENS:  Understood.

22          NOTE:  The sidebar discussion is concluded; whereupon

23     the case continues before the jury as follows:

24     BEFORE THE JURY

25          THE COURT:  All right, Mr. Kamens, you may proceed in

1    accordance with the Court's instructions.

2            MR. KAMENS:  Ladies and gentlemen, the easiest way to

3    think about this case is to think of a person who wants to

4    conspire, who wants to deliver, who wants to attempt to deliver

5    national defense secrets to China because their purpose is to

6    harm the United States or help China.

7            Now, go along the timeline and think to yourselves,

8    would that person do what Kevin Mallory did?  Absolutely not.

9            Kevin Mallory is completely innocent, and that's why

10   there is so much reasonable doubt in this case.

11           Thank you.

12           THE COURT:  All right, Mr. Gibbs, are you ready to

13   make your rebuttal argument?

14           MR. GIBBS:  I am, Your Honor.  Thank you.

15           THE COURT:  You may proceed.  Then we're going to

16   recess for lunch after this.

17           Proceed, Mr. Gibbs.

18           MR. GIBBS:  Thank you, Your Honor.

19           Ladies and gentlemen, as the judge indicated, this is

20   the Government's attempt -- opportunity to answer, or to use a

21   lawyerly word, rebut the defense argument.

22           And much of what the defense did, they went through

23   very painstakingly walking through the evidence in this case

24   and making arguments to you about why the activities and the

25   things that Mr. Mallory did were benign, were not intended to

1    harm the government, were not crimes, were not things that

2    showed any sort of intent to commit a crime.  And they tried to

3    offer an explanation for just about every event that we saw

4    during the course of this trial.

5             But I think what you should recall when you go back

6    in the jury room is that the defendant went to CIA and met with

7    Mike Dorsey for over four hours on May 12.  The defendant went

8    to that hotel room in Ashburn on May 24, met with the FBI and

9    Paul Lee for over three hours.  And at no time during the

10   course of that did he offer any of this information, any of

11   these arguments about wanting to get a job back at the CIA, or

12   saying that he was trying to do some sort of run his own

13   operation against the Chinese government.

14            So I think when you go back and look at the evidence

15   in the case, you will see that despite what the defense argued,

16   when the defendant had an opportunity to come in and explain

17   all this and to tell the truth, he didn't.  He lied, and he

18   continued to lie repeatedly.

19            Now, the defense also argued in their closing, they

20   talked about the defendant coming in and turning over the phone

21   and how incredibly valuable that was.  Well, as the judge will

22   tell you, whatever I tell you in the argument, whatever the

23   defense tells you, that's not evidence.  The evidence is what

24   you will receive back in the jury room, what you heard from the

25   witnesses and the exhibits.  And your recollection controls,

1    it's not the attorneys'.

2          However, when you go back and think about that phone,

3    the defendant didn't give it to the government.  The government

4    never got that phone until June 22 when the defendant was

5    arrested and his house was searched.  He was very clear about

6    taking that phone with him.  He could have given it to the

7    government.  And in fact, if his intent was to stop

8    communicating with Michael Yang because this one-man operation

9    he had run hadn't worked, he easily could have done that.  And

10   he didn't.

11         Now, the defense also talked in their closing, they

12   argued that the defendant only sent three things.  And again,

13   we don't want to confuse terms here, but there are very

14   specific terms related to the statute.  There is delivery of

15   national defense information.  And there is attempted or

16   conspiracy to deliver national defense information.  Those are

17   different things.

18         Now, in terms of delivery, we can show the defendant

19   sending the Table of Contents and Document No. 1 on that phone.

20   But to somehow suggest that the phone wasn't used to send more

21   classified documents is simply -- does not square with the

22   facts in this case.

23         I have one demonstrative exhibit I would like to pull

24   up that shows that, and if we could put that on the screen.

25         THE COURT:  All right.  Now, ladies and gentlemen,

1    you won't have this in the jury room.

2            By the way, there was another demonstrative handed to

3    you.  Do you have that?  Pass that to the left and that will be

4    collected.  You won't have that.

5            And you won't have this that is being displayed

6    either.  In other words, these demonstratives are a kind of

7    collection of what the attorney believes is the evidence

8    offered.  And it's presented in a way to help you follow it and

9    to help the attorney make an argument.

10           So you may proceed, Mr. Gibbs.

11           MR. GIBBS:  Thank you, Your Honor.

12           Now, ladies and gentlemen, this somewhat tracks at

13   least the format of the demonstrative that the defense used.

14   But in the one that they used, they left out a great deal of

15   detail about the actual CovCom device, the phone that the

16   defendant brought back from China after that second trip and

17   that was to be used to pass classified information.

