1

<pre>
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION

 3   ------------------------------x
                                   :
 4   UNITED STATES OF AMERICA,      : Criminal Action No.
                                   :
 5               versus             : 1:17-CR-154
                                   :
 6   KEVIN PATRICK MALLORY,         : May 30, 2018
                                   :
 7                      Defendant. : Volume I of VIII
     ------------------------------x

 8

 9             The above-entitled Jury Trial was continued
     before the Honorable T.S. Ellis, III, United States District
     Judge.

10
                         A P P E A R A N C E S
11

     FOR THE GOVERNMENT:
12
                    UNITED STATES ATTORNEY'S OFFICE
13                  John T. Gibbs, Esquire
                    Colleen E. Garcia, Esquire
14                  Jennifer K. Gellie, Esquire
                    US Attorney's Office
15                  2100 Jamieson Avenue
                    Alexandria, VA 22314
16
     FOR THE DEFENDANT:
17
                    OFFICE OF THE FEDERAL PUBLIC DEFENDER
18                  Geremy C. Kamens, Esquire
                    Todd Richman, Esquire
19                  1650 King St
                    Suite 500
20                  Alexandria, VA 22314

21
     OFFICIAL UNITED STATES COURT REPORTER:
22
                    MS. TONIA M. HARRIS, RPR
23                  United States District Court
                    401 Courthouse Square
24                  Ninth Floor
                    Alexandria, VA 22314
25                  703-646-1438
</pre>

2

TABLE OF CONTENTS
TRIAL
WITNESSES

On behalf of the Government:

Michael Londregan

     Direct examination by Ms. Garcia................. 45
     Cross-examination by Mr. Kamens.................. 66
     Redirect examination by Ms. Garcia.............. 78

Ralph Stephenson

     Direct examination by Mr. Gibbs.................. 80
     Cross-examination by Mr. Kamens................. 88

Peter Napoleon

     Direct examination by Ms. Garcia................ 100
     Cross-examination by Mr. Richman................ 115

Waldmar Prokopiuk

     Direct examination by Ms. Garcia................ 123

John Doe

     Direct examination by Ms. Gellie................ 131
     Cross-examination by Mr. Kamens................. 143
     Redirect examination by Ms. Gellie.............. 157

Michael Dorsey

     Direct examination by Ms. Garcia................ 159
     Cross-examination by Mr. Kamens................. 190

Paul Lee

     Direct examination by Ms. Gellie................ 214

EXHIBITS

On behalf of the Government:

                                      Admitted

Number 1-2........................................... 52
Number 1-3........................................... 52
Number 1-1........................................... 54
Number 1-4 - 1-7..................................... 54

3

1    Number 1-8.............................................. 61
     Number 1-10............................................. 63
2    Number 5-1............................................. 107
     Number 2-1............................................. 135
3    Number 2-2............................................. 137
     Number 2-3............................................. 163
4    Number 8-1A............................................ 220
     Number 8-1C............................................ 227
5    Number 8-2............................................. 239

6                          EXHIBITS

7    On behalf of the Defendant:
                                                      Admitted
8
     Number 3-A1............................................ 210
9
                          MISCELLANY
10
     Preliminary matters..................................... 04
11   Opening statements by Ms. Gellie........................ 15
     Opening statements by Mr. Kamens........................ 36
12   Certificate of Court Reporter........................... 246

13

14

15

16

17

18

19

20

21

22

23

24

25

———————U.S. v. Mallory———————

4

1    **P R O C E E D I N G S**

2    (Court proceedings commenced at 9:21 a.m.)

3         THE COURT:  All right.  Good morning.  You may call

4    the case.

5         THE DEPUTY CLERK:  United States versus Kevin

6    Patrick Mallory.  Criminal Case Number 1:17-CR-154.

7         MR. GIBBS:  Good morning, Your Honor.  John Gibbs,

8    Jennifer Kennedy Gellie, and Colleen Garcia on behalf of the

9    United States.

10        THE COURT:  All right.  Good morning.  Mr. Kamens.

11        MR. KAMENS:  Good morning, Your Honor.  Jeremy

12   Kamens and Todd Richman on behalf of Mr. Mallory.

13        THE COURT:  And Mr. Mallory is present in the

14   courtroom.

15        All right.  We will proceed now to call the jury in

16   and I will first call the roll and then we'll proceed with

17   preliminary instructions and then we will have opening

18   statements.  At that time we'll move the podium.

19        All right.  You may bring the jury in.

20        MS. GELLIE:  Your Honor, just one brief

21   clarification.  To the extent that this part of the courtroom

22   has been cleared for our government witness, that person will

23   not be testifying until after lunch at the soonest.  So the

24   Government would have no objection if folks come in and want

25   to sit in that part of the courtroom.

U.S. v. Mallory

5

1          THE COURT:  All right.  Anybody who wants to move

2     back is entitled to --

3          MR. KAMENS:  We are putting up a demonstrative

4     exhibit there and so their vision may be blocked.

5          THE COURT:  Now.  I'm glad you mentioned that Mr.

6     Kamens.  You have the tripod, the stands over there.

7          MR. KAMENS:  We do.

8          THE COURT:  It can be put up when you make your

9     opening statement, but it must be removed when you're done.

10    It cannot remain up.  The same is true for any exhibits, Ms.

11    Gellie that you intend to use.  In other words, we don't want

12    something to remain up when it's not being actually referred

13    to or used.

14         MS. GELLIE:  Understood, Your Honor.

15         THE COURT:  You may bring the jury in, sir.

16         (Jury in.)

17         THE COURT:  All right.  You may be seated.

18         Good morning, ladies and gentlemen.  We'll begin, as

19    always, with calling the roll.  But I'll begin first by saying

20    that when you all came in you stood.  You need not.  Everyone

21    stands for the jury.  So when you come in, you may be seated

22    immediately.  Because we stand for you.  I stand several times

23    because of my back.

24         All right.  Ms. Pham, you may call the roll.

25         THE DEPUTY CLERK:  Ladies and gentlemen, as I call

————U.S. v. Mallory————

6

1    your name --

2            THE COURT:  Just a moment.  Would you stand just for

3    this one time, please, ladies and gentlemen.  When your name

4    is called.

5            THE DEPUTY CLERK:  Juror 59, Matthew Scott Reynolds.

6            THE JUROR:  Present.

7            THE COURT:  Present.  That's fine.  Thank you.  Mr.

8    Reynolds.

9            THE DEPUTY CLERK:  Juror 2, Suresh Bhandari.

10           THE JUROR:  Here.

11           THE DEPUTY CLERK:  Juror 72, Mary Brienne Tierney.

12           THE JUROR:  Here.

13           THE DEPUTY CLERK:  Juror 21, Alice Daniel.

14           THE JUROR:  Present.

15           THE DEPUTY CLERK:  Juror 71, Armelle Pierrelle

16   Tallec.

17           THE JUROR:  Here.

18           THE DEPUTY CLERK:  Juror 30, Jennifer Elizabeth

19   Gerbi.

20           THE JUROR:  Present.

21           THE DEPUTY CLERK:  Juror 56, Marcia O'Toole.

22           THE JUROR:  Here.

23           THE DEPUTY CLERK:  Juror 31, Christy Stone Gorman.

24           THE JUROR:  Here.

25           THE DEPUTY CLERK:  Juror 28, Mary Buchanan Frankel.

─────────────────────U.S. v. Mallory─────────────────────

7

1              THE JUROR:  Here.

2              THE DEPUTY CLERK:  Juror 32, Gary Alan Gortenburg.

3              THE JUROR:  Here.

4              THE DEPUTY CLERK:  Juror 9, Carrie Cathleen

5    Bowman-Dalley.

6              THE JUROR:  Present.

7              THE DEPUTY CLERK:  Juror 33, Paige Taylor Gray.

8              THE JUROR:  Present.

9              THE DEPUTY CLERK:  Juror 20, Nicole D'Antuono.

10             THE JUROR:  Here.

11             THE DEPUTY CLERK:  Juror 17, Kate Alison Clarke.

12             THE JUROR:  Here.

13             THE DEPUTY CLERK:  Juror 51, Naveen Rammeduri.

14             THE JUROR:  Here.

15             THE DEPUTY CLERK:  Juror 54, Joseph Michael Mondoro.

16             THE JUROR:  Present.

17             THE DEPUTY CLERK:  Are there any jurors I have not

18   called?

19             THE COURT:  All right.  Ladies and gentlemen, again,

20   good morning.  Let me confirm that all of you were successful

21   in following the Court's instructions to refrain from

22   discussing the matter with anyone.

23             All right.  I see everyone nodding affirmatively.

24   And I assume that you -- I was correct that there was

25   curiosity, you were asked questions, and you resisted the

U.S. v. Mallory

8

1    temptation.  As this case goes on, you will find that that

2    courtesy falls off very quickly and fairly soon they won't ask

3    you any questions.  They won't be interested any longer.  It

4    always happen that way.  And then there will come a time when

5    they don't believe you've been doing what you say you've been

6    doing.  I'll let you deal with that when that time arrives.

7           All right.  Now, ladies and gentlemen now that

8    you've been sworn I'm going to give you some instructions to

9    guide you in your participation in this case.  First and very

10   importantly, it will be your duty to find what the facts in

11   this case are.  You will have to determine from the evidence

12   presented what the facts are.  And you and you alone will be

13   the sole judges of the facts in this case.  You will then have

14   to apply to the facts as you find them.  The law that the

15   Court will give to you in the form of instructions at the end

16   of the case.  And you must follow the law, those instructions

17   whether you agree with them or not.  Nothing the Court may say

18   or do, during the course of the trial, is intended to indicate

19   or should be taken by you as indicating what your verdict

20   should be.  What your verdict is, is your sole and exclusive

21   duty and responsibility.

22          Now, the evidence in which you will find the facts

23   in this case will consist of the testimony of the witnesses,

24   who will testify from the witness stand and documents and

25   other things received into the record as exhibits and any

U.S. v. Mallory

9

1    facts that the lawyers may agree or stipulate to or that the

2    Court may instruct you that you may find.

3            There are, however, certain things that are not

4    evidence and must not be considered by you.

5            First, the lawyers' statements, the lawyers'

6    arguments, and the lawyers' questions by themselves are not

7    evidence.  It's the answers that constitute evidence.  So

8    statements, arguments.  And questions by the lawyers are not

9    evidence.

10           Objections to questions are not evidence.  Lawyers

11   have an obligation to their clients to make objections when

12   they believe evidence is being offered that is improper under

13   the rules of evidence.  The essence of a fair trial is that it

14   be conducted pursuant to the rules of evidence and that your

15   verdict be based solely on admissible evidence.

16           So you should not be influenced by the objection or

17   by the Court's ruling on it.  If the objection is sustained,

18   then you should ignore the question.

19           If the objection is overruled, then you may treat

20   the answer to that question just as you would treat the answer

21   to any other question.  And if you're instructed by the Court

22   that some item of evidence is admitted for some limited

23   purpose, you -- you must adhere to that instruction and

24   consider that evidence solely for that limited purpose.

25           Now, there are two kinds of evidence from which you

U.S. v. Mallory

10

1   may find the facts of the case.  There is direct evidence,

2   that is direct proof of a fact, such as testimony of an

3   eyewitness.  And there is circumstantial evidence that is

4   proof of facts from which you may infer or conclude that other

5   facts exist.  And I'll give you further instructions on that

6   as well as other matters at the end of the case, but for now

7   you should have in mind that you may consider both direct and

8   circumstantial evidence.

9          Now, it will be up to you to decide which witnesses

10  to believe, which witnesses not to believe, and how much of

11  each witness' testimony to accept or reject.  You and you

12  alone are the sole judges of the credibility of the witnesses

13  and the weight and affect that their evidence or their

14  testimony deserves.  And I'll give you some guidelines for

15  determining the credibility of witnesses at the end of the

16  case.

17         Now, this is, as you know, a criminal prosecution

18  and there are certain rules that you must have in mind and let

19  me review those with you at this time.

20         There are three basic rules for you to keep in mind.

21  First, the defendant, as I told you at the outset is presumed

22  innocent unless and until the jury finds otherwise.  The

23  indictment against the defendant brought by the Government is

24  only an accusation, nothing more.  It's not proof of guilt or

25  evidence of any kind.  The defendant therefore starts out with

1    a clean slate.

2         Now, the second rule is that the burden of proof is

3    on the government until the very end of the case.  The

4    defendant has no burden to prove his innocence or to present

5    any evidence or to testify.  And since the defendant has a

6    right to remain silent, the law prohibits you in arriving at

7    your verdict from considering that the defendant may not have

8    testified.

9         And the fourth or third rule rather is that the

10   Government must prove defendant's guilt beyond a reasonable

11   doubt and I'll give you further instructions on this point

12   later.  But bear in mind, in this respect, that a -- that in

13   this respect a criminal case is different from a civil case.

14        Now let me give you some words about your conduct as

15   jurors.  As I told you yesterday, I'm going to repeat it

16   today, you are not to discuss the case with anyone during the

17   course of the trial.

18        You're not to discuss it among yourselves or with

19   anyone else.  Not until you retire to deliberate on -- at the

20   end of the case on your verdict, are you to discuss the matter

21   among yourselves.  If anyone should try to talk to you about

22   it, stop them and call that to the Court's attention promptly.

23        Next, do not listen or read anything about this case

24   from any source.  Don't read anything that you might see about

25   it.  I don't know that you will, but see anything.  But if you

U.S. v. Mallory

12

1   do, don't read it.

2           Now, do not undertake to do any research on your

3   own.  And I mentioned that last evening.  Don't use any

4   electronic device or even these things called books to look up

5   anything.

6           I have a grandson and every time I tell him to go to

7   the dictionary or an encyclopedia, he looks at me as if I'm

8   from another century, which, of course, I am.  But it's quite

9   amazing how much information is electronically at people's

10  fingers.  They live in a new age.  I'm glad I lived long

11  enough to see it.

12          I don't use it.  I don't use a computer.  I

13  irresolutely in the last century.

14          Now, so do not undertake to do any research or

15  investigation about the case on your own and do not form any

16  opinion until all the evidence is in.  Keep an open mind until

17  you start your deliberations at the end of the case.

18          I told you that you may take notes.  We furnish

19  booklets for you for that.  The booklets must stay here.  When

20  there's a recess, Mr. Flood, the court security officer, will

21  collect them, maintain their security during the recess,

22  including overnight.  And I assure you he can ensure that no

23  one looks at them.  No one will look at these books.  So you

24  may use them as you wish.  Let me amend that a bit.

25          We may be hearing evidence in the course of this

─────U.S. v. Mallory─────

13

1   case that the government believes is classified.  And you

2   should take whatever notes you want to take.  But at some

3   point, I need to tell you that after the case is entirely over

4   your books may be examined to ensure that it doesn't contain

5   classified information.  But the books ultimately will be

6   yours to take home.  Ultimately.  It may have some redactions

7   in it, but you will know what those redactions are.

8             Now, the trial will now begin.  First we'll have

9   opening statements.

10            Ms. Gellie has forecasted that her opening statement

11  will take no longer than 30 to 35 minutes.  And she will use

12  some exhibits in the course of that.  If they won't be on

13  tripods it will be on the -- on the screen.

14            MS. GELLIE:  Correct, Your Honor.

15            THE COURT:  All right.  And then Mr. Kamens will you

16  or Mr. Richman make the opening statement for the defendant?

17            MR. KAMENS:  Your Honor, I will making the opening

18  statement and we are also using a demonstrative from the last

19  century over there.  We will also have images on the screen as

20  well.

21            THE COURT:  All right.  And those will be up only as

22  long as they're used and they'll be taken down.

23            Now, a demonstrative evidence means that it doesn't

24  -- it isn't admissible, it may reflect admissible evidence.

25  And it's used to help lawyers make their point, but it won't

U.S. v. Mallory

14

1   be in the jury room with you, because it is not evidence

2   that's admissible. But it's permissible for the lawyers to

3   use it. That may be true of some of yours as well Ms. Gellie,

4   is that correct?

5            MS. GELLIE: We are only using one exhibit in

6   opening, Your Honor.

7            THE COURT: And is it an exhibit you expect will be

8   admitted into the record?

9            MS. GELLIE: That is correct, Your Honor.

10           THE COURT: All right. So that one you would have

11  back in the jury room with you.

12           All right. Then after the opening statements, the

13  government will then present its witnesses and counsel for the

14  defendant may cross-examine them. And following the

15  government's case the defendant may, if he wishes, present

16  witnesses whom the government may cross-examine. And after

17  all the evidence is in, the attorneys will present their

18  closing arguments in which they'll summarize and interpret the

19  evidence for you. But if the -- if anything they say differs

20  from what you recall the evidence to be, it is your

21  recollection that controls because you're the sole judges of

22  the facts of this case. And after the closing arguments, then

23  I will give you instructions on the law and permit you to

24  retire and deliberate on your verdict.

25           Now we'll take a mid-morning recess and a

U.S. v. Mallory

15

1    mid-afternoon witness.  I'll try to forecast that.  If at any

2    time any of you need a recess for some truly exigent reason, I

3    give you the privilege of raising your hand or giving me the

4    sports time signal and I will call a recess and I will not

5    inquire of you of the reason for it.  So I ask that you not

6    avail yourself of that privilege unless it's truly an exigent

7    and emergency reason.  But I want you to know that that's

8    available and you're certainly free to exercise that if you

9    need to.

10         Now, we'll proceed now with the opening statements.

11   I anticipate after we complete this, we'll go to a witness.

12   And at some time around 10:30 or closer to 11:30 we'll take a

13   recess.  I hope you filled in your luncheon menus.  And it was

14   my forecast that baked Alaska might not make it this time?

15         Well hopes spring internal and you may yet find it.

16         All right.  Mr. Flood you may move the podium,

17   please.

18         All right Ms. Gellie.  Are you ready to make the

19   government's opening statement?

20         MS. GELLIE:  I am, Your Honor.

21         THE COURT:  All right.  You may proceed.

22                    **OPENING STATEMENT**

23         MS. GELLIE:  May it please the Court.

24         Ladies and gentlemen, good morning.

25         All those who serve our country take an oath.  It is

─────U.S. v. Mallory─────
16

1   a pledge to defend the Constitution against all enemies,

2   foreign and domestic, and to bear allegiance to it.  Kevin

3   Mallory once served our country and he, too, took this oath as

4   he entered into service as a United States intelligence

5   officer.  But Kevin Mallory violated that oath to this nation

6   and its Constitution.

7          In the spring of 2017, facing mounting personal

8   debt, he made a decision to sell some of the sensitive secrets

9   he learned through his government work to a foreign

10  government, to China.

11         In the spring of 2017, Kevin Mallory betrayed his

12  country and its citizens and sold and attempted to sell secret

13  and top secret information to a Chinese intelligence officer.

14         On April 21, 2017, the defendant, Kevin Mallory, was

15  sitting in a long haul flight back to the United States from

16  Shanghai, China.  He's a six-year former member of the United

17  States intelligence community, having served as both a

18  clandestine case officer for the Central Intelligence Agency,

19  or CIA, and an intelligence officer for the Defense

20  Intelligence Agency, or DIA.

21         This is the second such return trip to Shanghai

22  Mr. Mallory had taken in less than two months.  On this

23  particular trip, Kevin Mallory has his son with him.

24  Mr. Mallory, could be any passenger on a 14-hour flight

25  returning to the United States, tired, a little bit

1    dishevelled, but he is not just any passenger.

2         Unlike probably everyone else on that flight, Kevin

3    Mallory bears with him the fruits and tools of his crime, the

4    fruits and tools of espionage.

5         Before heading through customs at Chicago O'Hare

6    airport that day, Kevin Mallory fills in the customs forms

7    that everyone returning to this country from abroad has to

8    fill out.  On one of those forms, there's a question that asks

9    whether he has more than $10,000 in currency on him.

10   Mr. Mallory checks the "no" box.  That is a lie.

11        At the airport, Kevin Mallory is selected by Customs

12   and Border Protection, often called CBP, for what is called a

13   secondary screening.  As part of that process, two CBP

14   officers take Mr. Mallory out of the customs processing line

15   to ask him some questions.

16        They ask Mr. Mallory what he was doing in China.  He

17   tells CBP that his primary purpose in visiting China was a

18   father/son trip and to meet with an acquaintance about

19   possibly developing an anti-bullying program.  These

20   statements are also lies.

21        As part of their secondary inspection, the CBP

22   officers searched Mr. Mallory's luggage.  During that search,

23   they find $16,500 in cash.  They also find a Samsung Galaxy

24   Note 4 smartphone in a box in one of the suitcases.  This

25   Samsung phone will become important later on.

U.S. v. Mallory

18

1       The CBP officers ask Mr. Mallory about the phone.

2   And he says it's a gift for his wife.  That, too, is a lie.

3   Upon finishing their inspection, the CBP officers allow

4   Mr. Mallory to amend his customs declaration and pay a tariff

5   on the $16,500 before letting him go.

6       Three days after the secondary search in Chicago,

7   Kevin Mallory reaches out to a former colleague at the CIA.

8   You will hear from witnesses during the course of this trial

9   that Kevin Mallory worked as a clandestine case officer,

10  sometimes called an operations officer at the CIA, as well as

11  an intelligence officer to the DIA before returning to the CIA

12  as a contractor.

13      In all of those roles, Mr. Mallory held a top secret

14  security clearance and had access to classified government

15  information.

16      So just three days after being questioned by Customs

17  and Border Protection, Mr. Mallory texts someone he knew

18  during his time as a CIA contractor.  You will hear from the

19  CIA contractor, who will testify under a pseudonym in this

20  case due to the classified nature of his work at the CIA.

21      Kevin Mallory asked his contact to connect him with

22  someone at the CIA who works on China issues .  This is not

23  the first time Kevin Mallory has reached out to former CIA

24  colleagues in 2017.  Just a couple of months earlier in

25  February, Kevin Mallory had reached out to the same contact as

U.S. v. Mallory

1   well as a second CIA employee.

2          Mr. Mallory asked both individuals to put him in

3   touch with someone working on China issues at the CIA.  The

4   defendant did not know it at the time, but both former CIA

5   colleagues immediately reported the defendant's contacts.

6          Both reported it because as CIA security clearance

7   holders, they are trained to report contacts they deem to be

8   suspicious.  Neither contact put Mr. Mallory in touch with

9   anyone else at the CIA in February of 2017.

10         And so having not met with anyone in CIA in

11  February, three days after being questioned by CBP in April,

12  Mr. Mallory, again, reaches out to his contractor contact,

13  again, asking to be put in touch with someone who focuses on

14  China.

15         Just a day after sending that April text on

16  April 25, having not heard back from his contact, Mr. Mallory

17  texts again asking his contact to please confirm receipt.

18  Without waiting for response, a little over a hour later Kevin

19  Mallory walks into a FedEx, the FedEx closest to his house in

20  Leesburg, and pays to scan a stack of documents to a microSD

21  card, a small document storage device that can be inserted

22  into a computer or a mobile phone.

23         This April 25 FedEx visit also becomes important

24  later on.

25         Four days after that FedEx visit, Mr. Mallory's CIA

20

1   contractor contact responds that he has passed Mr. Mallory's

2   request to meet with someone up the chain at CIA.  A couple of

3   days later, Mr. Mallory responds to his contact to tell him

4   that someone at the CIA did finally get in touch with him.

5   You will hear from that person, a CIA investigator named Mike

6   Dorsey.

7            Kevin Mallory meets with Mr. Dorsey on May 12th at

8   CIA headquarters.  The two speak for over four hours.  The

9   entire interview is videotaped, and you'll be seeing portions

10  of the interview in the coming days.

11           During that May 12th interview, Kevin Mallory tells

12  Mr. Dorsey that he had been approached on social media by

13  someone claiming to be a business recruiter in China.  That

14  recruiter had handed Mr. Mallory off to a second individual in

15  China going by the name Michael Yang.  Michael Yang held

16  himself out to be an employee of a Chinese think tank, the

17  Shanghai Academy of Social Sciences.

18           During the multiple hours of discussion at the CIA,

19  Kevin Mallory tells Mr. Dorsey that he suspects Michael Yang

20  may, in fact, be a Chinese intelligence officer, a Chinese

21  spy.  Mr. Dorsey asked Kevin Mallory whether he had provided

22  any documents to Yang.  Mr. Mallory said he had not.

23  Mr. Mallory reiterates more than once that he has not provided

24  any documents to the Chinese spy.  These statements, you will

25  learn, are also lies.

1          Kevin Mallory tells Mr. Dorsey that he was paid a

2   total of $25,000 for two trips to Shanghai and multiple days

3   of meetings with Yang and his boss.  $25,000 for meetings.

4   Mr. Mallory also notes that Yang paid for his travel, hotel,

5   and certain expenses during both trips to China.

6          Kevin Mallory also tells Mr. Dorsey during that

7   May 12th interview that on his second trip to China, Yang, the

8   suspected Chinese spy, gave him what Mallory called a CovCom

9   device.  And by CovCom, Mr. Mallory explains he means covert

10  communications.

11         This is the Samsung Galaxy Note 4 that CBP officers

12  found in Mr. Mallory's luggage in Chicago, the one that

13  Mr. Mallory told them was a gift for his wife.

14         Kevin Mallory offers to meet with Mr. Dorsey again

15  to show him the CovCom device.  Mr. Dorsey takes him up on

16  that offer and sets up a second meeting at an Ashburn Hotel

17  for May 24, 2017.  When Kevin Mallory arrives at the hotel for

18  that May 24th meeting, Mr. Dorsey takes him upstairs to a

19  hotel room.  There, Mr. Mallory is met by two FBI special

20  agents and an FBI computer forensic examiner.  Mr. Mallory

21  expresses surprise that FBI agents are there, but agrees to

22  speak with them.

23         He also agrees to let the FBI make an image of the

24  CovCom device, the Samsung Galaxy Note 4, and images a copy of

25  all of the information on a computer and mobile device.  The

─────U.S. v. Mallory─────

22

1   FBI computer forensic examiner creates an image that day while

2   Mr. Mallory is speaking with the agents.

3          During the May 24 interview, Kevin Mallory

4   reiterates his belief that Michael Yang is a likely Chinese

5   intelligence officer, a Chinese spy.  The FBI agents ask

6   Mallory multiple times about whether he provided any sorts of

7   documents to Yang.  Kevin Mallory claims that day that the

8   only written information he provided to Yang was in the form

9   of two unclassified papers based on information from his head

10  and the internet.

11         Once again, Mr. Mallory is lying.

12         Over the course of his conversation with the FBI,

13  Mr. Mallory offers to demonstrate how the CovCom device works.

14  He explains the phone is enabled with a special custom

15  application that permits secure communications between himself

16  and Yang.  The custom app works by hooking into the

17  commercially-available application WeChat.

18         Kevin Mallory further explains that through this

19  custom application, he is able to transmit information merged

20  or hidden within an image, a technique called steganography,

21  to send information to Yang without the possibility that the

22  information will be intercepted.

23         He explains that to transmit documents using the

24  CovCom, he must insert a microSD card containing documents

25  into the CovCom device before logging into the custom

U.S. v. Mallory

23

1    application.  The FBI Special Agent asked Mr. Mallory if he

2    has used the custom app to send any documents to Yang.

3    Mr. Mallory tells him he has only ever sent some text messages

4    using the custom app.

5         Yet again, Mr. Mallory is lying.

6         As he explains how the custom app works, Kevin

7    Mallory offers to log in and demonstrates to the agents.  He

8    tells the agents that they won't be able to see any of the

9    secure messages because the custom app is designed to

10   automatically delete the chat history.  He is mistaken on this

11   point.

12        Kevin Mallory logs into the custom app and

13   immediately reveals a few screens worth of chat history.  The

14   agents note that Mr. Mallory is visibly surprised to see that

15   chat history.  Mr. Mallory explains to the agents that the

16   chats are, in fact, between himself and Michael Yang.

17        Mr. Mallory also explains that the outgoing messages

18   are his using the screen name "Beans" and the inbound messages

19   are from Yang, using the screen name "My Yang."

20        In reviewing that chat history, the agents see

21   reference to a foreign country's intelligence service.  They

22   also see Mr. Mallory mentioned bringing additional documents

23   to Yang in China on his next visit.  Kevin Mallory wrote to

24   Yang and you'll see it on your screen, ladies and gentlemen,

25   "I can also come in the middle of June.  I can bring the

─U.S. v. Mallory─

24

1   remainder of the documents I have at that time."

2          Despite this message, Kevin Mallory claims, once

3   again, he has not provided Yang with any documents other than

4   the white papers, nor does he intend to do so.  He claims the

5   statements about documents were just meant to keep Yang

6   interested in continuing the relationship.  Once again, these

7   statements are false.

8          Kevin Mallory left the May 24 FBI interview with the

9   CovCom still in his possession.  Following that interview, the

10  FBI's reverse engineering consultant, Jim Hamrock, begins

11  analyzing the image of the CovCom.  He finds several key

12  pieces of evidence in that image.

13         First, Mr. Hamrock extracts a log file with a

14  history of secured chats sent and received using the custom

15  application.  In those chats, Kevin Mallory and Yang, the

16  Chinese spy, discussed documents Yang had already received

17  from Kevin Mallory as of May 3, 2017.

18         In one of the chats, Yang asked why certain

19  information had been blacked out.  Yang writes, "Anyway, I

20  suggest you send all and retype the handwriting.  And No. 1 is

21  obvious, the first page of a complete article.  Where is the

22  else?  And why is it black on top and bottom?"

23         Mr. Mallory responds a few messages later that the

24  black was to cross out the security classification, top secret

25  Orcon.

─────────────────────U.S. v. Mallory─────────────────────

25

1        In the chats, the two men also discuss payments for

2   the documents and future documents Mr. Mallory says he can

3   send.  Mr. Mallory writes, "I have arranged for a USD account

4   in another name.  You can send the funds broken into four

5   equal payments over four consecutive days."

6        In addition to the chats, Mr. Hamrock pulls out

7   scanned copies of a written table of contents and eight

8   handwritten cover pages.  The title on the eight cover pages

9   line up the list of documents and the handwritten table of

10  contents.

11       Mr. Hamrock also finds four document remnants on the

12  CovCom device.  He is able to see visible U.S. government

13  classification markings on those documents, some as high as

14  top secret.

15       The CIA determines that three of the four documents

16  contained CIA information classified at the secret and top

17  secret level.  The DIA later determines that the fourth

18  document contains DIA information classified at the secret

19  level.

20       On June 22, 2017, Kevin Mallory is placed under

21  arrest for, among other charges, passing and attempting to

22  pass national defense information to aid a foreign government.

23       Following the arrest, federal agents began to search

24  Kevin Mallory's home.  During that search, agents find the

25  CovCom device, the Samsung Galaxy Note 4, and two other items

─────U.S. v. Mallory─────

26

1   of particular interest.

2          First, buried in the back of a junk tray within

3   Mr. Mallory's closet mixed in with safety pins, Tylenol

4   packets, the usual random items we all keep in our homes,

5   Special Agent Melinda Capitano finds a small, bulb piece of

6   foil.  It looks like balled-up gum or some other trash stuck

7   at the back of that junk tray.  Special Agent Capitano opens

8   the balled up foil and discovers a Toshiba microSD card, about

9   the size of your thumbnail.

10          Knowing that the search team is particularly

11  interested in SD cards that could contain government

12  information, Special Agent Capitano immediately takes that

13  Toshiba SD card to the on-site computer forensic examiner,

14  Ryan Lamb.

15          Special Agent Lamb reviews that Toshiba microSD card

16  immediately.  He sees nine documents, most of which has

17  visible U.S. government classification markings at the secret

18  and top secret levels.  Of the nine documents, eight have a

19  handwritten cover page.  These handwritten cover pages match

20  those found on the CovCom device.

21          The ninth document on the Toshiba SD card is a

22  handwritten table of contents.  This is also identical to the

23  handwritten table of contents found on the image of the CovCom

24  device.

25          In the kitchen an agent finds a second microSD card,

—————————————U.S. v. Mallory—————————————

27

1   this one a Kingston brand.  In the deleted space on the

2   Kingston SD card, FBI is subsequently able to find the same

3   nine documents, eight documents with handwritten cover pages,

4   plus the handwritten table of contents that were found on both

5   the Toshiba microSD card and the CovCom.

6          Four of the documents from the two SD cards are also

7   the same as the partial and full documents FBI found on the

8   CovCom device image.

9          The remaining four documents from the SD cards are

10  confirmed to be CIA and DIA documents containing information

11  classified at the secret and top secret levels.

12         Based on the secure chats Kevin Mallory and Michael

13  Yang, the Chinese spy, it is apparent that Mr. Mallory

14  successfully passed to Yang a paper containing classified DIA

15  information that was found on both of the microSD cards.

16         For example, on May 3 Michael Yang writes that his

17  boss is interested in the products, but No. 1 is incomplete on

18  the first page and the handwriting cannot be read properly.

19  You will see that document, Document No. 1, and you will see

20  that it consists of one typed page and two handwritten yellow

21  pages.

22         The information Kevin Mallory sent to Yang in that

23  document included discussion of a human asset program.  That

24  is a program involving people who are secretly gathering

25  intelligence for the benefit of our country.

———————U.S. v. Mallory———————

28

1      There is no evidence that Kevin Mallory made any

2  attempt to make contact with anyone at the Defense

3  Intelligence Agency before passing this information to Yang.

4  There is no evidence that Kevin Mallory was authorized to pass

5  this information.

6      FBI Special Agents reviewed the properties for the

7  documents on the two SD cards.  The Toshiba files have names

8  that line up with the content of the documents, such as FISA,

9  which includes information related to core authorized

10  surveillance under the Foreign Intelligence Surveillance Act.

11      The Kingston files, however, are saved with titles

12  showing a date and time stamped.  Each one starts out

13  20170425, and then in hour, minute, seconds.  April 25, 2017,

14  followed by time.  The properties for the documents on both

15  the Kingston SD card and the Toshiba card found in Kevin

16  Mallory's home showed that each document was scanned on

17  April 25, 2017 around 4:00 p.m.

18      The properties for the documents also show that they

19  were scanned on a Canon C700.  This is a commercial scanner.

20  FBI agents decide to drive out to the FedEx closest to Kevin

21  Mallory's house.  The agents review surveillance footage from

22  April 25 around the time matching the time stamps from the

23  nine documents.  On that footage, they see Kevin Mallory enter

24  the FedEx location on April 25, which is the trip he made

25  immediately after texting his contacts at the CIA that same

—————U.S. v. Mallory—————

29

1  day.

2        In the surveillance footage, the agent see Kevin

3  Mallory hand a stack of papers to a FedEx clerk.  And they see

4  that clerk scan those documents to a SD card.  The FedEx

5  received for that April 25 transaction shows that the number

6  of pages scanned exactly matches the total number of pages for

7  the handwritten table of contents, handwritten cover sheet,

8  and eight classified documents found on the Toshiba and

9  Kingston SD cards.  The receipt also shows that Kevin Mallory

10  paid to have the documents shredded after they were scanned.

11        Following the June 22 search of Kevin Mallory's

12  home, FBI once again analyzes the CovCom device, the Samsung

13  Galaxy Note 4, but it is not the same when they last looked at

14  it.  They discover certain key changes to that device since

15  they imaged it on May 24.

16        First, WeChat the parent application the custom app

17  works through for secure communications, has been deleted.

18        Second, the custom apps database with the history of

19  secure chats has also been wiped at some point between May 24

20  and June 22.

21        FBI is still able, however, to pull the same four

22  classified remnants from the latest Samsung image.

