REDACTED / CLEARED FOR PUBLIC RELEASE

Filed with the Classified
Information Security Officer
CISO _____
Date  9 | 14 | 2018

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
#### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:17-cr-154 (TSE) |
| | ) | |
| KEVIN PATRICK MALLORY, | ) | Sentencing Hearing: September 21, 2018 |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DEFENDANT'S POSITION ON SENTENCING

Defendant Kevin Patrick Mallory, by counsel, and pursuant to Federal Rule of Criminal Procedure 32(i), hereby submits his Position on Sentencing in this case.

#### Introduction

Kevin Mallory has spent the vast majority of his life in service to his country, his family, and his church. He is a veteran of the U.S. Army, a former CIA case officer, a former DIA officer, and he has served this country overseas, including in areas of armed conflict.

Over the course of four months in the Spring of 2017, however, Mr. Mallory's family faced a financial crisis. And during that short period, Mr. Mallory communicated with an individual, Michael Yang, who promised that he would pay Mr. Mallory to serve as a consultant for a Shanghai think tank. In actuality, Mr. Yang was an intelligence operative for the People's Republic of China, and Mr. Mallory eventually provided two documents to Mr. Yang, a table of contents and a one-page White Paper, that the jury found to contain national defense information. Yet Mr. Mallory denies that he ever intentionally sought to harm the United States or provide anything of value to the P.R.C.

Nonetheless, taking as we must the jury's view of the facts, the underlying offenses resulted in very little harm to the United States. Indeed, according to the measures by which

REDACTED / CLEARED FOR PUBLIC RELEASE

sentences for espionage offenses typically turn --- the importance of the information lost, the length of time the defendant acted on behalf of a foreign power, whether the offense was motivated by ideology, and whether the offense occurred in connection with an ongoing armed conflict --- this offense falls toward the low end of espionage offenses.  In fact, Mr. Mallory provided information of almost no value to the People's Republic of China (PRC), while he also voluntarily provided extremely valuable intelligence to the United States, namely a Samsung cell phone containing a custom covert communication application used by Chinese intelligence.  In other words, the intelligence value of what Mr. Mallory provided to the United States far exceeded the intelligence value of what he provided to Mr. Yang.

"Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (quoting Jack B. Weinstein, *Does Religion Have a Role in Criminal Sentencing?*, 23 Touro L. Rev. 539, 539 (2007)). As this Court often notes during the course of sentencing hearings, it is a judgment, not a mathematical calculation.  Given Mr. Mallory's life-long service to the United States and to his community, the lack of value of the information that he provided to the PRC, the extraordinary value of the intelligence he provided to the United States, as well as the sentences imposed in analogous cases, we respectfully request that the Court impose a sentence of no more than 120 months of imprisonment followed by a term of supervised release.

### Argument

I.  **Standards By Which to Ascertain The Sentence Sufficient, But Not Greater Than Necessary, to Accomplish the Goals of Sentencing**

   A.  **18 U.S.C. § 3553(a) Factors**

"It has been uniform and consistent in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the

human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Pursuant to *Booker v. United States*, 543 U.S. 220 (2005), the Court's sentencing inquiry is defined primarily by 18 U.S.C. § 3553(a), which requires it to consider a variety of sentencing factors, including the United States Sentencing Guidelines range, "the nature and circumstances of the offense," "the history and characteristics of the defendant," and "the need to avoid unwarranted sentence disparities among defendants with similar records who been found guilty of similar conduct." *United States v. Lymas*, 781 F.3d 106, 112 (4th Cir. 2015).

All of these considerations are designed to "ensure[] that the punishment will suit not merely the offense but the individual defendant." *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011). Moreover, § 3553(a) "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *Lymas*, 781 F.3d at 112 (quoting *Kimbrough v. United States*, 552 U.S. 85, 101 (2007)). Indeed, "the district court's job is not to impose a reasonable sentence. Rather, the district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Foreman*, 436 F.3d 638, 644 (6th Cir. 2006). As such, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553(a), it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).

**B.    U.S. Sentencing Guidelines**

### 1.    A Downward Departure is Warranted Based Upon the Lack of Harm to National Security from the Offense

The Sentencing Guidelines are neither mandatory nor presumptively reasonable, but they do provide the starting point for this Court's determination of an appropriate sentence. *Gall v.*

*United States*, 128 S. Ct. 586, 596-97 (2007). And the guideline offense level in this case is driven by U.S.S.G. § 3M3.1, the guideline applicable to violations of 18 U.S.C. § 794. Nevertheless, the Sentencing Commission explicitly provided in Application Note 2 that it "has set the base offense level in this subpart on the assumption that the information at issue bears a significant relation to the nation's security, and that the revelation will significantly and adversely affect security interests. *When revelation is likely to cause little or no harm, a downward departure may be warranted.*" U.S.S.G. § 2M3.1 app. n.2 (emphasis added). In other words, the base offense level for this guideline is based upon the assumption that the offense involves information the disclosure of which will "*significantly* and *adversely* affect security interests." That is not the case here.

In this case, Mr. Mallory sent only two documents to Michael Yang, neither of which caused any appreciable harm from their revelation. The first was simply a list that included titles such as "S&T Targeting Opportunity," [ ] to China," "FISA," and ' [ ] Capabilities." Gov. Classified Ex. C9-3E. The second was a one-page document entitled "White Paper" which purported to propose [ ]

[ ] Gov. Classified Ex. C9-3E1. The "White Paper" proposed [ ]

[ ] *Id.* Finally, the document

The lack of harm from the revelation of this information to the P.R.C. is clear

and that they

use commercial cover, is already well-known and well-established through sources that are far

more credible than Mr. Mallory's hand-made documents. For example, the fact that U.S.

intelligence agencies use commercial cover is evident from, among other sources, a Westlaw

search of the Federal Reporter. In *Military Audit Project v. Casey*, 656 F.2d 724, 728 (D.C. Cir.

1981), for example, the opinion describes at length a CIA operation to raise a Russian submarine

using a commercial cover in which a company ostensibly sought to obtain "manganese nodules

from the ocean floor." "[T]he commercial cover nature of the arrangement" is fully revealed in

the opinion. *Id.* at 735 n.29.

Likewise, in *United States v. Rewald*, 889 F.2d 836 (9th Cir. 1989), the opinion discusses

the operations of CIA operatives in Honolulu, Hawaii, who were tasked with "obtaining a

commercial cable address and telephone in Hawaii for two cover agents operating in the Far

East." *Id.* at 841. "Basically," the opinion explains, "the CIA needed a private company willing

to provide light cover, known as backstopping in the intelligence community, for these foreign

agents." *Id.* The opinion goes on to reveal that the CIA "was seeking a commercial cover for a

covert agent in the Foreign Resources Division," and that an agent who assisted in "securing

commercial cover" was assigned to the "Corporate Cover Branch, which is responsible for

obtaining cover for covert agents." *Id.* at 842. In that case, the "cover needs" were "described in

an internal CIA memorandum as a 'well-backstopped cover identity.'" *Id.*

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

It should be no surprise, therefore, that a former CIA employee with 25 years of experience in the classification of information, Harry P. Cooper, concluded "that the information that was provided to Chinese intelligence [by Mr. Mallory] is information that has already been released officially by the US Government." Decl. Harry Cooper ¶ 3 (Exhibit 1). Mr. Cooper noted that the documents provided by Mr. Mallory to the P.R.C. were not U.S. government-generated documents and had not been classified by the government at the time of transmission. *Id.* ¶¶ 5, 6. Moreover, the fact that the documents suggest that the United States intelligence community is

*Id.* ¶¶ 5(a), 5(d).

*Id.* As Mr. Cooper noted, the information in the "White Paper" is so general that "there is no way to draw a conclusion that this text alone would give the Chinese any advantage

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

or cause changes to relationships with commercial firms in China that would hinder the collection of intelligence . . . .

Even though he had ample opportunity to do so, Mr. Mallory never sent any other document containing national defense information to Mr. Yang. Indeed, the testimony from government expert Jim Hamrock at trial that Mr. Mallory must have intended to send additional documents because it was impossible to enter into the secure mode of the Samsung phone without being in communication with another user was proven demonstrably false by the government's own evidence. See Def. Reply in Support of Motion for New Trial at 13-14.

