IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:17-CR-00154 (TSE) |
| | ) | |
| KEVIN PATRICK MALLORY, | ) | Sentencing Hearing: November 2, 2018 |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S REPLY TO DEFENDANT'S POSITION ON SENTENCING**

The United States, by and through undersigned counsel, hereby files its Reply to the Defense's Position on Sentencing. For the reasons set forth below, as well as for the reasons set forth in the Government's original Positon on Sentencing, *see* Dkt. 211, life imprisonment remains the appropriate sentence in this case.

**I.     THE AUTHORITIES CITED BY THE DEFENSE DO NOT SUPPORT THE CONCLUSION THAT A LIFE SENTENCE IN THIS CASE WOULD REPRESENT AN UNWARRANTED SENTENCING DISPARITY**

**A.     Defendant's Cited Authority Fails to Support the Defense's Argument that a Ten-Year Sentence in this Case would be Appropriate**

Defendant cites to certain case law and reports as purportedly supporting his position on sentencing. They do not. *United States v. Kuo,* 1:08-cr-00179, and *United States v. Bergersen*, 1:08-cr-00122, both prosecuted in the Eastern District of Virginia, arose out of the same investigation. The defense mischaracterizes these cases by describing them as involving "two defendants convicted of conspiring to disclose national defense information to a foreign nation." Defense Position on Sentencing at p. 10 [Dkt. 213]. In fact, Kuo and Bergersen were convicted of

1

two different crimes.  Kuo was convicted of the same offense as Kevin Mallory, 18 U.S.C. § 794,
while Bergersen was convicted of a violation of 18 U.S.C. § 793(d) and (g) (Conspiracy to deliver
national defense information to a person not entitled to receive it), which carries a lesser maximum
penalty of ten years in prison.  Given the difference in penalties between these two charges, as well
as the different level of culpability of these two defendants, the reasons for the difference in the 57
month sentence that Mr. Bergersen received, and the 188 month sentence that Mr. Kuo received,
becomes much more readily apparent.

1.     *The Bergersen Prosecution*

Gregg William Bergersen was a Weapons Policy Analyst with the U.S. Department of
Defense in 2007 and 2008.  *See* Bergersen Statement of Facts, *United States v. Bergersen*, 1:08-
cr-00122 (LMB) Dkt. # 22, attached at Exhibit A, ¶ 2.  In 2007 and 2008, Bergersen conspired
with Tai Shen Kuo to communicate national defense information ("NDI") to persons not entitled
to receive it.  *Id*. at ¶ 1.  Bergersen had been duped into the belief that the classified information
that he was providing to Kuo was being provided to the government of Taiwan.  Unbeknownst to
Bergersen, Kuo was actually providing the information to the People's Republic of China ("PRC").
*Id*. at ¶ 5, 6.  During the course of the conspiracy, Bergersen passed classified information orally
on at least two occasions, and in writing on at least two occasions.  This information was classified
at the Secret level.  *Id*. at ¶ 6, 8, 22, 24.

There are a number of differences between the Bergersen prosecution and this prosecution.
First, none of the information in the Bergersen case was classified Top Secret, unlike some of the
documents that the Defendant conspired to pass to Michael Yang and the PRC.  In addition, almost

immediately after being arrested, Bergersen accepted responsibility and admitted his crimes.[1] Following his arrest on February 11, 2008 (Dkt. 7), Bergersen filed a joint motion for extension of time to indict on March 7, 2008 (Dkt. 16), and on March 31, 2008, he waived indictment and pleaded guilty to a criminal information.  (Dkt. 18, 20, 21).  Undoubtedly, Bergersen's prompt acceptance of responsibility had some bearing on the sentence that he ultimately received.  At minimum, he certainly benefitted from receiving a three-level reduction for that acceptance of responsibility.

2.    *The Kuo Prosecution*

The case of Tai Shen Kuo is analogous to the instant case, at least to the extent that the offense of conviction was the same.  Kuo was also convicted of conspiring to deliver NDI to the People's Republic of China.  His Guidelines sentence was lower than this defendant's because he only conspired to pass Secret, as opposed to Top Secret, documents.  Kuo's base offense level of 37 pursuant to § 2M3.1 (a)(2), coupled with a two-level increase for his role in the offense, and a three-level reduction for acceptance of responsibility, resulted in an advisory Guidelines sentence of 188-235 months.  *See* Excerpt of Sentencing Hearing Transcript, *United States v. Kuo*, 1:08-cr-00179, Dkt. 67, attached at Exhibit B, [pp. 5-6].  Kuo was sentenced to 188 months in prison.  Dkt. 53.  Therefore, at minimum, the *Kuo* case stands for the proposition that for this type of offense, a *within Guidelines* sentence is entirely appropriate.  In the instant case that would be life.  In the *Kuo* case it was 188 months.  But there is nothing about the *Kuo* case that supports the ten-year sentence that the defense is seeking.

