# EXHIBIT A

FILED IN OPEN COURT

MAR 3 1 2008

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VA

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CRIMINAL NO. 1:08cr122 |
| | ) |
| GREGG WILLIAM BERGERSEN, | ) |
| | ) |
| Defendant. | ) |

## STATEMENT OF FACTS

Should this matter proceed to trial, the United States would prove the following beyond a reasonable doubt:

1. From in or about March 2007 to on or about February 11, 2008, defendant GREGG WILLIAM BERGERSEN unlawfully, knowingly and willfully conspired with Tai Shen Kuo, and others, to communicate national defense information to persons not entitled to receive it, in violation of Title 18, United States Code, Sections 793(d) and (g).

2. Throughout this time period, defendant BERGERSEN was employed by the United States government at the Department of Defense (DoD), as a Weapon Systems Policy Analyst at the Defense Security Cooperation Agency (DSCA). DSCA implements DOD's Foreign Military Sales (FMS) program. The FMS program is the means by which the United States transfers defense articles, services, and training to other sovereign nations and international organizations. The United States procures defense articles and services on behalf of the foreign customer through the FMS program, and the customer then pays for such articles and services with its own national funds or through certain United States assistance programs.

3. BERGERSEN held a Top Secret security clearance with access to Sensitive Compartmented Information (SCI). His office at DSCA was located in Arlington, Virginia, within the Eastern District of Virginia.

4. At various times during the conspiracy, BERGERSEN unlawfully provided classified national defense information to an acquaintance named Tai Shen Kuo, a resident of New Orleans, Louisiana. Kuo is a naturalized United States citizen who was born in Taipei, Taiwan. He would travel regularly to the People's Republic of China (PRC), and he maintained an office in Beijing, PRC. Kuo had a variety of business interests, primarily involving furniture, in the United States and the PRC. He had also taken steps to establish two companies in an effort to obtain sub-contracts related to the United States' sale of defense technology to Taiwan.

5. As BERGERSEN well knew, Kuo maintained relationships with various officials from the Taiwan Ministry of Defense. However, BERGERSEN was unaware that Kuo also maintained contact with a Foreign Official of the PRC, to whom Kuo would provide sensitive United States government information provided by BERGERSEN, including classified national defense information. Kuo did not hold a United States security clearance and, therefore, was not entitled to view or possess United States classified information.

6. On March 3, 2007, BERGERSEN and Kuo met for dinner at a restaurant in Alexandria, Virginia and discussed "Po Sheng" -- Taiwan's communications systems that collect, transmit, process, display, and manage information for the armed forces. During their conversation, BERGERSEN orally disclosed information about United States and Taiwan communications security, requested that Kuo share the information with Taiwanese officials, and asked Kuo to arrange a meeting with Taiwan Ministry of Defense officials. As BERGERSEN

well knew, certain of his statements to Kuo about this matter contained information pertaining to the national defense of the United States and classified at the Secret level. BERGERSEN also knew that he was not authorized to disclose this national defense information to Kuo. The defendant also had reason to believe that his unlawful disclosure of this information could be used to the injury of the United States or to the advantage of a foreign nation.

7. At the conclusion of their conversation, BERGERSEN warned Kuo that he could not repeat everything that BERGERSEN had told him. BERGERSEN also warned Kuo that he needed to be careful with the information that BERGERSEN had given him. Kuo assured BERGERSEN that he was "just gonna tell *them*," which BERGERSEN understood to be a reference by Kuo to Taiwan officials.

8. From April 6 to April 9, 2007, BERGERSEN met with Kuo in Las Vegas, Nevada. During their stay in Las Vegas, BERGERSEN orally disclosed information about United States and Taiwan communications security and a breach in computer security. As BERGERSEN well knew, certain of his statements to Kuo about these matters contained information pertaining to the national defense of the United States and were classified at the Secret level. BERGERSEN knew that he was not authorized to disclose this national defense information to Kuo. BERGERSEN also had reason to believe that his unlawful disclosure of this information could be used to the injury of the United States or the advantage of a foreign nation. Unbeknown to BERGERSEN, Kuo entered into his laptop computer the information provided by BERGERSEN and formatted it as a communication to the PRC official.

9. During the same trip to Las Vegas, BERGERSEN brought Kuo approximately nine unclassified Department of Defense (DOD) documents and one unclassified DOD compact

disc. The two also discussed having BERGERSEN later provide Kuo with information about projected weapons sales by the United States to Taiwan for the next five years.

