# Exhibit B



# Office of the Attorney General
## Washington, D. C. 20530
December 11, 2017

LIMITED OFFICIAL USE

MEMORANDUM FOR:   DAVID HARLOW
                  ACTING DIRECTOR
                  UNITED STATES MARSHALS SERVICE

FROM:             THE ATTORNEY GENERAL

SUBJECT:          Origination of Special Administrative Measures Pursuant to 28
                  C.F.R. § 501.2 for Federal United States Marshals Service Pretrial
                  Inmate Kevin Patrick Mallory

   Kevin Patrick Mallory is pending trial in the Eastern District of Virginia on a four-count indictment charging him with, among other related charges, gathering or delivering defense information to aid a foreign government and making material false statements in connection with his transmittal of Top Secret and Secret documents to an agent of the People's Republic of China (PRC). Trial is scheduled to commence on January 23, 2018. Mallory faces a maximum term of life imprisonment, if convicted. He is currently housed with the United States Marshals Service (USMS) at the Alexandria Detention Center, Alexandria, Virginia.

   The Directors of the Central Intelligence Agency (CIA) and the Defense Intelligence Agency (DIA) have certified, pursuant to 28 C.F.R. § 501.2, that the implementation of special administrative measures (SAM) is reasonably necessary to prevent disclosure of classified information by Mallory, and that the disclosure of such information would pose a threat to the national security. Based upon Mallory's unauthorized disclosure of classified information and the fact that he retains knowledge of such information, the recommendations of the CIA and the DIA, the Chief of the Counterintelligence and Export Control Section of the National Security Division (CES/NSD) requests that SAM be imposed on Mallory. The United States Attorney for the Eastern District of Virginia (USA/EDVA) and the Federal Bureau of Investigation (FBI) concur in this request.

   On July 27, 2017, a federal grand jury returned a four-count indictment against Kevin Mallory for: (1) conspiracy to gather or deliver defense information to aid a foreign government, in violation of Title 18, United States Code § 794(c); (2) delivering defense information to aid a foreign government, in violation of Title 18, United States Code § 794(a); (3) attempted delivery of defense information to aid a foreign government, in violation of Title 18, United States Code § 794(a); (4) material false statements, in violation of Title 18, United States Code § 1001(a)(2); and forfeiture provisions. The indictment alleges that between roughly February 22 and June 22, 2017, Mallory conspired with intelligence officers of the PRC to pass classified national defense

SPECIAL ADMINISTRATIVE MEASURES                    Page 2
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

information to the PRC government in exchange for payment, did in fact pass multiple classified documents containing national defense information, and attempted to pass additional national defense information.

Mallory is a 60-year-old U.S. citizen, married with five children, whose primary residence is in Leesburg, Virginia. He worked for the U.S. government for over 30 years, including for the U.S. State Department, the U.S. Army, and various federal contracting jobs. Of particular relevance to his pending criminal charges, he also worked for both the CIA and the DIA: as a covert case officer at the CIA (1990-1996); as a contractor at the DIA (2004-2005); as an Intelligence Officer and Senior Intelligence Officer at the DIA (2007-2010); and as a CIA contractor (2010-2012). He held Top Secret/SCI clearances at both agencies. Following his departure from the CIA in 2012, Mallory worked from his home as a self-employed consultant with GlobalEx, LLC, a company he incorporated in 2007.

On April 21, 2017, U.S. Customs and Border Protection (CBP) officers interviewed Mallory, who was returning from China with his 18 year old son, at Chicago O'Hare International Airport. During the interview, Mallory told the officers that he was returning from Shanghai, and he described his travel as a combination business trip/father-son vacation. Mallory told CBP that, while acting as a consultant for GlobelEx, he met with an individual in the PRC whom he knew through his church and consulted with that person on anti-bullying/family safety development. Mallory also stated that he had not received anything from this individual during his trip, and checked "no" in response to a question on the CBP Customs Declaration Form asking if he was carrying over $10,000 in U.S. or foreign currency. However, the officer searched Mallory's two bags and discovered $16,500 in U.S. currency, which they let Mallory keep.

On May 12, 2017, the CIA interviewed Mallory. An FBI agent observed a portion of the interview. During the interview, Mallory admitted that he believed the person with whom he was interacting in China was a Chinese intelligence agent, but denied giving that person any U.S. government information. As discussed below, the FBI later learned from Mallory that the unindicted co-conspirator (UCC) gave him a Samsung Galaxy Note 4 cellular phone to use for conducting secure communications. However, during this interview with the CIA, Mallory did not reveal that he was using the phone to communicate with the UCC or to send documents to the UCC.

