1

1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF VIRGINIA
2             ALEXANDRIA DIVISION

3    ------------------------------x
                                   :
4    UNITED STATES OF AMERICA,     : Criminal Action No.
                                   :
5              versus              : 1:17-CR-154
                                   :
6    KEVIN PATRICK MALLORY,        :
                                   :
7                     Defendant. : May 17, 2019
     ------------------------------x
8

9            The above-entitled Sentencing was heard by the
     Honorable T.S. Ellis, III, United States District Judge.

10                A P P E A R A N C E S

11   FOR THE GOVERNMENT:        JOHN T. GIBBS, AUSA
                                JENNIFER K. GELLIE, AUSA
12                              US Attorney's Office
                                2100 Jamieson Avenue
13                              Alexandria, VA 22314

14   FOR THE DEFENDANT:         GEREMY C. KAMENS, ESQ.
                                TODD RICHMAN, ESQ.
15                              1650 King St
                                Suite 500
16                              Alexandria, VA 22314

17   ALSO PRESENT:              Steven Green, FBI Case Agent

18

19   OFFICIAL COURT REPORTER:   MS. TONIA M. HARRIS, RPR
                                United States District Court
20                              Eastern District of Virginia
                                401 Courthouse Square, Ninth Floor
21                              Alexandria, VA 22314

22

23

24

25

─────────────────────U.S. v. Mallory──────────────────

2

**P R O C E E D I N G S**

1

2  (Court proceedings commenced at 1:01 p.m.)

3          THE COURT:  All right.  Good afternoon.  You may

4  call the next matter, please.

5          THE DEPUTY CLERK:  The Court calls criminal case

6  United States of America versus Kevin Patrick Mallory.  Case

7  number 2017-CR-154.

8          May I have appearances, please.  First for the

9  Government.

10         MR. GIBBS:  Good afternoon, Your Honor.  John Gibbs

11 and Jennifer Gellie on behalf of the United States.  And I

12 also have Special Agent Steve Green of the FBI at counsel

13 table.

14         THE COURT:  All right.  Good afternoon to all of

15 you.

16         Mr. Kamens.

17         MR. KAMENS:  Good afternoon, Your Honor.  Jeremy

18 Kamens on behalf of Mr. Mallory.  With me is Todd Richman from

19 our office.

20         THE COURT:  All right.  Good afternoon to you and to

21 Mr. Mallory.

22         All right.  Mr. Kamens, I understand you anticipate

23 wanting to offer some material that may be classified.  When

24 we come to that point, if you wish to do so, advise me, and I

25 will take steps to close the courtroom and we'll proceed.

─────────────────────────U.S. v. Mallory─────────────────────────

3

1          As I anticipate this will go, I don't see that

2   happening.  But if it does, because I haven't correctly seen

3   the future as clearly as you do, call that to my attention and

4   we'll take the appropriate steps.

5          MR. KAMENS:  I'm happy to do that whenever the Court

6   would like.  My intention was to discuss the value of

7   information that was disclosed in documents that were

8   disclosed.  And so, the specific words used in those

9   documents, as I understand it, remain classified and in order

10  to discuss those words, and the nature of their importance, I

11  had asked to have that portion of the proceeding closed.

12         THE COURT:  All right.  If that happens, we'll cross

13  that bridge when we come to it.  It may not.

14         MR. KAMENS:  Understood.

15         THE COURT:  I'm going to conduct this, as I do any

16  sentencing hearing, we'll begin at the beginning, which we did

17  not do before, because I want to be sure that we cover all of

18  the issues.

19         I think the last time we convened I continued the

20  matter until now.  I think Ms. Gellie you were not present for

21  the previous one.  Is that right or am I wrong?

22         MS. GELLIE:  I was here, Your Honor.

23         THE COURT:  Oh, I was going to welcome you back,

24  because I thought you'd been gone for some period of time.

25         MS. GELLIE:  Thank you, Your Honor.

U.S. v. Mallory

4

1              THE COURT:  All right.  The matter is before the

2    Court for sentencing.

3              This defendant, having been found guilty by a jury

4    of two offenses, first, engaging in a conspiracy to gather or

5    deliver defense -- national defense information to aid a

6    foreign government in violation of the 794(c) of Title 18.

7              And a second conviction under Count IV of the

8    indictment, material false statements in violation of 18

9    U.S.C. Section 100(a)(2).

10              Now, let me inquire, first of all, Mr. Kamens,

11    whether you had an adequate opportunity to review the

12    presentence report, as most recently amended in April, with

13    your client?

14              MR. KAMENS:  We have, Your Honor.

15              THE COURT:  Mr. Mallory, let me inquire of you

16    whether you've had an adequate opportunity to review the

17    presentence report as amended in April, and to review that

18    with your counsel, Mr. Kamens and Mr. Richman?

19              THE DEFENDANT:  Your Honor, I've reviewed that.

20              THE COURT:  And let me confirm that you are fully

21    satisfied with the advice and counsel you have received from

22    Mr. Kamens and Mr. Richman?

23              THE DEFENDANT:  Yes, I am.

24              THE COURT:  Thank you.  You may be seated.

25              Now , I believe, Mr. Kamens, there were objections

─────────────────────────U.S. v. Mallory─────────────────

5

1    to paragraph 39 and 40.

2              MR. KAMENS:  That's correct, Your Honor.

3              THE COURT:  And what other objections were there?

4              MR. KAMENS:  We objected to the two-level

5    enhancement for abuse of position of public trust.

6              THE COURT:  Any others?

7              MR. KAMENS:  We asked for a downward departure.

8              THE COURT:  No, that's not -- objection to the

9    calculation of the presentence report.

10             MR. KAMENS:  Nothing else, Your Honor.

11             THE COURT:  All right.  Those are three.

12             Mr. Gibbs, does the Government have any objections

13   or correction to the presentence report?

14             MR. GIBBS:  No, Your Honor.

15             THE COURT:  All right.  The Court will adopt the

16   findings and conclusions of the presentence report as the

17   Court's findings in the sentencing hearing with the exception

18   of the outstanding objections on which I have yet to rule.

19             Now, let's begin with paragraphs 39 and 40.  With 39

20   and 40, as I recall the parties' objections, because they had

21   previously been asserted, they have been exhaustively briefed,

22   including a declaration that I received yesterday or maybe it

23   was today.  Which was it, Mr. Kamens?

24             MR. KAMENS:  Your Honor, I believe we submitted a

25   declaration this past week ago Friday.  I think the Government

—————U.S. v. Mallory—————

6

1   submitted a response on Wednesday of this week.  We haven't

2   submitted anything this week.

3            THE COURT:  Yes, on the 10th of May, that's right,

4   you submitted a declaration of Brian Moran.

5            MR. KAMENS:  That's correct, Your Honor.

6            THE COURT:  And did you respond to that?

7            MR. GIBBS:  We did, Judge, that was on Wednesday of

8   this week.

9            THE COURT:  Yes.  So the matter has been very

10  exhaustively argued and briefed.  The focus of the

11  disagreement, the issue which has caused this dispute is

12  whether Mr. Mallory attempted to or intended to send

13  information to Chinese intelligence agents, which arguably

14  would have allowed Chinese intelligence agents to divine the

15  identity of human sources of the CIA within China.  I stated,

16  in a previous hearing and it wasn't under seal, that I thought

17  that was an important issue that I wanted to get resolved,

18  because I viewed that issue as a factor that I would consider

19  important in applying the 3553(a) factors.  And the reason for

20  that, as I think I stated at the time -- and Mr. Kamens, Mr.

21  Gibbs, you have leave to raise your hand if you think I'm

22  getting into prohibited territory, but I don't think I am.  I

23  think I've said all of this before.

24           But in my view, a defendant who conveys or attempts

25  to convey information that would identify human resources, or

U.S. v. Mallory

7

1  human sources in another country has done something really

2  serious, because these sources are retaliated against, they're

3  killed.

4          Indeed, I remember a case in this district in which

5  precisely that happened.  So I wanted to resolve that.  And

6  that on April 4th is what the parties then provided briefing

7  on, exhaustive briefing, I might say, and more declarations.

8  I have reviewed all of that.  I don't think, Mr. Kamens, that

9  any further briefing is going to be helpful.  I think

10  everything has been said.  I will be shocked and surprised if

11  there's something that hasn't been said.

12          MR. KAMENS:  If I can have one word, Your Honor.

13          THE COURT:  Yes.

14          MR. KAMENS:  I agree further briefing is not

15  warranted or helpful.

16          In the Government's pleading on Wednesday they said

17  something, which I think needs correction.  And it bears on

18  this topic.  They said that the jury returned guilty verdicts

19  as to both the completed passage of document number 1 and 2.