18           So on the far left column you see all the steps that

19   were taken with the CovCom device while the defendant was in

20   Shanghai on that second trip.

21           And then the columns across to the right reflect the

22   testimony, primarily of Jim Hamrock, who testified in great

23   detail about the attempts to send these documents, either the

24   successful send sequence; or a send sequence where he could not

25   show that there was actual receipt, although in some instances

1    there were conversations on the chat messages about these.

2            And he talked about sort of two different types of

3    analysis he did.   There were the X log files where he could

4    actually see real file names that corresponded to the file

5    names on that Kingston SD card.   And there were the exposed

6    file logs where he could see that a file had been sent, and you

7    see that on the far right, a file was sent on a certain date at

8    a certain time.   And that corresponded with the defendant on

9    those chat messages, and you will have those messages back in

10   the jury room saying:   Send one, send two.

11           And one of those documents was in fact the

12   PowerPoint.   The PowerPoint that had greater detail and greater

13   granularity related to the operation involving the Johnsons

14   that was described in the white paper.   And we will get to the

15   white paper in a minute.

16           But the defense argument simply makes no sense.   This

17   whole notion of attempting to send documents as if this were

18   some sort of practice.   Or you want to make Michael Yang think

19   you're doing something on here, and then talking about it with

20   him on these chat messages.

21           Again, that SD card had eight classified U.S.

22   government documents on there.   And again, if you're just doing

23   a test to somehow make someone on the other end think some

24   activity is occurring on this end, you're going to use

25   classified government documents from your time with CIA or DIA

1    to do that?  It simply makes no sense.

2              If we can take that down.

3              All right, let's talk about the white paper.  The

4    defense spent a great deal of time talking about the white

5    paper, Document No. 1, the one pager, it is C9-3E1.  You will

6    have that back there with you.  And when you go back there and

7    read it, really give it a good read.  And think about what Mike

8    Higgins said.  Because if you look at the end of the document,

9    especially the last two lines and then the three lines above

10   that, that information is singular and it is unique.  And you

11   don't have to have a background in the intelligence community

12   to see how valuable that would be to an adversary, such as

13   China, since it was an operation that related to targeting in

14   China.

15             And even the defense expert, Harry Cooper, he

16   testified that context matters with a document like that.  And

17   he didn't have all the context that Mike Higgins did, but as

18   you heard, Mike Higgins testified that when you put that

19   context with it, you put the other information that DIA had,

20   when you put the information in the PowerPoint, when you

21   consider an adversary like China, so sophisticated, so

22   technologically savvy, with such great collection capabilities,

23   that is information that would be both damaging to the United

24   States and helpful to our adversary.

25             Now, the defense also made the argument about how the

1   first two trips he got $25,000 in cash and that was just pocket

2   change.  Well, let's keep in mind though, although I think you

3   could certainly conclude circumstantially that the defendant

4   had to have talked about, if not specifics of classified

5   information, at least the fact that he could get it in order to

6   get the CovCom device.  But maybe he didn't talk in any great

7   detail.

8          And again, the defendant is a smart individual, he is

9   savvy operator.  You're not going to give up all the

10  information at one time for just one payment.  You are going to

11  string these things out, string it along, and try to make as

12  much money as you can.  There is a progression to this.

13         And in the communications with Michael Yang, you saw

14  that progression.  The talk about money and how Mr. Mallory was

15  not saying, okay, I've got eight documents on an SD card, let

16  me send them to you right now, let me bring them to China right

17  now.  They were talking document by document and talking about

18  payment by payment.

19         Now, the defense also argued that with regards to the

20  white paper, that there would be no harm to national security

21  with that document.  In terms of the definition of NDI, that's

22  only half the definition.  It's that it could harm -- it could

23  cause harm to national security or be useful to a foreign

24  nation.

25         Was it useful to a foreign nation?  The Chinese

1    government was going to pay for that document, and they wanted

2    more detail about that document.  That demonstrates that the

3    Chinese government certainly believed it was useful to them.

4           Now, the defense talked about that Document No. 2,

5    the PowerPoint.  Again, that comes back to the demonstrative we

6    looked at.

7           As Jim Hamrock testified, he could certainly see that

8    a file was sent.  And within a minute we had that send to

9    regarding -- or the send chat message from the defendant

10   regarding that document.

11          Now, the defense also argued that the defendant -- it

12   was almost as if he panicked when he sent the one document

13   because, as they said, the time was ticking, he couldn't wait

14   any longer.