23        On June 24, just two days after his arrest, Kevin

24  Mallory calls his family from jail.  During that call, he

25  asked them to look for an unnamed item to see whether FBI

─────────U.S. v. Mallory─────────

30

1   seized it during the search.  Over the course of the call, it

2   becomes clear that Mr. Mallory is looking for the Toshiba SD

3   card containing the classified government documents.  That's

4   the SD card that was found balled up in tinfoil in

5   Mr. Mallory's closet.

6           You'll hear that jail call during this trial.

7           Those facts, ladies and gentlemen, occurring over

8   just a few months in 2017, are why we are all here today.

9   Those facts demonstrate why Mr. Mallory is guilty of violating

10  18 United States Code Section 794, which makes it a crime to

11  provide or attempt to provide national defense information to

12  a foreign government with the attempt or intent to harm the

13  United States or benefit that government.  It also makes it a

14  crime to conspire with someone else to gather and pass

15  national defense information to a foreign government.

16          Now, Judge Ellis will explain a lot to you at the

17  close of this case, and what Judge Ellis says is the law for

18  you to consider.

19          But a few things you need to know now.  The

20  Government must show certain things in order to prove these

21  charges.

22          First, the Government will show that Kevin Mallory

23  did communicate and deliver in some way certain information or

24  documents to an agent, employee, or citizen of China.

25          Second, the Government must show that such

─────U.S. v. Mallory─────

31

1   information related to the national defense of the United

2   States.

3          Third, the Government must show that Kevin Mallory

4   acted with intent or reason to believe that that information

5   was to be used to the injury of the United States for the

6   advantage of China.

7          And fourth, the Government must show that Kevin

8   Mallory acted willfully, meaning that he had knowledge that

9   what he was doing was unlawful.

10          To prove that the information that Kevin Mallory

11   provided or attempted to provide to a Chinese intelligence

12   officer related to the national defense, the Government would

13   also need to prove both that the unauthorized release of that

14   information did have the potential to harm the United States

15   and that the information was closely held by the Government.

16          "Closely held" means that the Government took steps

17   to protect the information and that it was not publicly

18   available.  I have mentioned several times that the

19   information and documents found in Kevin Mallory's possession

20   were classified.  You will hear CIA and DIA witnesses explain

21   what that means.

22          The fact that a document is classified is not in and

23   of itself proof that information is closely held.

24          But you will hear from both Michael Higgins, from

25   the DIA, and Nancy Morgan from the CIA that classification is

─────────────U.S. v. Mallory─────────────

32

1   part of how the government closely held the national defense

2   information found in Kevin Mallory's possession.

3          Classification levels limit access to these

4   materials to individuals who not only have a government

5   security clearance, a monthslong intensive process, but also

6   limits access to only the subset of security clearance holders

7   who have a need to know that information.

8          Even security clearance holders do not have access

9   to the entirety of the government's classified information.

10          And you will hear from Mike Dorsey of the CIA and

11   Michael Londregan of the DIA that Kevin Mallory was briefed

12   multiple times on the rules governing his access to classified

13   information.  Mr. Mallory also signed multiple documents

14   acknowledging that he understood his responsibility to

15   safeguard government secrets.  And Kevin Mallory acknowledged

16   that this obligation to safeguard this information does not

17   end even when a person ceases government employment.

18          You will also hear from Mr. Higgins and Ms. Morgan

19   that some of the information and documents Kevin Mallory

20   passed or attempted to pass to the individual he, himself,

21   thought was a likely Chinese spy was about human assets, real

22   people who secretly provide information to the United States

23   in aid of our national security.

24          And you will hear from CIA and DIA witnesses that

25   the unauthorized disclosure of this information not only

─────U.S. v. Mallory─────

33

1   jeopardizes the national security of our country, but also put

2   those human assets, their families, and known associates at

3   risk.

4        You will see evidence of Kevin Mallory's intent and

5   knowledge that he was acting unlawfully.  You will see it in a

6   covert, secret way in which Mr. Mallory and Yang conducted

7   their risky business.

8        You will see it in Mr. Mallory's only statement to

9   Yang.  For example, on May 3 Mr. Mallory told Yang, "It was

10  dicey (look it up) when they asked for me by name.  If they

11  were looking for me in terms of State Secrets, and found the

12  SD card..., we would not be talking today.  I am taking the

13  real risk as you, [Mr. Ding], and higher up bosses know..."

14  Mallory later wrote, "There is info in the docs that could

15  lead back to me."

16       You will also see Mr. Mallory's intent and knowledge

17  that he was acting unlawfully in Mr. Mallory's multiple lies

18  to CBP, to Mr. Dorsey of the CIA, to the FBI.  You will see it

19  in having the FedEx store shred the classified documents he

20  scanned there as having deleted the WeChat app and wiping the

21  chats from the Samsung CovCom device after the FBI admission

22  on May 24 and his attempt to direct his family to the SD card

23  containing classified documents, which unbeknownst to him the

24  FBI had already found and seized.

25       By the end of this trial, there will be no question

34

1   as to Mr. Mallory's intent and his purpose in selling secrets

2   to the Chinese.  The evidence will show that Mr. -- that Kevin

3   Mallory chose to pass closely held government secrets to a

4   Chinese agent.  Kevin Mallory chose to pass information so

5   sensitive that its unauthorized disclosure jeopardizes both

6   the national security of the United States and the safety of

7   assets who have put themselves at risk to assist in the

8   protection of that national security.

9        And despite having multiple opportunities to tell

10  government investigators what had actually happened, Kevin

11  Mallory chose to lie.  Kevin Mallory's own statements in his

12  chats with the Chinese intelligence officer, Michael Yang,

13  show that he conspired with Yang to transmit these government

14  secrets in exchange for money.

15       And Kevin Mallory's own words to Yang, "Your object

16  is to gain information and my object is to be paid,"

17  Mr. Mallory also talked to Yang about transferring the money

18  without need leaving a trail back to him.  Mr. Mallory wrote,

19  "I will provide you banking instructions for you to send the

20  monies.  The money will go to the bank account not in my true

21  name but I have access to."

22       You will hear from FBI Special Agent Steven Green

23  that by the time Kevin Mallory was meeting with the Chinese

24  spy Michael Yang in March and April of 2017, Mr. Mallory is

25  several months behind in his mortgage payments, heading toward

35

1     default.  He also had over $30,000 in credit card debt.

2           At that point, in Kevin Mallory's own words, his job

3     was to be paid.  That is the choice Kevin Mallory made, money

4     in exchange for classified national defense information.

5           Over the next several days, Mr. Gibbs, Ms. Garcia,

6     and I will be presenting the evidence that establishes

7     Mr. Mallory's guilt.  We do so because it is the burden the

8     Constitution places upon us and that we embrace and because we

9     have a duty to create a detailed public record of the facts

10    that prove the very serious charges that Mr. Mallory is

11    facing.

12          The evidence will be as I described it, the

13    testimony from witnesses, documents pulled from the CovCom

14    device and SD cards, the chats with the Chinese intelligence

15    officer, Michael Yang, the videotape of the FedEx visit.

16          The proof of Mr. Mallory's guilt will not be hard to

17    find.  And at the end of the case, we will come back to you

18    and ask that you use the evidence as presented to you and the

19    law, as instructed by Judge Ellis, to return the only verdict

20    that the law, the evidence, and justice require, a verdict

21    finding Kevin Mallory guilty.

22          THE COURT:  All right.  Mr. Kamens, are you ready to

23    make your opening statement?

24          MR. KAMENS:  I am, Your Honor.  If the Court will

25    indulge us, we need to put up the demonstrative.  It's

─────────U.S. v. Mallory─────────

36

1   actually a summary exhibit.

2          THE COURT:  Well, all right.

3          MR. KAMENS:  It'll be just a moment.

4          THE COURT:  As I indicated, though --

5          MR. KAMENS:  It will come down.

6          THE COURT:  -- it will be as long as you need it and

7   then it will be taken down.

8          MR. KAMENS:  It will, Your Honor.  Thank you.

9                        **OPENING STATEMENT**

10         THE COURT:  All right.  You may proceed.

11         MR. KAMENS:  Ladies and gentlemen, I want to thank

12  you for serving as jurors in this very important case.

13         We are very proud to represent Kevin Patrick

14  Mallory, a loyal and patriotic American citizen, who has

15  served this country with distinction throughout his life.

16         Mr. Mallory is a military veteran.  He is someone

17  who is devoted to his church.  He is a person who, as you

18  heard, has served this country as a CIA or DIA officer for

19  over 20 years.

20         And the only reason we are sitting here in this

21  courtroom today is because Mr. Mallory knocked on the front

22  door of the CIA to tell them what he knew.  He did that

23  because he's a patriot.  He lives in Loudoun County with his

24  wife and daughter.  He has a son who just started college.  He

25  has a son who's on a religious mission overseas.

─────U.S. v. Mallory─────

1      And in this trial, you will learn he was trying to

2 help the United States, not harm it.  You will also hear

3 testimony that he is and always has been a patriot.  And that

4 is why he is innocent in this case.

5      This is a timeline of important events that took

6 place in the spring of 2017.  You'll learn about these events

7 during the course of this trial, but for now I just want you

8 to look at the red boxes.  Each red box in that timeline shows

9 Kevin's contacts with the CIA.

10      Kevin is charged with disclosing national defense

11 information, but at every step of the way he was trying to

12 help the CIA.  This case began when out of the blue in

13 February of 2017 Mr. Mallory received an e-mail on LinkedIn

14 from a Chinese headhunter.

15      It was about potential work as a consultant for a

16 think tank in Shanghai, that would be Shanghai Academy Social

17 Sciences.  It's a real think tank.  In fact, one of the people

18 that Mr. Mallory met and dealt with, Michael Yang, has been

19 paying people for -- or foreign consultants for research

20 papers and the like for years.  Kevin Mallory speaks Chinese.

21 He spent time in Asia, so this seemed like it could be a real

22 job lead.

23      Within days of that e-mail, Kevin reached out to

24 former colleagues of the CIA to let them know about the

25 contact.  He was interested in a potential job opportunity,

—————U.S. v. Mallory—————

1    but he was also a little suspicious.

2            He was interested in the job opportunity, but he was

3    also, as you heard -- he had fallen on some hard times over

4    the last few years.  He was running behind on his mortgage.

5    He did have significant credit card debt.  And he was

6    suspicious about this contact, which is why he kept reaching

7    out to people at the CIA.

8            The Chinese recruiter interviewed Kevin over Skype.

9    He had a subsequent e-mail, as you heard, with Mr. Michael

10   Yang.  He was invited to come to China for an in-person

11   interview.  And this was in early 2017.  The think tank said

12   to him that they were interested in the new Trump

13   Administration's policies in Asia.

14           Kevin agreed to go.  But he also kept reaching out

15   to colleagues at the CIA.  Kevin went to China.  He met with

16   Michael Yang and other people from the think tank.  They also

17   agreed to pay him $2,000 a day for his time, which actually is

18   not a great deal of money in comparison to Mr. Mallory's

19   debts.

20           Even while he was there, the think tank was not

21   exactly clear about what they were interested in.  They gave

22   him a short list of topics, including the Trump

23   Administration's policies that would affect China, and invited

24   him back for a second trip.

25           On the second trip, Kevin's suspicions that this was

U.S. v. Mallory

39

1  actually Chinese intelligence agents, who realized when they

2  gave him a cell phone with a communication -- covert

3  communication application, a special app, he took the phone

4  because he knew it might be useful to the CIA.

5        Within 72 hours of his return, you'll learn Kevin

6  reached out yet again to his contact with the CIA.  He was

7  practically begging to set up a meeting.  This is what he

8  said.  "Could you please go back to your point of contact to

9  reach over regarding the issue you and I discussed previously?

10  I recently returned from another business trip over there and

11  was again approached in a manner from their service."

12        Now, this message was before any of the documents at

13  issue in this case were sent to the Chinese.  His contact

14  didn't respond.  So Mr. Mallory reached out yet again.  He

15  said it was urgent.  Here's what he said.  "I sent you a text

16  message a couple of days ago.  Please look at the message.

17  It's kind of urgent for me because I've been over there again

18  and I keep getting banged on but in a little bit more detailed

19  way."

20        This is how his contact responded.  "Kevin, got your

21  text.  Sorry I haven't been able to pass on your request yet.

22  Been super busy at work.  Missed my colleague at work last

23  couple of days.  Will try again tomorrow."

24        Mr. Mallory was desperate to set up a meeting with

25  the CIA because a pitch by a foreign intelligence agency is

U.S. v. Mallory

40

1    also an opportunity, but one that can slip away.  It's an

2    opportunity for the United States to learn about foreign

3    intelligence.  Mr. Mallory did not want that opportunity to

4    slip away while CIA slowly got back to him.

5         So Mr. Mallory reached out yet again to his contact

6    and he said, "I know you're busy.  As I told you in the past,

7    I suspected who they are and didn't really know, but this time

8    they are even more suspicious with me.  You have my number.

9    Please feel free to let them know that this is obviously

10   someone from their counterpart to us."

11        Kevin wasn't thinking about making money from the

12   Chinese by consulting.  He was focused on telling the CIA what

13   he had learned.  But the CIA wasn't getting back to him and

14   the Chinese were already suspicious.  So Kevin did what he

15   knows how to do.  He pretended to the Chinese intelligence

16   agents that he had access to a recent classified government

17   information.

18        With the CIA responding so slowly, Mr. Mallory tried

19   to string the Chinese agents along.  So on May 1st, Kevin sent

20   the only things he ever sent to the Chinese using the phone, a

21   handwritten table of contents that listed eight documents, the

22   first document on the list and two unclassified handwritten

23   pages of notes.

24        The table of contents listed no information other

25   than the titles.  And Document 1 was essentially a fake.

─────────U.S. v. Mallory─────────

41

1   Kevin tried to make Document 1 look like it was a real

2   government document, but it's a one-page generic description

3   of how an intelligence operation could work.  And it's so

4   general, it could be of no real use.

5          And Kevin told Michael Yang that he had marked out

6   top secret classification marks on the top and the bottom,

7   but, in fact, they were fake.  You'll hear testimony, expert

8   testimony, that seven minutes after Kevin successfully sent

9   fake Document No. 1, he failed to send another document on the

10   list.  And that's because Kevin never intended to send any of

11   the other documents on the list.

12          Most importantly, you'll see that the information

13   that he actually did send posed no harm to the United States

14   from its release.  In fact, Michael Yang sent a text message

15   to Mr. Mallory.  And in the text message, he says, "The

16   Document 1 was just one introduction page.  No use at all."

17   He was right.

18          You'll also see that one of the things he sent, the

19   two unclassified notes on yellow-lined paper were essentially

20   gibberish that Kevin sent him to make the Chinese think that

21   he was sending them something important.

22          On May 2, 2017, one day after Mr. Mallory sent the

23   table of contents in Document 1, someone from the CIA finally

24   got back to him.  Kevin then told the Chinese agent that the

25   phone application wasn't working and he couldn't send any more

—U.S. v. Mallory—

42

1  documents.

2          But he knew how to work the phone.  He had written

3  down how to do it.  And he later brought those instructions

4  with him when he turned the phone over to the FBI.  But the

5  Chinese agents basically stopped communicating with him on the

6  phone after that.

7          When the CIA finally met with Kevin for the first

8  time on May 12, 2017, he was told not to bring the phone

9  because he can't bring it to the agency.  But Kevin told them

10  how to use the phone, he told him how to unlock it, he gave

11  them the password.

12          In this first meeting, he also told him how he had

13  used the phone to send something that was typed, that it was

14  an image, just as he told the CIA that the communications

15  system was designed to integrate a document into a picture.

16          At a second meeting two weeks later, Kevin gave the

17  agents the phone so they could copy it.  Then they gave it

18  back to him and let him go.

19          Now, the prosecutor just told you that Kevin was

20  surprised that there were chats on the phone, that he thought

21  they would all be deleted because of what he was told.  But

22  that's not true.  Kevin told the agents that he would show

23  them chats on the phone.

24          Now, Kevin admits he should not have kept documents

25  two through eight, the ones he never sent to the Chinese from

43

1   his work for the government a decade earlier.  And when he was

2   arrested, he was scared.  He called his family because he had

3   realized that the CIA had completely misunderstood his

4   intentions and he knew it was important to show that he had

5   never sent documents two through eight to the Chinese.

6          By turning over the phone, and describing how it

7   worked, Kevin Mallory demonstrated his patriotism.

8          THE COURT:  This has now turned to argument, not

9   opening statement.  The purpose of opening statement is to

10  forecast the evidence that the jury will hear.  Your

11  opportunity for you and Ms. Gellie to make argument will come

12  later.

13         MR. KAMENS:  Thank you, Your Honor.

14         You will also hear evidence that by turning over the

15  phone and providing it to the government, he ensured that the

16  phone and the application couldn't be used by him and it

17  couldn't be used by the Chinese to communicate with anybody

18  else in the future.

19         As I said at the beginning, the only reason we are

20  here is because Mr. Mallory wanted to share what he found with

21  the CIA.

22         If he was motivated by money, he would have kept his

23  mouth shut and never told the CIA anything.

24         But Kevin Mallory was trying to help the United

25  States.  And you cannot commit the incredibly serious crimes

---U.S. v. Mallory---

44

1    that he's charged with unless your purpose is to harm the

2    United States or help a foreign country.

3           Kevin Mallory has worn a white hat throughout his

4    career, and he didn't take it off and betray his country for a

5    relatively small amount of money that he was told was for

6    consulting work.  When he realized that this was a recruitment

7    effort by Chinese intelligence agents, he immediately went to

8    the CIA, essentially preventing him from getting any more

9    money from the Chinese.

10          Kevin Mallory was trying to do the right thing, and

11   that's why the evidence will show you all that he's completely

12   innocent of these charges.

13          Thank you.

14          THE COURT:  All right.  Mr. Flood, you may replace

15   the podium.  And remove the exhibit, please.

16          Ms. Garcia, will you be calling the first Government

17   witness?

18          MS. GARCIA:  Yes, Your Honor.  The United States

19   will call Michael Londregan.

20          THE COURT:  All right.  Come forward and take the

21   oath, please, sir.  You may use the Bible or simply affirm,

22   whichever you may prefer.

23          Thereupon,

24              **MICHAEL PATRICK LONDREGAN,**

25   having been called as a witness on behalf of the Government

—————U.S. v. Mallory—————

M. Londregan - Direct

45

1   and having been first duly sworn by the Deputy Clerk, was

2   examined and testified as follows:

3          THE COURT:  All right.  Ms. Garcia, you may proceed.

4                    **DIRECT EXAMINATION**

5   BY MS. GARCIA:

6   Q.   Mr. Londregan, will you please state your name and spell

7   it for the record.

8   A.   Michael Patrick Londregan, M-i-c-h-a-e-l P-a-t-r-i-c-k

9   L-o-n-d-r-e-g-a-n.

10  Q.   Where are you currently employed?

11  A.   The Defense Intelligence Agency.

12  Q.   And what is your current title there?

13  A.   I'm the director of security.

14  Q.   How long have you been employed at the DIA?

15  A.   I've been in the intelligence community 32 years, at DIA

16  21 years, and in my current position two years and nine

17  months.

18  Q.   Have you previously served as director of security

19  anywhere else?

20  A.   Yes.

21  Q.   Where was that?

22  A.   The Office of the Director of National Intelligence.

23  Q.   And as the director for security, what are your current

24  responsibilities?

25  A.   Oversee all aspects of security to protect the agency's

1   information, people, operations, and facilities.

2   Q.   Through your time working at DIA, have you become

3   familiar with SF86s, security readings, and debriefings?

4   A.   Yes, I have.

5   Q.   Can you please describe briefly SF86s?

6   A.   The standard form 86 is actually called the "National

7   Security Questionnaire."  It's the form that anybody seeking a

8   security clearance fills out.  That initiates the background

9   investigation process, which then looks into foreign contacts,

10  your background, your finances, et cetera.  That's the form

11  that initiates the process.

12  Q.   Can you briefly describe readings and debriefings to the

13  jury?

14  A.   Once a background investigation is complete, once someone

15  has successfully completed a polygraph, somebody makes a

16  favorable adjudication, in other words, a favorable decision

17  that this person is eligible for access to national security

18  information.

19        Once that favorable adjudication is made, we read

20  them in and indoctrinate them in and we provide them with the

21  terms and conditions of what it means to hold a security

22  clearance.

23  Q.   Have you ever yourself conducted security readings and

24  debriefings?

25  A.   Yes.

1    Q.   Ballpark, how many security readings and debriefings

2    would you estimate you've done?

3    A.   Actually readings, approximately 20.  In this current

4    capacity, I oversee the process as opposed to actually

5    conducting them.

6    Q.   And are documents that are signed as part of readings and

7    debriefings?

8    A.   Yes.

9    Q.   Generally speaking, what are those documents?

10   A.   The foundational document is a nondisclosure agreement.

11   The nondisclosure agreement is signed and you are attesting to

12   the fact that you understand the obligations inherent to

13   holding a security clearance.

14   Q.   And have you reviewed those documents that relate to

15   Kevin Mallory in preparation for your testimony here today?

16   A.   Yes, I have.

17   Q.   And have you also reviewed his SF86s and his entire

18   security folder in preparation for your testimony here today?

19   A.   Yes, I have.

20   Q.   Does his security folder contain information regarding

21   the dates and status of his employment with DIA?

22   A.   Yes, it does.

23   Q.   Generally, what is his employment history with DIA?

24   A.   Came to DIA in 2007.  Resigned in 2011.

25   Q.   And for his position with DIA, would those have required

─────────────U.S. v. Mallory─────────────

1   clearances?

2   A.   Absolutely.

3   Q.   What level?

4   A.   Top secret and also SCI, which stands for sensitive

5   compartmented information.

6   Q.   Would Mr. Mallory have had to fill out paperwork to

7   obtain this clearance?

8   A.   Absolutely, yes.

9   Q.   With the assistance of the court security officer.

10         Do you have a binder in front of you?

11         Mr. Flood, do you have the binder?  May we please

12   show him Government Exhibits 1-2 and 1-3?

13         Do you have Government's Exhibit 1-2 and 1-3?

14   A.   Yes.

15   Q.   Do you recognize those?

16   A.   Yes.

17   Q.   And what are they?

18   A.   This is the standard form 86, otherwise known as the

19   "National Security Questionnaire."

20   Q.   And who filled it out?

21   A.   This is the SF86 of Kevin Mallory.  This one is dated

22   June 23, 2004.

23   Q.   And the next one?

24   A.   Same national security questionnaire, standard form 86.

25   Kevin Patrick Mallory.  This one is dated October 3, 2005.

┌─────────────── U.S. v. Mallory ───────────────┐

1   Q.    Have you seen these prior to your testimony today?

2   A.    Yes, I have.

3   Q.    Where did you see them?

4   A.    In Mr. Mallory's security file.

5          MS. GARCIA:  And, Your Honor, I'm told that our --

6   apologize for interrupting testimony.  I'm told that our

7   laptop is not working.  I don't know if we can necessarily

8   take a break.  I can -- there are certain excerpts I was going

9   to highlight from the nondisclosure agreements Mr. Londregan

10  is going to talk about that we were going to put up.

11         THE COURT:  All right.  Is the problem on your

12  device or do we need to have the court IT people come up?

13         MS. GARCIA:  It's our device, Your Honor.

14         THE COURT:  All right.  Mr. Londregan, you may step

15  down, sir.  I'm going to take a brief recess.

16         Ladies and gentlemen, pass your books to the right.

17  The court security officer will collect them, maintain their

18  security during our morning break here.  It's now 10:30, so we

19  will recess for 20 minutes and then we will reconvene and

20  proceed till about 12:30.  Remember to refrain from discussing

21  the matter among yourselves or with anyone or undertaking any

22  investigation on your own.

23         There will be, I believe, soft drinks available for

24  you during this recess, which you may avail yourselves of.

25         You may follow Mr. Flood out.  Remember avoid any

U.S. v. Mallory

1    discussions in the case or undertaking any investigation.

2                 (Jury dismissed.)

3                 THE COURT:  All right.  Court stands in recess until

4    10 minutes to 11:00.

5                 (Recess.)

6                 THE COURT:  All right.  Mr. Londregan.

7                 MR. KAMENS:  Your Honor, can I briefly raise a

8    matter before the jury comes in?

9                 THE COURT:  Yes.

10                MR. KAMENS:  We had talked, I think, at a hearing on

11   Friday just about the rule on witnesses and the modifications

12   that the parties had agreed to.  I just want to make sure that

13   there are no witnesses in the courtroom today.

14                THE COURT:  Yes.  Well, I'll rely on counsel to

15   ensure that, because, of course, the Court can't know who the

16   witnesses are.  I'm sure you're looking carefully to make sure

17   your witnesses are not here.

18                MR. KAMENS:  Correct, Your Honor.

19                THE COURT:  Ms. Gellie, I'm sure you-all are doing

20   the same.

21                MS. GELLIE:  Correct, Your Honor.

22                THE COURT:  All right.

23                MS. GARCIA:  And, Your Honor, may they stay after

24   their testimony if they're not subject to recall?

25                THE COURT:  Yes.  I'll ask if there's any objections

1   to their being excused.  If they are excused, then they may

2   remain.

3            MS. GARCIA:  Thank you, Your Honor.

4            THE COURT:  All right.  Mr. Londregan, you'll

5   recall, sir, you remain under oath.  Come forward, sir, and

6   you may resume the stand.

7            Is the device now working, Ms. Garcia?

8            MS. GARCIA:  Your Honor, I'm sorry, it is imperfect,

9   but it is working, Your Honor.

10           THE COURT:  All right.  You may bring the jury in.

11           (Jury in.)

12           THE COURT:  Direct examination of Mr. Londregan.

13  BY MS. GARCIA:

14  Q.   Mr. Londregan, do you recall we were talking about

15  Government's Exhibit 1 -- I'm sorry -- 1-2 and 1-3?

16  A.   Yes.

17  Q.   Do you still have those in front of you?

18  A.   Yes, I do.

19  Q.   Looking at the pages --

20           THE COURT:  Are you offering these exhibits?

21           MS. GARCIA:  Not quite yet, Your Honor.  I'm just

22  having him verify the signatures and dates before I ask to

23  admit them.

24           THE COURT:  All right.  You may do so.

25  BY MS. GARCIA:

1    Q.   Looking at the ends of both documents, do you see

2    signatures and dates on both of those documents?

3    A.   Yes, I do.

4    Q.   What signature do you see on those documents?

5    A.   Kevin P. Mallory.

6    Q.   And are these documents substantially the same as when

7    you last saw them?

8    A.   Yes.

9          MS. GARCIA:  Your Honor, I would move at this time

10   to admit Government's Exhibits 1-2 and 1-3.

11         MR. KAMENS:  No objection.

12         THE COURT:  They're admitted.  You may display them

13   if you need to.

14                        (Government's Exhibit Nos. 1-2 and

15                        1-3 admitted into evidence.)

16   BY MS. GARCIA:

17   Q.   Looking at paragraph 31 in Government's Exhibit 1-2,

18   Bates-numbered on the bottom 1493 to 1494.

19         THE COURT:  Can you-all see those?  There's a screen

20   here to your left and there's also a screen down here at the

21   bottom.

22         All right.  Proceed.

23   BY MS. GARCIA:

24   Q.   What kind of information is contained within that

25   paragraph?

─────U.S. v. Mallory─────

1  A.    I'm sorry, the paragraph?

2  Q.    Paragraph 31, please.

3  A.    Paragraph 31.  This is a question on the national

4  security form that asks about your investigation record and

5  previous clearances that may have been granted to you.

6  Q.   And could you please read into the record the answer the

7  defendant provided.

8  A.    Defense Department sensitive compartmented information,

9  the date provided was February 4, 2004.

10 Q.    And underneath that?

11 A.    "Other CIA" is another answer under "Agency Description."

12 Q.    And it carries over to the next page, I believe, top of

13 the next page.

14 A.    "For sensitive compartmented information."  And then

15 third is the Defense Department for secret clearance.

16 Q.    And looking at Government's Exhibit 1-3, page 31 of that

17 exhibit, what kind of information does that contain?

18 A.    This is similar to the last.  This is the answer on the

19 standard form 86, the national security questionnaire, asking

20 the person of previous clearances granted.

21 Q.    And looking at -- and we can take that down now.

22         Looking at Government's Exhibit 1-1, just flipping

23 through 1-1 and 1-4 through 1-7.  I'll ask you if you

24 recognize these.

25 A.    1-1, yes, I recognize this.

U.S. v. Mallory

M. Londregan - Direct

54

1   Q.   And 1-4 and through 1-7.

2   A.   Yes, I recognize personal attestation form.

3          1-5 is the sensitive compartmented information

4   indoctrination, I recognize that.

5          1-6, sensitive compartmented information

6   nondisclosure statement, I recognize that.

7          1-7, sensitive compartmented indoctrination

8   memorandum for a specific program, I recognize that.

9   Q.   And have you seen these prior to today?

10  A.   Yes, I have.

11  Q.   Where did you see them?

12  A.   In Mr. Mallory's security file.

13  Q.   And do you see a signature at the end of each of those

14  documents?

15  A.   Yes, I do.

16  Q.   What signature do you see?

17  A.   Kevin P. Mallory.

18  Q.   Are these substantially the same as when you saw them

19  last?

20  A.   Yes.

21          MS. GARCIA:  Your Honor, I would offer Government's

22  Exhibit 1-1 and 1-4 through 1-7.

23          MR. KAMENS:  No objection.

24          THE COURT:  They're admitted.

25                      (Government's Exhibit Nos. 1-1,

─────U.S. v. Mallory─────

1            1-4 through 1-7 admitted into

2              evidence.)

3  BY MS. GARCIA:

4  Q.   All right.  Looking first to Government Exhibit 1-1,

5  please.  What specifically is the purpose of Government's

6  Exhibit 1-1?

7  A.   The nondisclosure agreement is the terms and conditions

8  that you accept when you are -- get granted a security

9  clearance.  It outlines clearly the rules and regulations that

10 go along in the expectations of you as an individual to

11 safeguard national security information.

12 Q.   And looking at paragraph 4, will you please read that

13 paragraph into the record?

14 A.   Paragraph 4?

15 Q.   Yes, please.

16 A.   "I have been advised that any breach of this agreement

17 may result in the termination of any security clearances I

18 hold, removal from any position of special confidence and

19 trust requiring such clearances or the termination of my

20 employment or other relationships with the departments or

21 agencies that granted my security clearance or clearances.  In

22 addition, I have been advised that any unauthorized disclosure

23 of classified information by me may constitute a violation or

24 violations of United States criminal laws, including the

25 provisions of Sections 641, 793, 794, 798, 952, and 1924,

M. Londregan - Direct

1  Title 18, United States Code; the provisions of Section

2  783(b), Title 50, United States Code; and the provisions of

3  the Intelligence Identities Protections Act of 1982.  I

4  recognize that nothing in this agreement constitutes a waiver

5  by the United States of the right to prosecute me for any

6  statutory violation."

7  Q.    And paragraph 8, will you please read paragraph 8 into

8  the record.

9  A.    Paragraph 8, "Unless and until I am released in writing

10  by an authorized representative of the United States

11  Government, I understand that all conditions and obligations

12  imposed upon me by this agreement apply during the time I am

13  granted access to classified information and all times

14  thereafter."

15  Q.    And turning next to Government's Exhibit 1-6.  I won't

16  ask you to read these into the record.  But, generally

17  speaking, paragraphs 6 and 9 -- well, first of all, what does

18  this document reflect?

19  A.    This form is the sensitive compartmented information

20  nondisclosure statement.  It's an additional nondisclosure

21  agreement that people that are going to hold a clearance for

22  SCI, sensitive compartmented information.  So if you imagine

23  top secret being the highest clearance, sensitive

24  compartmented information is that additional wrapper we put

25  around information that is gleaned from intelligence methods

──────────U.S. v. Mallory──────────

1    and sources.  So it's an additional disclosure and agreement.

2    Q.   And as I was saying earlier, I won't ask you to read

3    these paragraphs into the record.  But looking at paragraphs 6

4    and 9, generally what information do those paragraphs contain?

5    A.   Similar to the last, that I've been advised that any

6    breach of the agreement may result in termination of my access

7    to sensitive compartmented information and removal from a

8    position.

9    Q.   And looking at the last page, what is the date on this

10   document?

11   A.   Signed Kevin P. Mallory, 2007 September 4.

12   Q.   Turning next to Government's Exhibit 1-4.  What is this

13   document?

14   A.   This is a personal attestation form signed by Kevin P.

15   Mallory on September 4, 2007.  This form confirms that the

16   individual understands the standards and conditions contained

17   in the two nondisclosure agreements we just discussed.

18   Q.   Will you read the first paragraph, please.

19   A.   "I, Kevin P. Mallory, attest that I will conform to and

20   abide by all conditions and responsibilities imposed by law or

21   regulation or U.S. intelligence community standards as a

22   prerequisite of access to top secret information and

23   classified materials of any nature or kind."

24   Q.   Next looking at Government Exhibit 1-5.  What is that

25   document?

1   A.    This is an additional indoctrination form.  Oftentimes

2   there are special compartmented information that individuals

3   require to do their jobs.  And in this case, Mr. Mallory is

4   being indoctrinated and signed into sensitive information, SI,

5   top secret code word; TK; G, gamma; and H, HUMINT Control

6   System.

7   Q.    And what is the date on that document?

8   A.    The date is 2007, September 4.

9   Q.    Looking next to Government Exhibit 1-7.  What is that

10  document?

11  A.    Similar to the last where this is indoctrination

12  memorandum for a program related to critical and nuclear

13  weapons design information, CNWDI, Critical Nuclear Weapons

14  Design Information.

15  Q.    What is the date on that document?

16  A.    This is dated 2008, February 5.

17  Q.    Now, you've described security readings and debriefings.

18  Is there any training associated with security clearances?

19  A.    Yes, absolutely.

20  Q.    What are some of the things required when handling

21  classified information?

22  A.    In my 32 years in the intelligence community, at least

23  every year we are required to take some sort of refresher

24  training that reminds us on how to handle, safeguard,

25  classify, and mark information.

1  Q.   And can you go into a little more depth?  Those three

2  things you mentioned, I think you said safeguard, handle, and

3  mark.

4  A.   Correct.  So safeguarding is the -- is the handling of

5  and how we safeguard against unauthorized disclosure.  There's

6  basically three conditions that must be foundational, that

7  must be present in order for anyone to share classified

8  information.  And this is one of the things that we are

9  reminded of annually.

10      Individual must have a favorably adjudicated

11 security clearance.  You must have signed the nondisclosure

12 agreement, and then most importantly the individual you're

13 sharing the information with must have a need to know.

14      If any one of those conditions don't exist, you're

15 unauthorized to share.  And that is a constant reminder.

16 Q.   And -- apologize for interrupting.  Can you explain the

17 need to know?

18 A.   Need to know.  Just because I hold a top secret clearance

19 doesn't mean I have a need to know all top secret information.

20 I just have just the need to know that information, that

21 classified information, that I need to know in order to

22 perform and execute my duties in my job.

23 Q.   And at some point, did Mr. Mallory's employment status

24 change?

25 A.   Yes.

────U.S. v. Mallory────

1   Q.   And when was that?

2   A.   In 2009.

3   Q.   And just generally speaking, without circumstances, what

4   happened in 2009?

5   A.   His access to national security information was

6   suspended.