Finally, it is worth noting that Mr. Mallory provided extraordinary intelligence to the United States. On May 24, 2017, Mr. Mallory voluntarily provided the Samsung cell phone he received from Michael Yang for copying by the FBI. As Paul Lee, the FBI forensic examiner, testified at the trial, it was Mr. Mallory's "desire" to "demonstrate how [the custom cell phone application] worked." May 31, 2018, Tr. at 18. In fact, he brought written notes to the interview to make sure that he correctly described how the application functioned. Id. at 20. And Mr. Lee testified candidly that had Mr. Mallory not explained how to open the custom application, he would not have been able "to figure that out as a forensic examiner" because "this was a custom app and it was a feature that was not typical of a common app." Id. at 21. Mr. Mallory's provision of the Samsung phone with the custom covert application provided the FBI with a "rare" glimpse into Chinese covert technology, id. at 26, and it would not have been able to access that technology nearly as quickly without Mr. Mallory's assistance.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

In sum, given the short length of time in which Mr. Mallory interacted with Michael Yang, the lack of value of the information he provided, and the significance of the information that he provided to U.S. intelligence, it is plain that the revelation of the information at issue likely "cause[d] little or no harm." U.S.S.G. § 2M3.1 app. n.2. As such, the Court should depart downward twelve offense levels to offense level 31, to an advisory range of 108 to 135 months of imprisonment.

### 2. U.S.S.G. § 3B1.3, Abuse of a Position of Trust, Does Not Apply in this Case

Although it does not affect the ultimate advisory guideline calculation, the PSR wrongly applied an enhancement under § 3B1.3 for abuse of a position of trust. The fact that Mr. Mallory was previously a government employee of the CIA and DIA, where he had access to classified documents, is insufficient to support the application of this enhancement because he did not abuse any discretionary authority in the commission of the underlying offenses.

Relying on *United States v. Gould*, 983 F.2d 92 (7th Cir. 1993), a drug case involving a former police officer, the PSR Addendum provides that "former employees can abuse a position of trust." PSR Addendum. *Gould* is inapposite because the offense conduct occurred *while the defendant was a police officer*. In that case, the defendant "stipulated that, *while serving as a City of Carbondale police officer*, he had warned another member of the conspiracy of the identity of four informants and of police surveillance." *Id.* at 93. Explaining that "[t]he fact that Gould was a police officer cannot, in and of itself, trigger" application of the enhancement, the enhancement applied because the defendant "clearly used his position of trust as a police officer to garner intelligence which he knew would be useful to [a] co-conspirator . . . in concealing his cocaine dealing activities." *Id.* at 94. In other words, he used his position to conceal the commission of his offense.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / RELEASED FOR PUBLIC RELEASE

To warrant application of the enhancement, a defendant must "use [a] position of trust" to further or "conceal the illegal activities of himself and [or] his co-conspirators." *Id.* Accordingly, it is "improper to apply the enhancement solely because Defendant once occupied a position of trust. The enhancement could apply only if Defendant used his [] position to significantly facilitate the commission or concealment of the crime underlying this case." *United States v. Burt*, 134 F.3d 997, 999 (10th Cir. 1998).

In this case, Mr. Mallory did not occupy a position of trust at the time he engaged in the offenses of conviction. Even though he remained obligated by virtue of non-disclosure agreements to maintain the confidentiality of classified information, those agreements themselves gave him no discretionary authority or position to abuse. Furthermore, to support an enhancement under the guidelines, the conduct giving rise to the enhancement must occur "during the commission of the offense of conviction" or "in preparation for that offense." U.S.S.G. § 1B1.3(a)(1) (describing scope of relevant conduct). "Yet, the government presented no evidence to support [the] speculation," *United States v. Biheiri*, 299 F.Supp.2d 590, 607 (E.D. Va. 2004) (Ellis, J.), that Mr. Mallory improperly retained classified information from his former employment in the intelligence community in preparation for the commission of an espionage offense many years later.

And although the Fourth Circuit in an unpublished opinion has upheld the application of the enhancement in a case involving retention of national defense information, *United States v. Ford*, 288 Fed. Appx 54, 61 (4th Cir. 2008) (unpublished), in that case the underlying offense --- improper retention of NDI --- was identical to the conduct supporting the enhancement. Furthermore, other courts have rejected application of the enhancement when it depends solely upon access afforded by a security clearance. *United States v. Douglas*, 885 F.3d 124, 135-36

REDACTED / RELEASED FOR PUBLIC RELEASE

(3d Cir. 2018) (en banc) ("The mere fact that someone trusted the defendant does not satisfy the Guideline's definition"); *United States v. Parrilla Roman*, 485 F.3d 185, 191 (1st Cir. 2007) (declining to impose enhancement because defendant had security clearance that provided access to restricted area). The upshot is that the fact of Mr. Mallory's previous position of trust with the government does not support application of this enhancement because the offenses of conviction were not facilitated or concealed by the discretionary authority he held years before committing the offense.

**II.  Sentences Imposed in Analogous Cases Support A Sentence of No More than 120 Months In this Case.**

While no two cases are identical, a comparison of this case to other espionage cases prosecuted in this Court and elsewhere establishes that a sentence of no more than ten years in this case would avoid unwarranted sentencing disparities. A longer sentence, on the other hand, would put this case on par with cases involving far more aggravated facts – such as those involving multi-year (and sometimes multi-decade) spying operations, and those involving information the disclosure of which would cause far greater harm to national security than is the case here.

In a pair of cases prosecuted in this Court in 2008, for example, two defendants convicted of conspiring to disclose national defense information to a foreign nation were sentenced to 57 months (for the Pentagon analyst who obtained and sold the information, knowing it was to be delivered to a foreign country) and 188 months (for the person who coordinated with Chinese intelligence, recruited the Pentagon analyst, and received a manager/supervisor enhancement for recruiting and supervising other participants). *See United States v. Bergersen*, 1:08-cr-122

REDACTED / CLEARED FOR PUBLIC RELEASE

UNREDACTED / CLEARED FOR PUBLIC RELEASE

(LMB), *United States v. Kuo*, 1:08-cr-179 (LMB).[1]  That case involved the sale of information

on United States military equipment sales and communications security issues, for which Kuo

was paid at least $50,000 by Chinese intelligence.[2]  Although the information constituted NDI

and was valued in monetary terms at double the value of the information at issue here (before

adjusting further for a decade of inflation), Judge Brinkema departed downward in defendant

Bergersen's case under USSG § 2M3.2 App. Note 2 based on the minimal value of the

information. *See* Defendant Tai Shen Kuo's Memorandum in Aid of Sentencing, *United States

v. Kuo*, 1:08-cr-179 (LMB), dkt # 49 at 9 (citing sentencing transcript from *Bergersen*

sentencing).[3]

Similarly, in a Chinese spying case prosecuted in federal court in the District of

Columbia in 2011, the court imposed a sentence of 108 months upon a defendant convicted

under 18 U.S.C. § 794(a) of attempting to deliver NDI to China (the substantive offense that was

the object of the conspiracy of which Mr. Mallory stands convicted).  *See United States v.*

---

[1]  Mr. Kuo was convicted of the same offense at issue here (conspiracy to disclose NDI to a foreign nation under 18 U.S.C. § 794(a) & (c)), while Mr. Bergersen was permitted to plead to the lesser offense of conspiring to disclose NDI to a person not entitled to receive it (under 18 U.S.C. § 793(d) & (g)).  Both defendants agreed factually that they communicated NDI knowing that it was to be delivered to a foreign nation, however, so it appears that the lesser charge in the *Bergersen* case was a matter of grace rather than substance.

[2]  The factual descriptions of these and other cases are drawn from publicly available documents in each case (plea documents and/or sentencing memoranda), as well as information reported in *American Spies: Espionage Against the United States from the Cold War to the Present*, Michael J. Sulick (Georgetown University Press 2013) at 251-65.  The author, Michael Sulick, was noticed by the United States in this case as an expert witness on espionage and counterespionage, although he ultimately did not testify.

[3]  The record does not reveal whether this reduction was also applied in the *Kuo* case, but the two cases involved the same NDI (defendant Kuo's sentencing memorandum notes that an identical under-seal memorandum was filed by the government in each case describing the harm caused by the disclosure).  There were other differences in the two defendants' conduct, such as Mr. Kuo's leadership role in recruiting Mr. Bergersen and supervising another defendant, that appear to account for the disparity between the two sentences.

UNREDACTED / CLEARED FOR PUBLIC RELEASE

*Underwood*, D.D.C. No. 11-cr-271 (ESH).  Mr. Underwood was a Top Secret clearance-holder

whose job included protecting the construction of a new American consulate in Guangzhou,

China, but who demanded between $3 Million and $5 Million from Chinese intelligence for

assistance in planting listening devices in the new consulate.  The United States in that case

sought a sentence of 211 months (approximately 17.5 years), while the court ultimately imposed

a sentence of 108 months (nine years).  The government's sentencing memorandum in that case

made clear that Mr. Underwood did not receive a "substantial assistance" reduction because –

although he had been debriefed – he had repeatedly lied during those sessions with respect to

material facts, and had also failed to appear in court after being released on bond.