The fact that the court sentenced Kuo at the low end of the Guidelines range was almost

---

[1] The Defendant in this case had an absolute right to proceed to trial and to contest the charges against him.  However, having exercised that right, he cannot now claim that his case is analogous to two defendants who accepted responsibility early and completely.

certainly driven in part by the fact that Kuo, like Bergersen, accepted responsibility and admitted his crimes almost immediately. After his arrest on February 11, 2008 (Dkt. 8), Kuo filed a joint motion for extension of time to indict on February 29, 2008 (Dkt. 19), and on May 13, 2008, he waived indictment and pled guilty to a criminal information. (Dkt. 41, 42, 43).[2]

### 3.    The Underwood Prosecution

The third case cited by the defense, *United States v.Underwood*, D.D.C. No. 11-cr-271 (2011), is from the District of Columbia,. In that case, Underwood pled guilty to one count of attempting to communicate national defense information to a foreign government. *See*, WL 3752987 (attached as Exhibit C). Underwood worked as a cleared American guard at the construction site of a new U.S. Consulate compound in Guangzhou, PRC. Exhibit C at p. 1. After suffering personal financial losses, Underwood concocted a scheme to sell information about, and access to, the U.S. consulate to the Chinese Ministry of State Security ("MSS"). Underwood drafted a letter outlining this plan for the MSS. Underwood "attempted to deliver this letter to the offices of the Chinese MSS in Guangzhou, but was turned away by a guard who declined to accept the letter." Exhibit C at p. 2. As part of this scheme, Underwood also took photographs of the consulate buildings. These photographs were later determined to have been classified at the Secret level. *Id*. Significantly, however, the "U.S. government . . . found no evidence that Underwood succeeded in passing classified information concerning the U.S. Consulate in Guangzhou to anyone at the Chinese MSS." *Id*.

---

2 In fact, not only did Kuo promise to cooperate with the government as part of his plea agreement, but he fulfilled that promise by testifying in the trial of one of his co-conspirators, James W. Fondren, on September 21, 2009. *United States. v. Kuo*, Dkt. 62, 63. In all respects, his cooperation was substantial and, accordingly, he received a Rule 35 reduction for that cooperation.

The *Underwood* case does not support the defense's argument that Kevin Mallory should receive a sentence of 10 years in prison.  First, Underwood was unsuccessful in even making contact with anyone in the Chinese government, let alone successfully passing any NDI.  Second, to the extent that he attempted to pass NDI, it was classified Secret and not Top Secret, and again, it related to security features of a building, not identities of human assets.  Third, Underwood pled guilty and accepted responsibility, thereby benefitting from the reduction for acceptance.

### 4.    The PERSEREC Reports

The defense also cites to two Defense Personnel Security Research Center reports ("the PERSEREC Reports") in its brief to make the argument that a ten-year sentence for this Defendant would avoid unwarranted sentencing disparities.  However, the defense does so without citing to the facts of any of the cases in those studies.  We do not know the offenses of conviction, the type of classified information at issue, whether the defendants pled guilty and cooperated, and whether the defendants were successful in revealing classified information to persons not authorized to receive it (including any adverse foreign governments).

In reviewing the 2017 PERSEREC Report, the aforementioned relevant information is difficult to find.  That is because these reports present a high-level view of different espionage cases over the years, without delving too deeply into the individual facts of specific cases.  Certainly, they do not delve deeply enough to allow for a meaningful comparison between this case and any of the cases in the study.[3]  It is also noteworthy that, while the 2017 Report offers

---

[3] And where the report does provide more case-specific facts, they support the government's, rather than the defense's, argument.  *See, e.g.*, 2017 PERSEREC Report at p.p. 122 – 125 in which *U.S. v. Gowadia* is cited as a case of both export violations and transmission of classified NDI, and where the penalty was a 32-year sentence in which Gowadia was initially sent to the supermax penitentiary in Florence, Colorado.

some suggestions about ways to improve specific espionage statutes by, for example, revising offenses such as § 794 "to eliminate inconsistencies and frame better laws that reflect the current context of cyber capabilities, the Internet and globalization," 2017 PERSEREC Report at p. 159, nowhere does the Report contend that the maximum penalty for a § 794 violation is too harsh.