10. On the night of their arrival, Kuo provided $3,000 cash to BERGERSEN for use in playing poker. BERGERSEN used that money to gamble over the course of their stay in Las Vegas. In addition, on the night of their arrival, while at a gambling casino, Kuo handed BERGERSEN his wallet and allowed BERGERSEN to remove an undetermined amount of currency, which BERGERSEN then exchanged for casino chips, which he subsequently used to gamble. Later, BERGSERSEN and Kuo attended a show using tickets that Kuo had purchased for the two of them for $275.00.

11. The next day, April 7, 2007, unbeknown to BERGERSEN, Kuo used his laptop to send a message to the PRC official, reporting that BERGERSEN had not brought him the "gig," believed to be a reference to the Global Information Grid, a world-wide network that links together major DOD sites, but that BERGERSEN had said he would send Kuo "as much as he can when he goes back to dc." Kuo also reported to the PRC official that BERGERSEN had agreed to "print out the sale of T for 5 years," a reference to projected weapons sales by the United States to Taiwan.

12. On the evening of April 7, 2007, BERGERSEN and Kuo had dinner at a restaurant in Las Vegas. During dinner, BERGERSEN asked Kuo whether he had ever mentioned BERGERSEN to anyone in his country. When Kuo denied that he had, BERGERSEN replied, "Good, because I'll deny it. I swear I will testify that there is nothing going on." Following dinner, BERGERSEN and Kuo attended a concert, using tickets previously purchased by Kuo for a total of $597.45.

4

13. On May 8, 2007, unbeknown to BERGERSEN, Kuo made a telephone call to the PRC official, who asked about the status of the "GIG" document. Kuo responded "21 st; 21 st," a reference to his planned May 21 meeting with BERGERSEN in Mt. Pleasant, South Carolina, just outside the Charleston area. There, BERGERSEN planned to attend a meeting at one of DOD's Space and Naval Warfare Systems Command (SPAWAR) centers in Charleston.

14. On May 15, 2007, Kuo sent an email to BERGERSEN at DSCA reminding him "to bring the gig and taiwan paper." The next day, Kuo spoke to BERGERSEN by telephone, and Kuo said, "last time you gave me some roadmap . . . a lot of stuff is blacked out, do you have anything without black out?" Kuo was referring to a DOD document in which classified portions had been redacted.

15. When they later met on May 21 at a hotel in Mt. Pleasant, South Carolina, BERGERSEN brought Kuo a number of DOD documents, including one entitled GIG Tactical Edge Networks Engineering White Paper Version 0.4 (dated August 26, 2005, "For Official Use Only, Draft") and another that was marked for limited distribution. Subsequent to this meeting, Kuo returned to Louisiana and sent the PRC official an e-mail listing the names of each of the DOD publications that BERGERSEN had delivered to him.

16. In early July 2007, Kuo and BERGERSEN made plans to meet on July 14, 2007, in the Washington, D.C., metropolitan area. During one such telephone conversation on July 9, Kuo reminded BERGERSEN that BERGERSEN had previously said that he was going to give Kuo "that five year Taiwan sale." In a later call the same day, BERGERSEN asked Kuo if he was referring to sales to Taiwan for the past five years or projected sales for the next five years.

KUO responded, "yeah," and BERGERSEN replied, "that's hard stuff to get. Um, I'll check into it. I'll, I'll look see what I can do."

17. On July 10, 2007, in a telephone conversation between BERGERSEN and Kuo about Kuo's upcoming trip to the Washington, D.C. area, Kuo reminded BERGERSEN that he wanted five years of Taiwan's weapons purchase information. Later that same day, BERGERSEN told Kuo over the telephone that he had obtained everything the United States had delivered to Taiwan from 1980 to the present, as well as the projected sales for the next five years. During this conversation, Kuo told BERGERSEN he wanted "DSCA's paper" and that he already had the "CIA's paper." BERGERSEN told Kuo that what he wanted was "all classified" and that they had to be "very careful about it." Kuo responded, "I will, I will. Don't worry, don't worry."

18. On the morning of July 14, 2007, Kuo flew from Louisiana to Baltimore Washington International Airport (BWI). Kuo rented a car at BWI and drove to BERGERSEN's residence in Alexandria, Virginia. Once he arrived, Kuo gave BERGERSEN a box of cigars. The two went inside BERGERSEN's house for a few minutes, then both left in Kuo's rental car en route to Washington-Dulles International Airport (Dulles), where BERGERSEN was scheduled to board a flight to Bulgaria later that same day. While in the vehicle, Kuo placed into BERGERSEN's front shirt pocket a folded stack of cash in the amount of $3,000. Shortly thereafter, BERGERSEN told Kuo that he was "very reticent" to let him have certain information because it was "all classified," but that he could see it and take all the notes Kuo wanted. BERGERSEN also warned Kuo that if the information fell into the wrong hands he "would be fired for sure" and would "go to jail."