In a voluntary interview with the FBI on May 24, 2017, Mallory reported that in February 2017, a Chinese recruiter (PRC1) contacted him on a social media site. Over the next several days, Mallory had phone interviews with PRC1 and was introduced by PRC1 to the UCC, whom PRC1 described as a potential client for Mallory. In or around March and April 2017, Mallory made two trips to Shanghai, where he met with the UCC and the UCC's boss. The UCC paid Mallory $10,000 in cash during the March trip, and $15,000 in cash during the April trip.

<u>LIMITED OFFICIAL USE</u>

SPECIAL ADMINISTRATIVE MEASURES                                         Page  3
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

Mallory further reported that during the April 2017 trip, the UCC also provided Mallory with a
Samsung Galaxy Note 4, to be used for secure communications, and trained Mallory how to use
the device.  Mallory later described the Samsung phone to FBI agents as a "covcom" (i.e., covert
communications) device and voluntarily provided the phone to the FBI.

During the May 24, 2017, interview, Mallory repeatedly denied providing PRC
intelligence officers with any documents in any format, paper or electronic, other than two short,
unclassified white papers that he claimed to have written using information in his head and from
open sources.  As discussed above, Mallory also voluntarily turned his Samsung phone over to
the FBI and provided consent to search the phone.  A subsequent FBI examination of the phone
revealed that it contained encrypted documents consisting of three CIA documents classified at
the SECRET and TOP SECRET levels and a DIA document classified at the
SECRET//NOFORN/ORCON level, as well as a handwritten table of contents.  The titles and
numbering of the eight documents listed in the table of contents matched documents that Mallory
had saved on a Toshiba SD (secure digital memory) card, as discussed below.

During a court-authorized search of Mallory's residence on June 22, 2017, the FBI
discovered the aforementioned Toshiba SD card.  A review of the Toshiba SD card revealed that
on April 25, 2017, Mallory transferred eight documents belonging to the CIA and the DIA to the
Toshiba SD card.  These documents were classified at either the SECRET or TOP SECRET
level, and some were further compartmented as SCI (Sensitive Compartmented Information) and
had NOFORN (not for release to foreign nationals) and ORCON (dissemination and extraction
of information controlled by originator) dissemination controls.  A handwritten cover sheet
indicating the item number, title, and number of pages accompanied each of the documents.
Further examination of the phone revealed that sometime between April 25 and May 3, 2017,
Mallory used it to transmit two DIA documents classified as SECRET//NOFORN and
SECRET//NOFORN/ORCON to the UCC.

Based upon information provided to me, including the April 2017 discovery of $16,500
Mallory had not reported in his possession upon his return from the PRC, the classified
documents found on the Toshiba SD card hidden in his house which he transmitted to the PRC
intelligence officer using his PRC-provided Samsung phone, and his efforts to conceal
possession of both the money and the classified documents, I find that there is a danger that
Mallory will disclose classified information, the unauthorized disclosure of which would pose
a threat to the national security of the United States, and that SAM on Mallory are reasonably
necessary to prevent disclosure of such information.  Therefore, I am requesting that you,
pursuant to 28 C.F.R. § 501.2, implement SAM to restrict Mallory's access to the mail, the
media, the telephone, and visitors.  Implementation of the SAM will commence immediately
upon notice to the inmate, and the SAM will be in effect for one year from the date of my
approval, subject to my further direction or the direction of a designated delegee.

LIMITED OFFICIAL USE

SPECIAL ADMINISTRATIVE MEASURES                                    P a g e  **4**
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

1.    **General Provisions**

    a.    **Adherence to Usual USMS, BOP, and Detention Facility (DF) Policy
Requirements -** In addition to the below-listed SAM, the inmate must comply
with all usual USMS, BOP, and non-BOP DF policies regarding restrictions,
activities, privileges, communications, etc.  If there is a conflict between
USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM are
more restrictive than usual USMS/BOP/DF policies, then the SAM shall control.
If usual USMS/BOP/DF policies are more restrictive than the SAM, then
USMS/BOP/DF policies shall control.