20  And document 2 is the PowerPoint presentation that contained

21  information related to an operation and assets.  And that is

22  not accurate.

23          THE COURT:  That particular issue was not presented

24  in the jury to answer "yes" or "no."

25          MR. KAMENS:  That's right.  There was no special

—U.S. v. Mallory—

8

1   jury verdict, but also the Government --

2           THE COURT:  Well, the Government wants me to infer

3   that the jury decided that.

4           MR. KAMENS:  When they were arguing to the jury, the

5   Government argued when the defense attempts to play up the

6   fact that document number 1, the white paper, was the only

7   document we can all agree was actually sent, keep in mind,

8   that's all you need to convict the defendant of Count II of

9   the indictment.

10          THE COURT:  I recall all of that.

11          MR. KAMENS:  And so certainly they argued that the

12  jury didn't need to find the document.

13          THE COURT:  Mr. Gibbs, am I correct that what you're

14  arguing is that I could infer that from the jury verdict, but

15  Mr. Kamens says you argued to the jury that they didn't really

16  need to find all of that.  They only needed to find one?

17          MR. GIBBS:  That's exactly right, Judge.

18          THE COURT:  Thank you.

19          MR. KAMENS:  If I can make one further point.

20          THE COURT:  I'm not sure you do need to make any

21  further points.

22          MR. KAMENS:  All right.

23          THE COURT:  I think both sides have objections to 39

24  and 40, because it is the defendant's view, or let's start

25  with the Government's view, that there were many attempts to

1   send these documents on May 4 and May 5, and also on May 1 and

2   2 by hitting the send button.  The defendant has argued,

3   exhaustively, why I should not draw that inference.  It was

4   the post -- it was the forensic examination of the CovCom

5   device that enabled the Government to argue that --

6           And by the way, I'm standing for the comfort of my

7   back and not for any other reason.

8           I've reviewed all of that.  I think there is

9   substantial force to the Government's argument and substantial

10  force to the defendant's argument.

11          The defendant argues that you know he punched these

12  buttons, it doesn't show -- and nobody was connected on the

13  other side so it didn't go through.  There's all that

14  testimony and argument about all of that.

15          I have looked at all of that.  My conclusion is as

16  follows:  I think the evidence is an equipoise.  So I'm going

17  to sustain in part and overrule in part the objection to

18  paragraphs 39 and 40.

19          And I'm going to find as follows, and I'm going to

20  distribute this to you so that you can follow it.  And I'm

21  going to replace 39 and 40 with what I have prepared and I'm

22  handing to you at this time.

23          Now, what it shows, I'm going to read along, you can

24  read along with me.  Is that the Government submitted

25  testimony at trial tending to show that table of contents and

U.S. v. Mallory

10

1   white paper with handwritten notes, that was document 1, that

2   latter one, were sent by defendant to Chinese intelligence

3   agents, that should say.  Not agency.  Chinese intelligence

4   agents via the CovCom device.

5          The parties do not dispute that these two documents

6   were sent by defendant and received by Chinese intelligence

7   agents with the CovCom device.  Sent and received by them with

8   the CovCom device.  And I want to also note that those two

9   documents were classified at the secret level.

10          Then in paragraph 40 what I intend to substitute in

11   lieu of paragraph 40 is the following:  The parties sharply

12   dispute, however, whether the defendant intended and attempted

13   to send the following documents to Chinese intelligence

14   agents.  And there they're identified in a number of documents

15   and some of those were classified at the top secret level and

16   it doesn't show here, but I'm going to make it clear, the

17   others were classified at the secret level.

18          Now, those are the documents from which a Chinese

19   intelligence agency or agent might divine the identity of

20   human sources.  I didn't go through all of the testimony, a

21   presentence report does not have to have all of that in here.

22   What's important is my resolution of the objection to

23   paragraphs 39 and 40 and my -- also, I'm going to note, that

24   resolution of that particular dispute does not affect the

25   guidelines calculation, it does, and could affect conceivably,

─────U.S. v. Mallory─────

11

1    my 3553(a) analysis.

2          So let me give you a moment to look at this.  In

3    essence what I intended to say and what I will direct the

4    probation officer, Ms. White, who's present in the courtroom,

5    to substitute these two paragraphs for 39 and 40 and that will

6    address and resolve the party's views or difference of views

7    as to the existing paragraphs 39 and 40.

8          What I want to leave is I don't want to go

9    through -- there's no reason a presentence report should have

10   an extensive discussion of issues at trial or of evidence.

11   But I think it is useful for the presentence report to reflect

12   that at least two documents were sent and received by the

13   Chinese intelligence agencies and agents.  But, the other

14   documents are in dispute as to whether there was an attempt to

15   send them, because he punched "send" a number of times, and

16   whether they were in fact sent -- this involves a dispute

17   about whether somebody needed to be connected at the other

18   line or not -- or whether he was just playing with keys.  And

19   there's a dispute.

20         And I have elected to -- I have decided to consider

21   that dispute to be an equipoise in terms of the evidence.  And

22   not to affect the guideline calculation.

23         If you need a short moment to consider, I'll take a

24   brief five-minute recess, but I don't know that it will take

25   you any time.

──────────────U.S. v. Mallory──────────────

12

1          Mr. Gibbs, do you have any problem?

2          MR. GIBBS:  Judge, I just want to be clear.  So the

3    last sentence says, "resolution does not affect the guidelines

4    calculation."  So, as I read that the -- the top secret

5    documents drive the guideline calculation.  Documents 4 and 5

6    were the top secret documents.  So those are still calculated

7    as being part of the sentencing.

8          THE COURT:  Absolutely.  Because you didn't have to

9    prove that they were actually sent, actually received.

10          MR. GIBBS:  Correct.

11          THE COURT:  That's why they're still a part of the

12    guideline calculation.

13          But for my 3553 analysis, I have concluded that the

14    evidence is an equipoise as to whether they were attempted to

15    be sent or intended to be sent.

16          MR. GIBBS:  I'll have an argument on that.  We may

17    just need a minute, but let me confer.

18          THE COURT:  All right.  Mr. Kamens.

19          MR. KAMENS:  Your Honor, we don't oppose this

20    resolution.  I would suggest in paragraph 39 that it should

21    reference a single Chinese agent.  That is not plural.  "Sent

22    by the defendant to a Chinese intelligence agent."

23          THE COURT:  All right.  There's no problem with

24    that, is there, Mr. Gibbs?

25          MR. GIBBS:  No, he was communicating with Michael --

─────────────────────U.S. v. Mallory─────────────

13

1    that's fine, Judge.

2           MR. KAMENS:  That's in two places in paragraph 39,

3    but other than that we don't have any objection.

4           THE COURT:  Mr. Gibbs, do you need any more time?

5           MR. GIBBS:  No, Judge.

6           THE COURT:  All right.  Well, I think that then

7    resolves that dispute and we can now go on to an abuse of

8    position of trust, which is the only remaining guideline

9    calculation dispute and I've already adopted the findings and

10   conclusions of the presentence report as the Court's findings

11   and conclusions with -- with exception of the rulings that I'm

12   going to make on the abuse of trust and with the exception of

13   the substituting paragraphs 39 and 40, as I've provided them

14   to you.

15          All right.  I think I'm familiar with the parties'

16   arguments on the abuse of a position of trust, but -- oh, let

17   me also be clear, I didn't disregard your late submissions,

18   yours of the 10th and yours of this week.  Of course I

19   considered those.  They just moved me more persuasively to the

20   conclusion that it's an equipoise.  And I don't need to

21   determine that.

22          All right.  Do you need any more time, Mr. Gibbs?

23          MR. GIBBS:  No, Judge.

24          THE COURT:  All right.  The Court therefore, as I

25   said, will adopt -- not adopt -- the Court will sustain in

—U.S. v. Mallory—

14

1   part and overrule in part existing paragraphs 39 and 40, and I

2   will order the current versions of 39 and 40 to be redacted

3   and replaced with the 39 and 40, as I've read here and as

4   amended to reflect that it was the one Chinese intelligence

5   agent.

6           And I also want to be clear that the two documents

7   in paragraph 39 that were sent by the defendant and received

8   by a Chinese intelligence agent, were classified at the secret

9   level.  And that's the only changes.

10          All right.  We'll proceed now to the enhancement for

11  the abuse of a position of trust.  Mr. Kamens, do you want to

12  say anything more about that particular dispute?

13          MR. KAMENS:  Just briefly, Your Honor.  The

14  application defining the position of public trust in 3B1.3

15  says that for the adjustment to apply, the position of public

16  or private trust must have contributed in some significant way

17  to facilitate in the commission or concealment of the offense.

18          And so we would argue or have argued, in other

19  words, that the commission of the offense must be at the same

20  time as the person who occupies the position of public trust.