15          Well, if in fact that were true, and if time was

16   ticking and he couldn't wait any longer, you do sort of wonder

17   about why he delayed the interview with Mike Dorsey to have the

18   shoulder surgery.  But regardless of that, he had the shoulder

19   surgery, he went out to the CIA on May 12.

20          If that's the case, if this is truly what happened,

21   he was running a one-man intelligence operation, time had been

22   ticking, he had sent the white paper, that was done, there is

23   no way to change that, why not say that in the interview?  Why

24   not tell Mike Dorsey that?  Or why not tell the FBI that?

25          Because, ladies and gentlemen, the defense is right,

1   the defendant talked about a great many things in those

2   interviews.  And it sort of comes back to that statement that

3   telling the truth is easy.  Lying is hard.  And as a former CIA

4   case officer, the defendant knew it's a lot easier to stick as

5   close to the truth as possible on as much as possible so you

6   don't have to remember two contrary thoughts at the same time.

7          So, I way say probably for 90 percent or more of

8   those interviews, he told the truth.  But what was in that 10

9   percent or 5 percent?  What was in the stuff that he left out?

10  It was basically everything he did to commit these crimes,

11  everything he did to pass this information to the Chinese

12  government, information that he had once taken an oath to

13  protect.

14         Ladies and gentlemen, it is that sort of behavior,

15  and we had -- you know, we had the benefit of two interviews

16  that were recorded with the defendant.  And it was the fact

17  that we now know so much of what happened in this case for

18  real, so we got to see the defendant, we got to hear his words.

19  And we got to see that any time the questioning got close to

20  the truth of what he was really doing with Michael Yang, that

21  he had in fact conspired with Michael Yang to provide

22  classified government documents that the Chinese wanted, it was

23  valuable to the Chinese government -- and as you heard from the

24  intelligence community witness, it caused harm or could cause

25  harm to the United States -- any time the questioning got close

1    to that, any time a truthful answer would have touched on that,

2    the defendant lied.

3          And if his motives really were so pure and it was

4    simply a matter of wanting to come in and help the

5    Government -- or even, maybe, you know, his motives, there was

6    an ulterior motivate, he wanted get a job back at the CIA,

7    there is an easy way to do that.  And that is to come in, and

8    it is to hold up that phone and say, you know what, I got this

9    CovCom device from the Chinese government, I know that is a

10   very -- a piece of technology that you would have a great deal

11   of interest in, but let me tell you what happened.  And I'm

12   just going to have to deal with the consequences.

13         I put some documents on here.  I sent one document.

14   I don't believe it was classified.  I don't think there was

15   anything harmful in there.  But the reality is, it deals with

16   the operation involving the Johnsons, that's done.  I don't

17   think you're going to find it in there because this phone is so

18   secure.  There is chats, I don't think you're going to find

19   those because those are so secure.  But that's what I think

20   will be on here.

21         And that's what he didn't do.  And that's because

22   when he started down this road, he was never going to tell the

23   truth.  The road he started down was the road to commit these

24   crimes, and he was going to deny that until the very end.

25         Ladies and gentlemen, we have proven him guilty of

1    these crimes.  And when you go back in the jury room after

2    lunch and after you have heard the jury instructions, on behalf

3    of the Government I would ask that you find this defendant

4    guilty of these crimes because we have proved him guilty beyond

5    and to the exclusion of all reasonable doubt.

6          And again, I want to thank you on behalf of my

7    colleagues and the Government for how hard you have worked on

8    this case and for how attentive you have been to all the

9    evidence in this case.

10          Thank you very much.

11          THE COURT:  All right, ladies and gentlemen, we are

12    going to recess now for the luncheon period.  The instructions

13    will take approximately one hour.  So to do it now would be an

14    imposition that I think is unwarranted.

15          So we are going to take the recess, have lunch, and

16    then I will instruct you.  And following that, you will be

17    permitted to retire and deliberate on your verdict.

18          But for now, you must again pass your books to the

19    right -- or left -- yes, to the right.  Mr. Flood will collect

20    them, maintain their security.  The next time I do this, I will

21    tell you to hold on to your books.

22          And remember to refrain from discussing the matter

23    among yourselves or with anyone or undertaking any

24    investigation on your own.  And you will have your lunches

25    brought in at approximately 12:30.

1          And we will recess -- let's recess until then, until

2    1:30.

3          Court stands in recess.

4    -------------------------------------------------
                     PARTIAL TRANSCRIPT CONCLUDED

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19          I certify that the foregoing is a true and

20    accurate transcription of my stenographic notes.

21

22

23                          /s/  Norman B. Linnell
                         _____
24                       Norman B. Linnell, RPR, CM, VCE, FCRR

25