7   Q.   And were any security measures taken at that time?

8   A.   Explain -- the security measure that we took was a

9   suspension in a situation where we -- where we suspend access

10  to national security information, access to facilities, and

11  access to systems.

12  Q.   I'm going to -- if you'll please look at Government's

13  Exhibit 1-8.  Do you recognize this document?

14  A.   Yes, I do.

15  Q.   And what is it?

16  A.   This is a standard letter that the Office of Security

17  would send to an individual, notifying someone that their

18  access has been suspended.

19  Q.   And do you see a signature and date associated with this

20  document?

21  A.   Kevin P. Mallory, July 14, 2009.

22  Q.   Have you seen this prior to your testimony here today?

23  A.   Yes.

24  Q.   Where did you see it?

25  A.   Contained in Mr. Mallory's security file.

─────────────────U.S. v. Mallory─────────────────

1  Q.   Is it substantially the same as when you saw it?

2  A.   Yes.

3       MS. GARCIA:  Your Honor, at this time I'd like to

4  admit Government's Exhibit 1-8.

5       MR. KAMENS:  No objection.

6       THE COURT:  Admitted.  Next question.

7                          (Government's Exhibit No. 1-8

8                          admitted into evidence.)

9       MS. GARCIA:  Your Honor, I would ask that we publish

10 Government's Exhibit 1-8.

11      THE COURT:  You may do so.

12 BY MS. GARCIA:

13 Q.   Will you please read the second paragraph into the

14 record?

15 A.   Paragraph 2 of the letter, "Notification of access

16 suspension."  Paragraph 2, "You are reminded of your continued

17 obligation to protect classified information, sensitive

18 compartmented information, and intelligence sources and

19 methods from disclosure to unauthorized or uncleared personnel

20 under the provisions of Sections 793 and 794 of Title 18

21 United States Code and/or the appropriate articles of the

22 Uniform Code of Military Justice.  The time limit for

23 safeguarding such intelligence never expires."

24 Q.   And looking at Government's Exhibit 1-10, do you

25 recognize that?

———U.S. v. Mallory———

1    A.    Yes, I do.

2    Q.    What is it?

3    A.    This is a debriefing form.

4    Q.    And what does a debriefing form mean?

5    A.    The debriefing form is a reminder, it is a notification

6    that the individual is no longer in access and a reminder of

7    the need to continue to protect the classified information

8    that he was originally read into.

9    Q.    Do you see a signature and date associated with this

10   document?

11   A.    Yes.

12   Q.    What is that signature and date?

13   A.    Kevin P. Mallory, signed 2009 July 14.

14   Q.    Have you seen this document prior to your testimony

15   today?

16   A.    Yes, I have.

17   Q.    Where did you see it?

18   A.    In Mr. Mallory's security file.

19   Q.    Is it substantially the same as when you last saw it?

20   A.    Yes.

21           MS. GARCIA:  Your Honor, I would offer Government's

22   Exhibit 1-10 into the record.

23           MR. KAMENS:  No objection.

24           THE COURT:  Admitted.

25                        (Government's Exhibit No. 1-10

─────U.S. v. Mallory─────

1                          admitted into evidence.)

2            THE COURT:  You may display it, if you need to.

3    BY MS. GARCIA:

4    Q.   Yes.  Will you please -- may we publish and will you

5    please read the last typed portion before the signature,

6    please.

7    A.   "I was reminded of the need for special protection of

8    SCI," sensitive compartmented information, "of SCI material of

9    the fact that access to this material is governed by the terms

10   of the SCI nondisclosure agreement that I previously signed

11   and of my continuing obligation to comply with the terms of

12   that agreement."

13   Q.   At some point after this, did Mr. Mallory write to DIA

14   giving his resignation?

15   A.   Yes.

16                   (Discussion off the record.)

17            MR. KAMENS:  Your Honor, can we approach?

18            THE COURT:  What was the question asked?

19            MS. GARCIA:  I just asked whether at some point

20   after this Mr. Mallory wrote to DIA giving his resignation.

21   BY MS. GARCIA:

22   Q.   And what was your response, again?  Did you respond?

23   A.    I have not had a chance to respond.

24            MR. KAMENS:  He can respond.  We have no objection

25   to the response.

U.S. v. Mallory

M. Londregan - Direct

64

1          THE COURT:  You may respond.

2          THE WITNESS:  Mr. Mallory submitted his letter of

3   resignation in 2011.  I apologize, I don't recall the month.

4          MS. GARCIA:  And, Your Honor, I was going to have

5   him look at Government Exhibit 1-13, ask some questions and

6   move to admit it.

7          MR. KAMENS:  And that's why I'd ask to approach the

8   bench.

9          THE COURT:  1-13?

10          MS. GARCIA:  Yes, Your Honor.

11          THE COURT:  Just a moment.

12          (A pause in the proceedings.)

13          THE COURT:  All right.  Do you have an objection to

14   1-13?

15          MR. KAMENS:  Yes, Your Honor.

16          THE COURT:  All right.  Are you advised of that

17   objection, Ms. --

18          MS. GARCIA:  I don't know what the objection is,

19   Your Honor.

20          THE COURT:  I beg your pardon?

21          MS. GARCIA:  I haven't heard what it is quite yet,

22   Your Honor.

23          MR. KAMENS:  I would like to say it at the bench,

24   Your Honor.

25          THE COURT:  Yes.  But tell her first right now so

─────────────U.S. v. Mallory─────────────

1   that I can hear informed argument.

2                    (Discussion off the record.)

3          MS. GARCIA:  Your Honor, I'm advised of his

4   objection.  I disagree.  And we can discuss it at the bench,

5   Your Honor.  It relates to Your Honor's ruling this morning.

6          THE COURT:  404(b)?

7          MS. GARCIA:  Yes, Your Honor.

8          THE COURT:  All right.  He resigned from the Defense

9   Intelligence Agency at a particular date.  We have that in the

10  record.

11         MS. GARCIA:  We don't have the date yet, Your Honor.

12  I can refresh the witness' recollection.  He doesn't remember

13  the exact day, but he did say 2011.

14         THE COURT:  All right.  What is the date,

15  Mr. Londregan?

16         THE WITNESS:  27 April, 2011.

17         THE COURT:  All right.  Now I'll take your offer of

18  that exhibit under advisement, and I'll hear argument about it

19  later.  It relates to the same issue that I addressed earlier.

20         MS. GARCIA:  Mr. Kamens' objection does, as far as I

21  understand it, yes, Your Honor.

22         THE COURT:  All right.

23         MS. GARCIA:  Your Honor, may I check with my

24  co-counsel to see if they have any additional questions for

25  this witness?

U.S. v. Mallory

1          THE COURT:  Yes.

2          MS. GARCIA:  All right.  No further questions, Your

3   Honor.

4          THE COURT:  All right.  Any cross-examination?

5          MR. KAMENS:  Yes, Your Honor.

6                     **CROSS-EXAMINATION**

7   BY MR. KAMENS:

8   Q.   Good morning, Mr. Londregan.  You reviewed -- you

9   testified that you reviewed Mr. Mallory's employment file to

10  obtain these documents?

11  A.   The security file.

12  Q.   The security file.  And you identified the classified

13  nondisclosure agreements and his 2004 and 2005 security

14  clearance applications?

15  A.   Yes.

16  Q.   And you testified that Mr. Mallory worked for the Defense

17  Intelligence Agency from 2007 through 2011?

18  A.   That's correct.

19  Q.   But a number of these documents predate his employment

20  with the Defense Intelligence Agency; is that correct?

21  A.   The standard form, SF86, yes, it does.

22  Q.   Not just the standard form SF86, but also Government's

23  Exhibits 1-1, 1-5, 1-6.  If you can look, all of those date to

24  July 9, 2004; is that right?

25  A.   1-1 is dated 2007.  The others you mentioned, sir?

─────────────U.S. v. Mallory─────────────
M. Londregan - Cross
                                                                    67

1   Q.   Let me ask you:  What is the date of the signature on

2   1-1?

3   A.   2007, September 4.

4   Q.   Oh, I see.  So the month is second and then it's

5   September 4, 2007?

6   A.   My understanding.

7   Q.   Okay.  And go to Government's 1-5.

8   A.   Reading from the -- what's in parentheses 2007,

9   September 4.

10  Q.   All right.  So the same day?

11  A.   Yes.

12  Q.   And then Government's 1-6?

13  A.   2007, September 4.

14  Q.   All right.  So it's fair to say that all of these

15  documents were probably handed to Mr. Mallory on the same day?

16  A.   Correct.

17  Q.   And a stack of other documents that he was signing on the

18  first day of his employment?

19  A.   Correct.

20  Q.   And he was required to sign those as a condition of his

21  employment for the Defense Intelligence Agency?

22  A.   Yes.

23  Q.   Now, classified information can expire, or that is the

24  classified -- the classification of information can expire,

25  can it not?

────────────────── U.S. v. Mallory ──────────────────

M. Londregan - Cross                                                      68

1    A.    That's goes to a form of declassification process.

2    Q.    Isn't there a presumption in the governing executive

3    orders that provides --

4              MS. GARCIA:  Your Honor, objection.  Outside the

5    scope of his testimony.

6              THE COURT:  It is.

7    BY MR. KAMENS:

8    Q.    Well, you testified earlier that --

9              THE COURT:  I'm sorry, it is.  I've sustained that.

10             MR. KAMENS:  And I'm not going to ask about that.

11   I'm going to another question, Your Honor.

12             THE COURT:  All right.

13   BY MR. KAMENS:

14   Q.    You testified earlier about your training as a DIA

15   employee; is that right?

16   A.    Yes.

17   Q.    And that you get refresher training every year?

18   A.    Correct.

19   Q.    And in the -- pursuant to that training, have you been

20   advised that there are executive orders that govern or provide

21   regulations relating to the classification information?

22   A.    Yes.

23   Q.    Are you familiar with those executive orders?

24   A.    Yes.

25   Q.    And so if you would look at Defense Exhibit 8A-1 and

───────────U.S. v. Mallory───────────
M. Londregan - Cross
69

1    8A-2.

2                (A pause in the proceedings.)

3                MS. GARCIA:  Your Honor, if Mr. Kamens is

4    offering -- is going to ask him about this, I would object.

5    It's still outside the scope.

6                MR. KAMENS:  Well, I can just ask him, Your Honor.

7    BY MR. KAMENS:

8    Q.   Are you aware that there are presumptive expiration dates

9    for the classification of information from the governing

10   executive orders?

11   A.   I would challenge the word "presumptive."

12               MS. GARCIA:  We renew our objection to this line of

13   questioning, Your Honor.

14   BY MR. KAMENS:

15   Q.   Well, I'll ask him:  How do you -- how do you explain it?

16   What do you mean --

17               THE COURT:  I'm going to sustain.  There are

18   witnesses for this.  And I'm not going to have that

19   sidestepped.

20               MR. KAMENS:  Understood.

21   BY MR. KAMENS:

22   Q.   You testified earlier that you reviewed Mr. Mallory's

23   security file; is that right?

24   A.   Yes.

25   Q.   Did you notice in the security file whether Mr. Mallory

1   was ever given derivative classification authority?

2   A.   That was not in the security file, nor would that be the

3   place for it to be.

4   Q.   Would there be any information in the security file about

5   whether he was ever trained in the proper application of

6   derivative classification authority?

7   A.   That would be in his training file, not the security

8   file.

9   Q.   I see.  All right.  You testified earlier about need to

10  know.  You have to answer verbally.

11  A.   Yes.

12  Q.   And you stated that an individual is not entitled to

13  review classified information simply because they have a

14  requisite classification clearance level; is that right?

15  A.   Correct.

16  Q.   They also have to have a need to know?

17  A.   Correct.

18  Q.   Now, at the time that these exhibits were dated, the

19  governing regulation on classification defined the meaning of

20  need to know, did it not?

21  A.   I can't speak to that.

22  Q.   Well, if I showed you the executive order, definition of

23  need to know, would that refresh your recollection?

24  A.   Yes.

25  Q.   All right.  If you would, take a look at Defense

─────U.S. v. Mallory─────

1   Exhibit 8A-1.

2           Actually, if you can look at the one -- or 8A-3, on

3   the second page of 8A-3.

4   A.   Is that a binder?

5   Q.   Oh, I'm sorry, it's right there.

6           THE CSO:  Which binder is it?

7           MR. KAMENS:  I believe it's the third binder,

8   Exhibit 8A-3.

9           THE CSO:  8A-3?

10          MR. KAMENS:  8A-3.  That's right.

11  BY MR. KAMENS:

12  Q.   If you can, just look at the second page.  Don't read it

13  out loud.

14          Do you see that?  Can you look at it?

15          And can you review the information on that page and

16  see if it refreshes your recollection about the definition of

17  "need to know."

18          THE COURT:  The question before you is whether

19  having read this, do you have a present recollection, as you

20  sit here today, as to whether that defines or clarifies need

21  to know?

22          THE WITNESS:  Yes, Your Honor.  Thank you.

23          Yes, I understand that definition.

24  BY MR. KAMENS:

25  Q.   All right.  Does that refresh your recollection about the

———————U.S. v. Mallory———————
M. Londregan - Cross
                                                                            72

1    meaning of "need to know"?

2    A.   Yes.

3    Q.   And is it fair to say that under the governing order at

4    the time, need to know could be determined by the authorized

5    holder of information?

6    A.   It would be up to that individual to verify that the

7    other two conditions exists, meaning a favorably adjudicated

8    security clearance was present and a repository, a government

9    intelligence community repository; and, second, whether or not

10   they have signed a nondisclosure agreement.  And then you can

11   make that determination whether they have a need to know to

12   perform the function as stated here.

13   Q.   And the authorized holder would be the one who would make

14   that determination?

15   A.   Correct.  It's incumbent upon them.

16          MR. KAMENS:  Thank you.  Nothing further.

17          MS. GARCIA:  No redirect, Your Honor.

18          THE COURT:  I take it, though, the person who has to

19   make that determination is bound by the consequences if that

20   person makes an error?

21          THE WITNESS:  Yes, Your Honor.

22          THE COURT:  All right.  Thank you.  You may step

23   down.

24          (Witness excused.)

25          MS. GARCIA:  Your Honor, per Government's exhibit,

1    the last one, do you want to take it up after this witness

2    or --

3              THE COURT:  No, let's -- you may remain there for a

4    moment.  Come to the bench.  Let's take it up now.

5              Ladies and gentlemen, we frequently have conferences

6    at the bench in order to resolve certain objections that may

7    be raised to testimony or to exhibits.  The reason it is done

8    at the bench is because the arguments that will be made

9    generally involve material that won't be admitted into

10   evidence and therefore won't be part of what you have to

11   consider.

12             I'll try to make them as brief as possible.

13             (Bench Conference.)

14             THE COURT:  Now, what's your objection, Mr. Kamens?

15             MR. KAMENS:  Your Honor, there's a lot of

16   information in the resignation letter that is irrelevant to

17   the case.  It relates to Mr. Mallory's dispute with the

18   Defense Intelligence Agency.

19             THE COURT:  Well, it's currently irrelevant.  It may

20   become relevant under 404(b) if Ms. Garcia crosses the

21   threshold --

22             MS. GARCIA:  And, Your Honor, I --

23             THE COURT:  Wait until I --

24             MS. GARCIA:  I'm sorry, Your Honor.

25             THE COURT:  She can't get two of us at the same

U.S. v. Mallory

M. Londregan - Cross

74

1    time.

2            MS. GARCIA:  Yes, Your Honor.

3            THE COURT:  So if she crosses the threshold of

4    admissibility on 404(b), I'm not sure this wouldn't be

5    relevant.

6            MR. KAMENS:  Well, Your Honor, the difference is

7    that this includes information that goes beyond the OIG

8    investigation.  Mr. Mallory had a number of disputes with the

9    DIA.  There were a number of issues that led to his departure.

10           The Court found that one of those issues could

11   potentially be relevant under 404(b), but all the other

12   extraneous employment issues he had, I don't think, are

13   relevant and they fall outside of the Government's 404(b)

14   notice.  They relate to prior alleged bad acts that are not in

15   their 404(b) notice, which is limited to the OIG

16   investigation.

17           THE COURT:  All right.  Ms. Garcia?

18           MS. GARCIA:  Your Honor, I don't even think this is

19   404(b).  This talks about -- this is the Defense talking about

20   the enormous strain that DIA -- being on admin leave to put on

21   his family.  It talks about really what was at issue for admin

22   leave was a personality dispute, a personnel disagreement.

23   It's the circumstances behind his responses of the defendant's

24   own statements.  It doesn't get into prior bad acts.

25           It gets into -- and, frankly, Your Honor, it goes to

─────────────U.S. v. Mallory─────────────

1    -- just the fact that, you know, Mr. Kamens said in his

2    opening, "white hat, patriot."  This doesn't get into bad

3    acts, but it does show that he didn't leave on good terms.

4    But it doesn't get into bad acts.  He just was angry.

5            THE COURT:  What is it in this letter that you think

6    is relevant to the Government's case?

7            MS. GARCIA:  So we think it's relevant that he

8    didn't leave on good terms because he did not reach out to DIA

9    the same way that he reached out to someone from the CIA.  So

10   in the defense opening, they've made a big deal about all the

11   contacts that Mr. Mallory made with the CIA.  The alleged past

12   document contains DIA information.  He never reached out to

13   DIA, nor would he have because he left under bad

14   circumstances.  His own statements.  It doesn't talk about

15   prior bad acts.  It talks about the fact that he was put on

16   admin leave as a result of personality dispute.

17           THE COURT:  Do you have any objection, Mr. Kamens,

18   to the second sentence -- that is, the first and second

19   sentence, that is, that he resigns and that he "takes this

20   action due to the enormous strain the agency has placed upon

21   my family and me."

22           MR. KAMENS:  I don't have an objection to the first

23   sentence, "I resign my employment at DIA."  I think everything

24   thereafter relates to, as Ms. Garcia just said, that he didn't

25   leave on good terms and his bad relationship with the DIA.

U.S. v. Mallory

1          THE COURT:  What's wrong with the second sentence?

2  It's his word.

3          MR. KAMENS:  Right.  And so we're not saying it's

4  hearsay.  It's a statement from --

5          THE COURT:  You're saying it's just irrelevant?

6          MR. KAMENS:  Right.

7          THE COURT:  Well, you may lose on that unless you

8  want to say more.

9          MR. KAMENS:  Okay.  Well, simply, I'll agree with

10  the second sentence, but the rest of it all relates to just

11  irrelevant material.

12          THE COURT:  That seems to me, Ms. Garcia, to be best

13  at this time.  I don't know what evidence you'll submit in the

14  future, but I will permit the first and second sentences, and

15  the rest will be redacted.

16          MS. GARCIA:  Thank you, Your Honor.

17          THE COURT:  All right.  And I'll tell the jury that

18  you may publish this -- do you have the ability to publish the

19  first and second sentences?

20          MS. GARCIA:  We can --

21          THE COURT:  I mean, the electronic ability to do

22  that?

23          MS. GARCIA:  I can ask.

24          MR. GIBBS:  He may be able to.

25          MS. GARCIA:  Your Honor, we can keep the header as

U.S. v. Mallory

M. Londregan - Cross

77

1    well.  Mr. Kamens, do you have any objection to the header?

2              MR. KAMENS:  I don't have any objection to that.

3              MS. GARCIA:  And the -- and the signature?

4              MR. KAMENS:  And with respect to the signature, no

5    objection.

6              THE COURT:  All right.  Let's proceed.

7              MS. GARCIA:  Thank you, Your Honor.

8              (Open court.)

9              THE COURT:  Ladies and gentlemen, I've heard the

10   objection.  I'm going to sustain it in part and overrule it in

11   part.

12             Two sentences from the letter will be admitted.  I'm

13   exploring at the moment whether electronically that can be

14   divided up so that it can be displayed to you and then we will

15   go on.

16             And we won't need Mr. Londregan anymore; is that

17   correct?

18             MS. GARCIA:  Not for the Government, Your Honor.

19             THE COURT:  All right.  Is there any objection

20   beyond what was stated at the bench to the first two

21   sentences?

22             MR. KAMENS:  No objection, Your Honor.

23             THE COURT:  All right.  You may step down, sir.  You

24   don't have any questions about those two statements?

25             MS. GARCIA:  No.  I was just going to have him --

─────U.S. v. Mallory─────
M. Londregan - Redirect
78

1  rather than publish it, I was just going to have him read --

2  going to have him read the first two sentences into the

3  record.

4          THE COURT:  All right.  That's perfectly

5  appropriate.  I don't want to cause any electronic problems.

6  Go ahead, Ms. Garcia.

7                    **REDIRECT EXAMINATION**

8  BY MS. GARCIA:

9  Q.   Mr. Londregan, on Plaintiff's Exhibit 1-13, I would ask

10  that you state the signature, the date, and then read the

11  first two sentences into the record, please, once you have it.

12  A.   Okay.  I have it here.

13  Q.   And just --

14          THE COURT:  Read the header and the first two

15  sentences and the signature line.

16          THE WITNESS:  Yes, Your Honor.

17          From Kevin P. Mallory, date 27 April, 2011, subject:

18  Submittal of resignation.  I'll read the first two sentences.

19          THE COURT:  What about the first two things at the

20  header?

21          THE WITNESS:  I apologize, Your Honor.

22          It's addressed to whom it may concern through

23  Mr. James Mault from Kevin P. Mallory, date 27 April, 2011,

24  subject:  Submittal of resignation.  "Effective this date, I

25  resign my employment with DIA.  I take this action due to the

─U.S. v. Mallory─

1    enormous strain the agency has placed upon my family and me."

2    BY MS. GARCIA:

3    Q.   And then the signature, please.

4    A.   Signed Kevin P. Mallory, 28 April, 2011.

5             MS. GARCIA:  No further questions at this time, Your

6    Honor.

7             THE COURT:  All right.  Any cross-examination?

8             MR. KAMENS:  Nothing further.

9             THE COURT:  You may step down, sir.  May this

10   witness be excused or is he subject to recall?

11            MS. GARCIA:  He's not subject to recall for the

12   Government, Your Honor.

13            MR. KAMENS:  No objection.  He's released.

14            THE COURT:  All right.  You may be excused.

15            (Witness excused.)

16            THE COURT:  All right.  You may call your next

17   witness.

18            MR. GIBBS:  Thank you, Judge.  Ralph Stephenson.

19            THE COURT:  Mr. Gibbs, how long a witness will this

20   be?

21            MR. GIBBS:  My direct will probably be not even ten

22   minutes.

23            THE COURT:  All right.  Come forward, sir, and take

24   the oath, please.

25            (Witness seated.)

─────U.S. v. Mallory─────

1          Thereupon,

2                          **RALPH STEPHENSON,**

3    having been called as a witness on behalf of the Government

4    and having been first duly sworn by the Deputy Clerk, was

5    examined and testified as follows:

6          (Witness seated.)

7          THE COURT:  All right.  Mr. Gibbs, you may proceed.

8          MR. GIBBS:  Thank you, Your Honor.

9                        **DIRECT EXAMINATION**

10   BY MR. GIBBS:

11   Q.   Good morning, sir.

12          Sir, would you please state and spell your name for

13   the record.

14   A.   My name is Ralph Stephenson, R-a-l-p-h

15   S-t-e-p-h-e-n-s-o-n.

16   Q.   Sir, who do you work for?

17   A.   Central Intelligence Agency.

18   Q.   And that's also known as the CIA?

19   A.   Yes.

20   Q.   How long have you worked at the CIA?

21   A.   For over 30 years.

22   Q.   And were you working there in 2017, last year?

23   A.   Yes, I was.

24   Q.   Now, without going into great detail, what were you doing

25   at CIA in 2017?

—U.S. v. Mallory—

 1   A.   I'm what's called a plans officer or a resource analyst.

 2   We do long-term strategic resource planning.

 3   Q.   Now, do you know the defendant, Kevin Mallory?

 4   A.   Yes, I do.

 5   Q.   Is he here in the courtroom?

 6   A.   Yes, he is.

 7   Q.   Could you please point him out and identify him by what

 8   he's wearing?

 9   A.   He's wearing -- he's the fourth -- third from you to the

10   left.  He's wearing a dark suit, a black suit.

11        THE COURT:  The record will reflect that the witness

12   has identified the defendant.  Next question.

13        MR. GIBBS:  Thank you, Judge.

14   BY MR. GIBBS:

15   Q.   Now, Mr. Stephenson, was your relationship with Kevin

16   Mallory a professional relationship?

17   A.   No.

18   Q.   So how did you two meet?

19   A.   We met at church.  We worked together in a Chinese

20   language congregation in Centerville, Virginia.

21   Q.   And, sir, if could keep your voice up when you speak,

22   please.

23        And how long ago did you two meet.

24   A.   November 2011, so about six and a half years ago.

25   Q.   And how well did the two of you know one another?

1   A.   We're casual friends and, again, we work together.

2   Q.   And so did the defendant know where you worked?

3   A.   I believe I did tell him, yes.

4   Q.   And what happened in February of 2017 where the defendant

5   contacted you about your work?

6   A.   Okay.  On February 22 I received a text message on my

7   phone, in fact, a series of text messages where Kevin was

8   asking me whether I could get him in touch with people who

9   worked where I worked, particularly people in the East Asia

10  Division, the China program there.

11  Q.   And you said this was a series of text messages from

12  defendant?

13  A.   Yes.  Yes.  There's more than one back and forth between

14  us.

15  Q.   And what phone were these text messages sent to?

16  A.   My personal cell phone.

17  Q.   And did you recognize the defendant's phone?

18  A.   I recognized that it was from him, yes.

19  Q.   What did he say in these text messages beyond what you

20  just testified about getting in contact with someone?

21  A.   He wanted to get in contact -- I'm not going to name the

22  positions here unless I must.  But he wanted to get in touch

23  with people who were leading China operations in the East Asia

24  Division or the chief of the East Asia Division.

25  Q.   And, Mr. Stephenson, what was your reaction --

U.S. v. Mallory

1    THE COURT:  Mr. Stephenson, you sort of swallow your

2    words at the end, and my ears are not what they once were,

3    indeed, nothing is like what it once was.  So please speak up.

4    THE WITNESS:  Okay.  So you guys -- can you hear me?

5    You can't hear me.  Okay.  I'll speak louder.

6    MR. GIBBS:  All right.  Thank you.  And thank you,

7    Judge.

8    BY MR. GIBBS:

9    Q.   So, Mr. Stephenson, what was your reaction to receiving

10   these types of text messages on your personal phone?

11   A.   It made me extremely uncomfortable, very uncomfortable.

12   I thought it was extremely inappropriate, not just a little

13   inappropriate, but extremely inappropriate.

14   Q.   And why did it make you so uncomfortable?

15   A.   I can't get into classified things here, but it just made

16   me uncomfortable because it was talking about sensitive things

17   and in an environment that is not protected at all, that is

18   open.

19   Q.   And when you say a "sensitive environment," are you

20   talking about your personal cell phone?

21   A.   Well, no, I mean talking -- it was talking about

22   sensitive things related to work where I work in a completely

23   open environment, cell phones.  Cell phone messaging back and

24   forth, that's a completely unsecure, unsafe environment.

25   Q.   And so what did you do with your cell phone as a result

—————U.S. v. Mallory—————

1   of that?

2   A.   I responded that I didn't want to continue this

3   conversation here, and I immediately deleted all the text

4   messages.  I didn't want them on my phone.  They made me very

5   uncomfortable with them being on my phone.

6   Q.   And --

7            THE WITNESS:  Can everyone hear me okay?

8            THE COURT:  Yes.

9            THE WITNESS:  Okay.

10  BY MR. GIBBS:

11  Q.   Mr. Stephenson, what, if anything, did you tell -- he had

12  asked you about getting in contact with someone.  What, if

13  anything, did you tell him about who you could get in contact

14  with for him?

15  A.   I told him that I'd be willing to get in touch with

16  security, and he responded, no, that would not be good.

17  Q.   Now, why did you tell the defendant you would get in

18  touch with security?

19  A.   Because that is standard operating procedure when someone

20  starts talking to you about -- someone who is on the outside

21  who is not part of your organization, when they start talking

22  to you about things like that, that is standard operating

23  procedure.

24  Q.   And when you say "standard operating procedure," is this

25  standard operating procedure at the CIA?

─────── U.S. v. Mallory ───────

1   A.   Yes.

2   Q.   And is that something --

3   A.   To report such things to security, yes.

4   Q.   And is that something that you are trained to do as an

5   employee of the CIA?

6   A.   Absolutely, yes.

7   Q.   And when you told the defendant that you could report

8   this contact to security, what was his response again?

9   A.   He said that would not be good.

10  Q.   Did that prevent you from reporting it to security?

11  A.   No, it did not.  Absolutely not.  The next day I reported

12  it.

13  Q.   And why didn't the fact that the defendant said it would

14  not be good for him prevent you from reporting this to

15  security?

16  A.   Because, again, this is a legal issue and it's a

17  counterintelligence issue and it needs to be reported.  I

18  didn't think -- the only thing that made me uncomfortable

19  about this was that it was discussing very sensitive info.  I

20  had no idea what other implications there may be, but it made

21  me very uncomfortable discussing such sensitive intel over an

22  open phone line.  And that -- and the fact that that request

23  was made to me, to me, triggered the report it to security

24  rules and I did.  And I'm glad that I did.  They appreciated

25  it.

─────U.S. v. Mallory─────
R. Stephenson - Direct
86

1          THE COURT:  What was the last thing you said?  I'm

2    sorry.

3          THE WITNESS:  Reporting it to security, that the

4    fact that it was sensitive, that it was discussing it over

5    open phone lines triggered in my mind the need to report it to

6    security, which I did.

7          THE COURT:  Next question.

8    BY MR. GIBBS:

9    Q.   And you mentioned that in the original text messages from

10   the defendant, he wasn't asking you to report this to

11   security, he was asking you to report it to some other

12   component, correct?

13   A.   Yes, yes.

14   Q.   And what other component was he asking you to report it

15   to?

16   A.   To talk to the East Asia Division, to get him in touch

17   with certain leaders of East Asia Division.

18   Q.   And what, if anything, did you tell the defendant about

19   whether you would assist him getting in touch with someone

20   from the East Asia Division?

21   A.   I gave him no encouragement.  I don't know exactly what I

22   said, but I gave him no encouragement.  As I said earlier,

23   this conversation made me feel very uncomfortable.

24          I did follow up -- one thing that I should add here

25   is I did follow up with an e-mail after I deleted the text

─────────U.S. v. Mallory─────────
R. Stephenson - Direct
87

1   messages from my phone.  I went home, sent an e-mail that was

2   very generic, saying -- not discussing anything sensitive,

3   just saying the people you want me to get in touch with, I

4   don't work there anymore.  I moved on.  Many of them retired,

5   they are not there.  And I don't think we should continue this

6   conversation.  I will talk to you at church on Sunday morning

7   if you need to talk more.

8   Q.   It sounds like your discomfort level --

9        MR. KAMENS:  Objection to leading and

10  mischaracterization of the testimony.

11       THE COURT:  All right.  It is leading.  Go ahead,

12  Mr. Gibbs.

13  BY MR. GIBBS:

14  Q.   You mentioned about talking to him at church the next

15  Sunday.  Did you, in fact, see the defendant the next Sunday?

16  A.   I did.

17  Q.   Was that in person?

18  A.   This was -- February 22 was the exchange of text and

19  e-mails and February 26 was the Sunday where we talked.

20  Q.   And on February 26, when you talked to the defendant,

21  what did you tell him related to this testimony today?

22  A.   I told him to never do that again.  I spoke to Kevin very

23  harshly.  I've never spoken him to that way -- I've never

24  spoken to him -- to him that way before, and I think he was

25  shocked .  But I said, "Don't ever discuss something like that

R. Stephenson - Direct/Cross

1  in that way with me again.  Please never do this.  This is

2  inappropriate."  And that was that.  That was -- it was pretty

3  much a one-way conversation.

4  Q.   And what was his response when you spoke to him so

5  harshly that day at church?

6  A.   He just sort of withdrew.  And we really didn't talk too

7  much after that about much of anything, but definitely that

8  topic never came up again.

9  Q.   So you had no further communications with him about any

10  work he was doing in China after that?

11  A.   No.  I have no memory of anything, any conversations even

12  remotely related to that that was addressed to me.

13        MR. GIBBS:  That's all the questions I have, Judge.

14  Thank you, sir.

15        THE COURT:  Any cross-examination?

16        MR. KAMENS:  Yes, Your Honor.

17                   **CROSS-EXAMINATION**

18  BY MR. KAMENS:

19  Q.   Mr. Stephenson, you just testified you met Mr. Mallory in

20  2011?

21  A.   November 2011, yes.

22  Q.   You're both members of the same Mormon congregation?

23  A.   Yes.

24  Q.   You'd see him on a regular basis?

25  A.   Yes.

─────U.S. v. Mallory─────
R. Stephenson - Cross

1   Q.   On Sundays?

2   A.   Yes.

3   Q.   And you said you were casual friends?

4   A.   Yes.

5   Q.   Now, you are currently employed by the CIA?

6   A.   Yes.

7   Q.   But prior to 2017, Mr. Mallory never talked to you about

8   his prior employment in the intelligence community; is that

9   right?

10  A.   I heard him -- I can't say for sure that he never

11  discussed anything about it.  I had knowledge that he had

12  worked as a case officer before.  I don't remember how I got

13  that, but I did know that.  And he had talked to me about him

14  serving as -- serving in the military.  I do remember that

15  directly face-to-face.  We did have a face-to-face

16  conversation, that I remember, yes.

17  Q.   You didn't have any in-depth conversations about his

18  prior experience; is that correct?

19  A.   Not really, no.

20  Q.   Now, you testified that there was a series of text

21  messages on, I think you said, February 22?

22  A.   Yes, correct.

23  Q.   Now, before that, before that date, actually on

24  February 19, you had a phone call with Mr. Mallory; is that

25  right?

─────────U.S. v. Mallory─────────

1    A.    That's what I've heard.  I don't remember.  It was not

2    about what I just discussed.

3    Q.    All right.  Let me show you what's been marked for -- in

4    the Defendant's Volume 1, Exhibit 2A-4.  And I just want you

5    to look to see if that 2A-4 -- without saying your phone

6    number out loud, that that is your phone number, if it

7    refreshes your recollection?

8    A.    Which one?

9    Q.    2A-4.

10   A.    There are two phone numbers there.

11   Q.    Well, one for you and one for your relation?

12   A.    Yes.

13   Q.    All right.  So those are both phone numbers --

14   A.    Family phone numbers.

15   Q.    That are family phone numbers.  And I'm not going to say

16   what those phone numbers are.

17   A.    Thank you.

18   Q.    But now --

19   A.    I don't want to get telemarketing after this.

20   Q.    I don't know that --

21   A.    As a result of this.

22   Q.    If you can, now look at Defendant's 2A-2 and look at

23   page 81 of 2A-2.

24            THE COURT:  Is that in the book you provided before?

25            MR. KAMENS:  It is, Your Honor.  It's in the same

───U.S. v. Mallory───

1   volume.

2          THE WITNESS:  2A-2 and I see 2A-4 --

3   BY MR. KAMENS:

4   Q.   Yeah, I'm sorry.

5   A.   It's way back here.  Okay.  Got it.

6   Q.   It's a phone record.  If you'll look on page 81 at the

7   bottom.

8          THE COURT:  2A -- what was it?

9          THE WITNESS:  I'm sorry, I'm having trouble

10  following.

11  BY MR. KAMENS:

12  Q.   2A-2.  Look at the tab, 2A-2.  And the first page, I

13  think it says AT&T records.