In addition to the above cases, a comprehensive study by the United States Department of

Defense of espionage cases involving American citizens over a nearly 70-year period ending in

2015 establishes that the sentence requested here would avoid unwarranted disparities.  *See*

Herbig, Katherine L., Ph.D., *The Expanding Spectrum of Espionage by Americans, 1947-2015*

(Defense Personnel Security Research Center, Technical Report 17-10, August 2017) ("2017

PERSEREC Report").[4]  The report shows that, of the 66 espionage cases studied between 1990

and 2015 where the sentence was known, 66% received sentences of 0-10 years, an additional

17% received sentences of between 10 and 20 years, and the remaining 17% received sentences

longer than 20 years.  *Id.* at 40 (Table 8).  In previous years, the percentages were similar, with a

slightly lower percentage of offenders receiving sentences of 10 years or less (49% of 67 cases

---

[4]      Available at <www.dhra.mil/Portals/52/Documents/perserec/reports/TR-17-
10_The_Expanding_Spectrum_of_Espionage_by_Americans_1947_2015.pdf?ver=2018-02-14-
073446-943>.

The Defense Personnel Security Research Center ("PERSEREC") "is a Department of
Defense entity dedicated to improving the effectiveness, efficiency and fairness of DOD
personnel suitability, security, and reliability systems," and is part of the Office of the Secretary
of Defense. *See* http://www.dhra.mil/perserec/.

REDACTED / CLEARED FOR PUBLIC RELEASE

between 1947 and 1979, and 49% of 72 cases between 1980 and 1989). *Id.* And, while the report noted that the percentage of offenders who received no prison sentence declined steadily between the 1940s and the present (from 22% of the early cohort to only 4% of the later cohort), the percentage of offenders who received sentences over 10 years also "generally declined over time as espionage drew somewhat lighter sentences." *Id.* at 42. In particular, the report notes that only four out of 66 offenders in the recent cohort received life sentences as compared to about triple that rate in the earliest cohort. *Id.* And, of course, those few offenders who have received life sentences for espionage in the last quarter-century include well-known offenders like Robert Hanssen and Aldrich Ames, whose crimes were undoubtedly of far greater scope and caused far greater damage than the offense here.

Moreover, an earlier version of the PERSEREC Report (published in 2002 and comprehensively studying espionage offenses committed by United States citizens between 1947 and 2001) elaborated on the factors that differentiate between offenders, and observed that:

> Prison sentences for espionage or attempted espionage varied depending on factors such as the importance of the information lost, the length of time of the spying, the venue of the trial (military court martials have tended to mete out longer sentences), the then-current policies of the federal government on espionage prosecution, the context of the time (e.g., wartime or peace, chilly Cold War or détente), and the then-current relationship of the United States with the country that received the information (some were neutrals or allies of the U.S.).[5]

Applied to the facts of this case, nearly all those factors place this case toward the low end of the culpability spectrum: the information disclosed is of relatively little value, the conduct occurred over a very short period of time, the case is in civilian court, and the United States and

---

5       *See* Herbig, Katherine L. & Wiskoff, Martin F., *Espionage Against the United States by American Citizens 1947-2001* (Defense Personnel Security Research Center, Technical Report 02-5, July 2002 at 24.

REDACTED CLEARED FOR PUBLIC RELEASE

China are at peace with one another. It is true that the United States and China consider themselves geopolitical competitors, which makes the instant offense perhaps more serious than those involving allies, but that is only one factor and appears to differentiate only a small fraction of espionage cases. At bottom, there is simply no factual basis in these factors or the facts of this case on which to equate this case with the one-third of espionage cases that have received a sentence greater than ten years. Imposing such a sentence in this case would therefore create an unwarranted sentencing disparity.

III. **Mr. Mallory's History of Service to His Country and His Community Support a Variance In This Case.**

Mr. Mallory is 61 years old, and the sentence requested by the government in this case would effectively result in a life sentence. That would be an overly harsh and unjust result.

The Court is well aware that Mr. Mallory has devoted the majority of his career in the intelligence community and has spent substantial time overseas. His career goals were always to serve this country, not hurt it. Indeed, one of his colleagues, Kevin Mclane, who served with Mr. Mallory in Iraq, wrote in his letter to the Court, "Kevin Mallory was in Iraq to help save American lives, not to further his career." In fact, at one point while serving in Iraq, Mr. Mallory was captured and "hung by his arms and beaten for 48 hours" by insurgents before he managed an escape. PSR ¶ 84. He has had multiple surgeries as a result.

In the letters attached as Exhibit 2 to this Sentencing Memorandum, Mr. Mallory is also universally described as a loving father, a devoted family man, and an extremely active participant in his church community. Two examples of his conduct in his community are emblematic of how so many people feel about him. First, in the wake of Hurricane Sandy, Mr. Mallory drove with several of his children to provide assistance to residents suffering from the damage caused by the storm. As Ms. Chao wrote, "[i]t is instances such as this that truly

inspired those around Kevin, including myself, to also engage in self-less acts of service to others." Second, I-Ming Wang wrote that when he had gall bladder removal surgery, "Kevin was the one who took me to the hospital, waited there and drove me home since my wife was in her last stage of pregnancy and wasn't able to do that." These examples illustrate that Mr. Mallory's character is not defined by the underlying convictions.

It is no doubt true that "one of the most difficult and thankless responsibilities of a district judge is to pass sentence upon a defendant." *United States v. Tocco*, 200 F.3d 401, 436 (6th Cir. 2000). In performing that solemn duty in this case, and "[i]n deciding what sentence will be 'sufficient but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a)," we ask that the Court "have a 'generosity of spirit, [and] that compassion which causes one to know what it is like to be in trouble and in pain.'" *Singh*, 877 F.3d at 121 (quoting Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.*, 142 U. Pa. L. Rev. 513, 513 (1993)). A sentence of no more than 120 months would be sufficient to satisfy the goals of sentencing in this case.

Respectfully Submitted,

KEVIN PATRICK MALLORY
By Counsel,

Geremy C. Kamens
Virginia Bar No. 41596
Todd M. Richman
Virginia Bar No. 41834
Attorneys for Mr. Mallory
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0848 (telephone)
(703) 600-0880 (fax)
Geremy_Kamens@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2018, I delivered the foregoing pleading to the Classified Information Security Officer (CISO), who will deliver the pleading to opposing counsel and the Court.

Geremy C. Kamens
Virginia Bar No. 41596
Todd M. Richman
Virginia Bar No. 41834
Attorneys for Mr. Mallory
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA  22314
(703) 600-0848 (telephone)
(703) 600-0880 (fax)
Geremy_Kamens@fd.org

-16-

Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:17-cr-154 (TSE) |
| | ) | |
| KEVIN PATRICK MALLORY, | ) | Sentencing: September 21, 2018 |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DECLARTION OF HARRY P. COOPER

I, Harry P. Cooper, in accordance with 28 U.S.C. § 1746, hereby declare as follows:

1. I am over 18 years old and currently work as a Consultant on National Security Policy including classification. I spent 25 years at the Central Intelligence Agency and my primary duties involved responsibilities related to the classification of information.

2. Given my background and expertise, defense counsel has asked that I review the information pertinent to this case to opine upon the seriousness of the harm caused by the offense, as it is relevant to evaluating the nature of the offense under 18 U.S.C § 3553(a) *et seq.*

3. **Summary of Opinion**: Based on the analysis of the information that is provided below, it is my expert opinion that the information that was provided to Chinese Intelligence is information that has already been released officially by the US Government. My analysis was based on the premise that the harm to US National Defense is defined as information provided to a foreign adversary that would cause that adversary to take actions to prevent intelligence collection, identify intelligence officers or identify that country's citizens who may be providing information to US intelligence. This is a fairly low bar in that any information not readily available to a foreign nation that is specific enough to act upon can be considered damaging. The information in this case, however, is not specific, lacks the credibility of official documents,

REDACTED - CLEARED FOR PUBLIC RELEASE

and reflects only information already available in great quantity in the public domain. In my analysis I could not make any reasonable argument that the information provided, either in the document that was a purported "Table of Contents" or in the document prepared by the Defendant as a "White Paper" contained any information that was not available elsewhere. I considered in this analysis that the Defendant's access to actual classified information ended more than 5 years prior to the disclosure of his self-generated documents. Documents officially released by the CIA and DIA during those intervening 5 years contained substantially better and more accurate information than the documents the defendant provided. It is, therefore, my opinion that the disclosure of information contained in the two documents themselves did not risk any harm to U.S. National Defense, regardless of whether it is identified as National Defense Information (NDI). I provide in this Declaration extensive footnotes and references to exhibits. In addition to that information, my searches of released documents and other credible information in the public domain revealed hundreds of thousands of documents that provide similar information to that which is alleged to have caused harm to national defense.

4. The two documents specifically analyzed for purposes of this Declaration are identified as "Table of Contents" [Government Exhibit C 9-3E, copy attached as Exhibit A] and a "white paper" titled _____ [Government Exhibit C 9-3E1, copy attached as Exhibit B]. My conclusions regarding the potential harm caused by disclosure in 2017 of those documents to Chinese intelligence are set forth below.