Ultimately, what is most telling in the defense argument regarding unwarranted sentencing disparities is that it is unable to point to a single case that is analogous to this one where the defendant received a sentence anywhere close to ten-years. This is almost certainly due to the fact that no such cases exist. This is a defendant whose Guidelines sentence is properly set at life in prison; who conspired to pass NDI classified at the Top Secret level to Chinese intelligence officers; who succeeded in passing some classified NDI to those intelligence officers; and who is not entitled to receive the benefit of an acceptance of responsibility reduction.

## II.    NO DOWNWARD DEPARTURE IS WARRANTED IN THIS CASE

### A.    The Classified NDI that the Defendant Conspired to Deliver to the PRC was not of "Relatively Little Value"

The defense also argues that this case should be viewed at the low end of the culpability spectrum because "the underlying offenses resulted in very little harm to the United States," and "the information disclosed is of relatively little value." Defense Position on Sentencing at p.p. 1, 13.[4] In attempting to narrow the scope of the evidence that the Court should consider in sentencing this defendant by focusing only on the two documents that were actually delivered, the defense overlooks the fact that the offense of conviction is *Conspiracy* to Deliver National Defense

---

[4] In making this argument, the defense noted that Judge Brinkema departed downward in the *Bergersen* case, in part, due to the fact that she found that the information at issue was of relatively little value pursuant to USSG §2M3.1 App. Note 2. However, it should be emphasized that Judge Brinkema did not make that same finding in the *Kuo* case. *See* Exhibit B at p. 5. This may well have been due to the fact that Kuo was plainly the more culpable of the two defendants.

Information to a Foreign Government, not *Delivery* of NDI.  Therefore, it is plainly appropriate for the Court to consider not just the two documents that the Defendant successfully passed, but also all of the documents and information that he conspired to pass.

With regard to the two documents that were successfully passed, the second one was the White Paper involving the "Johnsons" that the Defendant labeled as "S + T Targetting (sic) in China."  GX 9-3E1.  He specifically informed Michael Yang that "S&T is science and technology."  GX 8-6, Row 64.  There was nothing about this document that can be characterized as being "of relatively little value."  It was a covert human asset operation utilizing "the Johnsons."  It involved targeting in the PRC, a fact that Chinese intelligence services would be keenly interested in, and which they would undoubtedly press Kevin Mallory to learn more about, especially as to the identities of all of the people involved.  In fact, Michael Yang did press the Defendant, telling him that "no1 is incomplete on the first page and the handwriting cannot be read properly."[5]  GX 8-6, Row 17.  In response, the Defendant made it clear that he could give Michael Yang the detail that he wanted – "The notes must be relayes (sic) in a conversation they care (sic) my notes.  It will have to wait until the next trip."  GX 8-6, Row 19. *See also* GX 8-6, Row 77 ("Not additional for no. 1.  Just my notes for my explanation.").  Here then, is the plainest example of the Defendant's conspiratorial intent.  He had no qualms about revealing information to Michael Yang, he just wanted to make sure he was handsomely compensated, and once that happened, he could give him more detail in person during the next trip to the PRC.

With regard to the first document that he successfully passed, the Table of Contents, the Defendant made it clear that *everything* listed in this document was something that he would sell

---

[5]  Number 1, or "# 1" as the Defendant wrote it, was listed next to "S + T Targetting Opportunity" on the Table of Contents (GX 9-3E) and at the top of the first page of the White Paper itself (GX 9-3E1).

to the Chinese government, *for the right price*. Therefore, the defense is simply wrong to argue that the Court in imposing a sentence should view this document in isolation as one of only two documents that the Defendant successfully passed.  To the contrary, the Table of Contents was a preview of all of the classified information that the Defendant was prepared to sell.  *See* GX 8-6, Row 32-33 ("I have additional documents as I can see from the INDEX. I will send more…later."); *see also* GX 8-6, Row 51 ("I will send more docs when payments are made."); GX 8-6, Row 59 ("I suggest your boss review the INDEX and I will send another document as a sigh (sic) of trust."); GX 8-6, Row 80 ("When you get the OK to replaced (sic) the prior payment…the (sic) I will send more docs. I will also type my notes."); GX 8-6, Row 83 ("I will typa (sic) notes and resend by Sat."); GX 8-6, Row 89 ("I will type two pages of notes (no. 1) and send later today or tomorrow."). The Defendant's willingness to provide Michael Yang with the Table of Contents, and then to promise that he would send more documents from that Table of Contents, demonstrates his criminal intent.[6]  The Defendant clearly viewed this as a long, profitable relationship.[7]  It was likely only because Michael Yang told him, "Stop sending doc," GX 8-6, Row 127, after learning