19. BERGERSEN and Kuo stopped for lunch at a hotel in Loudoun County, Virginia, before reaching Dulles. BERGERSEN handed Kuo a multiple-page document with visible, jagged cut marks at the top and bottom of each page. Kuo asked how he could be sure the document was classified. BERGERSEN assured Kuo that the document was classified and pointed out the fact that he had cut off the document's title and had also removed the classification markings from the top and bottom of every page. Kuo appeared satisfied with the explanation and said, "thank you, thank you, thank you."

20. Thereafter, while seated in the hotel restaurant, Kuo recorded notes, by hand, from the document BERGERSEN had given him to review. BERGERSEN told Kuo that he intended to destroy the document. Kuo remained at the restaurant table and spent approximately one hour recording notes. Kuo then went out to his rental car and handed the document to BERGERSEN. After the two resumed their drive to Dulles, BERGERSEN told Kuo that he did not want anyone to know about their relationship because it could get him "in a lot of trouble," and he would "go to jail." Kuo responded, "I'd probably go to jail, too."

21. The next day, July 15, 2007, Kuo flew from BWI to Louisiana. Later that same day, unbeknown to BERGERSEN, Kuo used his laptop to send a message to the PRC Official, reporting that BERGERSEN had given him two "very, very sensitive" papers, one on future sales to Taiwan and, the other, a complete update on the Po Sheng program.

22. On July 20, 2007, at O'Hare International Airport in Chicago, Kuo boarded a flight to Beijing, PRC. Kuo was carrying several pages of handwritten notes that he had taken from the document provided by BERGERSEN when the two met in Virginia on July 14. The document provided to Kuo by BERGERSEN included portions of the Taiwan section of a 2007

report of foreign military sales prepared by DSCA for Congress, listing the quantity, dollar value, and name of weapons system planned for sale by the United States to Taiwan over the next five years. As BERGERSEN well knew, the document he provided to Kuo contained information pertaining to the national defense of the United States and was classified at the Secret level. BERGERSEN knew that he was not authorized to disclose this national defense information to Kuo. The defendant also had reason to believe that his unlawful disclosure of this information could be used to the injury of the United States or to the advantage of a foreign nation.

23.   On September 2, 2007, Kuo telephoned BERGERSEN and the two discussed Kuo's upcoming trip to the Washington, D.C., area. Kuo asked BERGERSEN to make reservations for them at a Virginia restaurant. He also requested that BERGERSEN provide him with information about an Interoperability Management Board (IMB) conference that BERGERSEN had attended in August 2007. BERGERSEN agreed to provide Kuo with the requested information.

24.   On September 10, 2007, BERGERSEN and Kuo met for dinner at a restaurant in Alexandria, Virginia. At that time, BERGERSEN provided Kuo with an IMB conference brochure and a summary of classified information describing communications between the United States military and certain foreign nations or organizations. BERGERSEN told Kuo to be "very, very, very careful" with the documents, cautioning him not to lose them. Kuo promised BERGERSEN that he would not lose the documents. As BERGERSEN well knew, the documents he provided to Kuo contained information pertaining to the national defense of the United States and were classified at the Secret level. BERGERSEN knew that he was not authorized to disclose this national defense information to Kuo. The defendant also had reason

to believe that his unlawful disclosure of this information could be used to the injury of the United States or to the advantage of a foreign nation.

25.   Two days later, unbeknown to BERGERSEN, Kuo reported to the PRC official by telephone that he had received a "very sensitive" document from BERGERSEN. The following day, Kuo retyped into his laptop computer, in encrypted format, the information provided by BERGERSEN, which he then sent to the PRC official.

26.   At all times during the above-described incidents, defendant BERGERSEN acted unlawfully and knowingly and not by mistake or other innocent reason.

Respectfully submitted,

Chuck Rosenberg
United States Attorney

By: *signature*
W. Neil Hammerstrom, Jr.
Assistant United States Attorney

*signature*
Aaron M. Zebley
Assistant United States Attorney

*signature*
Ryan Fayhee
Trial Attorney
U. S. Department of Justice

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, GREGG WILLIAM BERGERSEN, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Gregg William Bergersen
Defendant

I am GREGG WILLIAM BERGERSEN's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Ross A. Nabatoff
Counsel for Defendant

_____
Mark D. Cummings
Counsel for Defendant