    b.    **Interim SAM Modification Authority -** During the term of this directive, the
Director, Office of Enforcement Operations (OEO), Criminal Division, may
modify the inmate's SAM as long as any SAM modification authorized by OEO:

        i.    Does not create a more restrictive SAM;

        ii.    Is not in conflict with the request of the CES/NSD, FBI, or
USMS/BOP/DF, or applicable regulations; and

        iii.    Is not objected to by the CES/NSD, FBI, or USMS/BOP/DF.

    c.    **Inmate Communications Prohibitions -** The inmate is limited, within the
USMS/BOP/DF's reasonable efforts and existing confinement conditions, from
having contact (including passing or receiving any oral, written, or recorded
communications) with any other inmate, visitor, attorney, or anyone else, except
as outlined and allowed by this document, that could reasonably foreseeably result
in the inmate communicating (sending or receiving) information that could
circumvent the SAM's intent of significantly limiting the inmate's ability to
communicate (send or receive) classified information.

    d.    **Use of Interpreters/Translators by the USMS/BOP/DF -**  Interpreter/Translator
approval requirement:

        i.    The USMS/BOP/DF may use Department of Justice (DOJ) approved
interpreters/translators as necessary for the purpose of facilitating
communication with the inmate.

        ii.    No person shall act as an interpreter/translator without prior written
clearance/approval from the USMS/BOP/DF, which shall only be granted
after consultation with the CES/NSD and FBI.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES**                    Page 5
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

      iii.     Interpreters/translators utilized by the USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with the inmate.  Interpreters/translators shall not be alone with the inmate, either in a room or on a telephone or other communications medium.

2.    **Attorney-Client Provisions**

    a.    **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document -** The inmate's attorney (or counsel) -- individually by each if more than one -- must sign an affirmation acknowledging receipt of the SAM restrictions document.  By signing the affirmation, the attorney acknowledges his or her awareness and understanding of the SAM provisions and his or her agreement to abide by these provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff.  The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM.  However, in signing the affirmation, the inmate's attorney and precleared staff[2] acknowledge the restriction that they will not forward third-party messages to or from the inmate.

      i.     The CES/NSD shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to the inmate's attorney.

---

[1] The term "attorney" refers to the inmate's attorney of record, who has entered an appearance in this criminal case, who has been verified and documented by the CES/NSD, and who has received and acknowledged receipt of the SAM restrictions document.  As used in this document, "attorney" also refers to more than one attorney where the inmate is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his or her individual capacity.

[2] "Precleared," when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or investigator who is actively assisting the inmate's attorney with the inmate's defense, who has submitted to a background check by the FBI and CES/NSD, who has successfully been cleared by the FBI and CES/NSD, and who has received a copy of the inmate's SAM and has agreed -- as evidenced by his or her signature -- to adhere to the SAM restrictions and requirements.  As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his or her individual capacity.  A "paralegal" will also be governed by any additional DF rules and regulations concerning paralegals.

LIMITED OFFICIAL USE

SPECIAL ADMINISTRATIVE MEASURES                    P a g e   6
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

ii.    After initiation of the SAM and prior to the inmate's attorney being
       permitted to have attorney-client privileged contact with the inmate, the
       inmate's attorney shall execute a document affirming receipt of the SAM
       restrictions document and return the original to the CES/NSD.

iii.   The CES/NSD shall maintain the original of the SAM acknowledgment
       document and forward a copy of the signed document to OEO in
       Washington, D.C., and the USMS/BOP/DF.

b.   **Attorney-Client Privileged Visits -** Attorney-client privileged visits may be
     contact or non-contact, at the discretion of the USMS/BOP/DF.

c.   **Attorney May Disseminate Inmate Conversations -** The inmate's attorney may
     disseminate the contents of the inmate's communication to third parties for the
     sole purpose of preparing the inmate's defense -- and not for any other reason --
     on the understanding that any such dissemination shall be made solely by the
     inmate's attorney, and not by the attorney's staff.

d.   **Attorney's Unaccompanied Precleared Paralegal(s) May Meet With Client -**
     The inmate's attorney's precleared paralegal(s) may meet with the inmate without
     the need for the inmate's attorney to be present.  These meetings may be contact
     or non-contact, at the discretion of the USMS/BOP/DF.

e.   **Simultaneous Multiple Legal Visitors -** The inmate may have multiple legal
     visitors provided that at least one of the multiple legal visitors is the inmate's
     attorney or precleared paralegal.  These meetings may be contact or non-contact,
     at the discretion of the USMS/BOP/DF.  An investigator or interpreter/translator
     may not meet alone with the inmate.