21  But in this case, the commission of the offense took place

22  well after Mr. Mallory was no longer in such a position.

23  Therefore, the fact that he previously have been in a position

24  did not occur contemporaneously in the commission of the

25  offense and therefore the enhancement does not apply.

─────────────────U.S. v. Mallory─────────────────
                                                              15

1              THE COURT:  All right.  Mr. Gibbs.

2              MR. GIBBS:  Your Honor, we obviously dispute that.

3              THE COURT:  Well, you wouldn't dispute it factually.

4    You dispute legally whether it has to be contemporaneous.

5              MR. GIBBS:  Exactly, Judge.  Again, the enhancement

6    itself does not restrict itself simply to current employees.

7    They certainly -- Congress and the sentencing commission

8    certainly could have done that if they wished.  The obligation

9    notes also don't restrict it simply to current employees.  And

10   here, when we look at Mr. Mallory, is a prime example of why

11   that's important, because a former intelligence case officer

12   is uniquely in a position to occupy a position of trust.

13             When someone, like Mr. Mallory, leaves the

14   Government, which there's millions of clearance holders in

15   this country, they get read out of whatever programs they are

16   read into, but they can't suck all that information out of

17   their head.  And Mr. Mallory, like any other clearance holder,

18   has a great deal of classified information in his head.  In

19   this case, apparently, he had classified documents that he had

20   retained improperly.

21             So in those cases it's very important that clearance

22   holders are notified that when you leave government service

23   your obligation to protect this information continues.  It

24   never ends.  And Mr. Mallory was explicitly instructed of

25   that.  We had signed documents where he acknowledged that.

16

1   And so having acknowledged that and left government service,

2   essentially pledging to protect that information, this is

3   clearly an abuse of a position of trust.  So the two-level

4   enhancement should apply in this case.

5        THE COURT:  All right.  The matter is before the

6   Court on the defendant's objection to a two-level enhancement,

7   applied by the probation officer to reflect abuse of a

8   position of trust.  The defendant argues that that would apply

9   only in cases where the abuse of a position of trust is

10  contemporaneous with the offense.  I don't agree.  I think it

11  is appropriate to apply the enhancement, even though, in this

12  case, Mr. Mallory had left the CIA and the DIA years before

13  this event, this crime, and therefore, I don't agree it has to

14  be contemporaneous.  I think it can apply.  Indeed, he only

15  had access to the information.  He only retained the

16  information because of the position of trust that he held at

17  the time that he was employed by the agency.  So I will

18  overrule that objection, sustain the position of the probation

19  officer.

20       Let me ask.  Ms. White, what now is the offense

21  level total?  It shouldn't change because the ruling I made on

22  paragraphs 39 and 40 does not change it.  What is the final

23  offense level and criminal history category and guideline

24  range?

25       THE PROBATION:  Your Honor, the total offense level

─────────────────U.S. v. Mallory─────────────────

17

1   is capped at 43, with a criminal history Category 1 and a

2   guideline provision of life.

3          THE COURT:  All right.  Now, we're at the point now

4   of argument on the sentence and allocution if he wishes by the

5   defendant.

6          Let's begin with -- let's begin with the Government

7   on argument as to sentence.  And let me confirm, however, Mr.

8   Kamens, did I -- do I correctly assume that we have obviated

9   the need for what you anticipated might be a classified --

10          MR. KAMENS:  Your Honor --

11          THE COURT:  Or would you prefer to wait until Mr.

12  Gibbs argues and then you'll tell me?

13          MR. KAMENS:  I'm happy to tell you our reasoning for

14  why I think it still would be helpful.  The sentencing -- the

15  sentencing statute 3553(a) requires that we're to consider the

16  seriousness of the offense.  And in other cases, and in the

17  study that we submitted to the Court, oftentimes Courts in

18  these circumstances consider the value of the information lost

19  as a measure or a proxy of the degree of culpability of the

20  defendant or the seriousness of the offense.

21          And so we would like to discuss what we have agreed

22  was given to the Chinese agent.

23          THE COURT:  All right.  Now, Mr. Gibbs, rather than

24  begin then with you, let's begin with that position by the

25  defendant so that you have an opportunity to address it.

U.S. v. Mallory

18

1          MR. GIBBS:  Thank you, Judge.

2          THE COURT:  All right.  For that, I'm afraid we will

3   have to clear the courtroom because you intend to -- is there

4   a court -- yes, there she is.  A court security officer is

5   here.

6          Have you reviewed with Mr. Kamens what he intends to

7   disclose?

8          THE CSO:  Yes, Your Honor.

9          THE COURT:  Is it classified?

10         THE CSO:  I believe so, Your Honor.

11         THE COURT:  All right.  Well, I'll have to ask all

12  of you to depart.  We'll have to close the courtroom for a

13  while.  And the court security officer, Mr. Flood, will tell

14  you when you may return.  I anticipate this will be on the

15  order of 30 to 45 minutes.

16         MR. KAMENS:  It could be much shorter than that,

17  Your Honor.

18         THE COURT:  All right.  It could be.  Let's hope

19  that it is.  I'll take a brief recess while Mr. Flood empties

20  the courtroom.

21         Is there anybody, Mr. Gibbs, that you want to remain

22  here, anybody from the agency?

23         MR. GIBBS:  There are some people -- in fact maybe,

24  Your Honor, if I could just ask them to stand, then I can have

25  them identify themselves and their agency affiliations.

─────────U.S. v. Mallory─────────

```
 1                THE COURT:  All right.

 2                MR. GIBBS:  Go ahead.

 3                MR. VERA:  Fabian Vera, I'm the director at the

 4   national intelligence.  I was the paralegal on this case.

 5                THE COURT:  I didn't hear the last thing you said.

 6                MR. GIBBS:  So Mr. Vera, he was actually the

 7   paralegal on this case.  He's now the director of national

 8   intelligence.

 9                THE COURT:  All right.  Who else?

10                MR. BALFANZ:  Chad Balfanz, the defense intelligence

11   agency, Your Honor.

12                THE COURT:  All right.  Next.

13                MR. BINI:  Steven Bini, defense intelligence agency,

14   Your Honor.

15                THE COURT:  All right.  Next.

16                MS. STEWART:  Hannah Stewart, for the Central

17   Intelligence Agency.

18                THE COURT:  All right.

19                MS. EDELSTEIN:  Julia Edelstein, national security

20   division at DOJ.

21                MR. BRATT:  Jay Bratt, national security division,

22   Department of Justice.

23                MR. GAYNOR:  Ryan Gaynor, Federal Bureau

24   Investigation, national security.

25                MR. TURGEON:  Evan Turgeon, national security
```

─────U.S. v. Mallory─────

20

1    division at DOJ.

2            MR. HAMMERSTROM:  Neil Hammerstrom, U.S. Attorney's

3    office.

4            UNIDENTIFIED SPEAKER:  And I'm employed with the

5    FBI.

6            THE COURT:  I'm sorry.

7            UNIDENTIFIED SPEAKER:  FBI.

8            THE COURT:  All right.  Anyone else?

9            All right.  Now, I assume, Mr. Gibbs, you were

10   asking to have all of these people remain and we'll ask the

11   court security officer to verify that they may remain.

12           When we reconvene, Mr. Kamens, I'll give you an

13   opportunity to tell me what you want to tell me relating to

14   the value or lack of value of the NDI.

15           MR. KAMENS:  Thank you.

16           THE COURT:  And then, Mr. Gibbs, you'll have an

17   opportunity to respond.

18           MR. GIBBS:  Thank you.

19           THE COURT:  Just so I can plan ahead, does your

20   client intend to allocute?

21           MR. KAMENS:  He does.  However, I advised him not to

22   say anything about the facts of the case, but he does intend

23   to provide a brief statement.

24           THE COURT:  Court stands in recess.

25           Will ten minutes be enough for you to clear the

─────────────────────────── U.S. v. Mallory ───────────────────────────

21

1   court?

2           THE CSO:  Yes, Your Honor.

3           THE COURT:  Court stands in recess for ten minutes.

4           (Recess.)

5           (Sealed hearing held but not included herein.)

6           (Open court proceedings resumed at 2:11 p.m.)

7           THE COURT:  All right.  We'll proceed now to

8   argument and allocution.

9           Let me note for the persons who were excluded from

10  the previous session, that I have directed the Government to

11  review the transcript and to put in the public record those

12  portions of it that do not need to be protected as classified.

13  That doesn't mean it will make sense to you, but it will be

14  there anyway.