14  A.   Yes.

15  Q.   Now, go to page 81 of that record.

16  A.   81.

17  Q.   I think at the bottom it says KPM95.

18  A.   Got it.

19  Q.   Okay.  Now, if you look, do you see the last three

20  entries on that page dated February 19, 2017?

21          Do you see that?

22  A.   Okay.  In page 81, last three entries.  Got it.

23  Q.   Okay.  And now do you see the phone numbers -- two of the

24  phone numbers that I just showed you --

25  A.   Yes.  Two of the three rows have those two phone numbers.

────────────U.S. v. Mallory────────────

1   Q.   In two of the rows, your number is on the right and then

2   the last one your number is on the left.  Do you see that?

3   A.   I'm looking.  The number is on the left.  Number

4   originating --

5   Q.   Originating.

6   A.   Yeah.

7   Q.   So do you see that?  Do you see that phone number there?

8   A.   Yes.

9   Q.   So that reflects that apparently on this date,

10  February 19, 2017, you had a series of phone calls using that

11  phone number; is that right?

12  A.   We discussed church business on a regular basis.  I'm

13  sure that's what that phone call was, because I have no memory

14  of it otherwise.  Yeah, he sometimes asked me to do things.

15  Sometimes I had to call him and ask questions.  It was -- it

16  was not an every week, every day, but we had business from

17  time to time, church business.

18  Q.   So you're saying, sir, that if we looked through all of

19  these phone numbers -- or these calls on this call record that

20  we would see your number come up occasionally?

21  A.   Probably.

22  Q.   Because you're kind of old friends?

23  A.   Well, because we were doing church business together.

24  Q.   I see.

25  A.   That is what I would call him about or he would call me.

─────────────────U.S. v. Mallory─────────────────

1   Q.   Now, the conversation that you had about church business,

2   did Mr. Mallory at that time tell you that he was planning to

3   do some work, consulting work?

4            MR. GIBBS:  Objection --

5            THE WITNESS:  I have no memory of that.

6            MR. GIBBS:  -- hearsay.

7            THE COURT:  I'll overrule it.  He's already

8   answered.  Let's proceed.

9   BY MR. KAMENS:

10  Q.   Now, the text message --

11           THE COURT:  Let's not ask questions calling plainly

12  for hearsay.

13           MR. KAMENS:  Not asking for the truth, Your Honor,

14  just whether he heard it.

15  BY MR. KAMENS:

16  Q.   Now, the series of text messages that you discussed, the

17  text messages that you deleted off of your phone --

18  A.   On the 22, yes.

19  Q.   On the 22.  But you do remember the context was that

20  Mr. Mallory told you -- or suggested that he might be doing

21  some consulting work; is that right?

22  A.   Yes, yes.  I believe he did mention that.

23  Q.   And he wanted to, I think you testified, talk with

24  someone from East Asia Division at the CIA?

25  A.   Uh-huh, or another officer that I will not -- another

─────U.S. v. Mallory─────

94

1   title that I will not mention.

2   Q.   All right.  And you sent him an e-mail in response to --

3   A.   We had the text exchange, and then I sent an even more

4   general e-mail, following up saying, "No more.  We're done."

5   Q.   Now, what concerned you was not the information in the

6   text that Mr. Mallory was thinking of doing some consulting

7   work, right?  Would that cause you --

8   A.   That wouldn't necessarily be an issue --

9   Q.   Okay.

10  A.   -- unless there was some other reason for it to be an

11  issue, not in and of itself.  It would not be an issue.

12  Q.   Now, the information that he wanted to speak to someone

13  in the East Asia Division at the CIA, did that by itself cause

14  you to be concerned?

15  A.   Yeah, yeah, because he was a freelancer from outside the

16  organization.  One thing I have to --

17          THE WITNESS:  May I interject something here, Judge.

18          THE COURT:  No, I think you need to just answer the

19  question.  Now, if it's responsive --

20          THE WITNESS:  It's responsive to this, I think.

21          THE COURT:  All right.

22          THE WITNESS:  Go ahead and ask the question again,

23  please.

24  BY MR. KAMENS:

25  Q.   If Mr. Mallory asked you -- or his question to be put in

1   touch with someone from the East Asia Division at the CIA,

2   that caused you to feel uncomfortable?

3   A.   Correct.  I think Kevin understood --

4   Q.   Sir, if you can answer my question and not --

5   A.   I said yes.  I -- well, ask the question one more time.

6   Q.   When Mr. Mallory told you that he wanted to speak to

7   someone at the East Asia Division at the CIA, that made you

8   feel uncomfortable?

9   A.   Yes, yes, because he was not employed by the CIA.  It was

10  not in his chain of command.  He understands authority.  He

11  spoke -- he spoke about authority and chain of command at

12  church on a regular basis, followed it and he lived it.  I

13  think he understood that he was outside the chain of command

14  and outside the authority of the CIA.  He was not a

15  contractor.  He was not an employee.  So that was

16  inappropriate for him to ask me to do that.

17  Q.   You have no idea whether he was seeking to contact other

18  people to report this contact, do you?  Well, let me --

19  A.   Rephrase that.

20  Q.   -- rephrase that.

21        At this time, on February 22, when you were

22  concerned by receiving these e-mails, you had no idea whether

23  he was seeking to report this conduct to anybody else?

24        MR. GIBBS:  Judge, that calls for speculation.

25        MR. KAMENS:  I'm just asking his knowledge.

1          THE COURT:  Either he knows or he doesn't.

2          THE WITNESS:  I don't really understand the

3     question.  I think the question is very vague.  I don't

4     understand what you're asking.

5          THE COURT:  All right.  Next question.

6     BY MR. KAMENS:

7     Q.   You didn't have any idea in your own mind whether he was

8     seeking to contact someone else --

9          THE COURT:  What difference does that make?  That's

10    also irrelevant.

11          MR. KAMENS:  Well --

12          THE COURT:  You may ask him what -- whether he knows

13    if there was any further efforts to contact, and that's end of

14    it.

15    BY MR. KAMENS:

16    Q.   Do you know whether at that time he was contacting

17    anybody else at the CIA.

18    A.   At the CIA, I don't know.

19    Q.   Now, basically, you told him that the people you knew in

20    that division had moved on; is that right?

21    A.   At least one of them, yes.

22    Q.   And you also said that you could put him in touch with

23    security; isn't that right?

24    A.   Either -- no -- honestly, I can't remember exactly what I

25    said, but I said -- what I remember saying was that -- and I

1  have notes that I can consult that I wrote the day after this

2  happened.

3          What I remember saying to him was that I could

4  contact security about this if he wanted to.  I don't remember

5  whether I told him I could put him in touch with security.  I

6  don't remember that.

7  Q.   All right.

8  A.   That, to me, is more of a -- it's more something on me to

9  do, so I -- what I remember saying was, "Would you like me to

10  contact security and have them get in touch with you?"

11  Q.   Didn't you also say you didn't know if security would

12  call him back?

13  A.   I don't -- I don't remember.  I can't say.  I don't

14  remember.

15  Q.   That's fine.  Take a look at Defendant's Exhibit 2A-3.

16          If you can, look at the second book.  Do you

17  recognize that, that document?

18  A.   Hang on just a second.

19  Q.   2A-3, sir.

20  A.   Yeah.  Yeah.

21  Q.   All right.  Do you recognize that document?

22  A.   Uh-huh.

23  Q.   It appears to be an e-mail from you -- oh, I'm sorry, did

24  you recognize this document?

25  A.   I do.  And I believe it's a document I shared with

1  defense --

2  Q.   Okay.

3  A.   -- after it was cleared by CIA.

4  Q.   All right.  It appears to be an e-mail from you, doesn't

5  it, sir?

6  A.   Yes.

7  Q.   And on the second page of that document, it appears that,

8  according to your recollection of the event at the time, you

9  said you didn't know if security would actually call

10  Mr. Mallory; is that right?

11  A.   Yeah.  Yeah.  Okay.

12  Q.   You also offered to talk to Mr. Mallory at church; is

13  that right?

14  A.   Yes.  And I already addressed that on the 26 of February

15  I talked to him.

16  Q.   One other thing, Mormon Church -- your relationship with

17  Mr. Mallory, the Mormon Church can provide financial

18  assistance?

19  A.   Yes.

20  Q.   And to members who are in financial trouble?

21       MR. GIBBS:  Objection, Your Honor, relevance.

22       MR. KAMENS:  Discussing their private relationship

23  in the Mormon Church.  I'm just asking about that.

24       THE COURT:  I'll sustain the objection.  I don't see

25  the relevance.

U.S. v. Mallory

1        MR. KAMENS:  Well, it does relate to the financial

2   circumstances of the defendant.

3        THE COURT:  All right.  I'll permit that.

4   BY MR. KAMENS:

5   Q.   Sir, you're aware that Mr. Mallory's family is receiving

6   assistance from the Mormon Church now; is that right?

7   A.   Yes.  I was the financial clerk and the membership clerk

8   for the branch.  I wrote the checks.

9   Q.   Okay.  Thank you, sir.

10        MR. KAMENS:  Nothing further.

11        MR. GIBBS:  Nothing further, Judge.  Thank you, sir.

12        THE COURT:  All right.  You may step down.  May this

13   witness be excused?

14        MR. GIBBS:  We do not intend to call this witness

15   again, Judge.

16        MR. KAMENS:  No objection, Your Honor.

17        THE COURT:  All right.  You may step down.

18        (Witness excused.)

19        THE COURT:  Who is your next witness, Mr. Gibbs?

20   Ms. Garcia?

21        MS. GARCIA:  Your Honor, it's -- the next two are

22   both CBP officers.  The first one, the first direct will take

23   approximately 25 minutes, the second will take about 15.

24   They're related in the same incident.

25        THE COURT:  All right.  Well, let's begin.

─────────U.S. v. Mallory─────────

P. Napoleon - Direct

100

1          MS. GARCIA:  Your Honor, the United States calls CBP

2   Officer Peter Napoleon.

3          THE COURT:  Come forward and take the oath, please,

4   sir.

5          Thereupon,

6                        **PETER NAPOLEON,**

7   having been called as a witness on behalf of the Government

8   and having been first duly sworn by the Deputy Clerk, was

9   examined and testified as follows:

10          (Witness seated.)

11          THE COURT:  You may proceed.

12                      **DIRECT EXAMINATION**

13   BY MS. GARCIA:

14   Q.   Officer Napoleon, will you please state your full name

15   and spell it for the record.

16   A.   My name is Peter Napoleon, P-e-t-e-r, Last name

17   N-a-p-o-l-e-o-n.

18   Q.   Where are you currently employed?

19   A.   Out of Chicago O'Hare International Airport.

20   Q.   How long have you been employed there at O'Hare Airport?

21   A.   Five years at O'Hare; nine years total with the United

22   States Customs.

23   Q.   Do you have a specific focus in CBP?

24   A.   I work for TTRT, Terrorism Task Force Response Team.

25   Q.   How long have you been employed with that team?

P. Napoleon - Direct

1  A.   Two and a half years.

2  Q.   What are your current responsibilities?

3  A.   We interview anyone that's coming into the United States

4  coming from a foreign country.

5  Q.   Ballpark figure how many interviews would you estimate

6  you've done?

7  A.   Three and a half years, I would say 15 to 20 a day.

8  Q.   And have you been involved in the case *United States*

9  *versus Kevin Patrick Mallory*?

10 A.   Yes.

11 Q.   Do you see Mr. Mallory sitting in the court today?

12 A.   Yes, I do.

13 Q.   Can you please point him -- point him out and identify an

14 article of clothing he's wearing?

15 A.   Seated to my left wearing the black suit with a white --

16 black tie.

17        THE COURT:  The record will reflect that the witness

18 has identified the defendant.  Next question.

19        MS. GARCIA:  Thank you, Your Honor.

20 BY MS. GARCIA:

21 Q.   Officer Napoleon, taking you back to April 21, 2017, do

22 you remember that day?

23 A.   Yes.

24 Q.   At some point that day did you encounter the defendant?

25 A.   Yes, I do.

─────────────U.S. v. Mallory─────────────
P. Napoleon - Direct
102

1   Q.   Can you explain how you initially encountered him?

2   A.   Myself and my fellow colleague were upstairs doing

3   inbound flight from Shanghai, China.  And at that point at the

4   gate, as they were walking out, I encountered Mr. Mallory.

5   Q.   And what did you do with Mr. Mallory at that point?

6   A.   At that time we proceeded to review his U.S. passport, it

7   was for him and his son, and the United States customs

8   declaration.

9   Q.   And did you take him anywhere after that?

10  A.   We took him down to immigration where he was processed as

11  a U.S. citizen and we proceeded forward to the carousels to

12  retrieve his bags.

13  Q.   Did you and your partner take custody of his luggage?

14  A.   Yes, we did.  We received two checked-in bags.  And at

15  that time, I had asked Mr. Mallory to -- if he had any

16  electronic devices on him.

17  Q.   And what did he respond?

18  A.   He responded he had two cell phones that were his and one

19  cell phone that belonged to his son.

20  Q.   And what happened with these electronics?

21  A.   At that point I had notified Mr. Mallory that we usually

22  hold on to the electronics until after the inspection is done

23  and then return them over at the end of the inspection.

24  Q.   Did Mr. Mallory make any statements to you regarding

25  this?

─────U.S. v. Mallory─────

P. Napoleon - Direct

103

1  A.   Yes.  He stated that he wanted to call his wife and --

2  Q.   Did he state why?

3  A.   He said he wanted to notify his wife that they had

4  arrived.

5  Q.   Did he make any other statements to you?

6  A.   He asked me if his rights were being violated --

7  Q.   And what did --

8             THE COURT:  Let him --

9             MS. GARCIA:  Sorry to interrupt.

10 BY MS. GARCIA:

11 Q.   Go ahead, please.

12 A.   He asked me if his rights were being violated as a U.S.

13 citizen.

14 Q.   And what did you respond?

15 A.   I notified him that anyone that enters into the United

16 States, they are subject to inspection and that's including

17 your luggage and all electronics.

18            THE COURT:  And it includes whether you're a citizen

19 or not?

20            THE WITNESS:  That's correct.

21            THE COURT:  Next question.

22 BY MS. GARCIA:

23 Q.   You mentioned that he asked if he could call his wife.

24 Was he permitted to?

25 A.   No.  We don't allow phone calls during an inspection

─────────────U.S. v. Mallory─────────────

1    period.  After the inspection period, you are -- we let you

2    make phone calls.

3    Q.   Did Mr. Mallory state whether he had any other

4    electronics with him?

5    A.   He stated that he had some items checked on his carry-on

6    and then some -- something in his checked-in bags.

7    Q.   Do you remember what electronics he said he had?

8    A.   I can't recall.  If I can see my report.

9    Q.   Certainly.

10             MS. GARCIA:  Your Honor, may I hand up his report to

11   refresh his recollection?

12             THE COURT:  All right.  Show it to Mr. Kamens.

13             MR. KAMENS:  Mr. Richman, Your Honor.

14             THE COURT:  All right.  These have already been

15   provided to the defense?

16             MS. GARCIA:  They have, yes.

17             THE COURT:  All right.  Show it to the officer,

18   Officer Napoleon.

19   BY MS. GARCIA:

20   Q.   Officer Napoleon, if you would look through it quickly,

21   but don't read any of it.  If you'll just read it to yourself.

22   A.   It was a laptop and an iPad in his carry-on.

23   Q.   And during this time -- what was your impression of the

24   defendant's demeanor during this time?

25   A.   Felt kind of agitated, but he appeared to be agitated why

──────────U.S. v. Mallory──────────
P. Napoleon - Direct                                          105

1   we were questioning him and why we were inspecting him and why

2   he couldn't have his cell phone.

3              THE COURT:  Speak up, if you would, please.

4              THE WITNESS:  Oh, I'm sorry.  He was just asking me

5   about why he was being inspected.  He seemed irritated that we

6   were inspecting him.

7   BY MS. GARCIA:

8   Q.   And what about -- did he make any statements about gifts

9   he brought home?

10  A.   He stated that he had bought -- purchased a few things, a

11  few items, while he was abroad in Shanghai, China.

12  Q.   Do you remember any of those specifically?

13  A.   I remember him telling me he bought a MacBook Pro, a

14  mouse, a saxophone for his son, and a Samsung -- a brand-new

15  Samsung phone for his wife.

16  Q.   Now, after -- during this time did you review any

17  paperwork with Mr. Mallory?

18  A.   That point I had -- his passport, his son's U.S.

19  passport, and a U.S. customs form, a declaration form that

20  everyone fills out coming into the country.

21  Q.   With the assistance of the court security officer, I'm

22  going to hand you up the original Government's Exhibit 5-1.

23  There's a copy -- it should be a copy in all binders.  And you

24  can look at Government Exhibit -- I'm sorry, can you look

25  at Government's Exhibit -- that original.

─────U.S. v. Mallory─────

1           All right.  Do you recognize it?

2   A.   Yes.

3   Q.   What is it?

4   A.   It's a United States Customs 6059.

5   Q.   Have you -- can you explain what that is?

6   A.   This is a form that everyone that comes into the United

7   States fills out, and basically what they're reporting, where

8   they are coming from, whether it's business, if they are

9   bringing anything with them into the United States.

10  Q.   And have you seen this before today?

11  A.   Yes, I have.

12  Q.   When did you see it?

13  A.   April 21, when Mr. Mallory handed it to me.

14  Q.   And who filled it out?

15  A.   Mr. Mallory.

16  Q.   Do you see a signature on the bottom?

17  A.   Yes.

18  Q.   What signature do you see?

19  A.   It says "Kevin P. Mallory."

20  Q.   And is this substantially the same as the day you saw it?

21  A.   Yes.

22          MS. GARCIA:  Your Honor, we would offer Government's

23  Exhibit 5-1 into evidence?

24          MR. RICHMAN:  No objection.

25          THE COURT:  Admitted.  You may display it, if you

─────────U.S. v. Mallory─────────

1  wish.

2                    (Government's Exhibit No. 5-1

3                    admitted into evidence.)

4        MS. GARCIA:  Yes, Your Honor, we would like to

5  publish it.

6  BY MS. GARCIA:

7  Q.   And, Officer Napoleon, looking at the original you have,

8  will you please read the question and answer for question 13

9  into the record.

10 A.   "I am.  We are carrying currency and monetary instruments

11 over 10,000 U.S. or foreign equivalent."

12 Q.   And what answer did Mr. Mallory check?

13 A.   No.

14 Q.   Talking -- did Mr. Mallory make any statements to you

15 about the length of his trip and where he was coming from?

16 A.   He stated that he was in Shanghai, China, for one week

17 for business/family -- sorry -- son -- father/son vacation.

18        THE COURT:  Are you offering the exhibit?

19        MS. GARCIA:  Oh, yes.  I'm sorry, Your Honor.  We

20 are offering it into evidence.

21        THE COURT:  All right.  Without objection, it's

22 admitted.  I may have already admitted it, but if not...

23        MS. GARCIA:  Thank you, Your Honor.

24        THE COURT:  Next question.

25 BY MS. GARCIA:

─────────────────── U.S. v. Mallory ───────────────────

1   Q.   Did he make any statements about his employment, who he

2   worked for?

3   A.   He stated that he works for himself, for a GlobalEx that

4   he's had since 2010.

5   Q.   Did he say that he met with anyone?

6   A.   He stated that he met with David Hong [sic], that he --

7   through church.

8   Q.   What did he say he discussed with Mr. Wong?

9   A.   He said they were talking regarding anti-bullying.

10  Q.   And how did he --

11          THE COURT:  Anti what, sir?

12          THE WITNESS:  Anti-bullying.

13          THE COURT:  Bullying.  All right.  Next question.

14  BY MS. GARCIA:

15  Q.   How did he say he communicated with Mr. Wong?

16  A.   He said he communicated with him through WeChat.

17  Q.   Did he say whether Mr. Wong gave him anything?

18  A.   He stated he did not receive anything from Mr. Wong.

19  Q.   Did he make any statements about whether he met with

20  anyone else?

21  A.   No.

22          THE COURT:  How did they chat, I'm sorry?

23          THE WITNESS:  Through WeChat.

24          THE COURT:  Is that a computer or --

25          THE WITNESS:  It's another app through your phone, I

─────────── U.S. v. Mallory ───────────

 1   believe.

 2              THE COURT:  Next question.

 3   BY MS. GARCIA:

 4   Q.    Did Mr. Mallory make any statements to you regarding his

 5   financial assets?

 6   A.    He stated that he had $6,000 in a HSB account that he

 7   said he didn't have access to.

 8   Q.    I'm sorry, where was that account?

 9   A.    Can I look in my notes?  It was an HSB account, but I

10   forgot what country he said it was in.

11   Q.    Would anything refresh your recollection?

12   A.    If I may look at my notes.

13              THE COURT:  Yes, you may.

14              THE WITNESS:  Thank you.  In Hong Kong.

15   BY MS. GARCIA:

16   Q.    And did he make any statements about the amount?

17   A.    6,000 U.S. dollars.

18   Q.    Was he sure about that?

19   A.    He said somewhere in that amount 6,000, but he's not

20   quite sure how much exactly.

21   Q.    Why wasn't he sure?

22   A.    Because he said he hasn't had access to it.

23   Q.    And as you continued to question Mr. Mallory, what was

24   your impression of his demeanor?

25   A.    Kind of offensive.  He was questioning why we were -- why

─────────────U.S. v. Mallory─────────────

1  he was being questioned at the time.

2  Q.   Did you ask him questions about how much money he took

3  out of the U.S. and how much he brought back?

4  A.   Yes.  I asked him -- what I do is I usually go over the

5  declarations with him to verify all of his answers.  And when

6  I got to No. 13, he did -- I go, "Are you bringing in over

7  $10,000?"  And he said -- well, I asked him how much money did

8  he take out, and he said he brought -- took out about 10,000.

9  And I asked him, "Was it more or less?"  He said, "Around

10  10,000."

11          And I said -- advised him at that point, I go, "You

12  can take as much money as you like out of country or in, you

13  just have to report it as you are either exiting -- leaving

14  the country or coming in."

15  Q.   And what did he say about the money coming in at that

16  point?

17  A.   At that point, he said -- I asked him, "How much money

18  are you bringing back?"  And he said about ten -- what did he

19  say -- ten -- can I look at my notes?

20          THE COURT:  Yes, you may.

21          THE WITNESS:  Thank you.  He said -- he stated that

22  he had about 13 to 14, but he said he wasn't quite sure.

23  BY MS. GARCIA:

24  Q.   And did you, during that inspection, verify the amount?

25  A.   Yes.  What I do is after going through this, we give him

U.S. v. Mallory

1  one more chance to amend his customs form.  So we went -- I

2  believe the money was in his check -- carry-on.  We found the

3  money.

4  Q.   And without going into the circumstances of the -- of the

5  search of the luggage -- well, first of all, who was doing the

6  search of the luggage?

7  A.   The search of luggage was myself and my co-worker.

8  Q.   And what's your co-worker's name?

9  A.   Prokopiuk, Officer Prokopiuk.

10  Q.   And as a result of his answer on the finances, did you

11  have him fill out any additional paperwork?

12  A.   Yes.  I had him fill out what we call FinCEN 105.

13          THE COURT:  Why?

14          THE WITNESS:  Anything that's reported -- anything

15  over 10,000 U.S. currency or foreign currency is -- we fill

16  out that form.

17          THE COURT:  Well, in his form that he submitted to

18  you, tell me again, that's Question 13.  How much did he say

19  he brought back in?

20          THE WITNESS:  He had -- at that time he told me he

21  was bringing 13- or 14,000.

22          THE COURT:  Before, I'm asking.

23          THE WITNESS:  It says under 10,000 -- if he has over

24  10,000.  He reported no.  But I gave him a chance to amend his

25  declaration and that's when he reported 13- to 14,000.

─────U.S. v. Mallory─────

P. Napoleon - Direct

112

 1          THE COURT:  Next question.

 2   BY MS. GARCIA:

 3   Q.   And as a result of his answers, did you have him fill out

 4   any additional paperwork?

 5   A.   Yes.  At that point he filled out the FinCEN 105.

 6   Q.   And looking at Government's Exhibit 5-2 in the binder.

 7          (A pause in the proceedings.)

 8   BY MS. GARCIA:

 9   Q.   Do you recognize that?

10   A.   Yes.

11   Q.   And what is it?

12   A.   It's the FinCEN 105.

13   Q.   Can you explain the purpose of that document?

14   A.   This is a reporting of international transportation of

15   currency and instruments based on anyone carrying over 10,000

16   U.S. currency or foreign currency.  Anything over $10,000 is

17   reported.  We fill it out with their information and then

18   state how much total they are reporting.

19   Q.   And who filled this out?

20   A.   Myself.

21   Q.   Anyone else?

22   A.   Filled out by myself, signed by Mr. Mallory.

23   Q.   And what's the date?

24   A.   The date is 4/21/2017.

25          THE COURT:  Where did you get the information to

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

─────────── U.S. v. Mallory ───────────

1   fill it out?

2           THE WITNESS:  I -- the address is from the ID that

3   he gave me.  And the passport number, which I did not put on

4   here --

5           THE COURT:  All right.  And you've got in here that

6   it came from Shanghai to Chicago.  It was hand-carried on

7   United Airlines.

8           THE WITNESS:  That's correct, sir, Your Honor.

9           THE COURT:  Where did you get that information?

10          THE WITNESS:  Well, I knew it was hand-carried

11  because it was on his person, and then he's coming off United

12  Airlines.

13          THE COURT:  The money was on his person?

14          THE WITNESS:  It was on his carry-on.

15          THE COURT:  All right.  And how much money was it?

16          THE WITNESS:  After we -- the account was verified

17  by Mr. Mallory and myself and we counted 16,500 U.S. dollars.

18          THE COURT:  Next question.

19          MS. GARCIA:  Your Honor, I would offer Government's

20  Exhibit 5-2 into evidence.

21          THE COURT:  All right.

22          MR. RICHMAN:  No objection.

23          THE COURT:  It's admitted.  Next question.  You may

24  display it, if you wish.

25          MS. GARCIA:  Thank you, Your Honor.

—————U.S. v. Mallory—————

P. Napoleon - Direct

114

1     THE COURT:  It's admitted.  You'll have it with you

2   in the jury room.  Next question.

3     MS. GARCIA:  If we could publish it and look at

4   part 3.

5   BY MS. GARCIA:

6   Q.   Officer Napoleon, would you read into the record the

7   amount listed in part 3.

8   A.   $16,500, U.S. dollars.

9   Q.   And how did you -- how did your interview conclude?

10  A.   After we did the currency verification, we handed back

11  Mr. Mallory his money, told him to hold on to it, and then we

12  did the bag exam.  I'm sorry?

13  Q.   Well, I'm going to have Officer Prokopiuk talk about the

14  baggage exam because he was the one doing it.

15     But what happened with Mr. Mallory after that.

16  A.   He was a little upset that I did ask a question to his

17  son.  He did get a little upset with that, still upset with

18  the whole inspection process.  Then we did -- we had the issue

19  of failure to declare.

20  Q.   Okay.  Explain that for the jury.

21  A.   He had failed to report anything he brought into the

22  United States.  There was a few things that he did not report

23  on -- because he was not truthful regarding how much money he

24  was bringing in, he was not given his exemptions on the items

25  he had purchased coming into the United States.

─────U.S. v. Mallory─────

1   Q.   And what, if anything, did Mr. Mallory have to do as a

2   result of not?

3   A.   He had to pay a duty on the items that he was bringing

4   into the United States.

5   Q.   And what was Mr. Mallory's -- what was your impression of

6   Mr. Mallory's response to having to pay duty --

7   A.   When he found out that all he had to do is pay the duty,

8   he made a sigh of relief.  He actually smiled for the first

9   time during the interview.

10          MS. GARCIA:  Your Honor, if I may inquire if my

11   counsel may have any additional questions?

12          THE COURT:  Yes.

13          MS. GARCIA:  No further questions, Your Honor.

14          THE COURT:  Any cross-examination?

15          MR. RICHMAN:  Yes, Your Honor.

16          THE COURT:  All right.

17                    **CROSS-EXAMINATION**

18   BY MR. RICHMAN:

19   Q.   Good afternoon, Officer Napoleon.

20   A.   Good afternoon, sir.

21   Q.   Now, again, the interaction you were testifying about was

22   at Chicago O'Hare on April 21 of last year?

23   A.   Two thousand- -- yes.

24   Q.   And it was shortly after 5:00 p.m. that day?

25   A.   I -- Mr. Mallory went through immigration, yup, 1705,

─────U.S. v. Mallory─────

1    approximately 1705.

2    Q.   And that was about the -- that was shortly after you had

3    first encountered him?

4    A.   That's correct.

5    Q.   So you first encountered him around 5:00 p.m.; is that

6    right?

7    A.   Give or take about 15 minutes.

8    Q.   And he was getting off a direct flight from Shanghai?

9    A.   Yes.

10   Q.   That's about a 14-hour flight?

11   A.   Yes.

12   Q.   And also there's a significant time difference?

13   A.   Yes.

14   Q.   So it's approximately 6:00 a.m. according to the time

15   where he left from, right?

16   A.   Yes.

17   Q.   And now the form, the customs declaration form, you

18   talked about, that had already been filled out before you met

19   him, right?

20   A.   Yes.

21   Q.   That is something that's handed out by flight crew, is

22   that right, on the plane?

23   A.   That's correct.

24   Q.   And do you know when he filled it out?

25   A.   I do not.

─────────────U.S. v. Mallory─────────────

1    Q.   Presumably sometime shortly before he arrived that

2    morning?

3            THE COURT:  All right.  That's speculation.  If he

4    doesn't know, he doesn't know.  Next question.

5    BY MR. RICHMAN:

6    Q.   Now, CBP doesn't consider that form to be what's called a

7    binding declaration, does it?

8    A.   Yes.

9    Q.   Well, in your report you talked about receiving a binding

10   declaration, right?

11   A.   Well, it's a binding declaration, but then we do -- we do

12   another oral declaration, and he's basically confirming his

13   answers.

14   Q.   And as a regular practice you go through that process

15   with the person and review the form, right?

16   A.   Yes.

17   Q.   And you give him the opportunity to make changes to the

18   extent there are changes?

19   A.   That is correct.

20   Q.   And then you ask him to sign again?

21   A.   It's already signed.

22   Q.   Do you ask him to then verify again whether it's accurate

23   once you've gone through that?

24   A.   I ask -- I read off the questions and then they

25   read off -- and then they say yes or no.

—U.S. v. Mallory—

P. Napoleon - Cross

118

1    Q.   And in that process, Mr. Mallory stated that he had about

2    13- or $14,000 with him, right?

3    A.   That is correct.

4    Q.   He didn't claim to know the exact amount, right?

5    A.   He said 13- to 14,000.  He wasn't sure and that's why we

6    verified the account.

7    Q.   And so you and he essentially together counted the money?

8    A.   That's correct.

9    Q.   Ultimately, he broke down the accurate amount on the

10   FinCEN 105 form?

11   A.   I wrote it down.

12   Q.   He signed for the accurate amount?

13   A.   Right.

14           THE COURT:  Who wrote down the amount on the

15   original form?

16           THE WITNESS:  On the FinCEN 105, myself, Your Honor.

17           THE COURT:  On the original form?

18           THE WITNESS:  On the 16 -- on the -- not on the

19   customs form.

20           THE COURT:  Yes, on the customs form.

21           THE WITNESS:  On the customs form, there is no

22   dollar amount written.  It was just a yes-or-no question on

23   whether --

24           THE COURT:  Who wrote that?

25           THE WITNESS:  The note -- Mr. Mallory.

U.S. v. Mallory

P. Napoleon - Cross

119

1          THE COURT:  All right.  And next question.

2   BY MR. RICHMAN:

3   Q.   All right.  And you also asked him about how much money

4   he had gone to China with?

5   A.   That is correct.

6   Q.   So he was -- and he said that was about 10,000?

7   A.   About 10,000.

8   Q.   So he was clear he had made money during his trip?

9          THE COURT:  Well, he doesn't know that, Mr. Richman.

10  That's argument.  Speculation argument.

11  BY MR. RICHMAN:

12  Q.   He was returning with more than he came with, according

13  to Mr. Mallory's own report, right?

14          THE COURT:  According to what?

15          MR. RICHMAN:  According to Mr. Mallory's own report.

16          THE COURT:  Well, the documents are in evidence.

17  You may argue as you wish.  Let's proceed.

18          MR. RICHMAN:  Well, there's no document about how

19  much he went with.  That's how much -- that's the statement

20  that the Government elicited from Officer Napoleon.

21          THE COURT:  No.  How much he took with him was a

22  statement Mr. Mallory made.

23          MR. RICHMAN:  Right.  And I was trying to get back

24  to refer to that statement.

25          THE COURT:  Well, you may have, but it was inartful.

─────────────U.S. v. Mallory─────────────

1    Next question.

2    BY MR. RICHMAN:

3    Q.    Mr. Mallory reported returning to the United States with

4    more money than he had gone to China with; is that right?

5    A.    From what he told me, yes.

6    Q.    He also told you he had purchased various electronics in

7    China, right?

8    A.    That is correct.

9    Q.    A new laptop, is that right?

10   A.    MacBook Pro, yes.

11   Q.    And an iPad?

12        MS. GARCIA:  Your Honor, the witness has already

13   answered this question.

14        THE COURT:  It's asked and answered.

15        MR. RICHMAN:  All right.

16   BY MR. RICHMAN:

17   Q.    He told you he had purchased a Samsung phone as well?

18        THE COURT:  Again, asked and answered.  Unless you

19   think his original answer was wrong.

20        MR. RICHMAN:  No I'm --

21        THE COURT:  You're trying to get him to repeat it.

22        MR. RICHMAN:  Trying to make sure I understand the

23   testimony.

24        THE COURT:  All right.  Well, I'm sure you do.  Next

25   question.

─────────────── U.S. v. Mallory ───────────────

P. Napoleon - Cross

121

1    BY MR. RICHMAN:

2    Q.   And you testified he paid a duty on the things he

3    reported purchasing in China, right?

4    A.   Yes.

5    Q.   That duty wasn't on the money he had with him, right?  It

6    was on the things he purchased?

7    A.   That is correct.

8    Q.   You didn't know at that time whether any of those

9    electronics had been brought with him to China other than his

10   reporting, right?

11   A.   Well, he stated what he had purchased that were new, and

12   that was the MacBook Pro, the new Samsung phone, and the other

13   items reported earlier.

14   Q.   You didn't have any independent knowing whether, for

15   example, the Samsung phone was something he had from the

16   United States other than his report?

17   A.   No.  He stated to me that it was a brand-new phone that

18   he purchased for his wife.

19          THE COURT:  Next question.

20          MR. RICHMAN:  Understood, Your Honor.

21   BY MR. RICHMAN:

22   Q.   Now, this interaction took about two and a half hours,

23   the total interaction that you described?

24   A.   Approximately.

25   Q.   Now, did -- other than the $188 tariff, did the United

—————U.S. v. Mallory—————

122

1    States seize any money from Mr. Mallory during this

2    interaction?

3    A.    No.

4    Q.    The bank account that you referred to, the HSBC account,

5    he reported that being his own account in his name, right?

6    A.    Yes.

7    Q.    And he reported it being an account he couldn't access

8    from the U.S.?

9    A.    That's what he stated to me.

10              MR. RICHMAN:  Nothing further, Your Honor.

11              THE COURT:  Any redirect?

12              MS. GARCIA:  No, Your Honor.

13              THE COURT:  Thank you.  You may step down, Officer

14   Napoleon.  Any reason why this witness should not be excused?

15              MS. GARCIA:  No, Your Honor.

16              THE COURT:  All right.  He's excused.

17              (Witness excused.)