5. **Government Exhibit C 9-3E** titled "Table of Contents": This document is a handwritten document that does not appear to have been created either by or for the US Government. At the time of transmission, the document was not marked as classified and has no other indications that it is an official government document of any kind. In assessing the harm to national defense that

REDACTED - CLEARED FOR PUBLIC RELEASE

might have occurred from the compromise of this document, I note that the document lacks the credibility of an official document.  Also noteworthy is the fact that the Defendant lost official access to government classified information in 2012 when he left federal service, and this document appears to have been prepared or provided about 5 years after the termination of the Defendant's opportunity to access new classified information.  Looking at the document and with the context that it was handwritten by a former federal employee who had been more than five years from official access to classified information, I am able to provide the following analysis:

a) On this document an entry labeled as _____ is found.  That statement alone, with no additional information, merely indicates that some information may be available that reflects an opportunity of _____ _____ When analyzing the potential that this information might do harm to the national defense, I considered the following factors:

-3-

REDACTED / CLEARED FOR PUBLIC RELEASE

- o   The entry on this handwritten document was made by someone who had not had

   access to current classified information for over 5 years,  and

- o   There is no information suggesting this tiny bit of information was derived from

   any then-currently classified government document.

The entry is not sufficient to draw any conclusion that such an

activity is actually ongoing and the information does not reveal how this intelligence

method would be carried out.  When trying to determine the harm that could be expected

---

[2]  *See* 2017 Report to Congress; U.S.-China Economic and Security Review Commission; One
Hundred Fifteenth Congress; available at http://www.uscc.gov.

from this information falling into the hands of the Chinese the following factors must be considered:

- The document itself lacks the credibility of an official US document. Even if created by a former intelligence officer, there is no way to ascertain its accuracy.

- Within the four corners of this document with only the context being the role of the defendant 5 years prior to the compromise, the facts purported to be provided include

- With respect to this intelligence method the public record is replete with much more detailed information that has much greater credibility than what is found in this entry in the "Table of Contents."

- The intelligence method "Commercial Cover," in order to be legal for U.S. intelligence agencies, must be supported by federal law. This legislative authorization has found its way into many laws pertaining to the personnel and budget of the US Intelligence Community including 50 U.S.C.A § 3523 (covering the CIA) and 10 U.S.C. § 431 (covering the DIA).[3]



o

This level of detail far exceeds that disclosed in
the Table of Contents.

o   Defense Exhibits already provided in this case including 10B-1, 10C-1,
    10C-2, 10C-3, 10C-4, 10C-5, 10C-6, 10C-7, 10C-8, 10C-9, 10C-11, 10C-
    12, 10C-13, 10C-14, & 10C-15 provide substantial detail

-7-

- A book by renowned former CIA official Mark Lowenthal[7] provides tremendous detail ⬚ and the book was approved by the CIA in accordance with Mr. Lowenthal's secrecy agreement.   Mr. Lowenthal has much greater credibility than the defendant, his books are well regarded by intelligence scholars and there is every reason to believe that virtually every intelligence agency on the planet has read his work to gain insight into US intelligence sources and methods.

c) The next entry on this "Table of Contents" is labeled as "#3 FISA".  Because this entry simply refers to the Foreign Intelligence Surveillance Act, a well-known and

---

[7] *See* Mark M. Lowenthal. *Intelligence From Secrets to Policy*; Sage Publications (7th Ed. 2017)⬚ (copy attached as Exhibit F).

-8-

publicly available federal statute, my analysis is that disclosure of this information, without further detail, could be of no harm to national defense or national security.

d) The next entries on the "Table of Contents" that are labeled as "#4 - #7" include the text "[    ] Capabilities (A) (3pgs), (B) (6pgs), (C) (3pgs) & (D)(2pgs)." The term

[    ] The entries on the Table of Contents suggest some discussion of this intelligence service's capabilities will be provided in 14 pages. Again in this entry the document is not an official document, the number of pages purported to be available do not appear to represent all the U.S. knows about [    ] and there is absolutely no detail provided as to what capabilities might be included on this list. It is extremely hard to find any argument for why the purported fact that the Defendant had access to 14 pages of information on [    ] capabilities would cause harm to US National Defense or National Security. Further, looking at information that should already be available to the Chinese on this topic, I conducted the following analysis:

- The scope of this potential compromise is limited to an intent to provide information consisting of 14 pages on the topic [    ] capabilities."

o  It is my opinion that the amount of information available in the public domain

provided by credible sources, including by the CIA and DoD, leaves no

reasonable doubt that no harm was done by the compromise of the information in the Table of Contents, which suggested that a former CIA employee might provide 14 pages of information on _____ capabilities. This is a distinct question from whether disclosure of those 14 pages themselves could cause harm, an issue on which I express no opinion in this Declaration. The issue addressed in this Declaration is whether disclosure of the Table of Contents to the Chinese could cause harm; with respect to the entries relating to _____ the question is whether disclosing the fact that 14 such pages existed and might be disclosed to Chinese intelligence could itself cause harm. On that question, it is my opinion that disclosure of the information regarding _____ in the Table of Contents to Chinese intelligence would not have the potential to harm national security.

e) The final entry on the document referred to as "Table of Contents" is shown as #8 "FISA Slugs." The FISA is a public law so the fact of its existence is not protected in any way. Slugs are the indicators in official US government messaging system that aid both systems and humans in routing these messages to all appropriate recipients. While some of the actual SLUGS (routing indicators) might reveal a classified entity, the fact that these routing indicators exist or that there may be specific routing requirements for messages pertaining to FISA is not sensitive.

   o It is therefore my opinion that the entry "FISA Slugs" does not provide any detail and does not reveal an administrative method for disseminating messages that would, if known to a foreign intelligence service, cause any harm to the national defense.

-11-

6. **Government Exhibit C 9-3E1** titled "White Paper." This is a typed single-page document that does not appear to have been created by or for the United States Government. It does not reference any U.S. government agency. While black marks on this document may appear to be crude redactions of former classification markings, there is no evidence on the document (or anywhere else, to my knowledge based on the trial evidence) to suggest it was ever classified by the US government at the time of transmission or that any markings that may have been applied to it were actual, authorized classification markings. The paper has line numbers (added for the legal proceedings) and has four topics that are bolded. These topics and the text that the US government believes to be sensitive will be analyzed individually below:

a) **Overview** (lines 1-6): These lines purport

At lines #3 and #6

and this information was identified as sensitive by US government reviewers.

REDACTED / CLEARED FOR PUBLIC RELEASE



REDACTED / CLEARED FOR PUBLIC RELEASE

b) **Concept of Operations** (lines 7-10): The information in lines 7-10 appears to be identical to

the information in lines 1-6 with the exception

For example, information-handling

procedures (such as the United States classification system, which generally forbids discussion

of classified information outside of approved areas and approved channels) exist in part to

prevent disclosure by a person whose information (such as email account password) may be

compromised without their knowledge.  In sum, while a significant amount of text in this section

has been identified as being sensitive, there are really no discernable facts in this text upon which

This is particularly true

in light of similar information in the public domain:

-14-





d) **Collection Opportunities** (lines 17-22): The text highlighted in this part of the "White Paper' provides a list of the kinds of collection interests such an operation might be focused on. The subjects listed, however, would not reveal anything to the Chinese that they did not already know, in light of information released by the U.S. government and available in the public domain:

○ Defense Trial Exhibit 10D-3, the Secretary of Defense Annual Report to Congress 2017, at Chapter 3 (pg 49, *et seq*) reveals U.S. interest in China's "Space & Counter Space" initiatives as well as radar and stealth technologies. This document also discusses in length Chinese Science and Technology goals in support of military modernization including development of laser technology. The fact of U.S. Intelligence interest in any of the many topics in this 80 page report to Congress is thus well known to Chinese

-16-



Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and accurate to the best of my knowledge, information and belief.