---

[6] And clearly Michael Yang viewed the Table of Contents in exactly the same way, which was why on May 1st he told the Defendant, "I cannot get ok answer before seeing the rest docs, because the previous one are not CN related and it's too simple, pls at least send the no2 [REDACTED NAME] and the FISN." GX 8-6, Row 84.  Document Number 2 with the redacted name was the PowerPoint involving the "Johnsons," which was visible in the unredacted version of the Table of Contents.  On May 5th, the Defendant dutifully attempted to send the FISA document and Document No. 2, just as Michael Yang had requested.  GX 8-6, Rows 88, 92-93.
[7] One example of the Defendant's belief that the information he was selling to Michael Yang was valuable was his comment, "I am expecting the previous payment ($15K + $4,400) seized at border. And at least $????, for the materials I have provided."  GX 8-6, Row 90.  While it would be up to these Chinese IOs to determine how much money $???? was, the Defendant clearly thought that the "materials I have provided" were valuable enough that he would need a "bank account is not in my true name," GX 8-6, Row 91 to receive payment in "4 equal payments over 4 consecutive days," *id.*, Row 46.  The request to break up the payment was no doubt an attempt by the Defendant to avoid raising any red flags with the bank by depositing a notably large lump sum.

about the Customs and Border Protection search in Chicago, that the Defendant stopped sending even more classified NDI to the Chinese government.

The defense's argument that the Court should view this as a case of two documents that were of "relatively little value," is highly misleading, especially in the context of what he provided about the "Johnsons." In fact, the Defendant's first efforts using the CovCom device were aimed primarily at revealing information about the "Johnsons." By May 3rd, he had already succeeded in sending the White Paper to Michael Yang. On May 5th, and consistent with Michael Yang's request from two days earlier, he attempted to send Document # 2, the "Johnson" PowerPoint. These efforts on the part of the Defendant, coupled with the fact that between his two trips to the PRC, he reinitiated contact with the "Johnsons" by sending them nine LinkedIn messages over the course of two days in March, GX 3-26, make it apparent that this was no mere coincidence. The Defendant was intent on selling some of the most damaging NDI imaginable – NDI that related to human asset operations in the PRC conducted by the U.S. government.

## B. This Criminal Conspiracy was not Limited to the Eight Documents Saved on the SD Card

It is also inaccurate to portray this as a criminal conspiracy that involved *only* the eight NDI documents saved to the Toshiba SD card. While those documents were damaging enough in their own right, as reflected in the testimony of Michael Higgins and Nancy Morgan, the Defendant clearly had more ambitious goals. With nearly 30 years in the U.S. Intelligence Community, the Defendant had a vast amount of classified information in his head that he had taken an oath to protect. But, having willingly entered into a criminal conspiracy with Chinese Intelligence, all of that information was potentially at risk.

And, in fact, it appears as though the Defendant had already had substantive discussions

with Michael Yang in the PRC.  For example, at one point the Defendant said that, with regard to the two pages of handwritten notes in document number one, "[t]his was a separate operation, *unrelated to our discussions*."  GX 8-6, Row 96 [Emphasis added].  Similarly, at another point, the Defendant made reference to "a myriad of other items I have **alluded to** but we have not discussed."  GX 8-6, Row 148 [Emphasis added].  There can be little doubt that the Defendant had engaged in substantive discussions with these Chinese IOs during his two trips to Shanghai.  It defies belief that Chinese Intelligence would fly him over twice, pay him $25,000 in cash, and entrust him with the CovCom device, unless he had convinced them that he was a valuable source of U.S. Government secrets.

In his covert communications, the Defendant also made it clear that he could provide the type of details that Michael Yang and his bosses were seeking in further face-to-face meetings in the PRC.  As noted previously, in GX 8-6, Row 19, the Defendant explained that a full explanation of his handwritten notes must be relayed "*in a conversation…It will have to wait until the next trip*."  Two days after meeting with Federal Bureau of Investigtion ("FBI") special agents in Northern Virginia, the Defendant attempted to schedule that "next trip."  *See* GX 3-21 ("Michael, I will you making (sic) reservations today please thank you.  Kevin P. Mallory.").  The Defendant's willingness to travel to the PRC a third time demonstrates his desire to continue to provide NDI as part of this criminal conspiracy.  He could not show up in the PRC empty-handed and expect to be paid.  Having already provided *some* classified documents, *and* a classified table of contents, and having promised to elaborate on that information in face-to-face meetings, the Defendant was clearly prepared to do precisely that.  It was only the swift and decisive action of the FBI that

prevented the Defendant from doing even greater damage to the national security.[8]  This was anything but a case involving information that was "of relatively little value."