f.   **Legally Privileged Telephone Calls -** The following rules refer to all legally
     privileged telephone calls or communications:

     i.    **Inmate's Attorney's Precleared Staff May Participate in Inmate
           Telephone Calls -** The inmate's attorney's precleared staff are permitted
           to communicate directly with the inmate by telephone, provided that the
           inmate's attorney is physically present and participating in the legal call as
           well.

     ii.   **Inmate's Initiation of Legally Privileged Telephone Calls -** Inmate-
           initiated telephone communications with his attorney or precleared staff
           are to be placed by a USMS/BOP/DF staff member and the telephone

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES**                    P a g e  **7**
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

handed over to the inmate only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is the inmate's attorney.  This privilege is contingent upon the following additional restrictions:

(1)    The inmate's attorney will not allow any non-precleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate.

(2)    The inmate's attorney must instruct his or her staff that:

(a)    The inmate's attorney and precleared staff are the only persons allowed to engage in communications with the inmate.

(b)    The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's calls, or any other communications, to third parties.

(3)    No telephone call/communication, or portion thereof, except as specifically authorized by this document:

(a)    Is to be overheard by a third party.[3]

(b)    Will be patched through, or in any manner forwarded or transmitted, to a third party.

(c)    Shall be divulged in any manner to a third party, except as otherwise provided in Section 2.d. above.

(d)    Shall be in any manner recorded or preserved.[4]  The inmate's attorney may make written notes of attorney-client privileged communications.

---

[3] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities when acting in connection with their official duties.  This section does not allow monitoring of attorney-client privileged communications.

[4] Except by the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities.  This section does not allow monitoring of attorney-client privileged communications.

SPECIAL ADMINISTRATIVE MEASURES                    P a g e  **8**
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

        (4)     If the USMS/BOP/DF, FBI, or CES/NSD determines that the inmate has used or is using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, the inmate's ability to contact his attorney by telephone may be suspended or eliminated.

g.     **Documents Provided by Attorney to Inmate** - During a visit, the inmate's attorney may provide the inmate with, or review with the inmate, documents related to his defense, including discovery materials, court papers (including indictments, court orders, motions, etc.), so long as any of the foregoing documents are translated or if translation is necessary, by a precleared interpreter/translator. Any documents not related to the inmate's defense must be sent to the inmate via general correspondence and will be subject to the mail provisions of subparagraphs 2.h. and 3.g. Documents previously reviewed and cleared for receipt by the inmate, and already in the inmate's possession at the outset of the visit, may be discussed or reviewed by the inmate and the inmate's attorney during the visit.

     i.     None of the materials provided may include inflammatory materials, materials relating to the dissemination of classified information, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the CES/NSD and FBI.

     ii.     The CES/NSD may authorize additional documents to be presented to the inmate. If any document not listed or described above needs to be transmitted to the inmate, consent for the transmission of the document may be obtained from the CES/NSD without the need to formally seek approval for an amendment to the SAM.

h.     **Legal Mail**[5] - The inmate's attorney may not send, communicate, distribute, or divulge the inmate's mail (legal or otherwise), or any portion of its contents, to third parties, except when disclosure of the contents is necessary for the sole purpose of providing necessary legal services related to the inmate's defense -- and not for any other reason.

---

[5] "Legal mail" is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES**                                P a g e   **9**
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

In signing the SAM acknowledgment document, the inmate's attorney and precleared staff will acknowledge the restriction that only inmate case-related documents will be presented to the inmate, and that the attorney and his or her staff are strictly prohibited from forwarding third-party mail to or from the inmate.

3.    **Inmate's Non-legal Contacts**

    a.    **Non-legally Privileged Telephone Contacts -**

        i.    The inmate is only authorized to have non-legally privileged telephone calls with his immediate family members.

        ii.    The quantity and duration of the inmate's non-legally privileged telephone calls with his immediate family members shall be set by the USMS/BOP/DF, with a minimum of one call per month.

    b.    **Rules for Telephone Calls -** For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

        i.    Is to be overheard by a third party.

        ii.    Is to be patched through, or in any manner forwarded or transmitted, to a third party.

        iii.    Shall be divulged in any manner to a third party.

        iv.    Shall be in any manner recorded or preserved.[6]
All telephone calls shall be in English unless a fluent USMS/BOP/DF- or FBI-approved interpreter/translator is available to contemporaneously monitor the telephone call.  Arranging for an interpreter/translator may require at least fourteen (14) days advance notice.