15          All right.  Mr. Gibbs, let's begin with the

16  Government's view.  I have your brief, of course.

17          MR. GIBBS:  Thank you, Judge.

18          Your Honor, at its heart, this was a very basic

19  crime.  The defendant needed money, he was desperate for

20  money, and the most valuable thing he had to sell were our

21  nation's secrets.  He was more than willing to sell those

22  secrets to one of our most serious adversaries, the Chinese

23  Government, for the right price.

24          As he told Michael Yang on that CovCom device, "Your

25  object is to gain information and my object is to be paid.

─U.S. v. Mallory─

22

1  The opportunity to work with you provided a means to generate

2  income.  I have arranged for a USD account in another name.

3  You can send the funds broken into four equal payments over

4  four consecutive days.  When you agree, I will send you the

5  banking instructions.  I will provide you banking instructions

6  for you to send the monies.  The money will go to the bank

7  account.  It's not in my true name, but I have access.

8          I have an account not in the U.S. you can send it to

9  and I have the means to move it from there.  If you can get me

10 reimbursed, I can provide you the mechanism."

11         This defendant was so eager to get paid a lot of

12 money that he even told Michael Yang that CBP had seized the

13 cash from him during the airport search in April.  "I am

14 expecting the previous payment, 15K plus $4400, seized at the

15 border and at least 'dollar sign question marks.'"

16         THE COURT:  He didn't tell Michael Yang that he got

17 the money back.

18         MR. GIBBS:  He did not.  And he told him he wanted

19 money for the materials I have provided.

20         And he also told him, "When you get the okay to

21 replace the prior payment, then I will send more docs."

22         As Your Honor noted this wasn't true.  CBP had given

23 that money back.  But this was a defendant who wanted to get

24 paid a lot of money and he viewed the Chinese government as

25 the means to do that.

U.S. v. Mallory

23

1          And this need for money wasn't an exaggeration.  As

2   Your Honor will recall from the PSR, in the five years from

3   2012 to 2017, defendant made only $23,000 from his consulting

4   firm GlobalEx.  He made more than that in one month from the

5   Chinese government.  And that was before they ever gave him

6   the CovCom device.

7          He was arrested in June of 2017.  Even with help

8   from his church, his family had to declare bankruptcy in

9   December of 2017.  And as for the mortgage on his house, the

10  first lender said he had made no payments in 18 months and the

11  balance due was over $900,000 and the house is worth $400 less

12  than the defendant paid for it.

13         And in the PSR the defendant's net worth is listed

14  more than negative $34,000.

15         Your Honor, this is a defendant who is going to need

16  hundreds of thousands of dollars to get out of that hole.

17  $25,000 was just a drop in the bucket.

18         That wasn't going to be enough money to get him to

19  stop.  And given how desperate he was for money, the defendant

20  had to convince Michael Yang that he had a lot of valuable

21  information to sell, which is precisely what he did.

22         On May 1st he successfully transmitted the

23  handwritten table of contents and the first document listed

24  there, Document No. 1.  Michael Yang told him he had received

25  them both.

─────U.S. v. Mallory─────

24

1          And at that point, the defendant made two things

2    clear.  First he told him that the table of contents was a

3    laundry list of some of the things that he could provide and

4    sell.  And secondly, that he was going to need to get paid

5    before he would provide those additional documents.  So he

6    told Yang on the CovCom, "The index or table of contents list

7    the document number and topic.  I have additional documents as

8    I can see from the index.  I will send more later.  I will

9    send more docs when payments are made.  I suggest your boss

10   review the index and I will send another document as a sign of

11   trust."

12          And as for Document No. 1, that was that document

13   with the very bland title of white paper.  But the defendant

14   renamed it S&T Targeting opportunity on the table of contents

15   and S&T Targeting in China on the handwritten cover sheet.

16          And that was a title that had to pique Michael

17   Yang's interest, especially after the defendant told him that

18   this was a type of targeting and that S&T stands for Science

19   and Technology.

20          Now, Your Honor, the fact that the defendant started

21   off by sending this particular document was absolutely

22   chilling.  He could have provided anything in the world to

23   Michael Yang, but the first thing he decided to send right out

24   of the box was a document that related to human assets, the

25   Johnsons.  And as Robert Ambrose from DIA testified, the white

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────────U.S. v. Mallory─────────

25

1   paper was a virtual executive summary of that longer

2   PowerPoint presentation, which was a full-blown operational

3   brief on how to use the Johnsons in a targeting operation in

4   China.

5            S&T Targeting in China.  And we can tell that

6   Michael Yang and the Chinese intelligence service read this

7   white paper carefully because he told the defendant, "No. 1

8   seems to be a beginning of a report."  A beginning of a

9   report.  That sure does sound like an executive summary just

10  as Ambrose testified.  And it sure makes it sound like the

11  Chinese intelligence service was reading this document very

12  carefully and they wanted to know more.

13           And in fact, Michael Yang even told the defendant:

14  No. 1 is obvious the first page of an incomplete article.

15  Where is the else?  And why is it black on top and bottom?

16           Your Honor, there is simply no way that the

17  defendant would dangle this information about the Johnsons and

18  then not follow through with more.  Especially when you have

19  the Chinese intelligence service which is going to pay him

20  asking, "Where is the else?"

21           And in fact, four days after sending the white paper

22  about the Johnsons, the defendant attempted to send the else.

23  He attempted to send that PowerPoint and he told Michael Yang

24  on the CovCom device that it was on the way.  He told him the

25  name of that document in the CovCom discussion.

U.S. v. Mallory

26

1        Now, it can't be a mere coincidence that this

2   defendant, who was so desperate for money, would make the

3   first two documents that he put on that SD card, information

4   about a targeting operation in China involving the Johnsons.

5        And also it can't be a coincidence that the Johnsons

6   had started to hear from the defendant a lot more right around

7   this time.  In late March, after having received a total of

8   three short LinkedIn messages from the defendant over a

9   three-year period, the Johnsons suddenly got nine messages

10  from this defendant in two days.

11       Are we really expected to believe that that was

12  harmless, that it had nothing to do with Michael Yang and the

13  Chinese intelligence service?  When those dates occurred

14  precisely between the defendant's two trips to China.  This

15  defendant knew where the Johnsons lived, he knew how to

16  communicate with them, he knew that they trusted him, he even

17  knew that they were planning a trip to China that summer, and

18  he was in active contact with Michael Yang.

19       Now, undoubtedly, and as the defense has already

20  argued, they want to argue that the information in this white

21  paper, the S&T Targeting in China, were simply too vague to

22  ever specifically identify who the Johnsons were.  But that's

23  exactly the point.  For the defendant, that's a good thing,

24  not a bad thing, because if it's too vague to fully identify

25  everything in there, that makes him valuable.  That makes him

1  someone that the Chinese need to pay a lot of money to so that

2  he will explain who those sadists, those people, in the white

3  paper were.  And the defendant was more than happy to go to

4  China again.  Two days after the May 24th interview with the

5  FBI, he sent an e-mail to Michael Yang that had the subject

6  "travel."  And he told Yang, "Will you make the reservations

7  today, please?"  That was May 26th.

8          Now, the third trip to China was going to happen for

9  this defendant.  He had already made it clear that that was

10  when he would really provide some valuable information.  On

11  that CovCom device, he had told Michael Yang, "The notes must

12  be relayed in a conversation.  They were my notes.  It would

13  have to wait until the next trip."

14          And he also had told him, earlier in May, "I can

15  also come in the middle of June.  I can bring the remainder of

16  the documents I have at that time."

17          The remainder of the documents would have to include

18  that PowerPoint about the Johnsons.  It would have to include

19  everything else on that SD card.  And Yang responded, "If you

20  think the situation is okay and you're available, you may

21  still come in June."

22          So, Your Honor, that's why this information that the

23  defense -- the defendant had already provided to the Chinese

24  and he was conspiring to the Chinese was so chilling.  He had

25  parceled this out for the Chinese intelligence services.  This

28

1   was information about human assets, it was about targeting

2   operations, he had clearly gotten their attention.  They were

3   reading this stuff very carefully, and now he was planning a

4   third trip to China.

5            He didn't need the CovCom device to transmit that

6   information to the Chinese, he could give it to them in

7   person.  And, Your Honor, ultimately that is what makes this

8   such a tremendous betrayal on the part of the defendant.  He

9   was the Johnsons former handler.  For people like the Johnsons

10  who step forward to help this country, they have to believe

11  that their help is based on an unbreakable promise.  That if

12  they do something as dangerous as a targeting operation

13  against China, that our government will protect them.  That

14  they will be protected, and that their former handler won't

15  betray them.  But despite his 30 years in the intelligence

16  world, despite all the promises he made to protect classified

17  information, despite acknowledging that this was a life-long

18  obligation, the defendant violated his oath, he violated every

19  trust that was placed in him.