18              THE COURT:  How long do you -- does this next

19   witness take?

20              MS. GARCIA:  About 15 minutes, Your Honor.

21              THE COURT:  All right.  Let's try to do it quickly.

22   By which time your baked Alaska would not have melted or

23   otherwise changed in form.

24              MS. GARCIA:  Your Honor, the United States calls CBP

25   Officer Waldmar Prokopiuk.

—————Tonia M. Harris OCR-USDC/EDVA 703-646-1438—————

EASTERN DISTRICT OF VIRGINIA

─────────────U.S. v. Mallory─────────────

1          THE COURT:  All right.  Come forward and take the

2     oath, please, sir.  You may either affirm or take the oath

3     with a Bible, whichever you prefer.

4          Thereupon,

5                    **WALDMAR PROKOPIUK,**

6     having been called as a witness on behalf of the Government

7     and having been first duly sworn by the Deputy Clerk, was

8     examined and testified as follows:

9          (Witness seated.)

10          THE COURT:  All right.  Ms. Garcia, you may proceed.

11                    **DIRECT EXAMINATION**

12     BY MS. GARCIA:

13     Q.   Officer Prokopiuk, state your full name and spell your

14     full name for the record.

15     A.   My full name is Waldemar Prokopiuk, W-a-l-d-e-m-a-r, last

16     name P-r-o-k-o-p-i-u-k.

17     Q.   Officer Prokopiuk, where are you currently employed?

18     A.   By U.S. Customs and Border Protection.

19     Q.   How long have you been employed there?

20     A.   Since 2005.

21     Q.   Where are you currently serving?

22     A.   Chicago International Airport O'Hare in Chicago.

23     Q.   How long have you been at O'Hare Airport?

24     A.   Since 2005.

25     Q.   What are your current responsibilities?

─────U.S. v. Mallory─────
W. Prokopiuk - Direct

124

1   A.    I am U.S. customs officer.  My responsibility is to

2   perform inbound and outbound inspections on everyone arriving

3   or departing the United States.

4   Q.    During your time working with CBP, have you been

5   experienced in inspecting luggages specific -- luggage

6   specifically?

7   A.    Yes, that's correct.

8   Q.    How many inspections would you estimate you've done?

9   A.    Thousands.

10  Q.    Have you been involved in a case *United States against*

11  *Kevin Patrick Mallory*?

12  A.    Yes, I did.

13  Q.    And do you see the defendant, Kevin Patrick Mallory,

14  sitting in the courtroom today?

15  A.    Yes.

16  Q.    Could you please point to him and identify him by an

17  article of clothing he's wearing?

18  A.    Mr. Mallory is wearing a blue tie, dark suit.

19          THE COURT:  All right.  The record will reflect that

20  the witness has identified the defendant.  Next question.

21          MS. GARCIA:  Thank you, Your Honor.

22  BY MS. GARCIA:

23  Q.    On April 21, 2017, do you remember that day?

24  A.    Yes, ma'am.

25  Q.    At some point did you encounter the defendant?

─────────────U.S. v. Mallory─────────────

W. Prokopiuk - Direct

125

1    A.    Yes.

2    Q.    Can you explain the initial encounter with the defendant?

3    A.    Mr. Mallory was inspected by myself and my partner,

4    Officer Napoleon.

5    Q.    And what was your role?

6    A.    My -- Officer Napoleon was the leading officer during

7    this inspection.  My responsibility was to inspect luggage

8    belongings to Mr. Mallory.

9    Q.    And what luggage did Mr. Mallory have on him that day?

10   A.    Two carry-ons, it was two pieces of luggage.

11   Q.    During your inspection, what did you find in the

12   carry-on?

13   A.    In the carry-on we discovered a currency.

14   Q.    And how much currency did you find?

15   A.    After verification, and I helped Mr. Mallory amend the

16   declaration.  It was total of $16,500.

17   Q.    And how did -- how was the currency packaged?

18   A.    There was -- I think in a two different like packages

19   inside in the -- in the luggage.

20   Q.    How was it packed inside the luggage?

21   A.    I believe it was in envelopes with a rubber band.

22   Q.    Was it on top?

23   A.    I'm sorry?

24   Q.    Was it -- where within the luggage was it?

25   A.    It was inside the luggage in the bottom of the carry-on.

─────U.S. v. Mallory─────

1    Q.    Did you find anything else when you were inspecting him?

2    A.    Carry-on baggage inspection, the baggage revealed also a

3    stack of business cards and the receipts from the bank and

4    electronic devices.

5    Q.    What electronic devices did you find?

6    A.    That was -- cell phone, I believe there was Samsung cell

7    phone.

8    Q.    And how was that packaged?

9    A.    It was packed in a box, but my attention -- when I saw

10   the box -- it was in a box, placed in a box, but I saw that

11   the seal was broken.  According to Mr. Mallory, it was a

12   brand-new it was a brand-new Galaxy Samsung phone purchased

13   for his wife as a gift.

14   Q.    Did he say anything else about the phone?

15   A.    When I lift the cover of the box, I noticed there was

16   fingerprints on it, which told me right away this is not a

17   brand-new phone.

18   Q.    And what was your impression Mr. Mallory's demeanor

19   during the search?

20   A.    During inspection he was very unhappy with the secondary

21   inspection and was aggravated, so he was unhappy.

22   Q.    What happened at the end of the inspection?

23   A.    By the end of the inspection, Mr. Mallory -- his demeanor

24   completely changed.  He was happy.

25   Q.    Why was that?

─────────────U.S. v. Mallory─────────────
W. Prokopiuk - Direct

127

1    A.   We --

2    Q.   Had you --

3         MR. RICHMAN:  Objection, Your Honor.

4         MS. GARCIA:  I can rephrase, Your Honor.

5    BY MS. GARCIA:

6    Q.   Go ahead.  How did the inspection conclude?  What were

7    the last steps of the inspection?

8    A.   The last step of the inspection was we collect duty from

9    Mr. Mallory on the purchased items abroad.

10   Q.   And what was your impression of Mr. Mallory's response to

11   paying the duty?

12   A.   His demeanor changed.  He paid the duty and he was --

13   Q.   How did his demeanor change?

14   A.   Well, from being very on head [sic] with police with the

15   inspection rights from the beginning.  By the end, he was

16   completely changed, looked kind of relieved.

17        MS. GARCIA:  Your Honor, may I inquire of my counsel

18   if we --

19        THE COURT:  Yes, you may.

20        MS. GARCIA:  No further questions, Your Honor.

21        THE COURT:  All right.  Any cross-exam?

22        MR. RICHMAN:  No, Your Honor.

23        THE COURT:  All right.  Thank you.  You may step

24   down.

25        Is this witness going to be recalled?

―――――――――――U.S. v. Mallory―――――――――――

128

1          MS. GARCIA:  No, Your Honor.

2          THE COURT:  Thank you.  You may be excused.

3          (Witness excused.)

4          THE COURT:  All right.  Ladies and gentlemen, it's

5  lunchtime.  I hope.  I hope your lunches came.

6          And we will recess until 1:30 and then we will

7  resume.  Now, pass your books to the right.  Mr. Flood will

8  collect them, maintain their security.  Remember to refrain

9  from discussing the matter among yourselves or with anyone or

10  undertaking any investigation on your own and you may follow

11  Mr. Flood out.

12          (Jury dismissed.)

13          THE COURT:  All right.  Court stands in recess until

14  1:30.

15          (Lunch Recess 12:35 p.m.)

16

17                    **P R O C E E D I N G S**

18                **A F T E R N O O N  S E S S I O N**

19

20          THE COURT:  All right.  Good afternoon.  Now, before

21  we begin, I want to say to counsel that I intend to explain to

22  the jury why we're doing this.  And I intend to tell them that

23  a witness will appear, the next witness, and he will give a

24  pseudonym.  And the reason is that his name and his identity,

25  as an employee of the CIA, is classified and cannot be

─────────U.S. v. Mallory─────────

129

1   revealed.  And that's why we have a screen so the rest of the

2   people in the courtroom -- I don't even know if there are

3   people behind there, but they can't see this person's face.

4   And the people on this side, I will tell them simply, are

5   clear to see it; is that correct?

6               Yes.  There is the court security officer.

7               THE COURT SECURITY OFFICER:  Yes, Your Honor.

8   That's correct.

9               THE COURT:  All right.  So that would explain to

10  them adequately.  And what pseudonym is he using?

11              MS. GELLIE:  John Doe, Your Honor.

12              THE COURT:  That's imaginative.  I thought you might

13  have used something like Patrick Henry or George Washington,

14  but John Doe will do.  Now, I will tell them also that his

15  real name and his appearance, of course, by virtue of the

16  Sixth Amendment, is disclosed to the defendant because he has

17  the right to confront all of the evidence against him.

18              Does he know all of that, Mr. Kamens.

19              MR. KAMENS:  Your Honor, I'm not sure we know his

20  last name.  We do know his first name.  And I'm not sure it's

21  ever been disclosed to us.

22              MS. GELLIE:  I'm sorry, Your Honor.  It's a little

23  bit confusing because Mr. Mallory worked with John Doe.  So it

24  was our understanding he knew.

25              MR. KAMENS:  They did work together, but everybody

U.S. v. Mallory

130

1    who worked together only went by first name.

2          THE COURT:  Interesting.

3          MS. GELLIE:  I'm happy to share that name with

4    defense counsel.  I think it may have been in one of our CIPA

5    filings, but I wouldn't swear to that in court today.

6          THE COURT:  All right.  Well, his name is not going

7    to be revealed today, but go ahead so that I can tell the jury

8    that -- the defendant knows his name.

9          Mr. Gibbs, is this the only witness this is going to

10   happen with?

11         MR. GIBBS:  It is, yes.

12         THE COURT:  All set?  And, Ms. Gellie, will you be

13   doing the examination?

14         MS. GELLIE:  I will, Your Honor.

15         THE COURT:  All right.  Let's bring the jury in.

16         There's no assigned seats.  You may sit wherever you

17   wish.  Although, it's my short experience, in short order --

18   and I can see its already happened -- in short order, members

19   of the jury claim a proprietary interest in a particular seat,

20   which is fine too.  You may be seated.

21         (Jury in.)

22         THE COURT:  Now, it would not have escaped your

23   attention that the topography, the furnishings of the

24   courtroom have changed.  You see the screen in front of you.

25         The next witness has a name and an identification

U.S. v. Mallory

131

1  that is classified.  So you will have his name as John Doe and

2  you will see him.  Part of the courtroom will not be able to

3  see him to identify him, and he will go by the name of

4  John Doe.  This side of the courtroom, these persons have all

5  been cleared to see him, and they are all people from an

6  agency or two; is that correct.

7          THE COURT SECURITY OFFICER:  Yes, Your Honor.

8          THE COURT:  All right.  Now, the defendant under the

9  Sixth Amendment has the right to confront all of the evidence

10  against him.  So he knows the identity of this person.  All

11  right.  You may call your next witness, Ms. Gellie.

12          MS. GELLIE:  Thank you, Your Honor.  The Government

13  calls to the stand John Doe.

14          THE COURT:  All right.  And he comes to the

15  courtroom differently, as you'll see.  Come forward and take

16  the oath, please, sir.  You may use a Bible or you may just

17  affirm, whichever you prefer.

18          Thereupon,

19                      **JOHN DOE,**

20  having been called as a witness on behalf of the Government

21  and having been first duly sworn by the Deputy Clerk, was

22  examined and testified as follows:

23          THE COURT:  All right.  Ms. Gellie, you may proceed.

24          MS. GELLIE:  Thank you, Your Honor.

25                  **DIRECT EXAMINATION**

─────────U.S. v. Mallory─────────
J. Doe - Direct
132

BY MS. GELLIE:

Q.   Good afternoon, sir.  Would you please state --

A.   Good afternoon.

Q.   Would you please state your name for the record?

A.   John Doe.

Q.   Where do you currently work, Mr. Doe?

A.   I work for the agency.

Q.   And when you say "agency," do you mean the Central

Intelligence Agency?

A.   Yes, I do.

Q.   John Doe is not your true name, correct?

A.   That's correct.

Q.   Why are you testifying under a pseudonym today?

A.   Because I -- I am involved in classified work.

Q.   During your time as a contractor at the CIA did you ever

meet the defendant, Kevin Mallory?

A.   Yes, I did.

Q.   Is Mr. Mallory in the courtroom today?

A.   Yes, he is.

Q.   Would you please identify him for the record by an

article of clothing.

A.   Mr. Mallory is sitting at the table, at the end of the

table at the left, to my left.

        THE COURT:  All right.  The record will reflect that

the witness has identified the defendant.  Next question.

─────────────────U.S. v. Mallory─────────────────

J. Doe - Direct

133

BY MS. GELLIE:

Q.   How long have you known the defendant?

A.   I'd say about six or seven years.

Q.   And what context did you meet the defendant?

A.   In connection with our work.

Q.   What was the defendant's role at the CIA at the time that you met him?

A.   He was a contractor.

Q.   How long did you work with Mr. Mallory as contractors at the CIA?

A.   I think it was a short period of time, about a year or two.

Q.   Would you consider Mr. Mallory to be a close friend?

A.   No.

Q.   While in the defendant's departure from the CIA, how often were you in contact with him?

A.   I wasn't in contact -- contact with him at all, except for when he reached out to me with -- with a call after having left the office that I worked with.

Q.   And when in time did that call you just referenced happen?

A.   That happened in April, I believe April of 2017.  Or maybe a little bit earlier, but in that timeframe.

Q.   And what did the defendant say to you on that initial phone call?

─────────── U.S. v. Mallory ───────────

J. Doe - Direct

1   A.   He wanted me to reach out to somebody in another office

2   to get in touch with him regarding a -- an issue regarding the

3   work that he was doing.

4   Q.   Did he say anything specifically about the work he was

5   doing?

6   A.   It was related to overseas work that he was doing.

7   Q.   Did he specify which overseas country?

8   A.   China.

9   Q.   And what, if anything, did you do following that initial

10  communication from the defendant?

11  A.   I passed that information on to our security officer.

12  Q.   Why did you pass that information along to security?

13  A.   I didn't have any contacts in the office that he had

14  asked me to contact, and I thought that his outreach to me was

15  a little bit strange.

16  Q.   What about the outreach seemed strange to you?

17  A.   I hadn't had any contact with Mr. Mallory after leaving

18  the office -- after he had left the office.  And the way that

19  he outreached to me seemed odd.  I would have thought that he

20  would have contacted somebody directly within the agency

21  involving security.

22  Q.   Were you able to put Mr. Mallory in touch with anyone

23  after that initial contact?

24  A.   I hadn't put him in contact with anyone.

25  Q.   After that first contact was there any further contact

—U.S. v. Mallory—

1   from the defendant in 2017?

2   A.   There were -- there was some follow-up text messages and

3   there may have been a call or two.

4   Q.   If you look in that folder in front of you at what's been

5   marked as Government Exhibit 2-1.  Do you recognize that?

6   A.   Yes, I do.  These are the text messages that I exchanged

7   with -- with Mallory.

8   Q.   These are photographs of the text messages from your

9   phone?

10  A.   Yes, that is correct.

11  Q.   Were you present when these photographs were taken?

12  A.   Yes.

13  Q.   Are these a fair and accurate depiction of the

14  information on your mobile telephone?

15  A.   Yes, they are.

16  Q.   The only change is that your true name has been replaced

17  with John?

18  A.   That's correct.

19          MS. GELLIE:  I'd offer and move this as evidence as

20  Government Exhibit 2-1 and ask to publish it to the jury, Your

21  Honor.

22          MR. KAMENS:  No objection, Your Honor.

23          THE COURT:  Admitted.  You may do so.

24                      (Government's Exhibit No. 2-1

25                       admitted into evidence.)

─────────────U.S. v. Mallory─────────────

1            MS. GELLIE:  Thank you, Your Honor.

2   BY MS. GELLIE:

3   Q.   Starting on the first photograph, which is stamped

4   U.S. 6165, who wrote the text message depicted?

5   A.   That's a text message from -- from Mallory.

6   Q.   And when Mr. Mallory wrote, "Could you please go back to

7   your security POC and ask him to reach out to EA/China," do

8   you understand what EA/China referred to?

9   A.   I did.

10  Q.   What is EA/China?

11  A.   It's an office in the agency.

12  Q.   And what do they specialize in?

13  A.   Chinese, Chinese operations.

14  Q.   Do you, yourself, have any contacts in that office?

15  A.   No, did not.

16  Q.   Is that within your personal area of expertise?

17  A.   No, it is not.

18  Q.   When the defendant wrote that he was again approached in

19  a manner from their service, did you have an understanding of

20  what that meant?

21  A.   I did.

22  Q.   What did you understand that to mean?

23  A.   I understood that to mean that he was likely being

24  contacted by the Chinese intelligence service.

25  Q.   And had the defendant told you prior to this April 24,

——————U.S. v. Mallory——————

J. Doe - Direct

137

1    2017, text that he believed he had been approached by the

2    Chinese intelligence services?

3    A.   No, I think the text messages, as I recall, is the first

4    time I heard about that.

5    Q.   Now, if you turn your folder, Mr. Doe, to what's been

6    marked as Government Exhibit 2-2.

7         Do you recognize this document?

8    A.   2-2?

9    Q.   Yes.

10   A.   Yes, I do.

11   Q.   What is this?

12   A.   That's a text message I forwarded to my agency colleagues

13   regarding my text message from Kevin, Kevin Mallory.

14   Q.   Other than the redactions, is this substantially the same

15   condition as when you sent the e-mail?

16   A.   Yes.

17        MS. GELLIE:   I offer this into evidence as

18   Government Exhibit 2-2 and ask to publish it to the jury.

19        MR. KAMENS:   No objection.

20        THE COURT:   Admitted.   You may do so.

21             (Government's Exhibit No. 2-2

22             admitted into evidence.)

23   BY MS. GELLIE:

24   Q.   So when in time, in relation to that April 24th text

25   message, did you send this e-mail, Mr. Doe?

J. Doe - Direct

138

1    A.    I sent this message on the 25th of April.

2    Q.    Why did you decide to send this e-mail?

3    A.    I wanted to document my contact with Kevin Mallory.

4    Q.    And why did you want to document that contact?

5    A.    I thought it was important because the situation struck

6    me as -- as odd.

7    Q.    As a CIA contractor, have you received any training on

8    certain reporting requirements regarding contact by outside

9    individuals?

10   A.    Yes.

11   Q.    And what is the guidance you received regarding reporting

12   outside contact?

13   A.    Outside contact has to be reported to the appropriate

14   authorities in the agency.

15   Q.    Is there a certain threshold that outside contact has to

16   meet before you are encouraged to report it?

17   A.    If the contact is suspicious, if it has possibly to do

18   with -- with being in touch or being contacted by foreign

19   intelligent services, yes, we are required to report that type

20   of contact.

21   Q.    And how did you categorize the contact from Mr. Mallory

22   in April of 2014?

23   A.    I thought the contact was -- again, as I mentioned

24   before, the contact from Kevin Mallory seemed a little bit odd

25   to me.

─────────────── U.S. v. Mallory ───────────────

J. Doe - Direct

139

1   Q.   In your e-mail that is Government Exhibit 2-2, you wrote,

2   "I will call him back today and let him know I passed along

3   this information."

4          Did you, in fact, call the defendant after sending

5   that e-mail?

6   A.   Yes.  Either I called him or I sent him a text message.

7   Q.   Now, turning back to Government Exhibit 2-1, the text

8   messages, on page U.S. 6168, who wrote that text message at

9   the top?

10  A.   I'm sorry, what's the page again?

11  Q.   6168.

12  A.   6168.  Okay.  Yes, that's the text message from me to

13  Mallory.

14  Q.   And when did you send that text message?

15  A.   About -- on or about April the 26th.

16  Q.   And you stated that you had missed your colleague at work

17  the last couple of days, will try again tomorrow.

18          What was that in reference to?

19  A.   That's in reference to the security officer that I

20  contacted and passed the information on regarding Mallory.

21  Q.   And turning to the next message in that chain on

22  April 26th, who wrote that?

23  A.   The next message below?

24  Q.   Yes, on 6168.

25  A.   That's Kevin Mallory.  I'm sorry, hold on a minute.

─────────────U.S. v. Mallory─────────────

J. Doe - Direct

140

1    6168.

2              (A pause in the proceedings.)

3              THE COURT:  It's also on the screen to your right.

4              THE WITNESS:  Yes, that's the -- the response is

5    from Kevin Mallory.

6              THE COURT:  Do you see the screen on your right?  It

7    will also appear there.  The screen on your right.

8              THE WITNESS:  Oh, I'm sorry.  Okay.  Got it.

9    BY MS. GELLIE:

10   Q.   And looking at the continuation of that text on

11   U.S. 6169, Mr. Mallory wrote, "As I told you in the past, I

12   suspected who they are and didn't really know, but this time

13   they were even more suspicious with me and even asked me a

14   couple questions that only him-something in this industry

15   would know."

16              What did you take that statement to mean?

17   A.   I understood that to mean that he was probably being

18   contacted by the Chinese intelligence service.

19   Q.   Turning ahead to 6171.  Who wrote the messages in these

20   white bubbles?

21   A.   I'm sorry, I don't see the page.

22   Q.   6171.

23   A.   That's from Kevin Mallory.

24   Q.   When Kevin Mallory wrote, "And they also have asked me a

25   few questions that only come from someone on our side of the

─────────── U.S. v. Mallory ───────────

1    house," what did you take that to mean?

2    A.   Someone from our side of the house would appear to mean

3    that the Chinese were in touch with another -- perhaps a

4    penetration of the agency.

5    Q.   Flipping ahead to 6173.  On Tuesday, May 2nd, who wrote

6    that message at the bottom?

7    A.   That was -- I wrote that message -- no, I'm sorry.

8         The message at the bottom?  That's a message from

9    Kevin to myself.

10   Q.   And where it says, "Finally made contact," what did you

11   take that to mean?

12   A.   I'm sorry, I'm not seeing that text.  Where is that?

13   Q.   At the bottom of 6173 where it says, "Good evening, John.

14   Finally made contact.  Talk to you soon."

15   A.   Okay.  That's -- that's Kevin Mallory's text message.

16   Q.   And did you have an understanding of what he meant by

17   "finally made contact"?

18   A.   I presume at that time that someone from the agency was

19   in touch with him.

20   Q.   Did you have any further communications with the

21   defendant after his May 2, 2017, text?

22   A.   No.  I believe that's the final text message from

23   Kevin Mallory.

24   Q.   And at any point in your communications with the

25   defendant in 2017, did you indicate you had authority to

─────U.S. v. Mallory─────

J. Doe - Direct

142

1   approve any sort of operational activity?

2   A.   No.

3   Q.   In your role as a contractor, are you authorized to

4   approve field operations?

5   A.   No, I am not.

6   Q.   And did you ever indicate to the defendant your opinion

7   of engaging with a suspected Chinese intelligence officer?

8   A.   I didn't express any opinion at that time.

9   Q.   At any point did the defendant tell you that he intended

10  to pass classified information to a Chinese individual he was

11  engaging with?

12  A.   No.

13  Q.   If he had, what would your response have been?

14  A.   I would have told him not to do that, he would be

15  breaking the law and creating espionage.

16  Q.   In your role at CIA, are you authorized to approve

17  passage of classified information to non-cleared individuals?

18  A.   No.

19  Q.   Are you authorized to approve passage of classified

20  information to foreign nationals?

21  A.   No.

22  Q.   In any of your communications with the defendant, did you

23  tell the defendant that you believe CIA would be interested in

24  the defendant continuing to engage with the individual in

25  China?

─────────────── U.S. v. Mallory ───────────────

J. Doe - Direct/Cross

143

1  A.   No.

2         MS. GELLIE:  No further questions.

3         THE COURT:  Cross-examination.

4                    **CROSS-EXAMINATION**

5  BY MR. KAMENS:

6  Q.   Sir, could you look at -- well, let me ask you this.  You

7  started with the CIA around 1981; is that right, sir?

8  A.   That's correct.

9  Q.   And you met Mr. Mallory in approximately 2012?

10  A.   Yes.

11  Q.   Did you work together?

12  A.   Yes, we did.

13  Q.   And you didn't have contact with Mr. Mallory from

14  approximately 2012 until early 2017?

15  A.   At the time that he had left at the office we were

16  working.  And I'm not sure exactly the -- the date, but once

17  he had left the office, then contact ceased.  I may have

18  bumped into him somewhere along the line in the northern

19  Virginia area, but we didn't have regular contact.

20  Q.   You discussed with Ms. Gellie your text messages in April

21  with Mr. Mallory.

22  A.   Yes.

23  Q.   And you specifically discussed Government Exhibit 2-1,

24  which is the text message dated April 24.  Do you recall that?

25  A.   Yes.

─────────────── U.S. v. Mallory ───────────────
J. Doe - Cross

144

1   Q.   You testified that this was the first time that you'd

2   heard about this; is that right?

3   A.   Yes.

4   Q.   Now, in this message itself it says, "Could you please go

5   back to your security POC, ask him to reach over to EA/China,

6   regarding the issue you and I discussed previously."

7         So doesn't the text message itself suggest that you

8   had prior conversations?

9   A.   Not on -- not regarding this specific topic.

10  Q.   All right.  So you're saying that you had prior

11  conversations --

12  A.   Going back to the time we worked in the office that we

13  worked in.

14  Q.   All right.  You actually spoke with Mr. Mallory in

15  February of 2017.  Do you recall that, sir?

16  A.   There may have been a contact, yes.

17  Q.   Yes.  You mentioned that there may have been a telephone

18  call?

19  A.   A telephone call, yeah.

20  Q.   Would it help for you to look at telephone records to

21  see -- to confirm or refresh your recollection that you had

22  telephone calls with Mr. Mallory?

23  A.   There may have been.  You can mention that or you can

24  identify the record if that will help.

25  Q.   Okay.  If you would, take a look at Defendant's

─────U.S. v. Mallory─────

1  Exhibit 2A-2.

2                     (Discussion off the record.)

3  BY MR. KAMENS:

4  Q.    2A-2, that's correct.  If you can look at pages 86 and

5  87.  Pages 86 and 87 of that record.  If you can, on page 86

6  of that record, that's 2A-2, do you have -- oh.

7  A.    I'm on page 86.

8  Q.    All right.  Now, the second line from the bottom under

9  terminating number, do you see a number starting with 757?

10  A.    Second line from the bottom?

11  Q.    Yes, in the middle, the middle column.

12  A.    Yes.

13  Q.    And do you see a number starting with 757?

14  A.    Yes, I do.

15  Q.    Do you recognize that number?

16  A.    Yes, I do.

17  Q.    And that is your number?

18  A.    That's correct.

19  Q.    All right.  Now, look at the following page, which is

20  page 87.  If you look at originating number -- one, two,

21  three, four, five, six -- seven from the top, originating

22  number, there's a 757 number.

23  A.    How far from the top did you say?

24  Q.    Seven numbers from the top, the seventh number.

25  A.    On page 87?

1  Q.    On page 87.  It's the same 757 number we just discussed

2  under originating number, the other column to the left maybe.

3  A.    The other column to the left.  On page 87.  I'm sorry, I

4  don't see that.  Oh, I see that.  I see that a little further

5  up, correct.

6  Q.    You do see it now?

7  A.    Yes.

8  Q.    Do you see the number next to it?  It's 12:24.  To the

9  left of your number, sir.

10  A.    To the left of my number, 12:24, yes, I see that.

11  Q.    Does that suggest that there was a telephone call on that

12  date of approximately 12 minutes and 24 seconds in duration?

13  A.    Yeah, there may have been.

14  Q.    And so it appears, sir, that you actually did speak to

15  Mr. Mallory in February, I think --

16  A.    That's certainly possible, yeah.

17  Q.    And you hadn't spoken to Mr. Mallory prior to February of

18  2017 since he left his work in 2012; is that right?

19  A.    I don't -- I'm not sure when he left his work.  It may

20  have been 2012, 2013, even perhaps even a little bit later.

21  I'm not sure when exactly he left his work because he left his

22  work rather suddenly.

23  Q.    My point is that your communication with him in February

24  of 2017 was not the -- in the course of ordinary

25  communications between you and Mr. Mallory.

─────────────U.S. v. Mallory─────────────
J. Doe - Cross                                          147

1   A.   No, because we didn't have -- we didn't have regular

2   contact.

3   Q.   That's right.  So given that he contacted you in

4   February 24, 2017, and you had a 12-minute conversation, and

5   Government's Exhibit 2-1 says that he had discussed this issue

6   with you previously --

7          THE COURT:  The question is now compound.

8   BY MR. KAMENS:

9   Q.   Sir, you discussed with Mr. Mallory in February of 2017

10  his interest in contacting someone at the CIA, did you not?

11  A.   In what -- what time?

12  Q.   February 24th of 2017.

13  A.   No, I don't recollect that involved this -- his

14  situation.

15  Q.   I see.  At some point he did discuss with you consulting

16  work in China; is that right?

17  A.   In February 2017?

18  Q.   Yes.

19  A.   No, I don't recall that.

20  Q.   You don't recall the contents of your 12-minute call with

21  Mr. Mallory at that point?

22  A.   It was -- my recollection was it was basically a social

23  call at that point.  I sort of vaguely -- I thought the call

24  had to do with maybe his interest in coming back to the office

25  to work.

─────U.S. v. Mallory─────

J. Doe - Cross

148

1  Q.   So after five years he made a social call to you?

2          THE COURT:  Is that a question?

3          MR. KAMENS:  Yes.

4  BY MR. KAMENS:

5  Q.   Sir, after five years he made a social call to you?

6  A.   Apparently so.

7  Q.   Okay.

8          THE COURT:  Is that why you found it odd?

9          THE WITNESS:  I found the contact regarding his

10 travels to China odd.  I didn't find the -- the contact in

11 February odd because that was somebody that I had worked with,

12 and he had made a call or I had called -- he had made a call

13 to me.  And that would have been -- at that point I consider

14 that a normal call.  Somebody who was calling saying "hello"

15 or "how are things," things like that.

16         THE COURT:  Next question.

17 BY MR. KAMENS:

18 Q.   You discussed again -- three days later there was a

19 telephone call on February 27, 2017.  Do you recall that?

20 A.   There may have been.  I don't recall the specifics of

21 that call.

22 Q.   If I were to point it out in the records here, would you

23 agree that you had a call on February 27th?

24 A.   Sure, it's possible.

25 Q.   Okay.  Do you want me to refresh your recollection or do

1    you just agree?

2    A.   No, that's fine.  It could have been.  There may have

3    been a call there.  As I mentioned, there may have been

4    contact between Mallory and myself.  It's just that the

5    contact was very infrequent.

6    Q.   Just to confirm, if you can look at page 90 of that same

7    document you're looking at.  Are you looking at page 90?

8    A.   Yes.

9    Q.   All right.  And if you can look under originating number

10   column.

11   A.   Got it.

12   Q.   Four numbers from the bottom.  Do you see the 757 number?

13   A.   Yes, I do.

14   Q.   And then the next line up in the terminating number, do

15   you see that same 757 number?

16   A.   Yes.

17   Q.   And those are both your numbers?

18   A.   Yes.

19   Q.   Okay.  And then you spoke again on March 1st of 2017.  Do

20   you recall that?

21   A.   May have happened, but it wouldn't have been unusual.

22   Q.   So if you can look at page 93, the same document you're

23   looking at.

24   A.   I'm on page 93.  And what are you --

25   Q.   Three lines from the bottom under originating number.

─────────── U.S. v. Mallory ───────────

1   A.    Yes.

2   Q.    It appears you called Mr. Mallory.  That's your 757

3   number?

4   A.    Yes, it is.

5   Q.    And you talked with him for approximately three and a

6   half minutes?

7   A.    Yeah, it's possible.

8   Q.    And so you had a series of calls after five years, and

9   you believe all of these were social calls?

10  A.    They were social calls or they may have been in

11  connection with coming back to the office, to work at the

12  office.

13  Q.    And you don't recall --

14  A.    But, again, I don't recall the specifics.

15  Q.    Okay.  So you don't recall the specifics that it's

16  possible he discussed what he said in the text message --

17  A.    No, that was not discussed.  I would have reported that.

18          MS. GELLIE:  Objection, asked and answered this line

19  of questioning on the third round.

20          THE COURT:  It's overruled.  He's already answered.

21  BY MR. KAMENS:

22  Q.    Just to be clear, none -- none of these contacts that you

23  had with Mr. Mallory in February of 2017, did you pass on to

24  or make a report to a security officer in the CIA?

25  A.    Regarding the calls in February and March, is that what

────────────U.S. v. Mallory────────────

1   you're referring to?

2   Q.   That's what I'm referring to.

3   A.   No, I did not -- I did not contact the security office at

4   that time because I didn't see anything strange about those

5   calls.

6   Q.   All right.  Well, in -- in Government's Exhibit 2-1,

7   Government Exhibit 2-1, the first text message.

8   A.   Got it.

9   Q.   When Mr. Mallory wrote to you and said, "Could you please

10  go back to your security point of contact, ask him to reach

11  over to EA/China regarding the issue you and I discussed

12  previously," what did you understand him to refer to?

13  A.   Something in connection with his -- with his travel to

14  China and his work in China.

15  Q.   All right.  And if you were to admit, sir, that you had

16  talked with Mr. Mallory about this in February and didn't

17  report it to a security officer, would that mean that you had

18  done something wrong?

19  A.   I didn't discuss his work in China in February.  And he

20  did not raise that type -- the same type of situation at that

21  point.  I can't remember what he -- what he was doing at that

22  time, but it certainly didn't involve being contacted by the

23  Chinese service.

24  Q.   All right.  Mr. Mallory --

25            THE COURT:  When did he advise you about some

──────U.S. v. Mallory──────

J. Doe - Cross

152

1   contacts with China?

2          THE WITNESS:  From my recollection, that happened in

3   roughly April of 2017 with these text messages that you have

4   in the exhibits.

5          THE COURT:  Next question.

6   BY MR. KAMENS:

7   Q.   In Government's 2B-1 where Mr. Mallory said he wanted to

8   contact someone about you discussed -- what you had discussed

9   previously, Mr. Mallory didn't describe what he had discussed

10  previously in the text message, did he?

11  A.   No.  He didn't describe anything having to do with

12  previous calls going back to March or February.

13  Q.   My point, sir, is that in the text message that he gave

14  you in Government's 2B-1 when he said he wanted to contact

15  someone at the CIA about what you had discussed previously, he

16  didn't enumerate or describe what you had discussed previously

17  in the text message?

18          THE COURT:  Well --

19          THE WITNESS:  No, I don't recall that he -- that --

20  that we had talked about his work in China.  That's why this

21  outreach that came across as so strange to me.

22          MR. KAMENS:  And yet --

23          THE COURT:  You keep referring to 2B-1.  I don't

24  think you mean 2B-1.

25          MR. KAMENS:  Oh.  I mean -- I do mean

————————U.S. v. Mallory————————

J. Doe - Cross

153

1   Government's 2 -- is it 2-1 -- 2-1, Your Honor.

2          THE COURT:  All right.  Well, you kept saying 2B-1.

3   There is no 2B-1.

4          MR. KAMENS:  Sorry, Your Honor.

5          THE COURT:  All right.

6          MR. KAMENS:  2B-1 is actually our exhibit.  It's

7   identical to the Government's, but -- sorry.