Executed on September 13, 2018
Alexandria, VA

Harry P. Cooper

-17-

Tab A

# Table of Contents

#1   S & T Targetting Opportunity   ( 2 pgs)

#2   Commercial [____] to Clins   (15 pgs)

#3   FISA   ( 7 pgs)

#4   [____] Capabilities (A)   ( 3 pgs)

#5   "   (B)   (6 pgs)

#6   "   4 (C)   ( 3 pgs)

#7   4   4 (D)   ( 2 pgs)

#8   FISA SLUGS   (1 pg)

GOVERNMENT
EXHIBIT
C 9-3E
1:17-cr-154

Provided to KEVIN PATRICK MALLORY in
United States v. Kevin Patrick Mallory,
Crim. No. 1:17-CR-00154 (TSE)
CIA 000028

Tab B

UNCLASSIFIED

Provided to KEVIN PATRICK MALLORY in
United States v. Kevin Patrick Mallory, Crim.
No. 1:17-CR-00154 (TSE)

S&T Targetting

#c6pgs (3)

GOVERNMENT
EXHIBIT
C 9-3E1
1:17-cr-154

DIA0000015

UNCLASSIFIED

DIA0000016



Tab C

Tab D



Tab E



Tab F



# Intelligence

## From Secrets to Policy

### Seventh Edition

Mark M. Lowenthal



 

FOR INFORMATION:

CQ Press
An Imprint of SAGE Publications, Inc.
2455 Teller Road
Thousand Oaks, California 91320
E-mail: order@sagepub.com

SAGE Publications Ltd.
1 Oliver's Yard
55 City Road
London, EC1Y 1SP
United Kingdom

SAGE Publications India Pvt. Ltd.
B 1/I 1 Mohan Cooperative Industrial Area
Mathura Road, New Delhi 110 044
India

SAGE Publications Asia-Pacific Pte. Ltd.
3 Church Street
#10-04 Samsung Hub
Singapore 049483

Senior Acquisitions Editor:  Carrie Brandon
eLearning Editor:  John Scappini
Editorial Assistant:  Duncan Marchbank
Production Editor:  David C. Felts
Typesetter:  C&M Digitals (P) Ltd.
Copy Editor:  Jared Leighton
Proofreader:  Jeff Bryant
Indexer:  Karen Wiley
Cover Designer:  Scott Van'Atta
Marketing Manager:  Amy Whitaker

Copyright © 2017 by CQ Press, an imprint of SAGE Publications, Inc. CQ Press is a registered trademark of Congressional Quarterly Inc.

All rights reserved. No part of this book may be reproduced or utilized in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the publisher.

Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Names: Lowenthal, Mark M.

Title: Intelligence : from secrets to policy / Mark M. Lowenthal.

Description: Seventh edition. | Los Angeles : CQ Press, [2017] | Includes bibliographical references and index.

Identifiers: LCCN 2016030817 | ISBN 978-1-5063-4256-6

Subjects: LCSH: Intelligence service—United States. | Intelligence service.

Classification: LCC JK468.I6 L65 2016 | DDC 327.1273—dc23
LC record available at https://lccn.loc.gov/2016030817

This book is printed on acid-free paper.



17 18 19 20 10 9 8 7 6 5 4 3 2



"Mark Lowenthal's Intelligence: From Secrets to Policy is a marvelous guide to the discipline's concepts and theories, and it keeps getting better with each edition. It is nuanced and comprehensive without losing sight of the big picture—that is, the key points that every scholar and practitioner must understand when it comes to the real world of strategic intelligence. Whether as an intelligence analyst, a manager, an overseer on Capitol Hill, or an outside scholar, Lowenthal has been there, done that. He brings a superb sense of realism and practicality into his book, while at the same time tapping into the most important scholarly research on the topic. Bravo!"

Loch K. Johnson, *University of Georgia*

"Intelligence: From Secrets to Policy remains the standard by which all other intelligence studies textbooks should be evaluated. Each chapter covers its topic clearly and concisely, conveying the information within with just the right amount of detail; the sidebar boxes offer excellent topics for classroom discussion. The book is comprehensive and covers topics that are themselves each book worthy."

Greg Moore, *Notre Dame College*

"Lowenthal's Intelligence: From Secrets to Policy is a comprehensive text that reflects current events and new developments in the field. It is able to introduce difficult to understand concepts in ways that students are readily able to comprehend."

John Comiskey, *Monmouth University*

Mark M. Lowenthal has over forty one years of experience in U.S. intelligence. He has served as the Assistant Director of Central Intelligence for Analysis and Production, Vice Chairman for Evaluation on the National Intelligence Council; staff director of the House Permanent Select Committee on Intelligence, office director and as a Deputy Assistant Secretary of State in the State Department's Bureau of Intelligence and Research (INR), and Senior Specialist in U.S. Foreign Policy at the Congressional Research Service, Library of Congress. He is now the President and CEO of the Intelligence & Security Academy, an education and consulting firm. Dr. Lowenthal received his BA from Brooklyn College and his PhD in history from Harvard University. He serves as an adjunct professor at the Johns Hopkins University; the National Intelligence University; and Sciences Po (Paris). He was an adjunct at Columbia University from 1993–2007.

Instructors, sign in at college.cqpress.com/sites/intel-resources for additional resources!






(S)SAGE | CQPRESS
www.cqpress.com

SUSTAINABLE FORESTRY INITIATIVE
Certified Chain of Custody

ISBN 978-1-5063-4256-6

9 781506 342566





Tab 7

Tab H

Tab I

Tab I

Exhibit 2

September 3, 2018

Dear Mr. Ellis:

My name is Aborn Chao. I have had the great pleasure of knowing Kevin Mallory for nearly seven years. In my opinion, Kevin is a very dedicated person. Kevin is dedicated to his country, fellow-men, and family. Kevin is also a loving father and husband, and has been a role model to not only his family, but to many others whom he has met and known.

As one example, I often remember Kevin as leading by example. Kevin was usually one of the first arrive at an event, and one of the last to leave. He is self-less in every sense of the word, and constantly puts his fellow-men first before himself. In doing so, Kevin was often seen in the service of others, and is constantly seeking opportunities to serve. It is therefore of no surprise that Kevin volunteered to serve in the military, putting his life at risk for his country so that we may all continue to enjoy the freedoms that this country gives to us all.

Additionally, I believe that one of the reasons why so many people have such a high regard for Kevin is because of his strong Christian background. I believe that his Christian roots have played an integral part of him being such a dedicated, self-less and honest person, and loving father and husband. For instance, I can fondly recall the time of when hurricane Sandy devastated the eastern seaboard in October 2012, leaving a path of destruction from Florida up to Maine. Some of the hardest hit states reported at the time were New Jersey and New York. Once the hurricane had dissipated, and when the time came for seeking volunteers to head to New Jersey and New York to assist with the clean-up and to provide much needed aid, Kevin immediately volunteered without hesitation. Not only did Kevin travel to the devastated areas of the hurricane, but his sons also went with him. To my recollection, their service spanned the course of several days in multiple trips. It is instances such as this that truly inspired those around Kevin, including myself, to also engage in self-less acts of service to others.

I truly have a high regard for Kevin. I strongly believe that the influences of love, compassion, service, honesty, and integrity that he has had on myself and those around him will never be forgotten. I believe that these are just some of the many reasons why Kevin is such a dedicated person, loving father and husband, and role model to all of us.

Sincerely,
Aborn Chao

To Whom It may Concern,

This is to state that Mr. Kevin Mallory, and his wife Mariah Mallory used to be a pair of very active, loving and respectable members of our Church – Church of Jesus Christ of latter Day Saints.

Brother Kevin Mallory, as we have called him, used to serve our Church in multiple functions. The most impressive facts were when he served as young men's leader and home teacher to the newly baptized members. He lead our young men in different occasions such as canoes and cliff climbing, teaching those young men the techniques in facing difficult environments and the spirit to cooperate in working together.

Both Brother and Sister Mallory will lead our Chinese Branch's Young men and Young women's group to attend the annual summer camp which was organized by church. The main trainings are helping the under privileged to rebuild their houses, to environmental cleanings, etc.

I had several chances to go together with him to conduct home teaching for new members of the Church. During the conversation with the person he home taught, he never forgot to advise him the important behavior a new member should do – loving people, serving people and honestly pay your income tax. The reason he mentioned about income tax was that he understood some of the new members might also the new immigrants who were from a country where tax was not a serious law and the citizen always had a chance to avoid pay tax out of a certain earnings. The way he taught our new members made me respect him and appreciate his deep concern about the situation of those new immigrant who could otherwise violate the law in the United States.

His wife, as we call Sister Mariah Mallory, has been young women's leader of the Church, has also been a very devotional member. Our young women, the teenaged members, always considered her as their elder sister. Whenever there was a festival such as Christmas Eve, Chinese New Year's Eve or Moon Festival, she was always the person to organize the program such as Chinese dances or songs for those young girls to perform. They loved her too.

Since there is another Chinese branch was established in Virginia where the couple live, they were transferred to the new branch. Their supports without reserving any efforts made the new branch a great success. What makes my wife and I appreciate is that even though they then belong to a different branch, they still come back to our branch whenever we have a special cultural activity. So our friendship has never been fading.

That's what we know about Brother and Sister Mallory, the couple with good character by nature.

Andrew and Charlotte Shen
Montgomery Branch
Church of Jesus Christ of Latter Day Saints

To Judge T. S. Ellis

September 2, 2018

Your Honour,

My name is Hai-I Nancy West. Mariah Mallory and I have been friends more than 30 years. We were coworkers at the LDS church office in Taipei and went to the same ward when we were single. When Mariah was married to Kevin Mallory, I started to have the chance to meet and get to know more about Kevin.

Though we have never lived nearby to each other, the Mallory's come to visit Utah about once a year. With each visit we stayed together and did activities or dined.

I observed Kevin was a good father and family man. He was attentive to his family's needs and wellbeing. He liked to get involved with his children's activities and provides the best experiences he could. When our two families were out playing, we had so much fun because Kevin knew how to make activities interesting.