      1.  *By Lying and Concealing Evidence, the Defendant made it Impossible to Determine the Full Scope of the Damage in this Case*

As a result of the Defendant's lies and deception, a full accounting of all of the damage that he caused this country is likely impossible.  All eight of the documents on the SD card were classified at either the SECRET or the TOP SECRET level.  By definition, unauthorized disclosure of information classified SECRET could be expected to cause serious damage to the national security.  Similarly, unauthorized disclosure of information classified TOP SECRET could be expected to cause exceptionally grave damage to the national security.  *See*, EO 13526.

At trial, both Nancy Morgan from the CIA, and MichaelHiggins from DIA, testified in great detail about the eight documents on the SD card.  They testified about the nature of those documents and about why their unauthorized disclosure could be so damaging to our national security.  They focused on the documents that related to human assets, in particular, as being especially significant.  *See* Government's Position With Respect To Sentencing, Dkt. 211 at pp. 15-17.

At minimum, the Defendant's conspiracy to deliver NDI to the PRC included all eight of those documents.  That alone is incredibly serious.   But critically, this conspiracy did not simply include the eight documents on that SD card.  It included everything else that the Defendant did to

---

8  The fact that this offense conduct was of relatively short duration is not a fact that should benefit the Defendant.  He did everything possible to conceal his crimes.  He lied repeatedly to CIA investigator Michael Dorsey.  He lied repeatedly when he was confronted by the FBI.  He destroyed and hid evidence.  He established bank accounts in other names in order to receive money from the Chinese government.  Clearly he wanted this criminal conspiracy to last a long time.  And even in the relatively short period of its existence, the Defendant successfully managed to meet with Chinese IOs for nearly two weeks, and to pass them classified NDI.

gain the trust of those Chinese IOs, to get them to pay him $25,000, to get them to give him a CovCom device, and to get them to promise him further payments in the future. Both the CIA and the FBI were keenly interested in what went on in the PRC in March and April of 2017. CIA and FBI personnel questioned the Defendant for hours about those meetings. And the Defendant's consistent response was to lie.

It defies belief to think that the Defendant, spent days talking about THAAD, currency manipulation, and the South China Sea, when he himself admitted to knowing next to nothing about those topics. What is almost certainly the case is that whatever he truly did reveal to those Chinese IOs, it was convincing enough that they gave him a CovCom device and $25,000 *before* the Defendant started sending any classified documents via the CovCom device.

Since the Defendant lied so much when he was questioned, there is no way to know the truth about everything that he sold to the Chinese government. We can only hope that the FBI's quick action prevented him from selling more NDI to the PRC IOs. But given that this was a conspiracy conviction, and given that the Defendant had thirty-years-worth of classified information in his head, he certainly had the ability to sell a vast amount of United States secrets to the Chinese government. This was anything but a case in which the information that the Defendant conspired to sell to the Chinese lacked value.

C.    The Defendant Provided No Intelligence Value to the U.S. Government

The most remarkable claim in the defense pleading is that a ten-year sentence in this case is warranted because of "the extraordinary value of the intelligence he provided to the United States." Defense Position on Sentencing at p. 2. According to the defense, the Defendant "voluntarily provided extremely valuable intelligence to the United States, namely a Samsung cell phone containing a custom covert communication application used by Chinese intelligence." *Id*.

The Defendant did no such thing.  The FBI seized the CovCom device pursuant to a criminal search warrant on June 22, 2017, the same date that the Defendant was arrested.