    c.    **Telephone SAM Restriction Notifications -** For all non-legally privileged telephone calls to the inmate's immediate family member(s):

        i.    The USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

---

[6] Except by the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES**                    P a g e   **10**
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

    ii.    The USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communication of the SAM restrictions.  The USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

    iii.    The USMS/BOP/DF shall document each such telephone notification.

d.    **Family Call Monitoring -** All calls with the inmate's immediate family member(s) may be:

    i.    Contemporaneously monitored by the FBI.

    ii.    Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging the disclosure of classified information or other crimes, or to otherwise attempt to circumvent the SAM.

    iii.    A copy of each telephone call recording involving an inmate/immediate family member/authorized contact shall be provided to the FBI by the USMS/BOP/DF.  These recordings shall be forwarded on a call-by-call basis as soon as practicable.

e.    **Improper Communications -** If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting of or encouraging of the disclosure of classified information, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of time to be determined by the USMS/BOP/DF.  If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

f.    **Non-legal Visits -**

    i.    **Limited Visitors -** The inmate shall be permitted to visit only with his immediate family members.  The visitor's identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI in advance.

    ii.    **English Requirement -** All communications during non-legal inmate visits will be in English unless a fluent USMS/BOP/DF- or FBI- approved

<u>LIMITED OFFICIAL USE</u>

interpreter/translator is readily available to contemporaneously monitor the communication/visit.  Arranging for an interpreter/translator may require at least fourteen (14) days advance notice.

 iii. **Visit Criteria -** All non-legal visits may be:

  (1) Contemporaneously monitored by the USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging the disclosure of classified information or other crimes, or to otherwise attempt to circumvent the SAM.

  (2) Permitted only with a minimum of fourteen (14) calendar days advance written notice to the USMS/BOP/DF facility where the inmate is housed.

  (3) Without any physical contact.  All such meetings shall be non-contact to protect against harm to visitors or staff.

  (4) Limited to one adult visitor at a time.  However, the FBI-verified children of the inmate may visit with a pre-approved adult visitor.

g. **Non-legal Mail -** Non-legal mail is any mail not clearly and properly addressed to/from the inmate's attorney and marked "Legal Mail" (incoming or outgoing). In addition to non-legal mail from the inmate's attorney, as discussed in subparagraph 2.h. above, non-legal mail is only authorized with the inmate's immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, or other federal law enforcement entities.

 i. **General correspondence with limitations -** Correspondence is only authorized with immediate family members.  The volume and frequency of outgoing general correspondence with immediate family members may be limited to three pieces of paper (not larger than 8 ½" x 11"), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF.  The identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI.

 ii. **General correspondence without limitations -** There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, the BOP, and

**SPECIAL ADMINISTRATIVE MEASURES**                                        P a g e   **12**
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

> other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order, or discipline of the institution; the public; or national security; may be jeopardized.

iii.   All non-legal mail shall be -

    (1)   **Copied -** Shall be copied (including the surface of the envelope) by the warden, or his or her designee, of the facility in which the inmate is housed.

    (2)   **Forwarded -** Shall be forwarded, in copy form, to the location designated by the FBI.

    (3)   **Analyzed -** After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail shall be forwarded to the USMS/BOP/DF for delivery to the inmate (incoming), or directly to the addressee (outgoing).

iv.   The federal government shall forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period of:

    (1)   A reasonable time not to exceed fourteen (14) business days for mail that is written entirely in the English language.

    (2)   A reasonable time not to exceed sixty (60) business days for any mail that includes writing in any language other than English, to allow for translation.

    (3)   A reasonable time not to exceed sixty (60) business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

v.   **Mail Seizure -** If outgoing/incoming mail is determined by the USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging the dissemination of classified information, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES**                     P a g e   **13**
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

the intended recipient but referred to the DEA, HSI, FBI for appropriate action.  The inmate shall be notified in writing of the seizure of any mail.

4.      **Communication With News Media**

The inmate shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, his attorney, or a third party; or otherwise.

5.      **Religious Visitation**

a.      The inmate shall not be allowed to engage in group prayer with other inmates.

b.      If a USMS/BOP/DF- and/or FBI- approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6.      **No Communal Cells and No Communication Between Cells**

a.      The inmate shall not be allowed to share a cell with another inmate.

b.      The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates.