20           But, Your Honor, as bad as this betrayal was, this

21  conspiracy shouldn't be seen as being simply limited to just

22  the Johnsons.  In order to make all the money that he was

23  going to need to make, the defendant would have to sell the

24  Chinese a lot more information than that.  Anything in his

25  head was fair game.

1    Those two top secret documents involved assets, that

2    was fair game.  Anything he knew about other assets about

3    classified programs, about how the U.S. Intelligence Service

4    operate, and about what they do in China, all of that would be

5    up for sale.

6    And the defense claimed that this is a conspiracy

7    that only involved the two documents that were successfully

8    passed, is just really an attempt to benefit from the

9    outstanding work of the FBI in arresting this defendant so

10   quickly.  But as Your Honor noted in the detention hearing,

11   when the defense made a similar argument about how this should

12   only be seen as a case involving two documents, because

13   that -- that's what the Government could show he had passed at

14   that point, that's now how these crimes work.

15   Espionage is not a crime where you sell all of your

16   information at one time for one price.  You draw it out over

17   time to get paid a lot of money.

18   By the spring of 2017, Kevin Mallory needed to get

19   paid a lot of money.  He was going to need to keep this

20   criminal conspiracy going for a long time.  And he was going

21   to need to sell a lot of information.  This was a frightening

22   conspiracy, precisely because of how much damage this

23   defendant was prepared to do to this country.

24   For that, he deserves a just punishment.  He

25   deserves a punishment within the guidelines.

U.S. v. Mallory

30

1      And a moment ago, Judge, you asked about if we

2  needed to address the 3553 factors.  We did that in our

3  pleadings but it's worth reiterating.  In terms of those

4  factors, the seriousness of the offense and providing just

5  punishment, it's telling that in a case like this that involve

6  top secret information, the statute that was charged carries

7  up to life in prison, it could be a death penalty case if a

8  death results.  It only took two enhancements and the

9  defendant was up at a level 43, which carried life in prison.

10      This is about as serious an offense as there is.

11  But betraying your country, selling your country's secrets, is

12  in fact a very serious offense.  And a just punishment should

13  be a punishment that carries a great deal of time for this

14  defendant.

15      In terms of deterrence, general and specific, it

16  comes back to the offense itself and how serious this crime

17  is.  The general deterrence is important, because there are

18  millions of clearance holders out there and should any of them

19  be tempted to sell classified information to our adversaries

20  it's important to understand that these are serious offenses

21  and it does have an impact when the penalties that are imposed

22  in these types of crimes are very high.

23      As far as specific deterrence in protecting the

24  public, it is important to protect the public from further

25  crimes of this defendant.  This is an unusual type of crime

U.S. v. Mallory

31

1   because so much of this information is information that

2   resides in his head.  This is a former CIA case officer.

3          And as the Court knows, two days after being in

4   jail, the defendant was calling his family about that SD card.

5   The defendant has been under special administrative measures

6   really since he was first put in custody.  That will continue.

7   That will have to continue.  But in terms of specific

8   deterrence in protecting the public from further crimes of

9   this defendant, those 3553 factors also weigh in favor of a

10  heavy sentence.

11         So, Your Honor, that really concludes my comments.

12  This is a very serious offense.  This was a conspiracy offense

13  that the defendant plainly hoped will last for a long time,

14  that will be financially profitable, but in order to make that

15  a reality, he had to sell a great deal of information to the

16  Chinese government, which he was fully prepared to do.

17         Thank you, Judge.

18         THE COURT:  Mr. Kamens.

19         MR. KAMENS:  Thank you, Your Honor.  The first line

20  of paragraph 40 of the PSR that the Court has drafted states

21  that the parties sharply dispute whether the defendant

22  intended and attempted to send any document other than the

23  table of contents and the white paper.  And the reason that

24  the parties were in such sharp dispute and the reason that we

25  spent so much time addressing that issue is because it

32

1    directly relates to this Court's evaluation of Mr. Mallory's

2    culpability.

3            According to the prosecutor, Mr. Gibbs, after a

4    30-year career in the military and in the Intelligence

5    Community, Mr. Mallory turned 180 degrees and was prepared to

6    do anything and give anything to the Chinese in return for

7    money.  The words that he used were "everything was fair game"

8    "everything was up for sale."

9            And so the prosecutor's arguments is about the fear

10   of what Mr. Mallory intended.  Even if he wasn't necessarily

11   successful in sending anything but the table of contents, and

12   the white paper, he intended to do much more and much worse.

13           The defense view is that this case is much more

14   complicated.  It is not black and white.  A person does not

15   turn and decide one day to throw away a 30-year career in the

16   military and in the Intelligence Community and his life of

17   service to this country for $25,000.

18           Yes, he was prepared and did send a Chinese agent

19   the table of contents and the white paper.  But, no, he was

20   not prepared and did not attempt to send the PowerPoint

21   document, Document No. 2 that contained specific information

22   about that intelligence asset and operation.

23           One compelling piece of evidence, in favor of our

24   view, is the creation of the white paper itself.  Why create

25   it?  Why create this executive summary if not to strip out all

─────────────U.S. v. Mallory─────────────

33

1    of the information that would potentially provide information

2    about the Johnsons or more detailed information about this

3    operation.

4            As we just discussed in the previous session, there

5    is nothing about any specific intelligence agency, nothing

6    about any assets, nothing of significant value in the white

7    paper.

8            Now the Government, Mr. Gibbs, says that he intended

9    and meant to send Document 2, but as the Court has seen in

10   exhaustive briefing, there is no send consequence associated

11   with Document 2.  The first argument from the Government is

12   well he's been pushing these buttons, but there are no buttons

13   associated with an attempt to send Document 2, the PowerPoint.

14   But Mr. Gibbs says:  Listen, he was talking to Michael Yang

15   about bank accounts.  He said there's one that's a foreign

16   account and you can deposit money there.

17           But in all of this extensive investigation, there

18   are no foreign bank accounts that were ever found to be

19   associated with Mr. Mallory.  There is no evidence that he

20   ever received any money in return for sending the table of

21   contents and the white paper.  In fact, the money in this case

22   is extraordinarily modest in comparison with other cases in

23   which individuals have been convicted of conspiring to submit

24   documents and intelligence to the Chinese.

25           It reflects --

34

1          THE COURT:  Mr. Gibbs says that's because the FBI

2   acted with alacrity, caught him and arrested him.

3          MR. KAMENS:  Mr. Mallory went to the CIA, he went to

4   the FBI, he turned over the phone.  The reason they acted with

5   alacrity is because of Mr. Mallory.

6          THE COURT:  Well, that's true.  Mr. Mallory is the

7   reason they acted with alacrity.

8          MR. KAMENS:  In that he intentionally contacted the

9   CIA.

10          THE COURT:  Yes.

11          MR. KAMENS:  He did not throw away the phone.  He

12   set up the meeting with the -- with --

13          THE COURT:  It's not clear he really understood

14   well, despite the instructions given to him by the Chinese

15   agents, how the phone worked.

16          MR. KAMENS:  Well, if someone who was concerned

17   about being uncovered as an agent of the Chinese, certainly

18   would have destroyed the phone before they handed it over to

19   be copied by the Government.  At least that's our view.

20          THE COURT:  All right.

21          MR. KAMENS:  But in any event, it reflects the lack

22   of value that Mr. Mallory actually provided to the Chinese in

23   that he only received on his trips $10,000 for the first and

24   15 on the second, which was under the guise of consulting for,

25   initially, this think tank.

─────────────U.S. v. Mallory─────────────

35

1          THE COURT:  He also asked the Chinese for money that

2   wasn't in fact seized from him, the Custom and Border Control

3   people returned to him the money.

4          What do you say to the notion that he was obviously

5   so hungry for money that he tried to have the Chinese pay him

6   for the money that he got back from the Customs and Border

7   Control.

8          MR. KAMENS:  It suggests that he was not, in that

9   sense, aligned with Chinese interests, and that he said many

10  things to the Chinese that were not true.

11         THE COURT:  Well, I must say, Mr. Kamens, that

12  particular statement I find unconvincing.

13         MR. KAMENS:  It is certainly --

14         THE COURT:  I think the evidence in the case points

15  very compellingly to the fact that he needed money.

16         MR. KAMENS:  And we've conceded that.

17         And I think that is a part of the reason that he

18  said to the Chinese he -- he lied to the Chinese, and said

19  this money was seized when in fact it hadn't.

20         THE COURT:  Well, I don't doubt that he may have

21  lied to the Chinese, but that doesn't give him an escape hatch

22  here.

23         MR. KAMENS:  Well, all I'm saying is that Mr.

24  Mallory was not in complete alignment with the interest of the

25  Chinese government here.  And the Government may be right that

─────U.S. v. Mallory─────

36

1    he was in financial straits, but at the bottom of this case is

2    a relatively modest amount of funds compared to other cases.