8   BY MR. KAMENS:

9   Q.   Sir, you testified earlier that you responded to the text

10  message with the statement, "Kevin, got your text.  Sorry,

11  haven't been able to pass on your request yet."

12         Do you recall that testimony?

13  A.   Yes.

14  Q.   And you sent that text message at the direction of

15  another person; is that right?

16  A.   I believe that's -- that's correct.

17  Q.   So you sent that text message that you hadn't been able

18  to find the time to forward Mr. Mallory's request at the

19  direction of the FBI?

20  A.   No.

21  Q.   At the direction of the CIA?

22  A.   No, I -- as I recollected, the security officer, who I

23  passed the information on, hadn't been able to contact the

24  China office to pass the information on.  So I was simply

25  indicating to Mallory I hadn't been successful in getting the

─────────U.S. v. Mallory─────────

J. Doe - Cross

154

1    information to the office that he wished me to get it to.

2    Q.   I see.  So the person that you had passed the information

3    on to was actually trying to reach someone in the China

4    office?

5    A.   I do believe so, yes.

6    Q.   So -- well, then, Mr. Mallory wrote in response to your

7    message that -- he said, "I know you're busy.  As I've told

8    you in the past, I suspected who they are.  Didn't really

9    know.  But this time they were even more suspicious with me."

10           Do you recall that?

11   A.   Yes.

12   Q.   And three days later you wrote him back and said you

13   finally passed on the message?

14   A.   Yes.

15   Q.   Was that also at the direction of the security officer?

16   A.   No, I passed that information on to the security officer.

17   Q.   I see.  But did the security officer tell you to send

18   that message back to Mr. Mallory?

19   A.   No, I sent that message back to him because it would have

20   been a normal response letting him know that I passed that

21   information on.

22   Q.   But the purpose of you conveying this information to the

23   security officer was actually to pass it on to the China

24   office?

25   A.   That's correct.

U.S. v. Mallory

J. Doe - Cross

155

1   Q.   And that's what Mr. Mallory was asking you to do in the

2   beginning?

3   A.   He asked me to get that information to someone in the

4   China office.  I personally did not have any contacts in the

5   China office so I passed the information on to the security

6   officer.  What the security officer did specifically I am not

7   aware.

8   Q.   But it was your understanding that the information was

9   passed on to the China office?

10  A.   I passed on the information to the security officer, and

11  I presumed the security officer took appropriate action.

12  Q.   All right.  Thank you, sir.

13          THE COURT:  Am I correct that nobody told you what

14  to respond to Mallory?

15          THE WITNESS:  No, not at this point.  I was simply

16  passing on the information that Mallory wanted me to pass on

17  to the China office where I had no contacts.

18          THE COURT:  But nobody at the CIA or the FBI or

19  anyone else told you what to say to Mallory?

20          THE WITNESS:  No.

21          MR. KAMENS:  Your Honor, if I can follow up on that,

22  take a look at Defendant's Exhibit 2B-2.  It's in the notebook

23  there.  2B-2, Defendant's 2B-2.

24  BY MR. KAMENS:

25  Q.   Okay.  Do you have 2B-2, sir?

─────────────────U.S. v. Mallory─────────────────

1   A.   I'm getting there.  Hold on.  Okay.  I think I got it.

2   Q.   2B-2.  And the second page of that document, I think

3   it's -- at the bottom it says, "U.S. 31118."

4   A.   Okay.

5   Q.   Now, at the bottom there, sir, it says -- it appears to

6   be an e-mail message from you, correct?

7          THE COURT:  Has this document been admitted?

8          MR. KAMENS:  No.

9          THE COURT:  Well, then, you may not read it.

10         MR. KAMENS:  Well, I'm impeaching him on

11   the testimony he just gave.

12         THE COURT:  You may not use it unless it's been

13   admitted.

14         MR. KAMENS:  I can certainly use it to impeach his

15   statement.  As I understand it, the testimony is that no one

16   directed him what to say to Mr. Mallory.  This is a document,

17   I believe, from this witness in which he is --

18         THE COURT:  Show it to the Government.

19   BY MR. KAMENS:

20   Q.   Sir?

21   A.   Yes.

22   Q.   Does this appear to be an e-mail from you?

23   A.   Yes.

24   Q.   Dated April 27, 2017?

25   A.   Yes.

─────────────U.S. v. Mallory─────────────

J. Doe - Cross/Redirect                                    157

1   Q.   And at the bottom does it not say, "My text message sent

2   to Kevin at 2003 hours, Wednesday, 26 April 2017, per your

3   request guidance"?

4   A.   Correct.

5   Q.   So it does appear you were at least given some direction

6   or guidance on what to say to Mr. Mallory?

7   A.   It was not -- I didn't get guidance specifically on what

8   to say to him except to keep in contact with him and pass on

9   the information that he was passing on to me.

10          THE COURT:  So let me go back.  Did anybody tell you

11  what to say in your communication with Mallory?

12          THE WITNESS:  Not specifically, not -- not, "You

13  have to say X, Y and Z."  I was instructed to maintain contact

14  with Mr. Mallory and then pass on the information that he

15  passed on to me, whatever that may be.

16          THE COURT:  All right.  Anything further?

17          MR. KAMENS:  Nothing further, Your Honor.

18          MS. GELLIE:  Just briefly, Your Honor.

19          THE COURT:  Any redirect?

20          MS. GELLIE:  Just briefly.

21                    **REDIRECT EXAMINATION**

22  BY MS. GELLIE:

23  Q.   Mr. Doe, why did you continue to coordinate with security

24  in your interactions with the defendant in April of 2017?

25  A.   Because the situation, again, as I mentioned from the

─────────U.S. v. Mallory─────────

J. Doe - Redirect

158

1    very start, seemed strange to me and it seemed to me that it

2    could have -- it could be moving into a -- an espionage

3    situation.

4             MS. GELLIE:  Nothing further for this witness, Your

5    Honor.

6             THE COURT:  Any reason why this witness should not

7    be excused?

8             MS. GELLIE:  No, Your Honor.

9             MR. KAMENS:  No, Your Honor.

10            THE COURT:  All right.  You may step down, Mr. Doe.

11            (Witness excused.)

12            THE COURT:  And I'll take a recess so that we can

13   change the furniture after Mr. Doe has left.  Court stands in

14   recess for ten minutes.

15            (Recess.)

16            THE COURT:  All right.  Who will have the next

17   witness?  Ms. Garcia?

18            MS. GARCIA:  Yes, Your Honor.

19            THE COURT:  Who is the next witness?

20            MS. GARCIA:  It's Mr. Michael Dorsey.

21            THE COURT:  All right.  And how long do you think he

22   will take?

23            MS. GARCIA:  I think he will -- I think the direct

24   will take an hour, Your Honor.

25            THE COURT:  All right.  Bring the jury in.

─────────U.S. v. Mallory─────────

1            (Jury in.)

2            THE COURT:  All right.  You may be seated.

3            All right.  Ms. Garcia, who is your next witness?

4            MS. GARCIA:  Your Honor, the United States calls

5    Mr. Mike Dorsey.

6            THE COURT:  All right.  Come forward and take the

7    oath, please, sir.

8            Thereupon,

9                        **MICHAEL DORSEY,**

10   having been called as a witness on behalf of the Government

11   and having been first duly sworn by the Deputy Clerk, was

12   examined and testified as follows:

13           (Witness seated.)

14                     **DIRECT EXAMINATION**

15           THE COURT:  All right.  You may proceed.

16   BY MS. GARCIA:

17   Q.   Mr. Dorsey, will you please state your name and spell it

18   for the record.

19   A.   Mike Dorsey, M-i-k-e D-o-r-s-e-y.

20   Q.   Where are you currently employed?

21   A.   CIA.

22   Q.   What is your title there?

23   A.   Investigator.

24   Q.   How long have you been employed in that position?

25   A.   Almost 20 years.

─────U.S. v. Mallory─────
M. Dorsey - Direct
160

1   Q.   Do you have a specific focus?

2   A.   Yes, I do.  I work in the counterintelligence missions

3   center within CIA.

4   Q.   What are your current responsibilities?

5   A.   I investigate counter espionage leads.

6   Q.   And at your time in your current position have you gained

7   experience in conducting interviews?

8   A.   Yes.

9   Q.   Ballpark figure, how many interviews would you say you've

10  done?

11  A.   I've easily done over 100 interviews.  And that would be

12  either as a team leader with somebody else or by myself.

13  Q.   Are you working on the matter in the Court today, United

14  States versus against Kevin Patrick Mallory?

15  A.   I was, yes.

16  Q.   Do you see Kevin Mallory sitting in the court today?

17  A.   I do.

18  Q.   Can you please point to him and identify him by an

19  article of clothing he's wearing.

20  A.   He's at the left end of the -- of the table here in a

21  dark suit.

22          THE COURT:  All right.  The record will reflect that

23  the witness has identified the defendant.  Next question.

24          MS. GARCIA:  Thank you, Your Honor.

25  BY MS. GARCIA:

─────U.S. v. Mallory─────

1  Q.   Mr. Dorsey, how did you first become involved in this

2  case?

3  A.   It was assigned to me by my supervisor.

4  Q.   And why did your supervisor assign it -- assign the case?

5  A.   He received an e-mail from another individual within CIA

6  talking about an unusual call that a CIA employee had received

7  from Mr. Mallory.

8  Q.   And what, if anything, did you review in response?

9  A.   Well, initially I began to collect records having to do

10  with Mr. Mallory's former career at CIA, and also as far as

11  possible to determine what his current activities were -- his

12  activities since he left CIA.

13  Q.   And what did you learn about the dates of his employment

14  at CIA?

15  A.   I believe he was employed from '90 through '96, if my

16  recollection is correct there.

17  Q.   And how about later?

18  A.   He came back.  He applied for a contract position and was

19  not accepted for that position, and then came back later on.

20  There were a number of different contract positions.

21  Q.   Do you remember around the time of when that contract

22  position began?

23  A.   I believe it was 2010 through 2012.

24  Q.   And for these positions would Mr. Mallory have had to

25  obtain clearances?

1    A.    Yes.

2    Q.    What level?

3    A.    Well, it would have been -- he was approved for TS SCI

4    level as I recall.

5    Q.    And what security measures must be taken before someone

6    can start work with a clearance?

7    A.    Well, if you have an in-scope background investigation

8    there's no need for a new background investigation, depending

9    on the kind of access you're going to have.  You may have to

10   take a polygraph examination.  Again, if you already have

11   those vehicles in line you don't have to do that again.  But

12   then you're typically going to have to sign paperwork.

13   Q.    Okay.  And talking about that paperwork, what kind of

14   paperwork are you referring to?

15   A.    Secrecy agreements are a part of that.

16   Q.    Have you reviewed that paperwork in preparation for your

17   testimony today?

18   A.    I did.

19   Q.    With the assistance of the courtroom security officer,

20   Mr. Flood, I would like you to look through -- just look

21   through the Government's binder, Government's Exhibit 2-3

22   through 2-17.  Once you've had a chance to flip through them

23   I'll ask you a couple of questions.

24   A.    Okay.

25   Q.    Do you recognize these?

─────U.S. v. Mallory─────

1  A.   Yes.

2  Q.   Generally speaking, what are they?

3  A.   Most of them are secrecy agreements having to do with

4  sensitive compartmented information.

5  Q.   And did you see a signature at the end of each of those?

6  A.   Yes.

7  Q.   What signature did you see?

8  A.   The signature appears to be that of Kevin Mallory.

9  Q.   Have you seen these prior to testifying today?

10  A.   Yes.

11  Q.   When did you see them?

12  A.   I first saw them when I reviewed his security record at

13  CIA.

14  Q.   And besides certain redactions, are these in

15  substantially the same condition as when you reviewed them?

16  A.   Yes.

17       MS. GARCIA:  Your Honor, I would offer into evidence

18  Government's Exhibit 2-3 through 2-17.

19       MR. KAMENS:  No objection.

20       THE COURT:  Admitted.  You may display them if you

21  wish.

22       MS. GARCIA:  Thank you, Your Honor.  I'd ask to

23  publish Government's Exhibit 2-3.

24       THE COURT:  All right.  You may do so.

25                    (Government's Exhibit No. 2-3

─────U.S. v. Mallory─────

1                               admitted into evidence.)

2    BY MS. GARCIA:

3    Q.   And, Mr. Dorsey, turning -- looking at Government's

4    Exhibit 2-3, what is that document?

5    A.   2-3 is a sensitive compartmented information

6    nondisclosure agreement.

7    Q.   And looking specifically at paragraphs 6 and 9, will you

8    please read those into the record?

9    A.   Paragraph 6?

10   Q.   Yes, please.

11   A.   "I have been advised that any branch of this -- any

12   breach of this agreement may result in the termination of my

13   access to SCI and removal from my position of special

14   confidence and trust requiring such access, as well as the

15   termination of my employment or other relationships with any

16   department or agency that provides me with access to SCI.  In

17   addition, I have been advised that any unauthorized disclosure

18   of SCI by me may constitute violations of United States

19   criminal laws, including the provisions of section 793, 794,

20   798, and 952, Title 18 United States Code, and of section

21   783-B, Title 50, United States Code.  Nothing in this

22   agreement constitutes a waiver by the United States of the

23   right to prosecute me for any statutory violation."

24         And then paragraph 9:  "And until I am released in

25   writing by authorized representative of the department or

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

─────────U.S. v. Mallory─────────
M. Dorsey - Direct
165

1    agency that last provided me with access to SCI, I understand

2    that all conditions and obligations imposed upon me by this

3    agreement apply during the time I am granted access to SCI and

4    at all times thereafter."

5    Q.   What is the date on this document?

6    A.   It is 28th February 1990.

7         MS. GARCIA:  Next, Your Honor, I would like to

8    publish Government's Exhibit 2-4, already in evidence.

9         THE COURT:  All right.  You may display it.  If it's

10   in evidence you may do so.

11   BY MS. GARCIA:

12   Q.   And will you please read into the record paragraphs 2 and

13   3, including the subparagraphs?

14   A.   Okay.

15        Paragraph 2:  "I understand that in the course of my

16   employment or other service with the Central Intelligence

17   Agency I may be given access to information or material that

18   is classified or is in the process of a classification

19   determination in accordance with the standards set forth in

20   Executive Order 12356 as amended or superceded, or other

21   applicable executive order that if disclosed in an

22   unauthorized manner would jeopardize intelligence activities

23   of the United States government.  I accept that by being

24   granted access to such information or material.  I will be

25   placed in a position of special confidence and trust and

─────────U.S. v. Mallory─────────

1   become obligated to protect the information or material from

2   unauthorized disclosure."

3          Paragraph 3:  "In consideration for being employed

4   or otherwise retained to provide services to the Central

5   Intelligence Agency, I hereby agree that I will never disclose

6   in any form or any manner to any person not authorized by the

7   Central Intelligence Agency to receive it, any information or

8   material in either of the following categories:

9   subparagraph A, information or material received or obtained

10  in the course of my employment or other service with the

11  Central Intelligence Agency that is marked as classified or

12  that I know is classified.  Subparagraph B, information or

13  material received or obtained in the course of my employment

14  or other service with the Central Intelligence Agency that I

15  know is in the process of a classification determination."

16  Q.   And stepping back, what is this -- what is the purpose of

17  this agreement?

18  A.   What's the purpose of the agreement?

19  Q.   Yes.

20  A.   It's essentially a contract between the United States

21  government and employee or other affiliate of CIA saying

22  you're being -- you're being provided a position of special

23  trust in which you're going to be granted access to classified

24  information.  And that as a condition of that employment and

25  trust, you're agreeing to maintain the confidentiality of that

—————U.S. v. Mallory—————

M. Dorsey - Direct

167

1   information for the rest of your life.

2   Q.    And if we can publish Government's Exhibit 2-5.  I won't

3   ask you to read it.  It's very short.

4          What is Government's Exhibit 2-5, generally?

5   A.    It's a form that employees are required to assign when

6   they enter on duty at CIA, noting that they are agreeing to

7   abide by a manual that contained security regulations.

8   Q.    And if we can publish Government's Exhibit 2-6.  What --

9   what does this agreement reflect?

10  A.    It's a sensitive compartmented information disclosure

11  agreement.  It repeats the same language that's in the basic

12  security agreement.  And this particular one is dated

13  26 October 1994, and it's prepared for and signed by a

14  Kevin Mallory.

15  Q.    Okay.  If we could publish Government's Exhibit 2-7.

16          What does Government's Exhibit 2-7 reflect?

17  A.    2-7 is another sensitive compartmented information

18  nondisclosure agreement.  This one is dated 26 October 1994.

19  And, again, it's prepared for and signed by Kevin Mallory.

20  Q.    And at some point did Mr. Mallory leave the CIA?

21  A.    Yes.

22  Q.    And what security measures are taken before an individual

23  leaves the CIA?

24  A.    Ideally there's an exit interview.  It's not always

25  possible to do that, but if at all possible someone will

─────────── U.S. v. Mallory ───────────

M. Dorsey - Direct

168

1    interview the person that's departing, remind them of their

2    security obligations, and there's a form that's filled out

3    that notes the reason why they left.

4    Q.   All right.  If you will look at Government's Exhibit 2-8

5    and if we could publish it.

6            What kind of information does Government Exhibit 2-8

7    reflect?

8    A.   Again, it's a sensitive compartmented nondisclosure --

9    nondisclosure agreement.  It's dated September the 4th, 1996.

10   And this one prepared for and signed by Kevin Mallory, and

11   it's specifically a debriefing statement for a number of

12   different SCI compartments.

13   Q.   And if you'll look at Government's Exhibit 2-9, if we can

14   publish that.

15           What is Government's Exhibit 2-9?

16   A.   It's titled "Security Reminder."  And it notes that --

17   it's a form obligating the recipient or the signer they have

18   to maintain the security information.

19   Q.   And will you read the first two paragraphs into the

20   record?

21   A.   Yes.

22           "I" -- and then there's a blank and it's filled

23   in -- "Kevin P. Mallory, have been reminded that, by virtue of

24   my duties with the Central Intelligence Agency, I have been

25   the recipient of classified information and information

─U.S. v. Mallory─

1  concerning intelligent sources and methods that my entrance on

2  duty secrecy agreement, as amended, requires me to protect

3  such data.  Moreover, I have been given an opportunity to

4  review my entrance on duty secrecy agreement."

5          Paragraph 2.  "I have also been reminded that I am

6  not permitted to retain any documents or other materials which

7  were the property of the CIA or the custodial responsibility

8  of the -- of the CIA and I affirm that I do not have in my

9  possession, nor am I taken away from CIA, any such documents

10  or materials.  I have also been reminded that as a former

11  employee I am no longer authorized access to classified

12  information and should not seek to obtain classified

13  information from current employees without first obtaining

14  proper authorization for such access."

15  Q.   And looking at Government's Exhibit 2-10, if we can

16  publish that, and you can say generally what that reflects.

17  A.    It's a preprinted form titled "Exit Interview Report."

18  There are spaces up at the top to require biographic

19  information about who the name of the subject is, and it

20  provides address and telephone number and title.  And then

21  about midway down the page, there's a blank for filling in

22  "Reason for leaving CIA."

23  Q.   And what reason does it list?

24  A.   Resignation.

25  Q.   At some point did Mr. Mallory return to work for CIA?

─────U.S. v. Mallory─────
                                                        170

1   A.    Yes.

2   Q.    As -- and what was his employment status?

3   A.    He was a contractor.

4   Q.    Looking at Government Exhibit 2-11, I know it's not the

5   best copy, but, generally, what is it?

6   A.    This is a -- another sensitive compartmented information

7   nondisclosure agreement that was prepared for Kevin Mallory.

8   Q.    Can you read the date on the second page?

9   A.    The date is the 3rd of December of 2010.

10  Q.    And if you could look at Government's Exhibit 2-12.

11  Generally, what does that reflect?

12  A.    It's an overall secrecy agreement.  It's prepared with

13  the -- the blank at the top for the subject, and the subject

14  is "Kevin Patrick Mallory."

15  Q.    What is the date on that one?

16  A.    The date on this is also the 3rd of December, 2010.

17  Q.    If you'll take a look at Government Exhibit 2-13.  And if

18  we could publish that.

19          What is this document?

20  A.    Again, it's another secrecy agreement.  Its blank at the

21  top.  It looks like it's -- it has the printed name

22  "Kevin P. Mallory."  And it's dated 14 December 2010 with a

23  signature by Mr. Mallory.

24  Q.    Looking at Government Exhibit 2-14.  Generally, what is

25  that document?

─────────────U.S. v. Mallory─────────────
M. Dorsey - Direct

171

```
 1   A.   This is another sensitive compartmented information

 2   nondisclosure agreement with the printed name "Kevin P.

 3   Mallory" at the top, and it appears to be signed by

 4   Mr. Mallory dated 14 December 2010.

 5   Q.   And Government's Exhibit 2-15.  Generally -- if we could

 6   publish that.  And, generally, if you could tell us what it

 7   reflects.

 8   A.   It's another sensitive compartmented information

 9   nondisclosure agreement.  The agreement is between

10   Kevin Patrick Mallory and the United States.  It's -- it's a

11   briefing into SCI programs, and it's dated the

12   15 December 2010 with his signature.

13   Q.   And at some point did Mr. Mallory leave the CIA again?

14   A.   Yes.

15   Q.   I am going to show you what's been marked Government's

16   Exhibit 2-16, if we could publish that.

17          If you can say generally what that document

18   reflects.

19   A.   2-15?

20   Q.   2-16.

21   A.   Sensitive non -- sensitive compartmented information

22   nondisclosure agreement.  That's dated the 11th of October,

23   2011.  And it's a debriefing statement for SCI material.  It's

24   prepared for Kevin P. Mallory and appears to be signed by

25   Kevin Mallory.
```

───────U.S. v. Mallory───────
M. Dorsey - Direct

172

1    Q.    I apologize, did you say the date already?

2    A.    Yes.  October the 11th, 2011.

3    Q.    And, lastly, will you look at Government's Exhibit 2-17,

4    if we can publish that.

5          And if you can say generally what that reflects.

6    A.    It's another sensitive compartmented information

7    nondisclosure agreement prepared for Kevin P. Mallory.

8    Appears to be signed by Mr. Mallory.  And the date, again, is

9    the 11th of October, 2011, and it's a debriefing statement.

10   Q.    In addition to signing documents to obtain clearance, do

11   employees also undergo training to obtain that clearance?

12   A.    Yes.

13   Q.    And what are employees told about sharing classified

14   information?

15   A.    Well, as indicated on the forms, both in general secrecy

16   agreement and -- and on the SCI nondisclosure agreements,

17   it's the -- the obligation is placed on the employee that they

18   can't share the classified information they've been provided

19   access to anyone except someone that they know have been able

20   to establish also has that access and a need to know.

21   Q.    Can you explain "need to know" as you understand it?

22   A.    You have a work-related reason for receiving the

23   classified information.

24   Q.    And taking you back to May 12, 2017, did you interview

25   Mr. Mallory on that day?

─────U.S. v. Mallory─────

1   A.   Yes.

2   Q.   And what day did you confirm the date of the interview?

3            THE COURT:   What was the question?   I'm sorry.

4   BY MS. GARCIA:

5   Q.   On what day did you confirm the date of that interview?

6   A.   I don't recall the actual date.   It was about two weeks

7   before.

8   Q.   And are you able to say in an unclassified manner where

9   this took place?

10  A.   It occurred at CIA headquarters.

11  Q.   What was the purpose of the interview?

12  A.   Mr. Mallory had information he wanted to provide to CIA

13  and I was there to collect it.

14  Q.   Who was present?

15  A.   I was the only person in the interview room with

16  Mr. Mallory.

17  Q.   Was anybody else watching?

18  A.   Initially, yes.   Initially, there was another officer

19  from my branch in the counterintelligence admissions center

20  and an FBI agent from WFO.

21  Q.   Do you remember the FBI agent's name?

22  A.   Special Agent Green.

23  Q.   Was the interview recorded in any way?

24  A.   Yes.

25  Q.   How so?

─────U.S. v. Mallory─────

1   A.   Audio and video.

2   Q.   And prior to testifying today, have you had a chance to

3   watch the full interview?

4   A.   Correct.

5   Q.   And for the purposes of today's testimony, were video

6   clips prepared tied to the defendant's interview?

7   A.   Yes.

8   Q.   Have you also had a chance to review a redacted

9   unclassified transcript of that interview?

10  A.   Yes.

11  Q.   Have you had a chance to review clips of that transcript

12  and make any changes to it?

13  A.   Yes.

14        MS. GARCIA:  Your Honor, at this point we have a

15  stipulation with the defense to the video clips and to the

16  transcripts.  It's Stipulation 7.

17        THE COURT:  Just a moment.  Let me locate it.  Do

18  you have it there?  I seem to have 6 and 8, but I don't see 7.

19        MS. GARCIA:  I have an unsigned copy, Your Honor.  I

20  don't have an --

21        THE COURT:  That's all I'm looking for at the

22  moment.  Just a moment.  Let me find it.

23        MR. KAMENS:  Your Honor, just to be clear, this

24  stipulates the authenticity.

25        THE COURT:  I understand that, but I need to look at

─────────U.S. v. Mallory─────────

1   it.  No.  No, I have it here.

2          MS. GARCIA:  Okay.

3          THE COURT:  I just need to find it.  It's my

4   practice that I will read stipulations to the jury at the

5   appropriate time and they'll go back to the jury room.

6          All right.  Stipulation 7.  My heavens time flies.

7   When did Mr. Terwilliger become the U.S. Attorney?

8          MS. GARCIA:  Last Friday, Your Honor.

9          THE COURT:  All right.  Ladies and gentlemen, the

10  law permits the parties to stipulate as to the existence or

11  truth to certain facts.

12         Here -- and you'll have the stipulations in the jury

13  room.  Here the Government, the United States, and the

14  defendant stipulate and agree that Government Exhibits 7-1

15  through 7-23, 7-1 through 7-23, 7-30 through 7-32 and 7-34

16  through 7-45 are video-recorded excerpts from the defendant,

17  Kevin Mallory's interview at the CIA on May 12, 2017.

18         The United States and the defendant further

19  stipulate and agree that Government Exhibits 7-1T through

20  7-23T and 7-30T through 7-32T and 7-34T through 7-45T are true

21  and accurate transcripts of the recordings contained in

22  Exhibits 7-1 through 7-23 and 7-30 through 7-32 and 7-34

23  through 7-35.

24         That's what the parties stipulated to.  Do you plan

25  to show those excerpts now?

U.S. v. Mallory

M. Dorsey - Direct

176

1           MS. GARCIA:  I do, Your Honor.  And --

2           THE COURT:  Do you have the transcripts?

3           MS. GARCIA:  I do.  And I have binders prepared for

4  the jury I was going to ask have handed out after everything

5  is admitted.  I just wanted to make sure they are in evidence.

6           THE COURT:  All right.  Any objection to this --

7  what's been stipulated to?  I assume not since they are

8  signed.

9           MR. KAMENS:  No objection, Your Honor.

10          THE COURT:  All right.  So those exhibits are

11  admitted.  And I take it it is the party's wish to have the

12  transcripts admitted as well.

13          MS. GARCIA:  Yes, Your Honor.  And those are

14  stipulated to as well.

15          MR. KAMENS:  Yes, Your Honor.

16          THE COURT:  All right.  So those -- all of those

17  exhibits are admitted.

18          MR. KAMENS:  To be clear, we may make additional

19  suggestions for admission based on completeness -- out of

20  bases.

21          THE COURT:  All right.  But for now we will hand out

22  the transcripts to the jury so that as the excerpts are played

23  you can use the transcripts to help you follow what you see

24  and hear.

25          MS. GARCIA:  Yes, Your Honor.  And we are asking

—————————U.S. v. Mallory—————————
M. Dorsey - Direct
                                                                    177

1   only to hand out -- there are two binders.  We are just asking

2   to hand out Transcripts 7-1T through 7-23T at this time.

3            THE COURT:  Do you have 14 of them?

4            MS. GARCIA:  Yes.

5            THE COURT:  All right.  Let's get it done.  Where

6   are they?

7            MS. GARCIA:  Ms. Pham has them.  She's handing them

8   out, Your Honor.

9            THE COURT:  All right.  It will be shown on the

10  screen to your left and in front of you there.  Is that

11  visible to all of you?  Good.

12           All right.  Ms. Garcia, you may proceed.

13  BY MS. GARCIA:

14  Q.  So moving back to the interview on -- in May of 2017, did

15  you ask Mr. Mallory questions about the suspicious contact he

16  reported and the people he met with?

17  A.  Yes.

18  Q.  And, generally, what people did he name and what were

19  their roles, as he understood it?

20  A.  He named three individuals, all named Yang, Y-A-N-G.

21           The first individual he represented as a head

22  hunter.  Richard Yang.

23           Richard Yang's boss or client he named -- identified

24  as Michael Yang.

25           And then Michael Yang also had a boss that was

─────────────U.S. v. Mallory─────────────

M. Dorsey - Direct

178

1    present for later interviews also named Yang, but -- but they

2    made a mistake during the meetings and also called him Mr.

3    Ding.

4            MS. GARCIA:  Your Honor, may we play Government's

5    Exhibit 7-1?

6            THE COURT:  All right.  You may go ahead.

7            (Video played.)

8    BY MS. GARCIA:

9    Q.   Why is the defendant's arm in a sling, by the way?  Did

10   he make any statements to you about that.

11           THE COURT:  Your question is compound.

12           MS. GARCIA:  I'm sorry, Your Honor.

13   BY MS. GARCIA:

14   Q.   Did the defendant make any statements to you about why

15   his arm is in a sling in that -- in the interview?

16   A.   Yes.

17   Q.   What was his statement on that?

18   A.   He had surgery on his elbow about two weeks before the

19   interview.

20   Q.   And did you ask -- during this interview did you ask him

21   questions about his recent foreign travel?

22   A.   Yes.

23   Q.   What statements did he make to you about his recent

24   foreign travel?

25   A.   He made a number of statements.  I mean, he described --

─────────U.S. v. Mallory─────────

1    he provided me a narrative from -- describing his activities

2    during both of those trips.

3    Q.   I apologize, I was unclear.

4         What about the frequency and the locations of his

5    recent travel?

6    A.   Does that -- does that question refer to all of his

7    foreign travel?  I think I understand the question.  He had

8    indicated that he had traveled to China, specifically to

9    Shanghai, recently in March and April.  But those had been the

10   only recent foreign trips he had taken.  He told me he had not

11   traveled overseas before then for about five years.

12        MS. GARCIA:  Your Honor, may we play Government's

13   Exhibit 7-2 and 7-3?

14        THE COURT:  Yes, they've been admitted.

15        (Video played.)

16   BY MS. GARCIA:

17   Q.   Did Mr. Mallory make any statements to you early in the

18   interview regarding his assessment of the Yangs?

19   A.   He suspected by the end of the first trip that they

20   were intel officers, or at least the second two Yangs.  He

21   thought the first one, Richard Yang, was just a head hunter.

22        MS. GARCIA:  Your Honor, may we play Exhibit 7-4?

23        THE COURT:  Yes, you may do so.

24        (Video played.)

25   BY MS. GARCIA:

─────U.S. v. Mallory─────

M. Dorsey - Direct

180

1    Q.   Did he give you any reasons for why he made that

2    assessment?

3    A.   There were a number of reasons including the fact that

4    all of their meetings occurred in hotel rooms and not an

5    office building associated with legitimate commercial client.

6         MS. GARCIA:  And, Your Honor, may we play

7    Government's Exhibit 7-5 and 7-6?

8         THE COURT:  All right.  You may do so.

9         (Video played.)

10   BY MS. GARCIA:

11   Q.   Did you also -- did Mr. Mallory also make statements --

12   was part of the assessment based on the topics they talked

13   about?

14   A.   I'm sorry, could you --

15   Q.   I'm sorry.  Was Mr. Mallory's assessment also based on

16   the topics that he talked about with the Yangs?

17   A.   Yes.

18   Q.   And, generally, what kinds of topics were those?

19   A.   Currency manipulation, South China Sea.  And, I'm sorry,

20   I've forgotten the other topics.

21        MS. GARCIA:  Your Honor, may we play Government

22   Exhibit 7-7 and 7-8?

23        THE COURT:  You may.

24        (Video played.)

25        MS. GARCIA:  And, Your Honor, may we play Government

─────U.S. v. Mallory─────

M. Dorsey - Direct

181

1   Exhibit 7-9?

2                   THE COURT:  Yes.

3                   (Video played.)

4   BY MS. GARCIA:

5   Q.   And did you discuss with Mr. Mallory payment after the

6   first meeting with the Yangs?

7   A.   Yes.

8   Q.   Generally, what did he say?

9   A.   He received a fee of $1,000 for each travel date, $2,000

10  for each day he actually met with them.  So he was expecting a

11  fee of $10,000, but he also intended to present them with a

12  bill of -- for other ancillary fees.

13                  MS. GARCIA:  Your Honor, may we play Government's

14  Exhibit 7-10?

15                  THE COURT:  All right.

16                  (Video played.)

17  BY MS. GARCIA:

18  Q.   Did you and Mr. Mallory talk about his second meeting in

19  April?

20  A.   Yes.

21  Q.   Did Mr. Mallory say he voiced his suspicions to the

22  Yangs?  He voiced his suspicions to the Yangs?

23  A.   Voiced his suspicions about what?

24  Q.   The assessment, what he expected of the assessment he

25  made about relating to intelligence?

1   A.   I'm sorry, I don't recall.

2          MS. GARCIA:  Your Honor, as it's already in

3   evidence, may we play 7-10?

4          THE COURT:  Yes.

5          MS. GARCIA:  7-11.  I'm sorry, Your Honor.

6          (Video played.)

7   BY MS. GARCIA:

8   Q.   Did Mr. Mallory also make statements to you about the

9   Yangs' interest in his access?

10  A.   Yes.

11         MS. GARCIA:  Your Honor, may we play Government's

12  Exhibit 7-12?

13         THE COURT:  Yes.

14         (Video played.)

15  BY MS. GARCIA:

16  Q.   Did Mr. Mallory make any statements to you in connection

17  with the website application he just mentioned about telling

18  the Yangs that he may have worked for -- maybe telling the

19  Yangs he worked for the CIA in the past?

20  A.   He talked about which agencies he had applied for on

21  that -- on the website he went to.  You click off which

22  agencies you were interested in working for, and he had -- he

23  had included CIA in that selection.

24         MS. GARCIA:  Your Honor, may we play Government's

25  Exhibit 7-13?

─────────U.S. v. Mallory─────────

M. Dorsey - Direct

183

1          THE COURT:  Yes.

2          (Video played.)

3    BY MS. GARCIA:

4    Q.   And how did Mr. Mallory say that the Yangs responded to

5    his efforts to get a job with Trump administration?

6    A.   They encouraged that effort.

7          MS. GARCIA:  May we play Government's Exhibit 7-14?

8          THE COURT:  Yes, you may.

9    BY MS. GARCIA:

10   Q.   And did Mr. Mallory ever mention to plan a third meeting?

11   A.   I'm sorry, what's what?

12   Q.   Did Mr. Mallory ever mention to plan a third meeting with

13   the Yangs?

14   A.   Yes.

15   Q.   And what were -- what information topics did Mr. Mallory

16   say were going to be discussed at the third meeting?

17         THE COURT:  I don't understand your -- the end of

18   your question.  You're swallowing your words.  Speak up,

19   please.