Also, Kevin was a generous person. In the past, when we were on trips together, he was sensitive of my income and was willing to pay for the spending, so that Mariah and I could spend time together.

Kevin might not be the warmest person I have met; however, he is a good person in heart. I see him striving to provide for his family and trying to spend precious time with them on their family trips.

This is my earnest testimony. If you have further questions, please feel free to contact me at ▓▓▓▓@gmail.com.
 Sincerely,

Hai-I Nancy West

Your Honor,

My father is a good man. He is a hard worker and will always do his best to help and serve others, especially his family and God. As his son, I have emulated those qualities growing up, especially his charitable love.

An instance in my life that has inspired me to look up to my dad was a service opportunity in New Jersey. This is the year super storm Sandy hit the East Coast.

We went up as a part of our church organization and my dad became the natural leader and helped guide everyone. He always asked and tried to do anything to help. Whether is was an easy or hard task. He sought out those in need.

I understand my dad is human and humans are not perfect, but I also understand that my dad has a good heart and is loyal. Toward his God, family, and country.

I hope you can see these qualities in my father and know that his good heart has good intentions.

What's most important is that the truth comes out.

I would like to ask you personally if I can be permitted to embrace and be with my father before he is possibly detained. In the near future, I am serving a religious mission for the next two years.

And it would be a unforgettable blessing to have a last moment with my Dad. I know he misses his family as much as we miss him. I'm sure you can understand that.

Thank you for you time and effort in this trial, both legal and emotional.

With warm regards,

Jeremiah Mallory

Honorable T. S. Ellis, III
U.S. District Judge

Dear Judge Ellis,

I am writing to you on behalf of Kevin Mallory. My name is Kevin McLane
and I met Kevin in 2004 while we were both working in Al Basrah, Iraq. I testified on behalf of Kevin
during his trial and to be honest I am pretty sure I did not help.

Kevin Mallory would never act against our country, never. He may have made a mistake in
judgment, but he is, and will always remain a loyal American. Kevin and I spent many hours together
while working in Iraq. We were both frustrated by the lack of direction, mission objectives and a
general malaise that set in during our deployment. We were a few Americans working in a British
controlled section of Iraq. Our British partners had invaded Iraq before and seemed to know how this
war was going to end. I came to understand what made Kevin tick, he was a family man, with a deep
faith in God. Always working, never sitting still.

Kevin did not enjoy a close relationship with my CIA colleagues, they resented his efforts to
identify and recruit human intelligence assets. Since I had worked in Pakistan and Afghanistan prior to
Iraq I understood the "way things get done", Kevin really didn't care that the CIA shunned him, he
knew that he was on his own, but he plodded along anyway. As an example, I had a very important
task that I need to accomplish and asked our Chief of Base for help. He declined. I went to Kevin and
he helped me. Kevin Mallory was in Iraq to help save American lives, not to further his career.

After I returned from Iraq, I spoke to Kevin several times on the phone and met him for lunch
once. I think Kevin was working for a "government contractor" but he seemed unhappy with the
mindless meetings and lack of organizational impact. I believe that living and working in a war zone
changes you, no one returns home a better person. It is a constant struggle when you return, some
people are better suited to cope with the lasting impact, most are not. Sometimes we make bad
choices because we don't have the same point of reference as we did before deploying, I don't offer
this as an excuse, just insight.

So now Kevin Mallory will be turned over to the Federal Bureau of Prisons. For punishment.
Since 2005 I have been visiting and supporting my stepson who is serving 20 years for a nonviolent
drug conviction at a medium security facility in Ray Brook, NY. Prior to Ray Brook, he served time in
Petersburg, VA, Ft. Dix, NJ and Big Springs TX. I have visited all of these prisons, witnessing the
human cost of our system of justice. And at 62 years old I am raising and supporting two
grandchildren that have no parents. Kevin Mallory has a family that will serve every day of his
sentence with him. All Americans need to visit a federal prison and see for themselves the cost of
minimum /mandatory sentencing, limited or near non-existent training, healthcare, and education.

I wrote to a Federal judge in 2005 prior to my stepson's sentencing. I was told that the letter
would be taken into account. It was not. I understand that you have very little discretion when passing
judgment on Kevin. I know deep down that you are also suspicions of our government. We all love our
country, but our government seems to be manipulated to serve individual political gains. I know the
government will allege that Kevin divulged the most damaging classified material in the history of
mankind, we both know that is not true. Please show mercy to a man that has earned it.

Respectfully submitted,
Kevin McLane
Millersville, MD 21108

Your Honor:

I am writing to urge leniency in the sentencing of my friend, Kevin Mallory.

I have known Mr. Mallory and his family for seven years, since we attended church together in Centreville Virginia. I am aware of the gravity of the crime for which he was convicted, but it is still difficult for me to believe that he was guilty of such a crime.

I have always known Mr. Mallory to be a kind and patriotic man. He was always the first to volunteer to provide community service. During hurricane Sandy, he took his sons to assist in the recovery efforts. He has also actively served in leadership positions in our church, always extending a hand of fellowship and service to those in the congregation.

Mr. Mallory is deeply committed to his family, always striving to provide the best for his wife and children. Unfortunately, due to this conviction the Mallory family risks losing not only their only source of financial support, but also a father figure just as the children begin to leave home for education and other pursuits.

I am unable to speak to the merits of the case against Mr. Mallory, but I have always known him to be a kind, service oriented man who is devoted to his family and his religion. Given this, I strongly believe that a lesser sentence is most appropriate in this situation.

Sincerely,


Lan Jiang

Your Honor,

I would first like to thank you for all of your time and effort that you have put into reading all of these character letters. It is more than greatly appreciated.

My dad is a very strong willed and caring person. All of the traits that my father portrays are not without faith and without the influence of God.
My father always puts God and others before himself and tries to do what is right. As I've gotten older, I have been able to see the discipline, humility and morals that my dad has displayed in myself.

Through every instance that I remember, my father was always there to help me learn in one way or another. He always thought that what we do should always have a purpose and he always completed every task that he started to the best of his ability.
My father always tried to help others out whenever he could, no matter what convenience it was to himself.

I remember this one time that my father was driving my brother and I home from practice. He already had a very long day and was not feeling to good and he was as ready as my brother and I was to go home. On the way home, he saw a man that was walking on the side of the highway who did not look like he had a lot or a home to go to. My father pulled over on the side of the road and insisted on giving the man a ride to where ever he had to go. The man got into our car and my father asked him if he wanted any food or something to drink. The man said yes so, we made our way to our home first and my father made great conversation with the man and asked him how his day was going and where he was heading as we drove there. As my dad dropped off my brother and I at home, he gave the man something to eat and drink and they continued on their way. The man was very grateful, but my father was very humble and was just trying to serve others.

My father always tried to help people out no matter if he did not know them and in serving others, also served God. I know that my father is not a perfect man, but his intentions are good and pure. They are always aimed toward truth and towards helping others.
My dad always pushed me to keep striving to be better and was always behind me in every decision and things that I wanted to pursue.
All of the little things that my father portrayed and taught me have helped me grow into the young adult that I am now.

Through my father's compassion and humility, he has helped me see my self-worth as a daughter of God and as a growing individual. I hope you are able to see his self-worth too.

Sincerely,

M███████ Mallory

Your Honor,

Kevin Mallory is one of the most admirable men we know. He serves others tirelessly and he is always the first person to help set up at any event and the last one to leave because he is cleaning up messes that other people leave behind. Kevin Mallory is a man of integrity and honor. He is incredibly disciplined and we are aware that he worked from 3:30 AM to 6:30 AM in the morning part-time during college in order to help support himself. He has consistently maintained this discipline throughout his life, including the last 5 years during which we have come to know him most closely. Throughout his military and government career, as well as among his neighbors and fellow church members, he has proven himself to be honest, loyal, and truly caring of everyone around him.

His caring nature has been instrumental in helping both of us become better people ourselves. He has led by a strong example. We respect and believe in Kevin very much. Kevin is very meticulous and has always shown himself to do everything, even small simple tasks, the correct and proper way. We know Kevin to be very faithful and devoted, to his religion, to his family, and of course, to his country and fellow soldiers. Kevin Mallory is a true hero, given his impeccable military career including leading soldiers in the Special Forces. He has shown bravery and courage while being sent by the United States government and military to war-torn and developing areas throughout the world, including Afghanistan, Iraq, and China.

There are few other men that we regard more highly. Time and time again, Kevin Mallory has demonstrated his sincerity, love, and compassion for his wife, his children, his friends, and his fellow men. We are highly confident in his principled, ethical character and tremendously high standards for everything he does. He has been a pillar in the Northern Virginia community and always personally assists others in need, whether it is a much-needed car ride, a special visit at a critical time, or even runs to the post office or grocery store for those who can't get there on their own. It is a privilege to be associated with a fine man like Kevin Mallory.