The reason that the FBI had to resort to a criminal search warrant was that at the meeting on May 24th, the Defendant kept the CovCom device, after he saw that some of his WeChat message with Michael Yang could be seen on the phone.  In fact, when he first turned the CovCom device on and entered his password,[9] he was visibly surprised to see some of his WeChat messages with Michael Yang.  He even commented, almost under his breath, "all this stuff came up – give me just a minute." GX 13-21T.  Included  within the "stuff" that came up was a WeChat communication with Michael Yang wherein the Defendant said, "I can bring the remainder of the documents I have at that time."  GX 8-6, Line 150.  When the FBI pressed the Defendant about that comment, he gave a long, convoluted explanation that included his claim that "I'm telling them that I can come over there and talk to them about, uh, additional things, like on the – whatever I have, whatever-whatever I've created, for June for THAAD or South China Sea, whatever I can figure out by then."  GX 13-23T at p. 1.  Though the FBI continued to press him about this statement, the Defendant remained firm in his answers that he had given the Chinese IOs nothing more than a paragraph on currency manipulation, and two to three paragraphs on THAAD,  all while he was in the PRC.  *Id*. at pp. 2-4.  He denied giving them any other documents.  GX 13-25T.

Not only is it inaccurate to say that the Defendant voluntarily provided valuable intelligence to the United States in the form of a Samsung cell phone, the opposite is true.  Almost

---

9  At the start of the interview, CART Examiner Paul Lee went into a separate room and downloaded an image of the CovCom device, pursuant to the Defendant's written consent. However, that consent only extended to imaging the phone, not seizing it.  Nonetheless, the FBI was able to successfully image the phone *before* the Defendant realized that he was mistaken in his belief that nothing would be visible on the phone.

immediately after leaving the meeting with the FBI, the *Defendant* chose to start removing crucial evidence from that device. The Defendant clearly deleted the WeChat application by May 26th, which explains why he told Michael Yang on that date, "Pls send my ur SKYPTE (sic). I am having problems with WeChat." GX 3-22. When the CovCom device was finally seized on June 22nd, the WeChat application (and any further communications the Defendant may have engaged in using that application) was gone.

While it is completely incorrect to claim that the Defendant voluntarily provided the CovCom device to the U.S. government, that is something that he could have done. Once he saw that his communications were there, he could have told the truth. He could have agreed to cooperate fully and truthfully in any way possible. But he did none of those things. And now, having lied to the U.S. Government at every opportunity, he is not entitled to a sentence reduction based on his extraordinary (and counterfactual) claim that he provided valuable intelligence to the U.S. Government.

### D. The Defendant is not Entitled to a Downward Departure Pursuant to U.S.S.G. §2M3.1, Application Note 2

Defendant's entire argument for a downward departure pursuant to Application Note 2 to U.S.S.G. §2M3.1 is belied by all of the arguments previously addressed above. This application note reads:

> The Commission has set the base offense level in this subpart on the assumption that the information at issue bears a significant relation to the nation's security, and that the revelation will significantly and adversely affect security interests. When revelation is likely to cause little or no harm, a downward departure may be warranted.

First, "the information at issue" is significantly more than just the two documents that the Defendant succeeded in passing. At a minimum, all of the documents on the SD card are at issue

in the conspiracy count.  That is more than enough for a finding that "revelation will significantly and adversely affect security interests."  Second, while the defense argues that a 12-level reduction is warranted based upon this application note, they offer no authority for such a large reduction in a case of this sort.  Given that the Defendant was convicted of conspiring to deliver NDI to the PRC, and given that the victim agencies testified in great detail about the damage such a release could do, there is no basis for a departure of any amount, much less twelve levels.

## III.    THE ENHANCEMENT FOR ABUSE OF A POSITION OF TRUST IS APPROPRIATE IN THIS CASE

The defense also seeks to avoid the two-level enhancement for abuse of a position of trust pursuant to U.S.S.G. §3B1.3.  This enhancement appropriately applies, and it should be imposed in this case.  Application Note 1 to USSG §3B1.3 reads in pertinent part, "[f]or this adjustment to apply, the position of public . . . trust must have **contributed in some significant way** to facilitating the commission of the offense."  [Emphasis added].

Here, the eight classified documents (and the Table of Contents) that the Defendant loaded onto the micro SD card, and that he conspired to sell to the Chinese government were all obtained as a direct result of the public trust that was placed in him.  In fact, the only reason that the Defendant ever had access to all of those documents in the first place, is that he occupied a position of public trust.  So the position of public trust did not just *contribute* to the offense in a significant way.  It was the *sole reason* that he was able to commit this offense.

The defense cites to the *Burt* case out of the Tenth Circuit for the proposition that, "it is 'improper to apply the enhancement solely because Defendant once occupied a position of trust.'" Defense Position on Sentencing at p.9.  However, the government is not saying the enhancement should apply solely because the Defendant once occupied a position of trust. Rather, the enhancement should apply because of how the Defendant violated that position of

15

trust to facilitate *this* crime.  Defendant's security clearance gave the Defendant access to highly classified U.S. government secrets that most U.S. citizens never get to see.  But that access came with some serious restrictions.  The Defendant had to sign multiple non-disclosure agreements that required him to protect that information.  The Defendant had to acknowledge that this was a life-long obligation that continued even after he left the government, and that a violation of these agreements could subject him to prosecution for violations of 18 U.S.C. § 794 (among other statutes).