7.      **Cellblock Procedures**

a.      The inmate shall be kept separated from other inmates as much as possible while in the cellblock area.

b.      The inmate shall be limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

8.      **Access to Mass Communications**

To prevent the inmate from receiving and acting upon critically timed information or information coded in a potentially undetectable manner, the inmate's access to materials of mass communication is restricted as follows:

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES**                           P a g e  **14**
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

a.   **Publications/Newspapers -**

    i.   The inmate may have access to publications determined not to facilitate criminal activity or be detrimental to national security; the security, good order, or discipline of the institution; or the protection of the public. This determination is to be made by the USMS/BOP/DF, in consultation with the CES/NSD. The inmate may correspond with the publishing company regarding technical aspects of the publication, i.e., availability of particular volumes, billing questions, etc. The review of this correspondence will be in accordance with section 8(a)(iii), below.

    ii.   Sections of any publication/newspaper that offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to the inmate.

    iii.   If restricted by the USMS/BOP/DF rules, access to a publication will be denied. If acceptable, upon delivery, the USMS/BOP/DF will review the publication and make the initial determination. If the FBI's expertise is required, the publication will be forwarded to the FBI for review. The USMS/BOP/DF will also forward the publication to the FBI if translations are needed to make that determination. (In these cases, the FBI shall respond to the USMS/BOP/DF within fourteen (14) business days.) The inmate shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with USMS/BOP/DF policy.

    iv.   In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share the publication(s) with any other inmates.

b.   **Television and Radio -** The inmate is authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

c.   **Termination or Limitation -** If the USMS/BOP/DF determines that mass communications are being used as a vehicle to send messages to the inmate relating to the furtherance of criminal activities or in violation of the SAM, the inmate's access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

<u>LIMITED OFFICIAL USE</u>

SPECIAL ADMINISTRATIVE MEASURES                                    P a g e   **15**
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

9.    **Access to Books**

The inmate may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution.  This initial determination is to be made by the USMS/BOP/DF and, if the USMS/BOP/DF determines that the FBI's and/or the CIA's expertise is required, the book(s) will be forwarded to the FBI and/or the CIA for review.  In conducting its analysis, the FBI and/or the CIA will determine whether access to the book by this particular inmate would pose a substantial threat to national security.

In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share books with any other inmates.

10.   **Transfer of Custody**

In the event that the inmate is transferred to or from the custody of the USMS, BOP, or any other DF, the SAM provisions authorized for this inmate shall continue in effect, without need for any additional DOJ authorization.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney-client privileged communications and family contact, are reasonably necessary to prevent the inmate from revealing classified information.  Moreover, these measures are the least restrictive that can be tolerated in light of the ability of this inmate to divulge such classified information.

With respect to telephone privileges, the SAM are reasonably necessary because of the high probability of calls to others in which classified information may be disclosed.

With respect to mail privileges, the SAM are reasonably necessary to prevent the inmate from receiving or transmitting classified information.  Accordingly, I have weighed the inmate's interest in the timely receipt and/or submission of mail, with the possible danger the contents of the mail may pose to national security.  I have determined that delaying mail delivery to allow authorized personnel to examine a copy of the mail is the least restrictive means available to ensure that the mail is not being used to communicate any classified information.

The SAM's prohibition of contact with the media is reasonably necessary.  Communication with the media could pose a substantial risk of disclosure of classified information.  Based upon the inmate's past behavior, I believe that it would be unwise to wait

**SPECIAL ADMINISTRATIVE MEASURES**                             P a g e   **16**
Pursuant to 28 C.F.R. § 501.2
Inmate – Mallory

until after the inmate attempts to disclose classified information to justify such media restrictions.

The SAM's limitations on access to mass communications are reasonably necessary to prevent the inmate from receiving and transmitting classified information or information coded in a potentially undetectable manner.  Such messages may be placed in advertisements or communicated through other means, such as television and/or radio.  I believe that limiting and/or delaying media access may interrupt communication patterns the inmate may develop with the outside world, and ensure that the media is not used to communicate information that threatens the national security.

## SAM CONTACT INFORMATION

Any questions that you or your staff may have about this memorandum or the SAM directed herein should be directed to the Office of Enforcement Operations, Criminal Division, U.S. Department of Justice, 1301 New York Avenue, N.W., JCK Building, Room 1200, Washington, D.C. 20530-0001; telephone (202) 514-6809; and facsimile (202) 616-8256.

LIMITED OFFICIAL USE