3              THE COURT:  Yes, but Mr. Gibbs would say immediately

4    that's because we caught him and arrested him before he could

5    do any more harm and get any more money.

6              Is that what you would say, Mr. Gibbs?

7              MR. GIBBS:  Absolutely, Judge.

8              MR. KAMENS:  But again --

9              THE COURT:  Thank you.

10             MR. KAMENS:  And I don't mean to be speaking in

11   circles.

12             In other cases where individuals have obtained much

13   more money.  For example, Mr. Hanssen, who was prosecuted in

14   Utah, he received $800,000.  And he --

15             THE COURT:  Oh, yes.  How about Mr. Aldrich Ames,

16   who received millions?  Why?  They didn't catch him.

17             MR. KAMENS:  And they didn't go in and turn

18   themselves in for meetings with the CIA or the FBI.

19             THE COURT:  Yes.  That's an interesting aspect of

20   this case and I'll remark on that in a few minutes.

21             MR. KAMENS:  My ultimate point here is simply that

22   if this offense presented the -- the significant harm that Mr.

23   Gibbs talks about, Mr. Mallory would receive much more money

24   than he did, and I think that the value of the money he

25   received, reflects on the value of the information that was

1    provided.

2            THE COURT:  All right.  Anything further?

3            MR. KAMENS:  Briefly, a couple of other points, Your

4    Honor.

5            The Court should also keep in mind the value of the

6    information that Mr. Mallory provided to the U.S. Intelligence

7    Community.  The Government's expert, Paul Lee, said at the

8    trial that Mr. Mallory wanted to show the FBI how the Samsung

9    phone worked and brought along notes so he could explain

10   precisely how to get into the secret communication mode of the

11   phone.

12           THE COURT:  He didn't have it right, did he?

13           MR. KAMENS:  He did.  They were able to get in.

14   They put it in the Faraday bag --

15           THE COURT:  He didn't have the operation of the

16   phone entirely right.

17           MR. KAMENS:  In terms of getting into the covert

18   mode of the phone he did.  I think that the instructions were

19   correct.  And he allowed them to be copied.

20           THE COURT:  But you concede there were other aspects

21   of the phone he didn't have a right to.

22           MR. KAMENS:  And I absolutely may not be fully

23   technically under -- with full apprehension of --

24           THE COURT:  I don't recall that the trial

25   testimony -- did the Government put on any evidence that he

─────────U.S. v. Mallory─────────

38

1    told them all about steganography?

2         MR. GIBBS:  Your Honor, they asked some questions.

3    I don't think he recognized it as that particular term.  They

4    asked him, "Is this steganography?"  He said, "no."

5         But what he essentially described, concealing a

6    document with a picture, that is steganography.

7         THE COURT:  All right.

8         MR. KAMENS:  That's correct.  Yes, I think the

9    terminology was something he didn't understand.

10        THE COURT:  Go on, Mr. Kamens.

11        MR. KAMENS:  Just to follow up, Mr. Lee, the

12   Government's expert, said that Mr. Mallory's effort at

13   presenting them the phone and how to get into this

14   communication mode, the secret communication mode, allowed the

15   FBI to immediately get a "rare glimpse into Chinese

16   technology."

17        THE COURT:  He also thought, as I recall, that

18   things have been erased from the phone as a matter of

19   security.  And he was visibly surprised, as I recall the trial

20   testimony, to learn that that was not the case.

21        MR. KAMENS:  And I think there was testimony about

22   that.  I don't think there was any indication that Mr. Mallory

23   was the author of the deletions of anything on the phone.

24   That is that --

25        THE COURT:  No, he expected it was automatically

1   deleted.  And to his surprise, and I suppose disappointment,

2   it wasn't because the material left on the phone was not

3   exculpatory.

4           MR. KAMENS:  Regardless of what he may have expected

5   to be viewed at that time, he did turn over the phone for

6   complete copying by the Government and --

7           THE COURT:  Yes, you're correct.

8           MR. KAMENS:  So just to be clear, the reason that

9   the Government was able to interrupt this communication

10  between Mr. Mallory and the Chinese agents was because of Mr.

11  Mallory.

12          I want to note briefly the Hanssen case that I said

13  involved much more money, much longer period of time, no

14  effort by Mr. Hanssen at any point to contact the FBI.  And he

15  also tried to recruit DEA -- a DIA agent --

16          THE COURT:  But in the end he pled guilty and

17  cooperated.

18          MR. KAMENS:  He did.  The cooperation, as I

19  understand it, is not something that would result in any

20  reduction.  And I've spoken to the lawyers in the case, but as

21  I understand it, as they plea to based on his effort to

22  provide information to the Chinese and he received $800,000

23  and the sentence agreed upon is 180 months.

24          We also pointed to the *Underwood* case in D.C. in

25  which an individual was a top secret cleared contractor who

1  asked for millions of dollars from the Chinese in return for

2  planting listening devices in a new consulate to be built in

3  Guangzhou.  That defendant actually fled after he was

4  originally arrested.  And he also, according to the

5  Government's pleading, lied repeatedly in debriefings.  And in

6  that case the Court sentenced him to 108 months.

7          It's also, as we've detailed in our papers,

8  important for the Court to consider Mr. Mallory's life leading

9  up to the offense.  That he's been devoted in his career to

10 his country, to his family, and to his church.  We've detailed

11 that he is 61 years old.  He has two children in college, he's

12 about to have a third, who will also attend BYU.

13         His entire career has almost entirely been either as

14 a soldier or in the -- as a member of the U.S. Intelligence

15 Community.

16         And we suggest, given the lack of value of

17 information that actually was delivered to the Chinese, the

18 significant value of what Mr. Mallory provided to the U.S.

19 Intelligence Community, and his life of service to this

20 country, we'd ask the Court for a sentence of 120 months --

21         THE COURT:  All right.

22         MR. KAMENS:  -- of imprisonment.

23         THE COURT:  Thank you.

24         MR. KAMENS:  The last thing I'll ask for is a

25 designation to a facility as close as possible to Salt Lake

─────U.S. v. Mallory─────

41

1   City, which is where I understand his family will be

2   relocating to be near his children.

3           THE COURT:  All right.

4           Mr. Mallory, this is now your opportunity to address

5   the Court and to say anything at all you wish to the Court by

6   way of extenuation, mitigation, or indeed anything you think

7   the Court should know before sentence is imposed.  You're not

8   required to say anything, but you have the opportunity to do

9   so if you wish to.

10          Do you wish to say anything?

11          MR. KAMENS:  Your Honor, just to be clear, I've

12  advised him not to say anything about the facts of this case.

13          THE DEFENDANT:  Your Honor, I just want to say that

14  my love for our country has never wavered and that I love my

15  family deeply.

16          THE COURT:  What did you say about your love for

17  your country?

18          THE DEFENDANT:  My love for United States has never

19  wavered and my love for my family is very deep.

20          THE COURT:  All right.

21          Any reason why the Court should not now impose

22  sentence?

23          MR. KAMENS:  No, Your Honor.

24          MR. GIBBS:  No, Your Honor.

25          THE COURT:  Mr. Kamens, I didn't hear you.

U.S. v. Mallory

42

1          MR. KAMENS:  I said no, Your Honor.

2          THE COURT:  All right.  Thank you.

3          Mr. Mallory, you stand convicted of the very serious

4    crime of espionage, that is engaging in a conspiracy to gather

5    or deliver national defense information to aid a foreign

6    government, and in this case, the People's Republic of China.

7          Few crimes are as serious as that.  The law requires

8    that I consider a number of factors in imposing an appropriate

9    sentence.  First, your personal history and characteristics,

10   about which I know a good deal in view of the presentence

11   investigation report, and the materials submitted by your

12   counsel.  And, yes, you have served in the Intelligence

13   Community and you did serve in the military, as I recall, on

14   two occasions.  That is for two periods.

15         But engaging in espionage, Mr. Mallory, is to erase

16   some of that.  Now, your counsel has argued vigorously about

17   the lack of value of anything you turned over.  The evidence

18   that I heard discloses that you needed money.  And you were

19   prepared to do things to get money, including criminal things,

20   like selling what you knew to the Chinese if you could.

21         I think Mr. Gibbs is correct that the way in which

22   typical espionage works is you don't trot it all out, you

23   dribble it out and see where it takes you.  The fascinating

24   thing and confusing thing about the record in this case is

25   that you seemed to want to play a double role.  That is to be

U.S. v. Mallory

43

1   a spy for China and to be a double agent or try to talk the

2   CIA into hiring you, or perhaps, you thought, I'm not sure,

3   that by going to the CIA or making an occasional call to

4   somebody you knew in the CIA would somehow protect you, that

5   you could walk that fine line.