20         MS. GARCIA:  I apologize, Your Honor.

21   BY MS. GARCIA:

22   Q.   What information or topics did Mr. Mallory say were going

23   to be discussed at the third meeting?

24   A.   I believe it was the same sort of topics.  South China

25   Sea.

─────U.S. v. Mallory─────

1          MS. GARCIA:  Your Honor, may we play Government's

2    Exhibit 7-15?

3          THE COURT:  You may.

4          (Video played.)

5    BY MS. GARCIA:

6    Q.   Did Mr. Mallory make any statements with regard to

7    whether he was supposed to produce anything for the third

8    meeting?

9    A.   Yes.

10   Q.   And, generally, what statement did he make?

11   A.   I asked him if he had prepared anything, such as a paper

12   or something, and he said nothing beyond what he had already

13   done.

14         MS. GARCIA:  Your Honor, may we play Government's

15   Exhibit 7-16?

16         THE COURT:  You may.

17         (Video played.)

18   BY MS. GARCIA:

19   Q.   Did Mr. Mallory discuss whether they gave him anything

20   during the second meeting?

21   A.   Yes.

22   Q.   What was that?

23   A.   That they gave him a communication device, a phone.

24   Q.   Okay.  I'm sorry, I interrupted you.

25   A.   A special phone.

U.S. v. Mallory

1  Q.   And did Mr. Mallory discuss with you any particular

2  messaging platform on that phone?

3  A.   WeChat was the -- it was a type of WeChat.

4           MS. GARCIA:  And, Your Honor, may we play

5  Government's Exhibit 7-17 and 7-18?

6           THE COURT:  All right.  You may do so.

7           (Video played.)

8  BY MS. GARCIA:

9  Q.   Did Mr. Mallory make any statements to you related to the

10  phone's level of security?

11  A.   He thought it was pretty secure.

12           MS. GARCIA:  All right.  Your Honor, may we play

13  Government's Exhibit 7-19?

14           THE COURT:  Yes, you may.

15           (Video played.)

16  BY MS. GARCIA:

17  Q.   And, Mr. Dorsey, did Mr. Mallory make any statements to

18  you about whether he had used the phone to send anything?

19  A.   Yes.

20  Q.   And what did he say he had sent?

21  A.   He said he sent a text message -- excuse me -- a test

22  message.  Test, T-E-S-T.

23           MS. GARCIA:  And, Your Honor, may we play --

24           THE COURT:  T-E-S-T?

25           THE WITNESS:  Yes, sir.

─────U.S. v. Mallory─────

M. Dorsey - Direct

186

1           THE COURT:  As in test examination?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  Not text?

4           THE WITNESS:  Correct.

5           THE COURT:  Next question.

6           MS. GARCIA:  Your Honor, may we play Government's

7    Exhibit 7-20, 7-21, and 7-22?

8           THE COURT:  Yes, you may.

9           (Video played.)

10   BY MS. GARCIA:

11   Q.   And with regard to these tests, did Mr. Mallory say who

12   he had sent these tests to?

13   A.   Michael Yang.

14   Q.   And how many times?

15   A.   One time.

16           MS. GARCIA:  Your Honor, may we play Government's

17   Exhibit 7-23?

18           THE COURT:  You may.

19           (Video played.)

20   BY MS. GARCIA:

21   Q.   Did he make any statements whether he would get paid at

22   the second meeting as well?

23   A.   Yes.

24   Q.   During the interview, what, if anything, did you tell

25   Mr. Mallory about authorization for this activity or his

U.S. v. Mallory

M. Dorsey - Direct

187

1   trips?

2   A.   I didn't.  I didn't make any statement authorizing him to

3   take any action.

4   Q.   What is your ability to provide such authorization?

5   A.   I suppose theoretically I could do so if I worked in

6   coordination with others at CIA, and in this case FBI as well,

7   but I've never done so.

8   Q.   And how did the recorded interview conclude?

9   A.   Well, we finished the -- the discussion in the room.  I

10  believe Mr. Mallory had stated all he wanted to say.  And then

11  I'm obligated to escort him out of the building since he's not

12  cleared.  And as I was taking him through the turnstiles to

13  exit the lobby of our headquarters building, he was asking me

14  questions.  So there was additional discussion for probably

15  about 20 minutes that was not recorded.

16  Q.   And what questions did he ask?  Or what type of

17  discussion did you have?  I'm sorry.

18  A.   Mr. Mallory was describing events that he encountered on

19  his return from the two trips to China.  And it was my

20  assessment that he was trying to see if he was under

21  investigation.

22  Q.   And did a second interview occur?

23  A.   Yes.

24  Q.   What was that date?

25  A.   It was May the 24th, I believe.

─────────────────── U.S. v. Mallory ───────────────────

M. Dorsey - Direct

188

1  Q.   Did Mr. Mallory bring anything with him to that?

2  A.   Yes, he had agreed to bring his phone, the special

3  communication device that the Chinese had provided him.  He

4  also had agreed to bring an iPhone in which he had recorded

5  the business cards of the individuals he met with, but he

6  didn't actually bring that to the meeting.

7  Q.   And what was your role in that second meeting?

8  A.   I had explained to Mr. Mallory that I was not a

9  technician that I would not be the interview -- the person --

10 he had agreed to show the device to technicians and to explain

11 how it worked.  I told him that I would not be that

12 individual.  So my role was to introduce them to officers that

13 he would demonstrate the device to.

14 Q.   And what was your impression of Mr. Mallory's response to

15 your role?

16 A.   Well, in terms of setting up the meeting, there was no

17 pushback at all to that.  But on the actual handoff, on the

18 day when I introduced him to two individuals who are FBI

19 agents, I think he was unhappy.  Now, perhaps I could have

20 done a better job at the handoff and had been present in the

21 room longer, but there was no agreement along that line and he

22 knew I wasn't going to be present.  So I got out of the way.

23       MS. GARCIA:  Your Honor, may I inquire my counsel if

24 they have any additional questions?

25       THE COURT:  Yes.

1       MS. GARCIA:  Your Honor, just a couple of additional

2   questions.

3   BY MS. GARCIA:

4   Q.   First, did Mr. Mallory explain CovCom, what a CovCom

5   device was as he understood it?

6   A.   Well, as he described the device he described how the

7   text message or whatever he was sending -- and it could be --

8   it could be a picture.  He could take a picture of a document.

9   But whatever the content of the actual message was would be

10  overlaid by another image, such that in transition the

11  original message, regardless of whether it was a picture or a

12  text message, could not be separated.

13      Now, that fit my understanding of steganography.  I

14  asked him, "Was it steganography?"

15      And to my surprise, he said, "No."

16  Q.   And could you please describe, if you recall,

17  Mr. Mallory's behavior at the time of handoff when you took

18  him to the second interview?

19  A.   We met in a Virginia hotel room.  And I met him in the

20  lobby and escorted him up to the room.  But while we stood in

21  front of the door and I knocked on the door, he -- he

22  continued to walk down the hallway of the -- of the hotel to

23  the end of the corridor where there was an open door.  And I

24  stayed at the -- I mean, there was five or six doors down.  I

25  stayed in front of the room where he was going to eventually

1   meet two FBI agents.  And they opened the door and I'm

2   standing there by myself and they are looking at me like,

3   "What's going on?"  And -- but I can see -- I can -- you know,

4   I can look down the hallway and see what he's doing.

5   Q.   And what was your impression of what he was doing when

6   he -- when he did that?

7   A.   He walked down to the end of the door to look -- and

8   looked into the room that had the open door.  I assumed that

9   he was looking for surveillance.

10  Q.   No further questions, Your Honor.

11          THE COURT:  All right.  Cross-examination.

12                    **CROSS-EXAMINATION**

13  BY MR. KAMENS:

14  Q.   You didn't know what he was doing, did you?

15  A.   Sir?  Did I --

16  Q.   You didn't know what he was doing, did you?

17  A.   No, sir.

18  Q.   You made an assumption?

19  A.   Yes, sir.  I made an assessment, not an assumption.

20  Q.   All right.  Mr. Dorsey, you discussed your review of

21  Mr. Mallory's security file; is that right?

22  A.   That's correct.

23  Q.   And it -- those documents over a series of years require

24  an individual who has worked for the CIA to maintain

25  confidentiality; is that right?

─────U.S. v. Mallory─────
M. Dorsey - Cross
191

A.    Secrecy agreements, correct.

Q.    And the individual has to maintain confidentiality with respect to classified documents?

A.    That's correct.

Q.    Unless the classification lapses or expires?

A.    There are a number of different provisions provided in the secrecy agreement about what steps you have to take to protect that information.

Q.    All right.

A.    And it doesn't have to be just documents.  It can be classified information in any form.

Q.    Right.  And it certainly doesn't apply, of course, to information that's not classified?

A.    Potentially, yes.  There's a provision in the document that even if you were to write something, work of fiction related to intelligence or to information you had access to in the course of your service for CIA, that you agree to submit that work, regardless of whether it's a written product, like a book or an article or a presentation, a speech, or PowerPoint, to a publication review board within CIA.

Q.    You're talking about prepublication review?

A.    Yes, sir.

Q.    To avoid the disclosure of classified information?

A.    Yes, sir.

Q.    And those are provisions that you didn't review with

1    Ms. Garcia; is that right?

2    A.    They are included in the secrecy agreements, both the

3    general secrecy agreement and the SCI agreements.  It's a --

4    it refers to that.

5    Q.    The specific paragraphs that you reviewed with Ms. Garcia

6    were not related to publication review, correct?

7    A.    I did not read the paragraph that related to

8    prepublication review, correct.

9    Q.    And so the paragraphs that you reviewed with Ms. Garcia,

10   they related simply to the ongoing obligation to ensure that

11   classified information is not disclosed, correct?

12   A.    Yes, sir.

13   Q.    You first contacted Mr. Mallory on May 2nd, 2017; is that

14   right?

15   A.    I thought it was May 3rd but I won't argue the date.

16   Q.    Can I -- well, would it help you if I showed you some

17   phone records?

18   A.    I -- it was -- it was on or about May 2nd or 3rd.  Is

19   that --

20   Q.    Fair enough.

21   A.    -- sufficient?

22   Q.    And you have a 703 number; is that right?

23   A.    That's correct.

24   Q.    And so on or about May 2nd you contacted Mr. Mallory in

25   response to, I think you testified, his effort to set up a

—U.S. v. Mallory—

M. Dorsey - Cross

193

1   meeting at the CIA?

2   A.   Correct.

3   Q.   And the meeting was scheduled for May 12th; is that

4   right?

5   A.   Well, initially I offered him a date as soon as possible

6   the following week, but because he had expressed some urgency

7   in wanting to speak with CIA but then he said he had the

8   surgery scheduled so we pushed it back.

9   Q.   Do you know when the surgery was scheduled?

10  A.   It was within a week.

11  Q.   Or about May 4th, fair to say?

12          THE COURT:  If you know.

13          THE WITNESS:  I do not recall, sir.

14          THE COURT:  Next question.

15  BY MR. KAMENS:

16  Q.   Would you agree it was within the week of when you first

17  called him?

18  A.   Yes.

19  Q.   You had a brief phone call with him on May 11th or so; is

20  that right?

21          Do you recall having subsequent phone calls with him

22  before the meeting on May 12th, probably just for logistical

23  purposes?

24  A.   Very possible.

25  Q.   And so then he came to, I think you said, CIA

1  headquarters on May 12th; is that right?

2  A.    Correct.

3  Q.    But Mr. Mallory couldn't bring the phone to CIA

4  headquarters, correct?

5  A.    He could bring -- he could -- initially we were talking

6  about an iPhone.  He didn't -- he didn't bring the -- what

7  I'll call the special communication device, the CovCom device.

8  He did not bring that to headquarters to my knowledge.  But he

9  did have his iPhone, his personal iPhone where he had recorded

10  contact information about the Chinese officers he met with.

11  That was in his car.

12  Q.    I see.  And you had discussed with him not bringing the

13  Samsung phone that he had received from these individuals to

14  headquarters at the CIA, correct?

15  A.    No.  I wasn't aware of that device until I talked to him.

16  Q.    All right.  Well, wouldn't it be potentially revealed

17  where that phone went if it came to CIA headquarters?

18              THE COURT:  Do you understand the question?

19              THE WITNESS:  Yes, sir, I believe I do.

20              THE COURT:  All right.  You may answer.

21              THE WITNESS:  Again, sir, I'm not a technician, but

22  I believe there are steps that you could have taken that would

23  have masked the fact that that phone was located on the CIA

24  compound.

25  BY MR. KAMENS:

1    Q.   Well, there are steps that perhaps someone could have

2    seen where that phone went, someone else; isn't that right?

3              THE COURT:  If you know.

4              THE WITNESS:  I'm not a technician, so --

5    BY MR. KAMENS:

6    Q.   After the interview on May 12th you had several calls

7    with Mr. Mallory to set up the second interview?

8    A.   That's correct.

9    Q.   And that interview -- well, there were four phone calls,

10   I think, on May 16th, on or about?

11   A.   I don't specifically recall four phone calls, but I did

12   call him back to set up the date and time first and then the

13   actual location.

14   Q.   All right.  And there was a call on May 17th, on or

15   about?

16   A.   Okay.

17   Q.   May 23rd?

18   A.   I don't recall those specific dates, sir.

19   Q.   Oh.  And then you met Mr. Mallory on May 24th; is that

20   right?

21   A.   That's correct.

22   Q.   And then you brought him to the hotel room; is that

23   right?

24   A.   That's correct.

25   Q.   And the purpose of meeting at the hotel room instead of

M. Dorsey - Cross

1   at CIA headquarters, did you know why?

2   A.   Yes.

3   Q.   Why was that?

4   A.   Because I was going to introduce him to two FBI agents.

5   Q.   Well, but you had arranged the location for this

6   interview with Mr. Mallory, correct?

7   A.   Yes.

8   Q.   And so Mr. Mallory knew that he was not going to

9   headquarters for this meeting, he was going a hotel room,

10  correct?

11  A.   Correct.

12  Q.   And he knew their meeting -- the reason for going to the

13  hotel room when you scheduled it with him, correct?

14  A.   Yes.

15  Q.   And that was to bring this phone so it wouldn't show it

16  had gone to headquarters; is that right?

17  A.   I told him that -- he had expressed some concern about

18  Chinese intelligence ability to track that device.  And I told

19  him that, although I wasn't a technician, I would contact the

20  people who could address those concerns.  And I did.

21  Q.   To the best of your understanding, that's why the second

22  meeting took place in a hotel room and not at CIA

23  headquarters?

24          THE COURT:  Do you know whether that's true or not.

25          THE WITNESS:  No, I think there were other reasons

──────U.S. v. Mallory──────
M. Dorsey - Cross
197

1  why the meeting took place at a hotel as opposed to CIA

2  headquarters.

3           THE COURT:  All right.

4  BY MR. KAMENS:

5  Q.   Back to the interview on May 12th, it took approximately

6  four hours?

7  A.   Yes, sir.

8  Q.   And I think you testified that Mr. Mallory introduced the

9  people that he had interacted with on several trips to China?

10 A.   He described them to me, correct.

11 Q.   And you testified that they went by the names Yang, three

12 individuals named Yang, correct?

13 A.   Yes.

14 Q.   First one Richard Yang?

15 A.   Correct.

16 Q.   Second one Michael Yang?

17 A.   Yes.

18 Q.   And the third one, it seemed like his name may not have

19 necessarily been Yang; is that right?

20 A.   Mr. Mallory, I think, probably accurately described the

21 fact that, you know, it could be that none of their names were

22 Yang, that they were using aliases.

23 Q.   Mr. Mallory told you that the third person introduced as

24 Yang was referred to as a Mr. Ding?

25 A.   Yes.

────────────U.S. v. Mallory────────────
M. Dorsey - Cross

1  Q.   And so he also told you that that person's name, his

2  actual name may have been Mr. Ding?

3  A.   Well, a name that he used in a meeting with Mr. Mallory,

4  correct.

5  Q.   He provided a physical description of these individuals?

6  A.   Yes, sir.

7  Q.   And they purported to be from the Shanghai Academy of

8  Social Sciences?

9  A.   I understood them to be with a think tank, yes.  Or

10 the -- the two latter Dings, Michael and Mr. Ding, Mr. Yang.

11 Q.   All right.

12 A.   The first individual Mr. Mallory believed was truly a

13 head hunter possibly associated with the Chinese intel.

14 Q.   And he said on this first trip he traveled to China and

15 was there for four days in country and then left?

16 A.   Yes.

17 Q.   And he also told you he didn't meet with these people for

18 all four days; is that right?

19 A.   That's correct.

20 Q.   That is, he also met an acquaintance named David Yang?

21 A.   Correct.

22 Q.   And that was to discuss a project on anti-bullying

23 campaign in China?

24 A.   Yes, sir.

25            THE COURT:  Who told you that?

─────U.S. v. Mallory─────
M. Dorsey - Cross
199

1          MR. KAMENS:  Mr. Mallory.

2          THE COURT:  No, I didn't ask you.

3          MR. KAMENS:  Oh, sorry.

4          THE COURT:  Who told you that?

5          THE WITNESS:  Mr. Mallory described that additional

6   meeting.

7          THE COURT:  All right.

8   BY MR. KAMENS:

9   Q.   But for the representatives of the think tank, he said --

10  I think you were discussing the topics that they raised with

11  him; is that right?

12  A.   Yes, sir.

13  Q.   Wasn't one of the topics also the Trump administration

14  policy towards China?

15  A.   Well, in terms of describing currency manipulation, South

16  China Sea, yes, they were interested in the U.S. foreign

17  policy toward those issues.

18  Q.   All right.  So there was a discussion of currency

19  manipulation by China; is that right?

20         THE COURT:  Discussion between whom and whom,

21  Mr. Kamens?  Make your question clearer.

22         MR. KAMENS:  Thank you, Your Honor.

23  BY MR. KAMENS:

24  Q.   This discussion between the representatives of the think

25  tank of Mr. Yang, Michael Yang, and Mr. Ding and Mr. Mallory

─────────────────U.S. v. Mallory─────────────────

M. Dorsey - Cross

200

1  where they are discussing the topics that Mr. Mallory may be

2  able to consult upon, one of them was currency manipulation by

3  China?

4  A.   Correct.

5  Q.   Or that is, U.S. policy in response to currency

6  manipulation by China?

7  A.   Correct.

8  Q.   The THAAD missile system?

9  A.   Correct.

10 Q.   The THAAD missile system is a system the U.S. has

11 installed in South Korea; is that right?

12 A.   Yes.

13 Q.   To the extent you know?

14 A.   Yes.

15 Q.   And then third was the South China Sea?

16 A.   Yes.

17 Q.   And then there was also general discussion of the new

18 administration's policies toward China?

19 A.   I have to say I don't recall that specifically, but --

20 Q.   If you could, take a look at Defense Exhibit 3-A, which

21 is in a book hopefully up there.  Defendant's Exhibit 3-A and

22 page 88.

23          THE COURT:  For planning purposes, Mr. Kamens, how

24 much more do you anticipate?

25          MR. KAMENS:  A fairly robust amount, Your Honor.

─────U.S. v. Mallory─────

1          THE COURT:  That's not what I --

2          MR. KAMENS:  Oh.

3          THE COURT:  How much more do you expect?

4          MR. KAMENS:  I would say half an hour to 45 minutes,

5   Your Honor.

6          THE COURT:  All right.  Proceed.

7          THE WITNESS:  Sir, I have a 3-2A.

8          MR. KAMENS:  Let's see.  It is Defense Exhibit 3A,

9   and it should be in the first volume.

10          THE COURT SECURITY OFFICER:  3A-1?

11          MR. KAMENS:  No, it's 3A.  Sorry.

12          THE COURT:  All right.  I'm going to take a recess.

13          MR. KAMENS:  Sorry, Your Honor.

14          THE COURT:  You all need to move it along.

15   Mr. Dorsey, you may step down.  You may not discuss your

16   testimony with anyone during the recess.  We will recess until

17   4:10, and then we'll proceed until 5 o'clock and we'll recess

18   at 5:00.  You may follow the court security officer out.  Give

19   him your book, or your books, and remember to refrain from

20   discussing the matter with anyone or among yourselves or

21   undertaking any investigation.  You may step down, Mr. Dorsey.

22          (Jury dismissed.)

23          THE COURT:  Court stands in recess until 4:10.

24          (Recess.)

25          THE COURT:  All right.  Mr. Dorsey, is he here?

─────U.S. v. Mallory─────

M. Dorsey - Cross

202

1    Let's get Mr. Dorsey in.

2              MR. GIBBS:  She's getting him, Your Honor.

3              THE COURT:  All right.  And who is your witness

4    after Mr. Dorsey?

5              MS. GARCIA:  Your Honor, it would be Paul Lee.

6              THE COURT:  And that's your witness as well?

7              MS. GARCIA:  No, Your Honor.  It will be

8    Ms. Gellie's witness.

9              THE COURT:  All right.  And how long do you think he

10   will be, Ms. Gellie?

11             MS. GELLIE:  Direct being somewhere around

12   45 minutes.

13             THE COURT:  All right.  Mr. Dorsey, come forward,

14   sir.  You'll recall you're still under oath.  You may resume

15   the stand.

16             THE WITNESS:  Yes, sir.

17             THE COURT:  And, Mr. Flood, you may bring the jury

18   in.

19             (Jury in.)

20             THE COURT:  All right.  You may be seated.  And,

21   Mr. Kamens, you may proceed with your cross-examination.

22   BY MR. KAMENS:

23   Q.   Mr. Dorsey, we were talking about the topics that came up

24   between the Chinese individuals and Mr. Mallory.

25   A.   Yes.

U.S. v. Mallory

1   Q.   And we were talking about whether you recalled discussing

2   new Trump administration policies, that being an area of

3   interest.

4   A.   Yes, generally.

5   Q.   And so I've directed you, I think, to a page in the

6   transcript and I opened it up to that page.  I'm going to call

7   it 1-22.

8            Do you see that?

9   A.   Yes, sir.

10  Q.   And it -- on that page of the transcript at line 10 does

11  it not say that they kept emphasizing that they wanted to

12  understand the policies, what Trump administration policies

13  are going to be?

14  A.   Yes, sir.

15  Q.   Now, you also talked about Mr. Mallory's suspicions;

16  isn't that right?

17  A.   Yes.

18  Q.   And some discussion about how suspicious he was, correct?

19  A.   Correct.

20  Q.   If you turn the page of that transcript to 123, do you

21  see that?

22  A.   Yes, sir.

23  Q.   And he talks about his suspicions on that first trip?

24  A.   Yes.

25  Q.   Do you see?

M. Dorsey - Cross

1          And he said he was a little bit suspicious on the

2   first trip; is that right?

3   A.   Correct.

4   Q.   Now, things became much clearer on the second trip; isn't

5   that correct?

6   A.   According to how he represented it, yes.

7          According to how he represented it, yes.  Sorry.

8   Q.   Now, with respect to the information he talked about on

9   the -- with respect to second trip, you mentioned that he

10  brought up the phone, the Samsung phone?

11  A.   Correct.

12  Q.   And he told you that he had received this Samsung Galaxy

13  Note cell phone from the Chinese individuals?

14  A.   Correct.

15  Q.   And he described the special communication system?

16  A.   Yes, sir.

17  Q.   He described how the custom app worked?

18  A.   Yes.

19  Q.   How to get it into secure mode?

20  A.   Yes.

21  Q.   Using the password?

22  A.   Yes.

23  Q.   And he described how the app would embed a document in a

24  picture?

25  A.   Yes.

─────U.S. v. Mallory─────

1   Q.   And you used the word "steganography"?

2   A.   Correct.

3   Q.   And he said, "No, I don't think that's it"?

4   A.   Correct.

5   Q.   But steganography is, in fact, in your understanding,

6   embedding information or a document into a picture; is that

7   right?

8   A.   Yes, sir.

9   Q.   Is that a fair definition of steganography?

10  A.   To my understanding, yes.

11  Q.   So Mr. Mallory may not have understood that word?

12  A.   He seemed to understand the word but stated it wasn't

13  steganography anyway.

14  Q.   Oh.  But he did tell you this app would embed a document

15  into a picture?

16  A.   Yes.

17  Q.   And he agreed to bring the Samsung phone to a subsequent

18  meeting?

19  A.   Yes.

20  Q.   And he discussed how to coordinate with the recipient

21  when you want to send information, did he not?

22  A.   Yes.

23  Q.   He said that there was a way to set up a time to transmit

24  information, correct?

25  A.   Yes.

──────────U.S. v. Mallory──────────
M. Dorsey - Cross
                                                                          206

1   Q.   Now, you also discussed, I think, there was a clip that

2   was played, Government Exhibit 7-20.  Do you have the

3   Government's exhibit -- the transcript of the Government

4   exhibits up there?

5   A.   No, sir.

6   Q.   Oh.  Well, if I can remind you, the clip, says, question

7   from you, "Did you send them anything on that phone?"

8          Do you recall asking Mr. Mallory that question?

9   A.   Yes.

10  Q.   And then the answer is, "I sent them some tests of some

11  sort just to see if I could do it right, and I couldn't figure

12  it out.  I messed that up because he -- you know, he wanted me

13  to try to communicate it and I couldn't" --

14          THE COURT:  Is this a question?

15          MR. KAMENS:  Yes.  I'm asking if this witness

16  recalls the exchange with Mr. Mallory.

17          THE COURT:  Well, can we do it in a less -- more

18  expeditious way?

19          MR. KAMENS:  Yes, Your Honor.

20  BY MR. KAMENS:

21  Q.   That is not the entire answer that Mr. Mallory gave you;

22  isn't that correct?

23  A.   Well, we watched the video clip of his answer.

24  Q.   Well, when you asked him whether he had ever sent

25  anything using the phone, he did tell you that he had sent

—————U.S. v. Mallory—————
M. Dorsey - Cross

1   something using the phone; isn't that right?

2   A.   Test messages, yes.

3   Q.   He said he had sent something typed; isn't that right?

4   A.   Yes, he did.

5   Q.   Something that he typed up?

6   A.   Yes.

7   Q.   And you asked him whether he had actually sent something

8   using the phone from the United States; isn't that right?

9   A.   Yes.

10  Q.   And he said he eventually got something to go secured;

11  isn't that right?

12  A.   I don't recall that particular statement, sir.

13          MR. KAMENS:  Your Honor, we would move to admit

14  Defense Exhibit 3A-1.

15          THE COURT:  Has the entire interview been offered?

16          MR. KAMENS:  No.

17          MS. GARCIA:  We had not, Your Honor.

18          MR. KAMENS:  It is not.  But the Government's

19  Exhibit 7-20 doesn't contain the entire exchange.  And so what

20  we've done in Defendant's Exhibit 3A-1 is include portions

21  that are responsive to that question.  And they are all --

22  they are on pages 259, 260, and 262 of the transcript.

23          THE COURT:  Any objection to that?

24          MS. GARCIA:  Your Honor, these are also expert --

25  excerpts stacked together.  It is not one long, running -- it

─────────────U.S. v. Mallory─────────────

M. Dorsey - Cross
208

1   was -- rule of completeness we would say, let's admit the

2   whole -- the whole thing rather than piece excerpts together.

3   And I can -- we can --

4            THE COURT:  All right.  Well, Mr. Kamens doesn't

5   object to that --

6            MR. KAMENS:  I don't.  I certainly don't.  I think

7   the reason for admitting the excerpts is that they are much

8   more clearer than reading five pages of the transcript.  We

9   have certainly given them this -- the -- the portions that

10  we --

11           THE COURT:  But in the future if there are excerpts

12  again and you have completeness arguments, tell them in

13  advance.  Resolve it in advance.

14           MR. KAMENS:  Understood.

15           THE COURT:  Because it's quite difficult to resolve

16  completeness arguments with a jury sitting here.  It would

17  take me 15 minutes.

18           All right.  Do this -- what was the -- if you admit

19  the whole thing, what is it?

20           MR. KAMENS:  I think it would be pages 259 to 262,

21  Your Honor.

22           MS. GARCIA:  Your Honor, it would be page 259, I

23  believe, starting on line 3 through 261 ending on line 16.

24           MR. KAMENS:  I think it's 262, line 12.

25                     (Discussion off the record.)

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

U.S. v. Mallory

M. Dorsey - Cross

209

1          THE COURT:  You're proving my point.

2          MS. GARCIA:  Your Honor, that's fine.  We won't

3   object to this, the entry of this exhibit, defense exhibit.

4          MR. KAMENS:  All right.

5          THE COURT:  What is it again now?

6          MR. KAMENS:  It's Defendant's Exhibit 3A-1, Your

7   Honor.

8          THE COURT:  All right.

9   BY MR. KAMENS:

10  Q.   And so in terms of Mr. Mallory's response, he did, in

11  fact, tell you that he had sent something secured through the

12  phone; isn't that right?

13  A.   I don't recall whether or not he said he got it to go

14  secure.  He -- he talked about he had trouble with that.

15  Q.   If you can, look at Defendant's Exhibit 3A-1.  And it's

16  been admitted so I'll read it to you.

17          THE COURT:  Let him read it and ask him.  Otherwise,

18  you can rely on the exhibit.  If I admitted it it's in

19  evidence.

20          THE WITNESS:  Yes, sir.  I'm on 3A-1.

21  BY MR. KAMENS:

22  Q.   All right.  Do you see at the bottom line 9?

23  A.   Okay.  Yes, I do.

24  Q.   And you asked Mr. Mallory, did you not, whether he got

25  something to go secure?

1    A.    Yes.

2    Q.    And he says, "Right, yeah.  I got something"?

3    A.    Correct.

4    Q.    All right.  Now, you also discussed --

5              THE COURT:  Tell me again what -- I've admitted it

6    without objection.  What is it again, Mr. --

7              MR. KAMENS:  It is an excerpt from the transcript --

8              THE COURT:  What is the exhibit number?

9              MR. KAMENS:  It is 3A-1, Defendant's Exhibit 3A-1.

10             THE COURT:  All right.  That's admitted.  Next

11   question.

12                            (Defendant's Exhibit No. 3A-1

13                             admitted into evidence.)

14   BY MR. KAMENS:

15   Q.    You also discussed with Ms. Garcia the Government Exhibit

16   7-23 where you asked Mr. Mallory if he had -- how many

17   communications he had with Michael Yang, do you recall?

18   A.    Yes.

19   Q.    Can you look at the transcript, page 62 of the

20   transcript, 262 -- I'm sorry.

21   A.    Yes, sir.  I'm on page 262.

22   Q.    And do you see at the top the discussion is about how to

23   send using the -- the application send an image or document

24   using the covert communication phone?  Do you see that?

25   A.    Are you talking about the first three lines?

─────────U.S. v. Mallory─────────
M. Dorsey - Cross

1   Q.   Yes.

2   A.   Yes, sir.

3   Q.   You can look back at 261 as well.

4   A.   Okay.  Yes, sir, I see that.

5   Q.   So the discussion that you had with Mr. Mallory about

6   communications with Michael Yang here is in the context of

7   actually sending something to Michael Yang; isn't that right?

8   A.   Well, I did ask him that question specifically.

9   Q.   Right.  So in the context of your discussion with

10  Mr. Mallory, you're asking him how many communications did you

11  have with Mr. Yang to send something through this covert app;

12  isn't that right?

13  A.   Correct.

14  Q.   And he says one; isn't that right?

15  A.   Correct.

16  Q.   That's not referring to how many times he spoken to

17  Mr. Yang; is that right?

18  A.   I would say so, sir.

19  Q.   So just to be clear, you're not asking him how many times

20  they may have chatted on some other format, you're asking how

21  many times he's used this app to send something to Mr. Yang?

22  A.   Yes.

23  Q.   Okay.

24       MR. KAMENS:  Your Honor, we have an Exhibit 3A-2

25  that reflects this conversation I've just had with the witness

─────────U.S. v. Mallory─────────

1    that puts the context for Government Exhibit 7-23.  7-23

2    itself doesn't make it clear.  So we would ask for Defendant's

3    Exhibit 3A-2 to be admitted.

4              THE COURT:  All right.  Any objection?

5              MS. GARCIA:  No, Your Honor.

6              THE COURT:  All right.  In the future if there are

7    any of these completeness things you do it out of the presence

8    of the jury before you see me in the morning or in the

9    evening.

10              MR. KAMENS:  Absolutely, Your Honor.

11              THE COURT:  Let's get it done that way.  Anything

12    further from this witness?

13              MR. KAMENS:  Just one last question, Your Honor.

14    BY MR. KAMENS:

15    Q.   You discussed with Mr. Mallory whether there was going to

16    be a second trip; isn't that right?

17    A.   We discussed whether there would be a third trip.

18    Q.   A third trip, correct.  Thank you, sir.

19              And he said to you that there may not be a third

20    trip.  Didn't he say that?

21    A.   My recollection is that he expected to go in mid June.

22    Q.   Take a look at page 210 of the transcript in front of

23    you.

24    A.   I'm on 210.

25    Q.   Do you see line 3, Mr. Mallory?

─────────U.S. v. Mallory─────────

1    A.    Yes.

2    Q.    It says, "The meeting planned for next month is -- I'm

3    not sure at this point if it's going to happen.  I'm not sure

4    what's going to transpire."

5    A.    Correct.  That's accurate.

6    Q.    So he did tell you that it may not?

7    A.    He was planning for a third trip.  It wasn't confirmed,

8    that's correct.

9    Q.    And he told you he wasn't sure it was going to happen?

10   A.    Correct.

11            MR. KAMENS:  Nothing further, Your Honor.

12            THE COURT:  Redirect examination?

13            MS. GARCIA:  No, Your Honor.

14            THE COURT:  Thank you.  You may step down.

15            Is this witness at risk of being recalled?

16            MS. GARCIA:  Not for the Government, Your Honor.

17            THE COURT:  All right.  I take it not for the

18   defendant either; is that correct?

19            MR. KAMENS:  No, Your Honor.

20            THE COURT:  All right.  Thank you.  You may be

21   excused.  Call your next witness, please, Ms. Gellie.

22            (Witness excused.)

23            MS. GELLIE:  The Government calls Special Agent

24   Paul Lee to the stand.

25            THE COURT:  Come forward and take the oath, please,

─────────────U.S. v. Mallory──────────────
P. Lee - Direct
214

1  sir.  Stand with the court security officer there and face the

2  deputy clerk, please.

3           Thereupon,

4                         **PAUL LEE,**

5  having been called as a witness on behalf of the Government

6  and having been first duly sworn by the Deputy Clerk, was

7  examined and testified as follows:

8           (Witness seated.)

9           THE COURT:  All right.  You may proceed.

10          MS. GELLIE:  Thank you, Your Honor.

11                    **DIRECT EXAMINATION**

12 BY MS. GELLIE:

13 Q.   Good afternoon.  Could you please state your name and

14 spell your last name for the record?

15 A.   Yes.  My name is Paul Lee.  My last name is spelled

16 L-e-e.

17 Q.   How are you employed, Mr. Lee?

18 A.   I am a special agent and a forensic examiner for the

19 Federal Bureau of Investigation.

20 Q.   How long have you been an FBI computer forensics

21 examiner?

22 A.   Roughly about 13 years.

23 Q.   Have you had any other roles at the FBI?

24 A.   Yes, I'm a special agent.  I started as a special agent.

25 Q.   What did you do prior to joining the FBI?

—————————U.S. v. Mallory—————————
P. Lee - Direct
215

1   A.   I worked in the area of technology and engineering and

2   electronic manufacturing to include the Boeing company, and I

3   interned for IBM and an instrument company called John Fluke.