Pi-Fang Tu and Sergey Purtsezov

To the Honorable Judge,

We have known Zhiping Mao for the last eight years. My family and I would like to share with you what we know about him and some stories about him.

Zhiping is a good brother, a good father, a good husband and a good soldier. He is also a person who loves his country and community passionately. During the last eight years, I learned that he has a steadfast faith. He is also a decisive, brave person and is able to execute tasks. Zhiping did not grow up in a wealthy family. Since young, he has learned to be independent; working hard to support himself. He believed that hard work can change a person's life. His military training enhanced his independence and efficiency at work. It has also helped him develop many wonderful virtues.

I often saw him serving quietly. In every activity, Zhiping was always the first one to arrive and help with set up. He was also the last one to leave, helping with clean-up and emptying the trash cans. For several summers a few families, including ours, would go camping and canoeing. His family was always the first one to arrive. He led his own children to help everyone else to secure their camp sites. Later, he would help others set up their tents. At the end of each camping trip, he was always the last one to leave because he wanted to make sure that there was no trace of trash left behind on the ground. He didn't say why he was doing it. However, we could tell that he really loves the environment and didn't want the ground to be trashy.

The way he did things is not like some people who just talk big. He would roll up his sleeves and actually do it. Once on a cold and windy day, when people were leaving church and rushing to enter into their own cars, I saw him walking across the street and talking to a ragged homeless man. He asked the man what help he needed. Later, I saw him bringing out cash to give the homeless man to buy some food. It moved me greatly because I know he rarely took his own family to go out to restaurants. Here he was so generous to a stranger. He is very thrifty and doesn't waste money on pursuing personal pleasures. He loves his family. He is very heavily involved in his children's education and extracurricular activities so that they would learn different skills and how to be independent and take initiative.

I remembered when my kids were young, during Memorial Day and Independence Day, Zhiping would ask our kids what the meaning of these holidays are and remind them of their importance. I saw the pride of being an American solider in him. One time I had a kidney stone. It was so painful that I went to the emergency room. Later when I described the excruciating pain to him, and told him I thought of dying, he shared with me about his intelligence mission experience in the Middle East war zone. During the mission, his own kidney stone flared up. He didn't want his where-about to be exposed and threaten the success of the mission. Therefore, he endured the pain and hid in a location where the enemy wouldn't discover him until his pain subsided. Then he continued to finish his mission. I highly respect his strong patriotic heart and his loyalty to accomplish his mission.

In him I saw the virtues of Christ, a steadfast faith and an independent spirit. I am so glad that our country has a soldier like him who is willing to sacrifice his life for his country. We love him and we support him.

Xu Family

尊敬的大法官

我和我的家庭想和您分享一些我們在過去的八年中所認識的朋友--毛治平，他和他的一些故事。

治平是一個好弟兄，一個好父親，一個好丈夫，一個好軍人，更是一個對國家和團體具有愛心與熱忱的人。在相處的八年中，我知道他有堅定的信仰，並且是果斷勇敢有執行力的人。治平在年幼時候家中並不富裕，從小就必須學習自食其力，勤奮的工作來維持自己的生活開銷，他相信靠自己努力可以改變人生，部隊的訓練使他更加獨立，做事更有效率，使他的具備多項美德。

我時常看到他默默的服務，在任何活動中，治平總是第一個到現場幫忙佈置的人，他同時也是最後一個人拿著垃圾桶清潔善後的人。有幾年的夏天裡，我們有幾個家庭會一同去露營和泛舟。他的家庭永遠是第一個到，他帶著他的孩子們幫大家把營地確定好並協助後來的家庭搭帳蓬。露營結束離開時，他一定是最後上車的人，因為他要確定沒有一個垃圾留在地面而沒有被清理乾淨。他沒說，但我們看得出來，他真愛這片土地，他愛它就像愛他自己的家人一樣，不要它被弄髒。

他做事的方式，不是像一些人將仁義之事掛在嘴邊，他是捲起袖子真正動手去做。一次在冷風颼颼的天氣，大家離開教堂正準備快快的鑽進車內回家，卻看到他走過街並走向路邊的一位衣褸襤衫無家可歸的男子，問他需要什麼幫忙，之後便看到他拿出一張鈔票給了那男子並打發他去買點食物。這感動了我，因為我知道他極少帶他的家庭上餐館享受大餐，他卻慷慨接濟陌生人。他很節儉，不浪費金錢尋求個人的享樂。他熱愛家庭，對子女的教育和課外活動都細心的培育，讓子女都學習到不同的技能，並且學習自立，做事自動自發。

記得當我家的孩子還小的時後，每當Memorial Day和 國慶日的時候，他便會問孩子們有關這些節日的義意和提醒他們國家的重要性。我在他身上看到他以身為美國軍人為傲的榮耀。一次我得了腎結石，疼痛難耐的去了急診室。事後我向他描述那無比的疼痛令我幾乎想死了算了，他告訴我，多年前他被派往中東戰區執行情報任務，在執行任務當中腎結石發作，他因不願曝露行蹤破壞了任務，只能咬牙忍痛的躲在不被敵人發現的位置，直到一天將近疼痛漸緩後，繼續執行並完成任務。我對他的強烈愛國心及忠貞完成任務的精神肅然起敬。

在他的身上我看到基督的美德，堅定的信仰和獨立不撓的精神。我慶幸我的國家有像他這樣勇敢願意為國奉獻的軍人。我們愛他，也支持他。

須家庭

To the Honorable Judge T.S. Ellis,

Hello! With a grateful heart, I represent the Jin family to testify that Mr. Zhiping Mao is a loyal, honest person and he is willing to serve others. His heart is always full of pure love for others. On August 5, 2011, my husband Shuang Jin, PhD, had a heart attack and died suddenly. He parted from me and my son forever. I lost my beloved husband. My son lost his gentle and kind father. We were in deep grief during that time. Through the church's kind arrangement, Mr. Zhiping Mao brought his family to visit us and gave their love wholeheartedly. They gave us such great comfort and helped us finish Shuang Jin's memorial service and burial smoothly. Their help gave us so much peace during that painful and sorrowful period. Our whole family are very grateful for Mr. Zhiping Mao and his family. We also love them very much. Attached are the memorial service program for Shuang Jin, PhD, and his family pictures.

Thank you.

Sincerely,

Chenjingming Jin

尊敬的大法官 T.S. Ellis

您好！我怀着感恩的心，代表着金家庭来证实毛智平先生是位忠诚、诚实并乐意为他人服务的人，他一直是充满着对他人的纯真的爱...2011年8月5日，我的先生金爽博士因突发心脏病与我和我的儿子永别了·我失去相亲相爱的先生，我儿子失去了和蔼可亲的父亲，我们处在非常悲痛悲伤中·在教会温暖的按排下，毛智平先生带领着他的家人来到了我们身边，付出了他们全部的爱·给予我们极大的安慰安抚和帮助·圆满的完成了金爽博士的追思会及葬礼. 使我们从悲哀悲伤痛苦中获得了平安！我们金家庭非常感谢毛智平先生及家人！也非常爱他们！附 金爽博士追思会日程、金爽博士生前与家人照

谢谢！ 金陈稀明敬上

To the Honorable Judge,

I have known Zhiping Mao and his family for over eight years. Since we have similar age children and we have attended the same church and through our long term relationship and understanding, our two families have become very close friends. His devotion, honesty, kindness, passion, responsibility and helpfulness to others impress us deeply.

I remembered there was a strong storm one summer. Due to the continuous rain, the little stream behind our house quickly overflowed and the water entered into our basement. A lot of our possessions were underwater. Because it was the first time we experienced this situation, we were quite confused and didn't know what to do. When Zhiping Mao learned about our situation, he was the first person to come to our home. He brought with him his own small DE-humidifier. He didn't just comfort and encouraged us with his words, he also quickly took action and helped out. He helped us contact the related contractors to come to drain the water, clean and disinfect. He also called the insurance company to help us reduce our losses. He offered us a great amount of help so that we could get out the difficult situation quickly. The event happened a long time ago, however, we still feel grateful to this day for his eagerness to help. The most precious thing about him is that he doesn't just help the people that he knows well. When those whom he doesn't know well or a friend of a friend need help, he always tried his best to help out and sacrifice selflessly.

During the year we both served at the church, I personally had experienced many things. I also witnessed his noble character traits. He was always willing to serve quietly and didn't want others to know. He enjoyed organizing all different kind of community activities. He was the first one to arrive and the last one to leave and always offered his service and time.

My deepest impression of him being a church leader is that he always takes responsibility, putting high expectations on himself but is gracious towards others. He will not demand others to do things. He can do what others can't do and at the same time think that it is not a big deal. I deeply respect his steady perseverance and responsibility.