The Defendant's use of his security clearance to commit this crime makes the enhancement applicable in this case.  Having been granted a security clearance, and having promised that he would always protect those secrets, the Defendant blatantly violated those oaths.  In fact, the Defendant was not authorized to have any of the classified documents that he loaded onto the SD card in 2017, even though he was a former U.S. government security clearance holder.  But having improperly retained those documents, he then conspired to sell them to a U.S. adversary – the People's Republic of China.  He successfully transmitted at least two documents, he attempted to transmit more, and he was clearly in the process of attempting to maximize his financial gain by doling all of them out over time.  Some of these documents dealt with the "Johnsons," actual human assets who were put in grave danger by the Defendant's actions, and whom the U.S. government has a solemn obligation to protect.  This was an abuse of a position of public trust that is about as egregious as one can imagine.

The other cases that the defense cites to are equally unpersuasive.  *United States v. Douglas*, 885 F.3d 124 (3d Cir. 2018) involved a defendant who was an "ordinary line mechanic" at an airport convicted of conspiracy to distribute cocaine.  *Douglas* at 135.  The court in that case determined that the 3B1.3 enhancement did not apply even though Douglas

possessed a security clearance and a badge which allowed him to move freely through the airport. *Id.* The court primarily based this opinion on the fact that Douglas was a low-level employee without professional or managerial discretion. Unlike in this case, Douglas's clearance did not give him access to the very material that he used to commit the crime.

*United States v. Roman*, 485 F.3d 185 (1st Cir. 2007), involved a cocaine conspiracy conviction of an airport "fleet service clerk" whose duties consisted of "loading and unloading cargo" which were the "kinds of tasks that almost invariably require oversight." *Id*. at 191. In also concluding that the 3B1.3 enhancement did not apply, the *Roman* court based its decision on the fact that the defendant's fleet service position was a very low-level job that did not give him "discretion to establish policies or to supervise co-workers." *Id*. at 192.

The Defendant here was not a low-level employee at an airport. He was a highly-trained, highly-skilled case officer with two of the premier intelligence agencies in the world – the CIA and the DIA. He had a TOP SECRET/SCI[10] security clearance that gave him access to classified information that he had promised to protect. That security clearance also afforded him the opportunity to steal the information, and to market it to the Chinese government. The Defendant also did not commit a low-level drug offense. He committed espionage: a crime that calls for up to life in prison for criminally conspiring to sell classified material that he obtained through an abuse of public trust.

The language in the non-disclosure agreements that the Defendant signed with both DIA and CIA were unequivocal:

> I understand that all information to which I may obtain access by signing this Agreement is now and will remain the property of the United States Government unless and until otherwise determined by an appropriate official or final ruling of a court of law. Subject to such determination, I do not now, nor will I ever,

---

[10] SCI stands for Sensitive Compartmented Information and a TOP SECRET/SCI clearance is reserved for only a subset of TOP SECRET security clearance holders.

possess any right, interest, title or claim whatsoever to such information. I agree that I shall return all materials that may have come into my possession or for which I am responsible because of such access, upon demand by an authorized representative of the United States Government or upon the conclusion of my employment or other relationship with the United States Government entity providing me access to such materials. If I do not return such materials upon request, I understand this may be a violation of Section 793, Title 18, United States Code.

The Defendant signed a non-disclosure agreement with the CIA with this language on September 4, 1996, *See*, GX 2-8 at Par. 8, and he signed a non-disclosure agreement with the DIA with this language on September 7, 2004, *See*, GX 1-1, at Par. 7. In fact, during his lengthy government service, he routinely signed non-disclosure agreements such as these.

And, critically, when the Defendant's access to DIA facilities was suspended in 2009, he signed a Notification of Access suspension on July 14, 2009 that included the following language:

> You are reminded of your continued obligation to protect classified information, sensitive compartmented information, and intelligence sources and methods from disclosure to unauthorized or uncleared personnel under the provisions of Sections 793 and 794 of title 18, United States Code and/or the appropriate articles of the Uniform Code of Military Justice. **The time limit for safeguarding such intelligence never expires.**"

*See*, GX 1-8, at Par. 2 (emphasis in original). This is a far cry from the scenario for which the defense cites the *Burt* case. Here, the Defendant continued to occupy a position of public trust because he had signed documents attesting to his understanding that he had an obligation to protect classified information for the rest of his life.