6        Well, the message should go forth from here today to

7   everybody in the Intelligence Community, you cannot do that.

8        If you choose to play footsie with another country

9   and give information to another country, you have made a

10  decision to commit a crime.  And calling up somebody and

11  telling them things and asking them to put you in touch with

12  this or that person and this or that desk is not going to save

13  you.

14       What you have to do when you're contacted by

15  somebody from another country and you know that they're making

16  a run at you, you tell them no, you report it and you run.  Do

17  not play footsie.  Don't think you can be a double agent.

18  That's fatal.

19       So the law requires that I consider your personal

20  history and characteristics, which I have.  The law requires

21  that I impose a sentence that promotes respect for the law,

22  that provides just punishment for the offense, and serves to

23  deter you and to deter others.  That is, this sentence must

24  stand as a beacon, as a warning to others, not to engage in

25  this sort of conduct.

─────────U.S. v. Mallory─────────

44

1              We spent a great deal of time in this case, because

2    I focused sharply on whether Mr. Mallory disclosed or intended

3    to disclose sources.  That is, individuals who provide

4    information to the Intelligence Community.  I thought that was

5    very important.

6              In the end, I concluded that the evidence was in

7    equipoise, but when I said that he intended or attempted to,

8    intended at that point in time.  His long term intentions, I

9    think, are more sinister, but I don't know for sure what would

10   have developed.  He needed money, he was going to do what he

11   had to do to get the money.

12             For example, I pointed out that he lied to the

13   Chinese when he said:  You got to pay me for this money that

14   was taken from me in Chicago at the airport by Customs and

15   Border Patrol, but when in fact Customs and Border Patrol had

16   given him the money back.  That's how bad his need for money

17   was.

18             I'm not moved by the fact that he was lying to the

19   Chinese.  I wouldn't doubt that anybody who commits a crime

20   would lie to both sides.  And indeed he did make some

21   misrepresentations in the course of his interviews.  Indeed,

22   that's reflected in the -- in the guidelines calculation.

23             Am I correct, Mr. Gibbs?

24             MR. GIBBS:  It is.  And Count 4 is a false statement

25   count as well.  That's right, Judge.

—————————————————U.S. v. Mallory—————————————————
45

1           THE COURT:  That's right.

2           So I'm not surprised.  Espionage is typically

3    committed for one or all three specific reasons.  One is

4    ideological.  For example, I would assume that the Rosenbergs

5    are in that category, or at least he is.

6           The second reason is money.  This defendant is in

7    that category.  So, I think, was Aldrich Ames in that category

8    and others.

9           But his wasn't ideological.  His, by that, I mean

10   this defendant, his purpose was money.

11          A third purpose that I don't think had much to do

12   with this case, but it may have been, is where someone feels

13   wronged by the Government of this country and seeks to get

14   back at him.

15          Those are the three reasons that I've seen from many

16   of the espionage cases.

17          But it's pretty clearly to me that in this case he

18   really needed money.  For some reason, he concluded that he

19   could play both ends here.  That he could go to the FBI and

20   tell them things and that will give him immunity from what he

21   was doing and he could, at the same time, get more money from

22   the Chinese.

23          As I've said, it doesn't work.

24          Now, the law requires that I consider the

25   guidelines, which are life in prison.  They're not mandatory,

─U.S. v. Mallory─

46

1   they're advisory.  I have considered all of the factors in

2   this case and it is the judgment of this Court, and I say

3   "judgment" advisedly.

4          A criminal sentence is not a mathematical

5   calculation, it is a judgment based on a variety of factors.

6   The Congress makes a judgment about maximum penalties, the

7   Sentencing Commission makes judgments about guideline ranges

8   in various categories.  And ultimately, the sentencing judge

9   has to make a judgment about a particular sentence in a

10  particular case.

11         It is my judgment that this defendant should be

12  committed to the custody of the Bureau of Prisons with respect

13  to Count 1 for a period of 240 months.  Upon release from

14  confinement, he is to serve five years of supervised release.

15  He's to pay a $100 special assessment.  The presentence report

16  did not disclose that he could afford any fine.

17         Ms. White, is that correct?

18         THE PROBATION:  That is correct, Your Honor.

19         THE COURT:  No fine is recommended.

20         With respect to Count 2, the Court concludes that he

21  should be committed to the Bureau of Prisons for a period of

22  five years.  And that time is to be served concurrently with

23  it.  So it's a total sentence of 242 [sic] months.

24         I didn't impose, Mr. Gibbs, I did not impose --

25         Did you hear what I said, Mr. Richman [sic]?

47

1          MR. KAMENS:  I think you meant 240 months, Your

2    Honor.

3          THE COURT:  Oh, what did I say?

4          MR. KAMENS:  242.

5          THE COURT:  That's right.  240 months.  You're quite

6    right.  If I said 242, I misspoke.

7          Mr. Gibbs, I didn't impose life.  It was a closer

8    question.  I was moved by a number of things, including

9    arguments made and the alacrity, which is good, with which the

10   Government moved to have him arrested.

11         If I had determined -- and I want this message to be

12   taken back and made clear to the Intelligence Community.  Let

13   me see your hands.  I want to be sure you're here -- yes,

14   good.

15         If I had concluded that sources had been

16   compromised, as did occur in the Aldrich Ames case, and in

17   other cases, I would impose a far more severe sentence.  That

18   is, a betrayal that has very, very severe consequences, as Mr.

19   Gibbs argued.

20         But I didn't conclude that in the end, Mr. Gibbs.

21   Now would he have done it if he gone on for a year or two and

22   gotten hundreds of thousands?  Who knows.  But I'm not going

23   to sentence him today for that kind of speculation.  But I

24   think you were correct to raise the specter of that occurring

25   and it might have occurred.

─────────────────U.S. v. Mallory─────────────────

48

1          But, I think ten years that you recommended, Mr.

2    Kamens, is not enough to reflect the seriousness of it, not

3    enough to reflect his conduct, and certainly not enough to

4    provide for general deterrence in the public.

5          This is serious stuff and a crime and it needs to be

6    communicated to people in the Intelligence Community that

7    disclosure of this material to a foreign government is going

8    to lead to a very long sentence.

9          Mr. Mallory is now 61 years old.  It can be argued

10   that 20 years is a life sentence.  I hope not, because I'm

11   there and I intend to live a little longer.  I'm much older

12   than you are, Mr. Mallory.  But it is serious and I want

13   people in the Intelligence Community to be aware of that of

14   this sentence and what I've said is to have any deterrent

15   effect that needs to be made public to the Intelligence

16   Community.

17         Don't play footsie with other agents and think you

18   can use that to absolve you or to preclude you from getting a

19   severe sentence.  I was not moved by your argument, Mr.

20   Kamens, that I should take into account the value of what he

21   gave the Government.  No.  After what he had done, it was too

22   late.  He should not have done that.

23         I don't know precisely what was going on in his

24   head.  I think Mr. Mallory fancied that he could walk that

25   line in fooling the Chinese that he was going to be their

─────────── U.S. v. Mallory ───────────

49

1   agent for a long time, give them a lot of valuable stuff, and

2   also persuade the Intelligence Community to give him a job

3   back there and pay him some money too.  Not going to happen.

4        That message should be loud and clear.

5        You're to pay $100 special assessment for each of

6   the offenses.  I'll also impose five years of supervised

7   release with respect to Count 1 and three years of supervised

8   release with respect to Count 4.  And those terms will run

9   concurrently with one another.  Special conditions of the

10  supervised release --

11       Ms. White, what special conditions did the probation

12  office recommend?

13       THE PROBATION:  We would recommend financial

14  disclosure.

15       THE COURT:  All right.  I'll require that there be

16  financial disclosure to the probation officer.  Go ahead.

17       THE PROBATION:  All employment be approved by the

18  probation office.

19       THE COURT:  And what?

20       THE PROBATION:  All employment be approved.

21       THE COURT:  Yes, of course, I'll adopt that as well.

22  Anything else?

23       THE PROBATION:  No, Your Honor.

24       THE COURT:  Anything further, any other conditions

25  of supervised release, Mr. Gibbs?

1          MR. GIBBS:  Your Honor, will he be allowed to travel

2    abroad during the five years of supervised release?  We would

3    ask that he not.

4          THE COURT:  Well, I'll cross that bridge when I come

5    to it.  We'll see.  For example, I approve and disapprove

6    international travel all the time for defendants.  If Mr. --

7    let's say, hypothetically, Mr. Mallory is released from

8    prison, after serving his sentence, and two weeks after he's

9    released he wants to go to the People's Republic of China,

10   assuming it still exists, then I'm not likely to be

11   sympathetic, but if he serves a good part of his supervised

12   release without any violations, and he has a good reason for

13   going to China or Costa Rica or wherever he wants to go, yes,

14   I approve those.

15         MR. GIBBS:  Understood.  Thank you, Judge.

16         THE COURT:  He does have, I think, I know he has

17   in-laws in China, I assume.  Is that correct?