4   Q.   What does an FBI computer forensic examiner do?

5   A.   Basically we take digital evidence and we recover data

6   from digital evidence to include computers, electronic device

7   like cell phones, tablets, and also media, like thumb drives

8   and optical disks.

9   Q.   What experience do you have personally in computer

10  forensic examinations?

11  A.   We recover data from computers and also from cell phones

12  and we provide criminal investigations.

13  Q.   Does the term "computer forensic examination" include

14  examination of smart phones, such as Apple or Android devices?

15  A.   That's correct.

16  Q.   Approximately, how many computer forensic examinations

17  have you completed over the course of your career?

18  A.   At least 650 exams and spanning about 1500 items.

19  Q.   And when you say "1500 items," does that include both

20  computers and mobile devices such as smart phones?

21  A.   That's correct.

22  Q.   What training did you receive in computer forensic

23  examinations?

24  A.   I received the basic FBI certification training a while

25  ago, and then every year we have additional trainings,

U.S. v. Mallory

P. Lee - Direct

216

1  advanced trainings.  I'm also advanced certified for hardware

2  recovery of data for mobile phones to include what they call

3  an ISP and then JTAG as well.  And then I also do have

4  training in Linux file systems and certification, and the FBI

5  do conduct Linux exams and Windows.  And then I have external

6  training as well.

7  Q.  And, Special Agent Lee, what is your educational

8  background?

9  A.  I have a bachelor of science in mechanical engineering.

10      MS. GELLIE:  The Government moves to certify Special

11  Agent Lee as an expert in electronic forensic examinations.

12      MR. KAMENS:  No objection, Your Honor.

13      THE COURT:  All right.  Ladies and gentlemen,

14  ordinarily witnesses may not testify to their opinions about

15  things.  But, as I'll instruct you at the end of the case,

16  certain witnesses who, by virtue of special training and

17  experience, are expert in some field, they're able to give

18  their opinions.

19      However, the extent to which you accept them as

20  experts in a particular area and the extent to which you

21  accept their expert opinions are matters left entirely to you.

22  And I'll give you further instructions on that at the end of

23  the case as well.

24      All right.  Ms. Gellie, you may proceed to question

25  him as an expert.

─────────────────U.S. v. Mallory───────────────

1      MS. GELLIE:  Thank you, Your Honor.

2  BY MS. GELLIE:

3  Q.   Special Agent Lee, what processes are available for

4  conducting a computer forensic examination of a mobile

5  telephone?

6  A.   In general, there are two major steps for any forensic

7  examinations to include mobile phones as well as computers.

8  Your first step is you acquire the image or you acquire the

9  data from the device.  In this case we call them image because

10  it is basically a replica of what's in the memory.  And then

11  the next step is you take that image or the data that you

12  collected and you conduct the analysis to recover the data so

13  that -- so it's reviewable by the case agent.

14  Q.   Could you please explain to the jury how an image is

15  obtained from an original that preserves the integrity of the

16  original.

17  A.   So basically there's -- there's a couple ways to do that.

18  One of the most acceptable way in the industry in forensic is

19  to use a hash comparison.  What they call a hash is a

20  mathematical calculation of the data that you've extracted at

21  the initial completion of the extraction.  It's basically like

22  a fingerprint.  It's a unique number.  It's a fingerprint on

23  that dataset.  So if anything changes on that dataset, that

24  hash number will change.  So it's a unique identifier to

25  verify.  And every time you move that data you make a copy

P. Lee - Direct

1   somewhere else, you run the hash again, and make sure that the

2   hash matches and the data is -- you know, maintains original

3   integrity.

4   Q.   What would happen to that hash value if even a single

5   period is added or removed from the original?

6   A.   It would be dramatically different.

7   Q.   Were you involved in the investigation to the defendant,

8   Kevin Mallory?

9   A.   Yes, ma'am, I was.

10  Q.   Did you participate in a May 24, 2017, meeting with the

11  defendant?

12  A.   Yes, I do.

13  Q.   And do you see the defendant in court today?

14  A.   Yes, I do.

15  Q.   Would you please identify him by an article of clothing

16  for the record?

17  A.   It's the gentlemen sitting there with a blue tie.

18        THE COURT:  All right.  The record will reflect that

19  the witness has identified the defendant.  Next question.

20  BY MS. GELLIE:

21  Q.   Special Agent Lee, what was your role at that May 24

22  meeting?

23  A.   My mission that day was to basically collect the data

24  from the phone, extract the data from the phone without

25  changing the phone.

─U.S. v. Mallory─

P. Lee - Direct

219

1   Q.   And how did it come about that you were able to image

2   that device?

3          I'll rephrase.

4   A.   Yeah.

5   Q.   What was the basis of your authority to image that

6   device?

7   A.   Okay.  So the legal authority for me to access the device

8   was basically purely on consent of the owner.

9   Q.   Special Agent Lee, there's a binder in front of you.  If

10  you would please turn to the tab for -- marked Government

11  Exhibit 8-1A.  Do you recognize the document?

12  A.   Yes, I do.

13  Q.   What is it?

14  A.   This is a -- what Government referred to as a Form FD941.

15  And what that form is is a consent to search a computer.  And

16  in it it's a -- a standard consent to search form that the

17  owner would sign and acknowledge that they are going to

18  consent the Government to search their electronic device.

19  Q.   Were you present when the defendant signed this form?

20  A.   Yes, I was.

21  Q.   And is Government Exhibit 8-1A a true and accurate

22  representation of the consent form the defendant signed?

23  A.   Yes.  This is a copy of the form, yes.

24          MS. GELLIE:  I offer this into evidence as

25  Government Exhibit 8-1A, Your Honor.

─────U.S. v. Mallory─────

1          THE COURT:  All right.  Without objection it's

2   admitted.  Next question.

3                          (Government's Exhibit No. 8-1A

4                          admitted into evidence.)

5   BY MS. GELLIE:

6   Q.   What type of device did that consent apply to?

7   A.   It applies to a Samsung device, a Samsung mobile phone

8   that goes by a serial number, a particular serial number.

9   Q.   Did the defendant place any parameters on your review of

10  that smart phone?

11  A.   Yes.  The defendant requested that we not install any

12  tools in that phone and we not disturb the content of that

13  phone.

14  Q.   Did the defendant indicate to you why he was making that

15  request?

16  A.   So that he would not be caught with that phone with FBI

17  fingerprints or data in that phone in the event that he take

18  that phone overseas.

19  Q.   Were you able to comply with that request?

20  A.   Yes, I did.

21  Q.   What sort of trail, if any, to the type of extraction you

22  performed leave on the Samsung?

23  A.   None.

24  Q.   Was the Samsung provided to you all in one piece?

25  A.   No.  The phone was provided to me with the battery

─────U.S. v. Mallory─────
P. Lee - Direct
221

1   separated from the device.

2   Q.   Do you know who took the battery out of the phone?

3   A.   I think the owner removed the battery from the device.

4   Q.   Did the defendant explain to you why he had done that?

5   A.   It's to disable the device basically.

6   Q.   Did you examine the battery?

7        THE COURT:  The question was:  Did he tell you why

8   he did it?

9        THE WITNESS:  He alluded to it that, you know, this

10  is -- I'm going to give you this phone, you know, in the

11  stable -- disabled form.

12       THE COURT:  And did he tell you why?

13       THE WITNESS:  I can't recall.

14       THE COURT:  Next question.

15  BY MS. GELLIE:

16  Q.   Did you examine the battery chamber of the Samsung phone?

17  A.   Yes, I did.

18  Q.   Was there any writing on the battery chamber?

19  A.   Yes, it was.

20  Q.   In what language?

21  A.   There was writing in Chinese.

22  Q.   Do you, yourself, speak any Chinese, Special Agent Lee?

23  A.   I speak very little.

24  Q.   Where are you from originally, Special Agent Lee?

25  A.   I was born in Hong Kong.

─────────U.S. v. Mallory─────────

P. Lee - Direct

222

1   Q.   Are you familiar with what Chinese characters look like?

2   A.   Yes, I am.

3            THE COURT:  Is this Mandarin or Cantonese?

4            THE WITNESS:  It's Cantonese, sir.

5            THE COURT:  Next question.

6   BY MS. GELLIE:

7   Q.   Now, turning in the binder to what is marked as

8   Government's Exhibit 8-1B.  Do you recognize this?

9   A.   Yes, I do.

10  Q.   And what is this?

11  A.   This is a photo that I took with -- of the phone with the

12  battery removed.

13  Q.   Is this a true and accurate depiction of the battery

14  compartment you took a photo of on May 24, 2017?

15  A.   Yes, it is.

16           MS. GELLIE:  I offer this as 8-1B and ask to

17  publish, Your Honor.

18           THE COURT:  You may do so.  No -- is there an

19  objection?

20           MR. KAMENS:  No, Your Honor.

21           THE COURT:  It's admitted without objection.  You

22  may publish.

23  BY MS. GELLIE:

24  Q.   What, if any, information did the battery chamber provide

25  you with?

─────────U.S. v. Mallory─────────
P. Lee - Direct

223

1   A.   The battery chamber provided me with the actual model

2   number of the phone and also the serial number as well that --

3   that we used to put on the phone for the consent.  And, also,

4   a couple of IMEI numbers which stands for International Mobile

5   Equipment Identity.

6   Q.   And what exactly is an IMEI number?

7   A.   An IMEI serves kind of like a serial number but it has to

8   follow a certain standard format, international format that

9   represents the -- the make and the model and the series of the

10  number and what countries it's operating from and so forth.

11  Q.   Is that a number that is unique to each individual phone?

12  A.   Yes, it is.

13  Q.   What was the IMEI number for the Samsung?

14  A.   The Samsung has two IMEI numbers.  The number is

15  355848061382951 for the one set, and the other one is the same

16  except the last digit is 9 instead of 1.

17  Q.   And what does it mean when a phone has two IMEI numbers?

18  A.   Basically this phone has two SIM card slots.  In other

19  words, there's two provisions for two separate SIM cards and

20  each one is tied to each of the SIM card.

21  Q.   And, Special Agent Lee, does this photograph of the

22  battery chamber line up with the phone that you imaged on

23  May 24, 2017?

24  A.   Yes, it does.

25  Q.   Was there anywhere else on the phone you were able to

—————U.S. v. Mallory—————

P. Lee - Direct

224

1    confirm the IMEI number in your review?

2    A.    Yes.  This is from -- often we extract the data.  If you

3    look at the data, it will show the IMEI number within the data

4    pack itself.  So it's etched in the software itself inside.

5    Q.    So, Special Agent Lee, will you please turn to Government

6    Exhibit 8-1F, as in "Frank"?  Do you recognize this?

7    A.    Yes, I do.

8    Q.    What is it?

9    A.    This is another photograph that I took later on after we

10   completed the imaging process.  And this is the About, you

11   know, in the phone when you have the About under the Settings,

12   this is the status menu from the About Settings that shows the

13   IMEI number.

14   Q.    And who took this photograph?

15   A.    I did.

16   Q.    Is it a true and accurate representation of the status

17   settings you viewed on the defendant's phone on May 24, 2017?

18   A.    Yes, it is.

19           MS. GELLIE:  Your Honor, I offer this into evidence

20   as Government Exhibit 8-1F and ask to publish.

21           MR. KAMENS:  No objection.

22           THE COURT:  All right.  Admitted.  You may do so.

23   BY MS. GELLIE:

24   Q.    Special Agent Lee, can you please point out the IMEI

25   number as displayed in this photo.

─────U.S. v. Mallory─────
P. Lee - Direct

225

1   A.   If I can circle that -- there it is.

2   Q.   Thank you.  Special Agent Lee, did you do any research

3   into the Samsung phone model?

4   A.   I did.  I also did after the fact as well, after the

5   examinations.  And it's not a typical model that's under the

6   Samsung line, manufacturing line.  And then I later discovered

7   that this particular model was indeed made by Samsung, but it

8   was made specifically for certain country, a certain region.

9   In this case, China.

10  Q.   Was there a camera on this phone?

11  A.   Yes, there was.

12  Q.   Does that affect how you handle a phone?

13  A.   As a precautionary what I usually do is I cover the

14  camera.

15  Q.   Why do you do that?

16  A.   There are apps sometimes in the phone that when you --

17  you could cause a camera to take a photo.  And because the

18  owner has specifically, you know, requests as a condition of

19  the consent that we don't add any data to the phone, so taking

20  a photo of me and storing it on the phone would kind of

21  violate that.  So I covered the camera.

22  Q.   What type of analysis, if any, were you able to perform

23  on the Samsung?

24  A.   I didn't do any analysis.  I just did the image

25  acquisition.

─────U.S. v. Mallory─────

1  Q.   And what type of method did you use to do the image

2  acquisition?

3  A.   I acquired the image using Linux -- in a Linux platform

4  using a command line.

5  Q.   What did that process entail?

6  A.   Basically it involves putting a phone in a certain status

7  in the recovery mode and then connecting to the phone on my

8  laptop running Linux.  And then I run a set of commands that

9  would extract the data bit by bit from the internal memory

10 into an image file.  And then after that extraction is

11 completed, I run a hash to verify that image.

12 Q.   Why do you put the phone in recovery mode?

13 A.   It's part of the process of -- of starting the phone

14 without -- fully booting the phone without causing it to make

15 a record.

16 Q.   And was anything displayed on the phone when you did put

17 it into that recovery mode?

18 A.   There was a display that I wasn't expecting.  I was

19 expecting a -- something that comes from Samsung, and it

20 wasn't.  It was something that was written in Chinese again.

21 It had eight buttons.

22 Q.   Turning in your binder, Special Agent Lee, to what has

23 been marked as Government Exhibit 8-1C.  Do you recognize

24 this?

25 A.   Yes, I do.

—U.S. v. Mallory—

1  Q.   What is this?

2  A.   This was the recovery mode that I found on this

3  particular Samsung device.

4  Q.   Who took this photo?

5  A.   I did.

6  Q.   Is it a true and accurate representation of the screen

7  showing the software you found on the Samsung?

8  A.   It is.

9         MS. GELLIE:  I offer this into evidence as

10  Government Exhibit 8-1C and ask to publish, Your Honor.

11         MR. RICHMAN:  No objection.

12         THE COURT:  You may do so.

13                    (Government's Exhibit No. 8-1C

14                     admitted into evidence.)

15  BY MS. GELLIE:

16  Q.   Special Agent Lee, are you able to read any of the

17  Chinese on here?

18  A.   No.

19  Q.   Do you know what the open lock signifies?

20  A.   That tells me that the phone is unlocked, in its unlocked

21  state.

22  Q.   Were you able to access the phone's data in order to

23  image it?

24  A.   Yes.

25  Q.   What were the results of that process?

─────────U.S. v. Mallory─────────

1   A.   The result of the image that I get a image file, a single

2   file, and then the file is hashed to verify its integrity.

3   Q.   And what was the result of that hash verification?

4   A.   It's a -- it's a hash number that -- that ties into the

5   original data arrangement on that file.  So if anything

6   changes on that file that hash would not match.

7   Q.   Did your hash value of the image match up with the hash

8   value on the Samsung device?

9   A.   The hash value -- how often you copy the file you run the

10  hash again and then the two numbers match.

11  Q.   What do you do as a result --

12            THE COURT:  Did they match in this case?

13            THE WITNESS:  Yes.

14            THE COURT:  Next question.

15            MS. GELLIE:  Thank you, Your Honor.

16  BY MS. GELLIE:

17  Q.   What did you do with that resulted image?

18  A.   The image was archived on an optical media and non --

19  it's a read-only optimal media.  And then it was submitted to

20  the case agent for collection as a derivative evidence.

21  Q.   During your extraction did you attempt to extract any

22  data from the SIM?

23  A.   No, I did not make any attempt on the SIM.

24  Q.   Why is that?

25  A.   Because sometimes some providers will have a -- a lock on

U.S. v. Mallory

P. Lee - Direct

229

1   the SIM, especially pay-as-you-go phones.  And what that is is

2   that it does not allow you to access the SIM data, which is a

3   subscriber data, without a pin.  So what happened is that if I

4   try to extract that SIM card it may trigger a count towards

5   your attempt to access the card, and that would trigger the

6   account as, requested by the owner, that we not alter any of

7   the data.  I did not make an attempt on the SIM.

8           THE COURT:  What's the reference to SIM?

9           THE WITNESS:  It's a subscriber identity module.

10  And what it is is a little silver -- it's a little card, it's

11  a little chip that carries the subscriber information of the

12  network.  Say, for example, a Verizon or AT&T or T-Mobile, so

13  forth.  The phone number -- what's important about a SIM is

14  that phone number is actually stored in the SIM.  So in case

15  -- in countries outside the United States SIM cards are very

16  commonly used.  And they can switch the SIM card to a

17  different phone and carry that service to a different phone

18  and carry that service to a different phone if the phone

19  matches the -- you know, it's agreeable to the service.

20          THE COURT:  Next question .

21          MS. GELLIE:  Thank you, Your Honor.

22  BY MS. GELLIE:

23  Q.   In addition -- in addition to imaging the Samsung phone,

24  did you have any other role during the May 24, 2017, interview

25  of the defendant?

───────U.S. v. Mallory───────
P. Lee - Direct
230

1   A.   I was present in the owner of the phone describing how

2   the phone works, the tools in the phone.

3           THE COURT:  When you say "owner of the phone," who

4   are you referring to?

5           THE WITNESS:  Mr. Mallory.

6           THE COURT:  Next question.

7           MS. GELLIE:  Thank you, Your Honor.

8   BY MS. GELLIE:

9   Q.   Was Special Agent Stephen Green also present while

10  Mr. Mallory was demonstrating on the phone?

11  A.   Yes, he was.

12  Q.   What was it that the defendant wanted to demonstrate for

13  you?

14  A.   He wanted to demonstrate the tools -- what he conferred

15  to as a CovCom tool, or covert communication.  CovCom is short

16  for covert communication.

17  Q.   In addition to covering the cameras, which you've already

18  discussed, were any other precautions taken before the

19  defendant performed that demonstration?

20  A.   Yeah.  In adherent to the -- to Mr. Mallory's request of

21  not putting any data in there we -- this would be the first

22  time that I would start this phone and through the normal

23  process.  But in doing so, it will try to connect with a tower

24  and report its location and so forth and establish a date and

25  time.  So to prevent that, I put it in a Faraday bag.  A

─────────────U.S. v. Mallory─────────────

1   Faraday bag is a -- it's a shielded bag that will shield any

2   wireless transmission while in its enclosure.  So I start the

3   phone in a Faraday bag and then I put the phone into airplane

4   mode.  And airplane mode is a feature on most cell phones,

5   both iPhones and Androids, that will allow you to cut off

6   wireless communication while you take the device on an

7   airplane to fly to a different location, for example.

8   Q.   What effect does a Faraday bag have on the phone's

9   ability to connect with Wi-Fi or cell towers?

10  A.   It prevents connection to the -- any wireless

11  transmission.

12  Q.   Once the phone was in airplane mode, what did the

13  defendant do first in demonstrating how the device worked?

14  A.   The defendant showed us the app of WeChat, which is a

15  commercial app that is -- it's published in China by a company

16  called Tencent.  And it was -- it was stated that that app had

17  been modified by the -- by the person that the party that

18  provided the phone, the CovCom device, and it's not the same

19  commercial app that you can download like, say, from the

20  Google Store or something like that.  It's been modified.

21  Q.   Did the defendant have to do anything to enter that

22  modified custom app from commercial WeChat?

23  A.   Yeah.  The -- Mr. Mallory has demonstrated how to enter

24  the covert communication mode by enter -- entering from the

25  app the text -- the -- a password.  In this case it's actually

—————————U.S. v. Mallory—————————

1    the word "password," P-A-S-S-W-O-R-D.  And in doing so, it

2    will place that app into a secure communication encrypted

3    mode.

4    Q.   Did the message look different once the defendant entered

5    that secure communications mode?

6    A.   Yes, it does.  What -- the feedback you would get from

7    the phone to tell you that you're in the communication mode is

8    the icon where you type in the chat will change to, I believe,

9    if I can recall, it's an exclamation and then a colon.

10   Q.   Mr. Special Agent Lee, in preparation for your testimony

11   today did you listen to certain clips from the May 24th

12   interview with the defendant?

13   A.   Yes, I did.

14   Q.   And while listening to those clips did you read along

15   with transcripts as well?

16   A.   Yes, I did.

17          MS. GELLIE:  Your Honor, we have a stipulation for

18   proposed Government Exhibits 13-27 through 13-32 and 13-34

19   through 13-36, along with their transcripts.  It's Stipulation

20   Number 8, paragraph 1.

21          THE COURT:  May I have a copy, please?  No, I want

22   8, my copy of 8.

23          THE DEPUTY CLERK:  That is his copy.

24          THE COURT:  Did we return those?

25              (Discussion off the record.)

U.S. v. Mallory

P. Lee - Direct

233

1          THE COURT:  All right.  Ladies and gentlemen, here

2    is a further stipulation between the parties that the United

3    States and the defendants hereby stipulate and agree that the

4    Government Exhibits 13-1 through 13-37 are audio-recorded

5    excerpts from defendant, Kevin Mallory's interview with the

6    FBI on May 24, 2017.  And the United States and the defendant

7    further stipulate and agree that the Government Exhibits 13-1T

8    through 13-37T are true and accurate descriptions or

9    transcriptions of the recording contained in Government

10   Exhibits 13-1 through 13-37.

11          So I will admit the Government Exhibits 13-1 through

12   13-37 and the related transcripts are admitted into evidence.

13          Now, do you plan to play those transcripts or play

14   those excerpts?

15          MR. KAMENS:  Just to be clear, we have entered into

16   a stipulation that is broader than the exhibits than I think

17   the Government was going to admit through this witness.

18          THE COURT:  You mean what I read isn't --

19          MR. KAMENS:  It's a little bit broader.  I think --

20   if I can --

21          THE COURT:  A little bit broader than what I read?

22          MR. KAMENS:  Well, Your Honor, I think the

23   Government was seeking to introduce 13-27 through 13-32 and

24   13-34 through 13-36.

25          MS. GELLIE:  That's correct.  Special Agent Green

P. Lee - Direct

1   will admit the remaining exhibits.  If the defense is --

2           THE COURT:  This stipulation was just -- handed to

3   me as having just been signed.  And now you're telling me it's

4   not entirely accurate?

5           MR. KAMENS:  No, it is accurate, Your Honor.  I just

6   didn't want there to be any confusion that we're allowed to

7   cross-examine on those exhibits later through a separate

8   witness.  But however the courts want to do it.

9           THE COURT:  Is this the issue of completeness?

10          MR. KAMENS:  Well, to discuss the clips that I don't

11  think this witness will talk about.

12          THE COURT:  Let's proceed.  I've admitted the

13  exhibits pursuant to the stipulation.

14          MS. GELLIE:  Thank you, Your Honor.

15          THE COURT:  You may proceed.

16          MS. GELLIE:  Thank you, Your Honor.

17          THE COURT:  Let me ask.  Ladies and gentlemen, I

18  promised you 5 o'clock.  Is that still a promise you want

19  kept?  Are you willing to stay a bit longer to see if we can

20  finish some of this?  I don't see any cries of anguish or pain

21  but you're doing a good job masking it.

22          Let's proceed, Ms. Gellie.

23          MS. GELLIE:  Thank you, Your Honor.  I appreciate

24  it, Your Honor.

25  BY MS. GELLIE:

1   Q.   Special Agent Lee, did the defendant during the May 24th

2   e-mail discuss what those secure mode communications look

3   like?

4   A.   Yeah, he did.

5           MS. GELLIE:  I'd like to now play Government Exhibit

6   13-27, Your Honor.

7           THE COURT:  All right.  You may do so.

8           (Video played.)

9           THE COURT:  This transcript doesn't --

10          (Video played.)

11  BY MS. GELLIE:

12  Q.   Special Agent Lee, when the defendant logged into that

13  secure mode on May 24th, were you able to view any chat

14  history?

15  A.   No.  It was just the chat that -- well, there was --

16  there was history of prior chats on there.

17  Q.   Turning in your binder to what's been marked as

18  Government Exhibit 8-3, 8-4, and 8-5, do you recognize these?

19  A.   Yes, I do.

20  Q.   What are they?

21  A.   These are the history of prior chats.

22  Q.   And who took these photographs?

23  A.   I did.

24  Q.   Are these a true and accurate representation of the chat

25  history as shown to you by the defendant on May 24th?

─────────── U.S. v. Mallory ───────────

1  A.   Yes, they are.

2         MS. GELLIE:  I offer these in evidence as Government

3  Exhibits 8-3 through 8-5.

4         THE COURT:  All right.  Without objection, they're

5  admitted.  You may display them.

6         MS. GELLIE:  And I would -- thank you, Your Honor.

7  BY MS. GELLIE:

8  Q.   Are those exclamation points that are shown in this

9  photograph indicative that the defendant was communicating in

10  the secure mode?

11  A.   That's correct.  It's the exclamation followed by a

12  colon.

13  Q.   At the top of the conversation it says, "Mi Yang."  Do

14  you have an understanding of who Mi Yang is?

15  A.   Mi Yang is the other party that are involved in this chat

16  conversation.

17  Q.   What is that understanding based on?

18  A.   This is based on the left side as the incoming and then

19  on the right side is the outgoing.  But also the avatar of a

20  vehicle that he explained was the other party.

21         THE COURT:  I don't see the name that you're

22  referring to on this screen.  Where is it?

23         THE WITNESS:  That is in another view that we went

24  through that was in the contact list, that if you -- if you

25  access the contact for that avatar you would see that name.

─────────U.S. v. Mallory─────────

1          MS. GELLIE:  It's, Your Honor, on the top left in

2    white where there's an arrow pointing leftward.  It's now

3    circled in red, I believe.

4          THE COURT:  All right.  And what does that mean?

5          THE WITNESS:  That is the other party that you're

6    talking to?

7    BY MS. GELLIE:

8    Q.   And who -- who told you that that's the other party to

9    the communication?

10   A.   That's Mr. Mallory who explained that.

11         MS. GELLIE:  Now I'd like to play Government's

12   Exhibit 13-30.

13         THE COURT:  Well, wait a minute.  Go back for a

14   minute.  Display that.  All right.  It says, "You mean which

15   info," who is that?

16         THE WITNESS:  That's from Mi Yang.

17         THE COURT:  That's who?

18         THE WITNESS:  That's from the person sitting --

19   asking the question.  That's not from Mr. Mallory.

20         THE COURT:  And then it says, "It could be," what?

21         THE WITNESS:  Yes, that was blocked there.  I don't

22   know if there's a way you can --

23         THE COURT:  Well, who is saying that?

24         THE WITNESS:  I think that's -- that may be -- was

25   that in Chinese and it was interpreted or --

──────U.S. v. Mallory──────

P. Lee - Direct

238

BY MS. GELLIE:

1

2  Q.    That's a redaction.  I think what the Court is asking is:

3  Who is the speaker in all of the green bubbles?

4  A.    That is the user of the device.

5  Q.    And in this case who was that?

6  A.    That's Mr. Mallory.

7          THE COURT:  All right.  And this is information you

8  found on the machine?

9          THE WITNESS:  That's already on the phone, yes.

10          THE COURT:  All right.  Next -- next question.  I

11  assume if it's significant that -- Ms. Gellie, that you'll

12  call attention to it.

13          MS. GELLIE:  I will, Your Honor.  First I would like

14  to play clip 13-30.

15          THE COURT:  All right.  You may do so.

16          (Video played.)

17  BY MS. GELLIE:

18  Q.    Were you able to view the WeChat contact entry for

19  Mi Yang on the defendant's phone?

20  A.    Yes, I did.

21  Q.    Can you turn now to what's been marked in your binder as

22  Government Exhibit 8-2.  Do you recognize this?

23  A.    Yes, I do.

24  Q.    What is it?

25  A.    This is the profile of Mi Yang inside WeChat app.

─────────U.S. v. Mallory─────────

P. Lee - Direct

239

1   Q.   Who took this photograph?

2   A.   I did.

3   Q.   Is it a true and accurate representation of the WeChat

4   contact information for Mi Yang that you viewed on the

5   defendant's phone on May 24th?

6   A.   Yes, it is.

7          MS. GELLIE:  I offer this in evidence as

8   Government's Exhibit 8-2.

9          THE COURT:  All right.  Without objection it's

10  admitted.  Next question.

11                        (Government's Exhibit No. 8-2

12                        admitted into evidence.)

13         MS. GELLIE:  I'd ask to publish this to the jury,

14  Your Honor.

15         THE COURT:  You may do so.

16         MS. GELLIE:  Thank you.

17  BY MS. GELLIE:

18  Q.   Does this contact entry provide you with any additional

19  information besides the screen name, "Mi Yang"?

20  A.   Yes.  There's a WeChat ID that goes by YM551227.

21  Q.   Did the defendant provide you with an understanding of

22  what his own screen name was for communications with Mi Yang?

23  A.   His own screen name -- I believe he said -- my

24  recollection was Beans, I think, Bean.

25         MS. GELLIE:  I now ask to play Government Exhibit

────U.S. v. Mallory────

240

1   13-36, Your Honor.

2         THE COURT:  You may do so.  Enlarge that.

3         (Video played.)

4   BY MS. GELLIE:

5   Q.   Did the defendant explain the process for sending

6   documents using the secure messaging mode?

7   A.   Yes, he did.

8   Q.   What did he say he had to do?

9   A.   To enter the secure mode you'd have to -- both party has

10  to be involved.  They have to be on.  And you have to maintain

11  the session going, both parties, and then you would each enter

12  into a secure mode by typing in the word "password" into the

13  text line.  And then after you enter that the password,

14  the exclamation and colon would appear that would indicate

15  that you are in secure communication.

16  Q.   And once you're in that mode, what was your understanding

17  of how one sends documents?

18  A.   You can attach document in that mode and it would be

19  encrypted.  So if it wasn't in something it wouldn't be able

20  to decipher that communication.

21        MS. GELLIE:  Your Honor, I ask to play clip 13-28.

22        THE COURT:  You may do so.  It's been admitted

23  pursuant to stipulation.

24        MS. GELLIE:  Yes, Your Honor.  Thank you.

25        (Video played.)

—————U.S. v. Mallory—————

1   BY MS. GELLIE:

2   Q.   Did the defendant provide any details as to how he got

3   documents onto the device?

4   A.   Yeah.  He had mentioned that there are two folders that

5   are mentioned in that audio clip, the IDIR and the SDIR.  So I

6   direct -- "I" stands for input directory.  "S" is your output,

7   SDIR.  So what they do is they -- yes, he did describe it.

8          MS. GELLIE:  I'd now ask to play Government

9   Exhibit 13-32, Your Honor.

10          THE COURT:  All right.  You may do so.

11          (Video played.)

12   BY MS. GELLIE:

13   Q.   During the May 24th interview did the defendant provide

14   any further detail about how information is embedded into an

15   image using the custom application?

16   A.   Yes, he did.

17          MS. GELLIE:  Your Honor, I'd ask to play Government

18   Exhibit 13-31.

19          THE COURT:  All right.  Before you do it -- you may

20   do so, but where are you in your examination?  In other words,

21   how much more do you anticipate?

22          MS. GELLIE:  Probably about five minutes, five to

23   ten minutes.

24          THE COURT:  All right.  I may recess a little before

25   that time.  Would that be suitable?

─────────────────U.S. v. Mallory─────────────────

242

 1            All right.  Proceed.

 2            (Video played.)

 3  BY MS. GELLIE:

 4  Q.   Did the defendant tell you anything on May 24th about

 5  software updates for WeChat?

 6  A.   Yes, he did.  He said to not do it.

 7  Q.   Did he explain why not?

 8  A.   Because it would -- it would override the custom

 9  modification that was put there on the WeChat app.

10            THE COURT:  Is this a good stopping place?

11            MS. GELLIE:  It can be, Your Honor.  That's fine.

12            THE COURT:  All right.  Ladies and gentlemen, you

13  can pass your books to the right.  Mr. Lee, you may step down.

14  Remember, you must refrain from discussing your testimony with

15  anyone overnight.

16            When you became a forensic examiner did you lose the

17  special agent title?

18            THE WITNESS:  No, I keep that.

19            THE COURT:  All right, Agent Lee.  We'll see you

20  tomorrow morning at 9 o'clock.

21            THE WITNESS:  Thank you.

22            (Witness excused.)

23            THE COURT:  Remember to refrain from discussing the

24  matter among yourselves or with anyone and remember to resist

25  the temptation not to discuss the matter with anyone.  Now,

─────U.S. v. Mallory─────

243

1  tomorrow morning -- and don't undertake any investigation at

2  all on your own.  Tomorrow morning we will not convene until

3  9:30 because I have other matters that are going on beginning

4  at 8 or 8:30, but I am sure that I will be done before 9:30.

5  And I can assure you you won't have to sit around and we'll

6  continue with Agent Lee.  Thank you for your careful attention

7  to the evidence as it was presented today.  You may follow

8  Mr. Flood out.

9            (Jury dismissed.)

10           THE COURT:  All right.  You may be seated.

11 Ms. Gellie, are the contents that we viewed from the tone --

12 from the phone, as Agent Lee extracted from it, are those

13 contents particularly significant?

14           MS. GELLIE:  We will have other witnesses, Your

15 Honor, who will get into the actual text of the chats.

16 Special Agent Lee merely took the photographs showing that

17 when the defendant logged in all the parties present could see

18 some chat history there.

19           THE COURT:  Are you saying you will have witnesses

20 explain the meaning of what was seen?

21           MS. GELLIE:  Absolutely, Your Honor.

22           THE COURT:  All right.  Now, if there are any

23 completeness arguments that you-all have, resolve those this

24 evening so that we can move with some speed or alacrity

25 through them.

—U.S. v. Mallory—

244

1          MR. KAMENS:  We'll do that, Your Honor.

2          THE COURT:  All right.  Thank you.  And that means,

3   as I see it now, tomorrow afternoon when we recess I want to

4   give the jury an estimate of what remains.  My hunch is that

5   the Government will complete its case Monday or Tuesday at the

6   latest.

7          MS. GELLIE:  Yes, Your Honor.  My hope is that by

8   the afternoon of Tuesday we will have finished all of our

9   experts next week.

10          THE COURT:  All right.  We may or may not begin

11   Monday until 1 o'clock.  I have to make up my mind about that.

12          MS. GELLIE:  Your Honor, then just one scheduling

13   point.

14          THE COURT:  Yes.

15          MS. GELLIE:  We do have an OCA testifying and we

16   would hope to have her testify on Monday.  She has a child

17   graduating from high school on the Tuesday, so we do need to

18   get her in on Monday, if possible.  And her testimony does

19   build off of other witnesses' testimony.

20          THE COURT:  Is this -- which witness is this?

21          MS. GELLIE:  This is Nancy Morgan, Your Honor.

22          THE COURT:  Yes.  Okay.  We'll work to accommodate

23   that.  She cannot miss her daughter's graduation.

24          MS. GELLIE:  Thank you, Your Honor.

25          THE COURT:  All right.  I thank counsel for your

─────U.S. v. Mallory─────

245

1   cooperation.  We'll recess this evening to reconvene tomorrow

2   morning at 9:30.  Court stands in recess.

3                **(Proceedings adjourned at 5:21 p.m.)**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus KEVIN**

8    **PATRICK MALLORY**, Criminal Action No. 1:17-CR-154, in said

9    court on the 30th day of May, 2018.

10         I further certify that the foregoing 246 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16   name, this September 25, 2018.

17

18

19

20

21   _____

22   Tonia M. Harris, RPR
     Official Court Reporter

23

24

25

246