Since our children are similar ages, it gave our two families more opportunities to discuss the topics of family relationships and children's education. Therefore, I not only know Zhiping Mao from a friend's perspective, I can also understand him from a husband and father's perspectives. Through many years, I saw that he is full of love and responsibility towards his family. His is serious and strict in educating his children, not just academically but also in character building. His three educated, mature and excellent children are the pride of his life.

As a trusted friend over many years, the Zhiping Mao that I know is a devoted, honest, kind and passionate person. He is full of love towards his family, friends and community. He is devoted to the church selflessly and does not ask for anything in return.

Tonghui Jin

8-30-2018

尊敬的大法官，

我认识毛智平及其家人已超过八年了，因为小孩年纪相仿，而且我们又在同一间教会，长时间的接触和了解，使我们两家成为了非常要好的朋友，他的虔诚，正直，善良，热情，负有责任心和乐于助人给我们留下了非常深刻的印象。

记得有一年夏天，暴雨成灾。由于连续下雨，我家背后小溪水位迅速上涨，最后我们家地下室遭遇溪水倒灌，许多物品淹没水中，因为第一次碰到这种情况，大家都很慌乱而不知所措。毛智平知道后第一时间赶到我家还带来了自家的小型除湿设备，不但只是言语的安慰和打气，更是迅速展开实际的行动，帮助联系施工人员排水，除污，消毒。打电话给保险公司据理力争帮我们减少损失。他对于我们的帮助巨大，使我们能很快的走出困境。一直到事情过去很久，我们也会常常感慨他的热心肠。最为可贵的是，他帮助别人并不是只限于相熟的朋友，对于不太熟的朋友或是别人介绍的人需要帮助时他也总是不遗余力，无私奉献。

在教会共同服务的一年中，我也亲身经历了太多事情，也看到了他人品的高贵，而且总是愿意默默付出而不愿为人知。他热衷于各种社区活动组织，每次都是最早来最晚走，奉献自己的心力和时间。

做为教会的领导，他给我最深刻的印像就是他总是能以身作责，严于要求自己而宽以待人，他不会要求别人做什麼，他总能做到别人做不到的而且习以为常。那种持之以恒的毅力和责任心让我非常敬佩。

做为有相似年龄的孩子，也使得我们两家有机会在家庭关系和孩子的教育有很多共同语言，也让我不但看到了朋友角度的毛智平，更能从丈夫和父亲的角度去了解他。这麼多年以来，我看到的是他对家庭充满了爱和责任心，对孩子的教育严格认真，从不放松，不但是学业，更多的也是做人的品格。三个知书达理的优秀子女也是他一生的娇傲。

做为多年可以信赖的好友，我了解的毛智平虔诚，正直，善良，热情。对家人对朋友充满浓浓的关爱，对社区，对教会无私奉献而且从不求回报。

金彤辉

Tonghui Jin

8-30—2018

To the Honorable Judge Ellis,

As his family, we are very grateful that you give us this opportunity to share and testify for Zhiping. We can confirm he is someone who is loyal to God, loyal to his family and loyal to his country. He has many wonderful character traits: firm, loyal, kind, honest, obedient and willing to help others. As long as he is there, everything can be solved. That is my beloved husband Kevin.

I know that he learned and gained these character traits from three important places: his mother, religion and military. My late mother-in-law was a strong woman. She raised 9 children and finished her college at 50 years old. Later, she continued and finished her graduate school. His mother was a good example for Kevin.

When Kevin was 16 years old, through a missionary from the Church of Jesus Christ of Latter Day Saints he came to know God and joined the church. As of this year, 2018, it has been 45 years. I am also a member of this church. Because of the church, our lives are very disciplined. We don't smoke. We don't drink alcohol, coffee or tea. We don't use harmful drugs. We live according to the teaching of our church and we teach these principles to our children. Please allow me to share two of these teachings:

12. We believe in being subject to kings, presidents, rulers, and magistrates; in obeying, honoring, and sustaining the law.

13. We believe in being honest, true, chaste, benevolent, virtuous, and in doing good to all men; indeed, we may say that we follow the admonition of Paul—We believe all things, we hope all things, we have endured many things, and hope to be able to endure all things. If there is anything virtuous, lovely, or of good report or praise worthy, we seek after these things."

Kevin officially retired from military in 2010. He has over 30 years of military service. He is always proud of it. He is an excellent officer and received many awards. After 9/11, he was among the first who joined the team to protect the country. He was stationed in Iraq, Kuwait and Iran for 5 ½ years. He is a solider who would give his life for his country. Honorable Judge, I again stand before God that what I have given you is my personal testimony. I confirm that Kevin Mallory is a good person who is loyal to God, loyal to family and loyal to his country.

Thank you for your time and mercy.

Sincerely,

Mariah Mallory

Honorable Judge Ellis,

作為家人的我們,非常感謝你給我們機會分享,並且為智平做見証。証實他是位忠於神, 忠於家庭以及忠於國家的人。他擁有很多美好的特質, 堅定, 忠誠, 善良, 誠實, 服從, 以及樂於助人。只要有他在, 凡事都能迎刃而解。這就是我愛的丈夫Kevin．

我知道他從三個重要的地方學習並獲得這些特質。母親, 宗教以及軍隊。我已過逝的婆婆是位堅毅的女性, 扶養9位孩子長大, 並在50歲之後才完成大學學業, 並繼續拿到研究所的學位。母親是他的好榜樣。

Kevin在16歲時, 因耶穌基督後期聖徒教會的傳教士認識神並加入了教會。到今年2018年已經是45年了。我自己也是這個教會的成員。因為教會的關係我們的生活非常的嚴謹, 我們不碰煙、酒、咖啡,茶以及有害的藥物。而且我們依據著教會的信條生活, 並教導我們的孩子。請容許我分享其中的二個信條。

12We believe in being subject to kings, presidents, rulers, and magistrates, in obeying, honoring, and sustaining the law.

13 We believe in being honest, true, chaste, benevolent, virtuous, and in doing good to all men; indeed, we may say that we follow the admonition of Paul—We believe all things, we hope all things, we have endured many things, and hope to be able to endure all things. If there is anything virtuous, lovely, or of good report or praiseworthy, we seek after these things."

Kevin 2010年從軍隊正式退伍。他有30年以上的軍歷。他一直都以此為荣, 他是一名非常优秀的军官, 他也得過許多的殊榮。911之後, 他也是第一批加入保衛國家的戰隊。他在伊拉克, 科威特以及伊朗前後待了5年半的時間, 一位把自己的生死交給國家的軍人。

法官大人我再次在神前, 跟你做我個人的見證, 我証實Kevin Mallory 是位忠於神, 忠於家人和忠於國家的好人。

感謝你的時間和仁慈
Mariah Mallory
敬上

To Whom It May Concern,

I first met brother Zhiping Mao on a church camping trip. We were seekers at that time and he taught us enthusiastically how to set up a tent. He also told us how to tie a piece of white cloth on the tent's rope to ensure no one will trip over it. We learned from him the right way to camp and we felt brother Mao's deep care at that time.

Later when I joined the church, I often noticed him with the same attitudes toward the ministry of the church and its members – selfless and enthusiastic dedication: from the smallest thing of greeting everyone on Sabbath days to serving in the church's ministries, he was always trying his best. Even when his hands were injured or he was not feeling well, he would work hard and finish his tasks.

Brother Mao and Sister Nanhua both are loyal and devoted Christians. The couple have three children. Because of their wonderful examples, each of their children is gentle, polite and mature. They are truly a family to be envied. Even during this difficult time, the whole family still keeps their steadfast faith and tries their best to be God's children. It is such a hard thing to do!

I kindly ask you to review Mr. Mao's case carefully. Based on his uprightness and his eagerness to help others, I believe that you will be able to make a fair judgment and let Mr. Mao return to his wonderful family soon.

Sincerely

Hsiao-Ching Lu

敬啓者,

剛開始認識毛智平弟兄,是透過教會的露營活動。他非常熱心地教導當時是慕道友的我們,如何紮營,如何將白布條繫在紮營的繩子上以確保人不會被絆到。我們當時從他學習到露營的正確知識,也感受到毛弟兄他的細心照顧。

後來我加入教會後,常常看到他對教會的事工和成員就一如當初我對他的印象一樣-無私而熱心的奉獻:小至安息日對大家溫暖的問候,大至對教會事工的盡心盡力,即使自己手受傷或身體不舒服,他也是努力的完成。

毛弟兄和南華姊妹都是忠信而虔誠的基督徒。他們夫妻有三位兒女,因為他們作為好榜樣,所以他們的孩子也各個溫和有禮又懂事。這真是一個非常讓人羨慕的家庭。即使在此艱難的時刻,他們一家還是秉持著對主的信心,盡力做好主的兒女,這是多麼不容易的事情啊。

懇請您仔細審查毛弟兄的案件。基於他正直又熱心助人的為人,相信您可以做出正確而公道的判斷,讓毛弟兄早日回到他溫暖的家。

Hsiao-Ching Lu

敬上