In fact, where the evidence warrants it, courts have applied the USSG §3B1.3 enhancement to U.S. government clearance holders, including former clearance holders. *See United States v. Ford*, 288 F. Appx. 54, 61 (4th Cir. 2008) (No error in application of abuse of position of trust enhancement for 18 U.S.C. § 793 conviction because defendant's "abuse of his

position of public trust contributed significantly to his commission of the offense. [The defendant] simply would not have been able to commit the offense of retaining classified documents without permission if he had not held a top secret security clearance. . . .").  The Fourth Circuit in *Ford* began by identifying the factors to consider in determining whether a defendant held a position of trust:

> First, courts ask whether the defendant had special duties or "special access to information not available to other employees." Second, the defendant's level of supervision or "degree of managerial discretion" is relevant. Bank tellers who embezzle from their employers provide an example of a situation where there is little trust to abuse because the employees are closely supervised, and it is expected that wrongs they commit will be readily detected. Third, the analysis also entails an examination of "the acts committed to determine whether this defendant is 'more culpable' than others who hold similar positions and who may commit crimes."

*Ford* at 60-61 (quoting *U.S. v. Glymph*, 96 F.3d 722, 727 (4th Cir. 1996)).  The Court also noted that it is "important to inquire into the level of harm occasioned by the breach of trust."  *Id.* at 61. (quoting *U. S. v. Pitts*, 176 F.3d 239, 246 (4th Cir. 1999)).  Ultimately, the Fourth Circuit concluded as follows:

> The district court did not commit clear error in finding that Ford held a position of public trust.  Ford held a top secret security clearance as an employee of the National Security Agency and he was able to remove classified documents from his office without detection by his supervisors.  Ford's actions exposed classified information to discovery by a person without a security clearance and created a potential for serious harm to our nation's security.

*Id.*

If the enhancement can apply in a case where a defendant merely "exposed classified information to discovery," and "created a **potential** for serious harm to our nation's security," [emphasis added], then it certainly applies in the case of this Defendant who really did convey classified information to the People's Republic of China.

This Court in *United States v. Pitts*, 973 F. Supp. 576, 584 (E.D. Va. 1997) (Ellis, J.)

came to a similar conclusion.  In *Pitts*, the Court imposed the abuse of a position of trust enhancement, as well as an additional one-level enhancement, for a *former FBI agent* convicted of violating 18 U.S.C. § 794 because he "held a special position of awesome responsibility and trust [and] was supposed to safeguard this nation from foreign espionage activity" but who "[i]nstead . . . betrayed his country by engaging in the very activity that he was sworn to protect the nation against."), *aff'd*, 176 F.3d 239, 245 (4th Cir. 1999) (affirming district court's enhancement where "abuse of trust was extraordinary").

For the foregoing reasons, the two-level enhancement pursuant to U.S.S.G. §3B1.3 should apply.

## IV.    CONCLUSION

For all of the foregoing reasons, the government respectfully requests that this Court sentence the Defendant to the recommended sentence under the Guidelines: a term of imprisonment for life.  That sentence not only comports with the Guidelines calculation, but also appropriately reflects the seriousness of the offense and the great risk of harm the Defendant created.

Dated October 25, 2018                          Respectfully submitted,

                                                G. Zachary Terwilliger
                                                United States Attorney

                                    By:    _____/s/_____
                                                JOHN T. GIBBS
                                                Virginia Bar No. 40380
                                                Assistant United States Attorney
                                                United States Attorney's Office
                                                2100 Jamieson Avenue
                                                Alexandria, Virginia 22314
                                                Phone: 703-299-3700
                                                Fax: 703-299-3981

                                                JENNIFER KENNEDY GELLIE

Trial Attorney
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Tel.: (202) 233-0785
Fax: (202) 233-2146
Jennifer.Gellie@usdoj.gov

COLLEEN E. GARCIA
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Ave.
Alexandria, VA
Tel.: (703) 299-3700
Fax: (703) 299-3980
Colleen.E.Garcia@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused an electronic copy of the *GOVERNMENT'S REPLY TO DEFENDANT'S POSITION ON SENTENCING* to be served via ECF upon counsel for Defendant Kevin Patrick Mallory.

By:        /s/
John T. Gibbs
Virginia Bar No. 40380
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: 703-299-3700
Fax: 703-299-3981