18         MR. KAMENS:  In Taiwan, Your Honor.  The Republic of

19   China.  There may be extended family in China.

20         THE COURT:  Yes, so I'm not going to decide that

21   now.  I'll cross that bridge when I come to it, Mr. Gibbs.

22   We'll see.

23         Anything further in this matter today?

24         Mr. Mallory, you have an absolute right to appeal

25   your sentence and your conviction to the Court of Appeals for

───────────────U.S. v. Mallory───────────────

1   the Fourth Circuit.  You have ten days from today in which to

2   do it or you may ask me to note your appeal now.  You may do

3   as you wish.

4           Mr. Kamens?

5           MR. KAMENS:  Your Honor, we will note the appeal

6   formally in writing within 14 days.

7           THE COURT:  All right.  14.  Thank you, Mr. Kamens.

8           All right.  Anything further in this matter today,

9   Mr. Gibbs?

10          MR. GIBBS:  Your Honor, we did file a motion for a

11  preliminary order of forfeiture which the defense did not

12  object to so if I could hand that up.  I don't believe that's

13  been entered.

14          THE COURT:  Yes, you may.  This relates to the

15  CovCom device?

16          MR. GIBBS:  It's the CovCom device and the $25,000.

17          THE COURT:  Yes, you-all -- some of you, maybe both

18  of you, refer to it as a CovCom device.  I always thought it

19  was a covert communications device.  Am I right?

20          MR. GIBBS:  It does -- it's an abbreviation for

21  covert communications device.

22          THE COURT:  CovCom.

23          MR. GIBBS:  I'm not sure how it's pronounced.  I'll

24  go with CovCom.  That sounds good.

25          THE COURT:  All right.

─────────U.S. v. Mallory─────────

52

1          MR. KAMENS:  Can I ask the Court's indulgence for

2     one moment?

3          THE COURT:  Yes, you may.

4          (Discussion off the record.)

5          THE COURT:  Have I omitted anything, Ms. White, from

6     the sentence?

7          THE PROBATION:  No, Your Honor.

8          MR. KAMENS:  I'm sorry, Your Honor.

9          THE COURT:  I asked Ms. White, the probation

10    officer, have I omitted anything?  And she confirmed that I

11    had not.

12          Let me ask once again.  Mr. Gibbs, have I omitted

13    anything from this sentencing proceeding?  That is, have I

14    addressed all the issues and made all the rulings necessary?

15          MR. GIBBS:  You have, Your Honor.  Thank you.

16          THE COURT:  All right.  And I have now entered the

17    unopposed, I think that's the right way to put it, Mr. Kamens,

18    unopposed forfeiture order.

19          MR. KAMENS:  Thank you, Your Honor.

20          THE COURT:  Anything else?

21          MR. KAMENS:  There's one last thing, Your Honor.  If

22    I --

23          THE COURT:  Oh, the designation.

24          MR. KAMENS:  Well, we did ask for a designation as

25    close as possible to Salt Lake City.

─────────────────U.S. v. Mallory─────────────────

53

1          Also that Mr. Mallory is able to speak Chinese to

2    his wife.  Her primary first language is Chinese.

3          MR. GIBBS:  Your Honor, if I may, the -- the special

4    administrative measures that are on now, I think that is a

5    restriction within the SAMs that the communications on the

6    phone have to be in English so he would violate that if he

7    were to speak in Chinese.

8          THE COURT:  So what's your view, Mr. Gibbs?

9          MR. GIBBS:  We would object to that.  He should

10   comply with the SAMs.  He's been provided with a copy.  He's

11   required to speak in English on there.

12         THE COURT:  Well, what would you say to it, Mr.

13   Gibbs, if she couldn't speak English?

14         MR. GIBBS:  Your Honor, we played the recording in

15   court where they were on the phone together and she --

16         THE COURT:  She did speak English.  I recall that.

17         MR. GIBBS:  She did, Your Honor.

18         MR. KAMENS:  She does.  It's not her first language.

19   All of these recordings, all of these calls, are recorded, and

20   so given that this case is concluded, it makes it much easier

21   for them to communicate.  And the Government is not at all

22   prevented from reviewing any communication that they would

23   like.

24         THE COURT:  All right.  Let me come back to that.

25   When you say "it's not her first language," Mr. Kamens,

─────U.S. v. Mallory─────

54

 1   English isn't my first language.  But, of course, you can tell

 2   that from my speech.

 3            MR. KAMENS:  I could not.

 4            THE COURT:  Mr. Gibbs, why do we need to have this

 5   restriction continue?

 6            MR. GIBBS:  Well, there's a couple of reasons.  One

 7   is that it's just difficult for BOP to --

 8            THE COURT:  He's not going to be a very effective

 9   agent for the People's Republic of China as he's incarcerated.

10   And if his wife is you can prosecute her.

11            MR. GIBBS:  Right.  But that's obviously the truth.

12   The concern is there's always a lag time if the -- if the

13   recorded conversation is in a foreign language, in terms of

14   monitoring, because they would have to take a Chinese

15   conversation, translate it, determine if anything

16   inappropriate had been said, and in that amount of time some

17   damage could be done.  So that is the concern.

18            And I believe that -- and I have to go back and

19   look.  It's been a while so I have to look at these

20   particular --

21            THE COURT:  Well, let's do this, I think the request

22   you make, Mr. Kamens, is not unreasonable but I want to think

23   about it.

24            MR. KAMENS:  Understood.

25            THE COURT:  Do you know of any authority on the

─────────────────U.S. v. Mallory─────────────────

55

1   issue?  I don't.  And I'll doubt you'll find any, but if you

2   do let me see it within a week and you may do the same within

3   a week.  And then I'll issue an order on that.

4           MR. KAMENS:  Thank you, Your Honor.

5           THE COURT:  At the moment, Mr. Gibbs, I just don't

6   see how it's a big problem.  Yes, he could probably say

7   things.  Maybe you're reminding me about the -- what was it

8   that was in the closet that he wanted to get rid of?

9           MR. GIBBS:  The SD card, Your Honor.

10          THE COURT:  And what did that have on it?

11          MR. GIBBS:  It had all eight of the classified

12  documents that we presented at trial.

13          THE COURT:  Including ones at top secret.

14          MR. GIBBS:  Correct.  And the PowerPoint.

15          THE COURT:  And so you would argue, I suppose, who

16  knows what else he has hidden.

17          MR. GIBBS:  That's correct, Judge.

18          THE COURT:  Tell her to get rid of it.  Well, you

19  might be right.

20          On the other hand, I'll bet you that if he says that

21  in Mandarin, it isn't going to be in plain language Mandarin.

22  It will be like steganography.  It would be hidden in there

23  somewhere.  It's going to take you a while to find anyway.

24          Well, let me hear from you in a week.  I'll rule on

25  it promptly.  At the moment, Mr. Gibbs, I don't see a strong

───────U.S. v. Mallory───────

56

1    reason for precluding this.  He's subject now to a long period

2    of confinement.  It's got to be difficult for his wife and

3    children.  Although I think, at least one of this children,

4    they speak Mandarin too.

5              MR. KAMENS:  They may.  But there's no objection to

6    the children speaking in English.  It's just to facilitate

7    communication with his wife.

8              THE COURT:  Yes, and I'm, at the moment, a bit

9    sympathetic to your request, but we'll see after I see what

10   you send me.

11             What else, Mr. Kamens?

12             MR. KAMENS:  That's it, Your Honor.

13             THE COURT:  All right.  I thank counsel for your

14   cooperation in this case.  And wish you good luck, Mr.

15   Mallory.

16             MR. KAMENS:  Thank you, Your Honor.

17             THE COURT:  Court stands in recess.

18             And, Ms. White, you will file -- please file a

19   presentence report that comports with the rulings that I made.

20             THE PROBATION:  Yes, Your Honor.

21             THE COURT:  Thank you very much for all your help.

22             Court stands in recess.

23

24             **(Proceedings adjourned at 3:04 p.m.)**

25

1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Sentencing

7    in the case of the **UNITED STATES OF AMERICA versus KEVIN**

8    **PATRICK MALLORY**, Criminal Action No. 1:17-CR-154, in said

9    court on the 17th day of May, 2019.

10         I further certify that the foregoing 57 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16   name, this July 30, 2019.

17

18

19

20

21   _____

22   Tonia M. Harris, RPR
     Official Court Reporter

23

24

25

                                                              57